United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 17, 2021

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **BASIC ENERGY SERVICES, INC.,** *et al.,* | § § § § | **Case No. 21-90002 (DRJ)** **(Jointly Administered)** |
| Debtors.[1] | § § | **(Emergency Hearing Requested)** |

**INTERIM ORDER PURSUANT TO SECTIONS 105, 361, 362, 363, 364, 503 AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES FOR THE USE THEREOF; (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b); AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Basic Energy Services, Inc. ("BES") and its affiliated debtors, each as a debtor and debtor in possession (collectively, the "Debtors") in the above captioned-cases, seeking, among other things, entry of an interim order (this "Interim Order") pursuant to sections 105(a), 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Rules"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic ESA, Inc. (2279); Basic Energy Services, Inc. (1194); C&J Well Services, Inc. (5684); KVS Transportation, Inc. (4882); Indigo Injection #3, LLC (7657); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Taylor Industries, LLC (7037); SCH Disposal, L.L.C. (8335); Agua Libre Holdco LLC (3092); Agua Libre Asset Co LLC (1409); and Agua Libre Midstream LLC (6701). The Debtors' headquarters and service address for the purposes of these chapter 11 cases is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Motion.

a. authorizing the Debtors to obtain up to $35 million in senior secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to (and in accordance with the terms of) that certain *Debtor-In-Possession Secured Multi-Draw Term Promissory Note*, by and among BES, as the borrower (the "Borrower"), certain of the other Debtors, as guarantors (the "Guarantors", and together with the Borrower, the "Loan Parties"), Guggenheim Credit Services, LLC ("Guggenheim"), as agent (in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders," and, together with the DIP Agent, the "DIP Secured Parties"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Loan Agreement," and the DIP Loan Agreement, together with any other related agreements, documents, security agreements, instruments, pledge agreements, including the Interim Order and the Final Order (as defined below), collectively, the "DIP Loan Documents"), which DIP Facility shall be available as term loans (the "DIP Loans") to the Borrower and the other Loan Parties upon entry of this Interim Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

b. authorizing the Debtors, prior to the entry of the Final Order, to use up to $27,000,000 of the proceeds of the DIP Loans for the purposes set forth in the DIP Loan Documents, the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and this Interim Order, with the remainder of such proceeds to be available to the Debtors upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

c. authorizing the Loan Parties to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

d. authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, administrative agent fees, upfront and exit fees, or other fees, costs, expenses, charges, and disbursements of the DIP Secured Parties (including the reasonable and documented out-of-pocket fees and expenses of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute in each case, to the extent required by and constituting obligations of any kind under the DIP Loan Documents (such obligations, the "DIP Obligations") subject to the terms of this Interim Order;

e. authorizing the Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Loans as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the

applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to: (A) repay all obligations outstanding under the Prepetition Superpriority Loan Documents (defined below); (B) pay costs, premiums, fees, and expenses incurred to administer or related to the above-captioned cases (collectively, the "<u>Cases</u>") or in connection with the DIP Facility; (C) provide for adequate protection for certain secured parties, and (D) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents);

f.  granting and approving superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject to the Carve-Out (as defined below);

g.  granting the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the Carve-Out and the relative rankings and priorities set forth in this Interim Order, and as further set forth on **<u>Exhibit B</u>** attached hereto;

h.  authorizing the Debtors to use the Cash Collateral (as defined below) and other Prepetition Collateral of the Prepetition Secured Parties (as defined below) in accordance with the terms and conditions set forth herein;

i.  granting (i) (A) the Prepetition ABL Agent and the Prepetition ABL Secured Lenders (each as defined below) and (B) the Prepetition Second Lien Secured Party (each as defined below), superpriority claims and automatically perfected liens, security interests, and other adequate protection, as applicable, to the extent of any diminution in value of their interests in the Prepetition ABL Collateral and the Prepetition Second Lien Collateral (each as defined below), as applicable, including Cash Collateral, and (ii) (A) the Prepetition Secured Notes Trustee and the Prepetition Secured Noteholders (each as defined below) and (B) the Additional Prepetition Secured Note Secured Party, superpriority claims and automatically perfected liens, security interests, and other adequate protection, as applicable, to the extent of any diminution in value of their interests in the Prepetition Secured Notes Collateral and the Additional Prepetition Secured Note Collateral (each as defined below), as applicable, including Cash Collateral, which liens shall have the relative priorities set forth in this Interim Order, and as further set forth on **<u>Exhibit B</u>** attached hereto;

j.      subject to certain challenge rights of certain parties in interest (subject to the limitations specified herein), approving certain stipulations by the Debtors with respect to (i) the Prepetition ABL Loan Documents (as defined below); (ii) the Prepetition Second Lien Note, (iii) the Prepetition Superpriority Loan Documents (as defined below); (iv) the Prepetition Secured Notes Documents (as defined below); (v) the Additional Prepetition Secured Note and (vi) the liens and security interests arising therefrom;

k.      vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent set forth herein;

l.      (i) without prejudice to any provisions of a Final Order with respect to costs or expenses incurred following the entry of such Final Order, waiving upon entry of the Interim Order the Debtors' right to assert with respect to the DIP Secured Parties, the Prepetition Secured Notes Secured Parties and the Prepetition Superpriority Secured Parties any "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code, and (ii) subject to entry of a Final Order, the remaining Prepetition Secured Parties shall be entitled to (A) all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the such Prepetition Secured Parties, and (B) waiving the equitable doctrine of "marshalling" or any similar doctrine;

m.      without prejudice to any provisions of a Final Order with respect to costs or expenses incurred following the entry of such Final Order, limiting any right to surcharge the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Adequate Protection Collateral under section 506(c) of the Bankruptcy Code as to the DIP Secured Parties, the Prepetition Superpriority Secured Parties and the Prepetition Secured Notes Secured Parties only;

n.      scheduling, pursuant to Bankruptcy Rule 4001(b), a final hearing (the "Final Hearing"), to be held within thirty (30) calendar days of the entry of this Interim Order, to consider entry of a final order (the "Final Order") approving the relief granted herein on a final basis;

o.      waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order and, as later applicable, the Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h)); and

p.      granting related relief.

This Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found

that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the interim hearing having been held on August 17, 2021 (the "Interim Hearing"); and this Court having found based on the record of the Interim Hearing that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and it appearing that approval of the interim relief request in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' business and the preservation of value of the Debtors' assets; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion and the interim relief granted herein were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the Supporting Declarations (as defined in the Motion); and this Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:** [3]

1.    *Petition Date.*   On August 17, 2021 (the "Petition Date"), each Debtor filed a voluntary petition for relief (each, a "Petition") under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").   The Debtors continue to manage their businesses and

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee or examiner has been appointed in any of the Chapter 11 Cases.

2.     *Jurisdiction; Venue*. This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §1334.  The Motion is a core matter under § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     *Committee Formation.*  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "Creditors' Committee") or any other statutory committee has been appointed in the Chapter 11 Cases.

4.     *Notice*. Under the circumstances of these Chapter 11 Cases, proper, timely, adequate and sufficient notice of the Motion, the Interim Hearing, and the entry of this Interim Order has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice of the Motion, the Interim Hearing, or this Interim Order shall be required. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

5.     *Debtors' Stipulations*. In requesting use of the Cash Collateral and the other Prepetition Collateral, and in exchange for and as a material inducement to the Prepetition Secured Parties' agreement to permit consensual use of their Cash Collateral and the other Prepetition Collateral, the Debtors acknowledge, represent, stipulate, and agree, subject to the challenge rights set forth in paragraph 32 below, as follows (collectively defined as the "Debtors' Stipulations"):

    a.    Prepetition ABL Credit Facility.

        (i)    *Prepetition ABL Credit Facility*. On October 2, 2018, BES entered into that certain ABL Credit Agreement (as amended, restated, amended and restated, supplemented, or modified, the "Prepetition ABL Credit Agreement," and together with all security, pledge and guaranty agreements and all other Loan Documents (as defined in the Prepetition ABL Credit Agreement) executed in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to

time, the "<u>Prepetition ABL Loan Documents</u>"), with Bank of America, N.A., in its capacity as administrative agent (the "<u>Prepetition ABL Agent</u>"), and the lenders party thereto (the "<u>Prepetition ABL Lenders</u>," and together with the Prepetition ABL Agent and the other Secured Parties (as defined in the Prepetition ABL Credit Agreement), the "<u>Prepetition ABL Secured Parties</u>").

(ii)     *Prepetition ABL Obligations*. As of the Petition Date, pursuant to the Prepetition ABL Loan Documents and applicable law, the Prepetition ABL Secured Parties hold valid, enforceable, secured, and allowable claims against the Debtors with respect to outstanding letters of credit issued under the Prepetition ABL Credit Agreement, which are undrawn as of the Petition Date, in an aggregate amount equal to $36,049,307, plus any and all other accrued and unpaid interest, fees, expenses (including advisors fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition ABL Loan Documents), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the Prepetition ABL Loan Documents, or applicable law, whether arising before or after the Petition Date, including any "Obligations" (as such term is defined in the Prepetition ABL Credit Agreement), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition ABL Loan Documents (collectively defined as the "<u>Prepetition ABL Obligations</u>").

(iii)     *Prepetition ABL Liens*. The Prepetition ABL Obligations are secured by continuing, legal, valid, binding, properly perfected, enforceable, non-avoidable first priority liens on and security interests in (the "<u>Prepetition ABL Liens</u>") all of the "Collateral" as such term is defined in that certain Security Agreement, dated as of October 2, 2018, among BES and the other Debtors party thereto, in favor of the Prepetition ABL Agent (the "<u>Prepetition ABL Security Agreement</u>"), including all of the Debtors' cash (including the cash in their deposit accounts (including, without limitation, the cash held in the treasury account with the Prepetition ABL Agent in the name of BES (Account No. x0202) to secure, among other things, the Debtors' credit card program) and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition ABL Collateral except for Excluded Property (as defined in the Prepetition ABL Security Agreement)) that constitutes Cash Collateral (as defined below) (the "<u>ABL Cash Collateral</u>," and the foregoing, collectively, the "<u>Prepetition ABL Collateral</u>"). As of the Petition Date, the aggregate book value of the Prepetition ABL Collateral exceeded the aggregate amount of the Prepetition ABL Obligations.

(iv)    *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations*. The Prepetition ABL Liens on the Prepetition ABL Collateral (i) are valid, binding, and enforceable in accordance with the terms of the applicable Prepetition ABL Loan Documents, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value; and (ii) are senior in priority to any and all other liens on and security interests in the Prepetition ABL Collateral, subject only to valid, perfected and unavoidable liens permitted under Section 7.01 of the Prepetition ABL Credit Agreement to the extent that such liens or security interests are senior in priority to the Prepetition ABL Liens (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (any such lien, a "Permitted ABL Encumbrance"). The Prepetition ABL Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the applicable Prepetition ABL Loan Documents. No portion of the Prepetition ABL Obligations or any payments made to the Prepetition ABL Secured Parties or applied to or paid on account of the obligations owing under the Prepetition ABL Loan Documents prior to the Petition Date is subject to any contest, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, reduction, recoupment, disallowance, impairment, rejection, attack, effect, counterclaim, cross-claim, set-off, offset, defense or any other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any other challenge of any kind or nature under the Bankruptcy Code or any other applicable law or regulation or otherwise, and the Debtors do not possess, and shall not assert, any claim, counterclaim, setoff or defense of any kind, nature or description that would in any way affect the validity, enforceability and non-avoidability of any Prepetition ABL Obligations. The Debtors waive, discharge, and release any right to challenge any of the Prepetition ABL Obligations, the priority of the Debtors' obligations thereunder and the validity, extent, and priority of the Prepetition ABL Liens.

b.      Prepetition Second Lien Note

(i)     *Prepetition Second Lien Note*. On October 15, 2020, BES entered into that certain Second Lien Delayed Draw Promissory Note (as amended, restated, amended and restated, supplemented, or modified, the "Prepetition Second Lien Note," and together with all security, pledge and guaranty agreements and all other Loan Documents (as defined in the Prepetition Second Lien Note) executed in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents"), with the other Debtors, as guarantors, and Ascribe III Investments LLC ("Ascribe" and in such capacity, the "Prepetition Second Lien Secured Party").

(ii)     *Prepetition Second Lien Note Obligations*. As of the Petition Date, pursuant to the Prepetition Second Lien Loan Documents and applicable law, the Prepetition Second Lien Secured Party holds valid, enforceable, secured, and allowable claims against the Debtors with respect to outstanding loans made under the Prepetition Second Lien Note in an aggregate principal amount equal to $15,000,000, plus any and all other accrued and unpaid interest, fees, expenses (including advisors fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the Prepetition Second Lien Loan Documents, or applicable law, whether arising before or after the Petition Date, including any " Guarantied Obligations" (as defined in the Prepetition Second Lien Note), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Second Lien Loan Documents (collectively defined as the "<u>Prepetition Second Lien Note Obligations</u>").

(iii)    *Prepetition Second Lien Note Liens*. The Prepetition Second Lien Note Obligations are secured by continuing, legal, valid, binding, properly perfected, enforceable, non- avoidable second priority liens on and security interests in (the "<u>Prepetition Second Lien Note Liens</u>") all of the "Collateral" as such term is defined in the Prepetition Second Lien Note (the "<u>Prepetition Second Lien Collateral</u>"), including all of the Debtors' cash (including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Second Lien Collateral except for Excluded Property (as defined in the Security Agreement (as defined in the Prepetition Second Lien Note)) that constitutes Cash Collateral (as defined below) (the "<u>Second Lien Note Cash Collateral</u>").

(iv)    *Validity, Perfection, and Priority of Prepetition Second Lien Note Liens and Prepetition Second Lien Note Obligations*. The Prepetition Second Lien Note Liens on the Prepetition Second Lien Collateral (i) are valid, binding, and enforceable in accordance with the terms of the applicable Prepetition Second Lien Note Loan Documents, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Second Lien Secured Party for fair consideration and reasonably equivalent value; and (ii) are senior in priority to any and all other liens on and security interests in the Prepetition Second Lien Collateral, subject only to (x) the Carve-Out (as defined below) (y) the Prepetition ABL Liens and (z) valid, perfected and unavoidable liens permitted under Section 7.01 of the Prepetition ABL Credit Agreement to the extent that such liens or security interests are senior to the Prepetition ABL Liens (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected

after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (any such lien, a "Permitted Second Lien Note Encumbrance"). The Prepetition Second Lien Note Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Second Lien Note Loan Documents. No portion of the Prepetition Second Lien Note Obligations or any payments made to the Prepetition Second Lien Secured Party or applied to or paid on account of the obligations owing under the Prepetition Second Lien Loan Documents prior to the Petition Date is subject to any contest, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, reduction, recoupment, disallowance, impairment, rejection, attack, effect, counterclaim, cross-claim, set-off, offset, defense or any other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any other challenge of any kind or nature under the Bankruptcy Code or any other applicable law or regulation or otherwise.

c.   Prepetition Superpriority Credit Facility.

(i)   *Prepetition Superpriority Credit Facility.* On May 3, 2021, BES entered into that certain Superpriority Credit Agreement (as amended, restated, amended and restated, supplemented, or modified, the "Prepetition Superpriority Credit Agreement," and together with security, pledge and guaranty agreements and all other Loan Documents (as defined in the Prepetition Superpriority Credit Agreement) executed in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Superpriority Loan Documents"), with Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent (the "Prepetition Superpriority Agent"), and the lenders party thereto (the "Prepetition Superpriority Lenders," and together with the Prepetition Superpriority Agent and the other Secured Parties (as defined in the Prepetition Super Priority Credit Agreement) (collectively, the "Prepetition Superpriority Secured Parties").

(ii)   *Prepetition Superpriority Obligations.* As of the Petition Date, pursuant to the Prepetition Superpriority Loan Documents and applicable law, the Prepetition Superpriority Secured Parties hold valid, enforceable, secured, and allowable claims against the Debtors with respect to loans made under the Prepetition Superpriority Credit Agreement in an aggregate principal amount equal to $10,336,438.86, plus any and all other accrued and unpaid interest, fees, expenses (including advisors fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Superpriority Loan Documents), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the Prepetition Superpriority Loan Documents or applicable law, whether arising before or after the Petition Date, including any "Obligations" (as defined in the Prepetition Superpriority Credit Agreement), of any kind or nature, whether

or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Superpriority Loan Documents (collectively defined as the "<u>Prepetition Superpriority Obligations</u>").

(iii)     *Prepetition Superpriority Liens*. The Prepetition Superpriority Obligations are secured by continuing, legal, valid, binding, properly perfected, enforceable, non-avoidable first priority liens on and security interests in (the "<u>Prepetition Superpriority Liens</u>") all of the "Collateral" as such term is defined in the Prepetition Superpriority Credit Agreement (the "<u>Prepetition Superpriority Collateral</u>"), including all of the Debtors' cash proceeds of such Collateral that constitutes Cash Collateral (the "<u>Superpriority Cash Collateral</u>"). As of the Petition Date, the aggregate book value of the Prepetition Superpriority Collateral exceeded the aggregate amount of the Prepetition Superpriority Obligations.

(iv)     *Validity, Perfection, and Priority of Prepetition Superpriority Liens and Prepetition Superpriority Obligations*. The Prepetition Superpriority Liens on the Prepetition Superpriority Collateral (i) are valid, binding, and enforceable in accordance with the terms of the applicable Prepetition Superpriority Loan Documents, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Superpriority Secured Parties for fair consideration and reasonably equivalent value; and (ii) are senior in priority to any and all other liens on and security interests in the Prepetition Superpriority Collateral, subject only to (x) the Carve-Out (as defined below) and (y) valid, perfected and unavoidable liens that are permitted to be senior under Section 7.01 of the Prepetition Superpriority Credit Agreement and solely to the extent that such liens or security interests are senior to the Prepetition Superpriority Liens (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (any such Lien, a "<u>Permitted Superpriority Encumbrance</u>"). The Prepetition Superpriority Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Superpriority Loan Documents. No portion of the Prepetition Superpriority Obligations or any payments made to the Prepetition Superpriority Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Superpriority Loan Documents prior to the Petition Date is subject to any contest, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, reduction, recoupment, disallowance, impairment, rejection, attack, effect, counterclaim, cross-claim, set-off, offset, defense or any other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any other challenge of any kind or nature under the Bankruptcy Code or any other applicable law or regulation or otherwise.

d.    <u>Prepetition Secured Notes Indenture</u>.

(i)    *Prepetition Secured Notes Indenture*. On October 2, 2018, BES entered into that certain Indenture (as amended, restated, amended and restated, supplemented, or modified, the "<u>Prepetition Secured Notes Indenture</u>," and together with security, pledge and guaranty agreements and all other Notes Documents (as defined in the Prepetition Secured Notes Indenture) executed in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Secured Notes Documents</u>"), with UMB Bank, N.A., in its capacity as trustee and collateral agent (the "<u>Prepetition Secured Notes Trustee</u>" and, together with the Prepetition ABL Agent, the Prepetition Second Lien Secured Party, the Prepetition Superpriority Agent and the Additional Prepetition Secured Note Secured Party (as defined below), the "<u>Prepetition Agents</u>") the other Debtors, as guarantors, and issued senior secured notes (the "<u>Prepetition Secured Notes</u>") to certain holders thereof (the current holders of the Prepetition Secured Notes, the "<u>Prepetition Secured Noteholders</u>," and together with the Prepetition Secured Notes Trustee, the "<u>Prepetition Secured Notes Secured Parties</u>").

(ii)    *Prepetition Secured Notes Obligations*. As of the Petition Date, pursuant to the Prepetition Secured Notes Documents and applicable law, the Prepetition Secured Notes Secured Parties hold valid, enforceable, secured, and allowable claims against the Debtors with respect to notes issued under the Prepetition Secured Notes Indenture in an aggregate principal amount equal to $347,500,000, plus any and all other accrued and unpaid interest, fees, expenses (including advisors fees and expenses, in each case, that are chargeable or reimbursable under the Prepetition Secured Notes Documents), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the Prepetition Secured Notes Documents or applicable law, whether arising before or after the Petition Date, including any "Obligations" (as defined in the Prepetition Secured Notes Indenture), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Superpriority Loan Documents (collectively defined as the "<u>Prepetition Secured Notes Obligations</u>").

(iii)    *Prepetition Secured Notes Liens*. The Prepetition Secured Notes Obligations are secured by continuing, legal, valid, binding, properly perfected, enforceable, non- avoidable liens on and security interests in (the "<u>Prepetition Secured Notes Liens</u>") all of the "Collateral" as such term is defined in the Prepetition Secured Notes Indenture (the "<u>Prepetition Secured Notes Collateral</u>"), including all of the Debtors' cash proceeds of

such Collateral that constitutes Cash Collateral (the "<u>Secured Notes Cash Collateral</u>").

(iv)    *Validity, Perfection, and Priority of Prepetition Secured Notes Liens and Prepetition Secured Notes Obligations*. The Prepetition Secured Notes Liens on the Prepetition Secured Notes Collateral (i) are valid, binding, and enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Notes Secured Parties for fair consideration and reasonably equivalent value; and (ii) are senior in priority to any and all other liens on and security interests in the Prepetition Secured Notes Collateral, subject only to (x) the Carve-Out (as defined below), (y) the Prepetition Superpriority Liens and the Prior Additional Prepetition Secured Note Liens (as defined in <u>Exhibit B</u>), and (z) valid, perfected and unavoidable liens permitted under Section 3.6 of the Prepetition Secured Notes Indenture to the extent that such liens or security interests are senior to the Prepetition Secured Notes Liens (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (a "<u>Permitted Secured Notes Encumbrance</u>"). The Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Secured Notes Documents. No portion of the Prepetition Secured Notes Obligations or any payments made to the Prepetition Secured Notes Secured Parties or applied to or paid on account of the obligations owing under the Prepetition Secured Notes Documents prior to the Petition Date is subject to any contest, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, reduction, recoupment, disallowance, impairment, rejection, attack, effect, counterclaim, cross-claim, set-off, offset, defense or any other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any other challenge of any kind or nature under the Bankruptcy Code or any other applicable law or regulation.

e.    <u>Additional Prepetition Secured Note</u>

(i)    *Additional Prepetition Secured Note*. On March 9, 2020, BES entered into that certain Senior Secured Promissory Note (as amended, restated, amended and restated, supplemented, or modified, the "<u>Additional Prepetition Secured Note</u>," and together with all security, pledge and guaranty agreements and all other Bridge Loan Documents (as defined in the Additional Prepetition Secured Note) executed in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Additional Prepetition Secured Note Loan Documents</u>" and, together with the Prepetition ABL Loan Documents, the Prepetition Superpriority Loan Documents, the Prepetition

Second Lien Loan Documents, and the Prepetition Secured Notes Documents, the "<u>Prepetition Documents</u>"), with the other Debtors, as guarantors, and Ascribe (in such capacity, the "<u>Additional Prepetition Secured Note Secured Party</u>" and, together with the Prepetition ABL Secured Parties, the Prepetition Superpriority Secured Parties, the Prepetition Secured Notes Secured Parties and the Prepetition Second Lien Secured Party, the "<u>Prepetition Secured Parties</u>").

(ii)     *Additional Prepetition Secured Note Obligations*. As of the Petition Date, pursuant to the Additional Prepetition Secured Note Loan Documents and applicable law, the Additional Prepetition Secured Note Secured Party holds valid, enforceable, secured, and allowable claims against the Debtors with respect to outstanding loans made under the Additional Prepetition Secured Note in an aggregate principal amount equal to $15,000,000, plus any and all other accrued and unpaid interest, fees, expenses (including advisors fees and expenses, in each case, that are chargeable or reimbursable under the Additional Prepetition Secured Note Loan Documents), disbursements, charges, claims, indemnities and other costs and obligations of whatever nature incurred in connection therewith which are chargeable or otherwise reimbursable under the Additional Prepetition Secured Note Loan Documents, or applicable law, whether arising before or after the Petition Date, including any "Guarantied Obligations" (as defined in the Additional Prepetition Secured Note), of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the <u>Additional Prepetition Secured Note Loan Documents</u> (collectively defined as the "<u>Additional Prepetition Secured Note Obligations</u>", and together with the Prepetition ABL Obligations, the Prepetition Second Lien Note Obligations, the Prepetition Superpriority Obligations and the Prepetition Secured Notes Obligations, the "<u>Prepetition Obligations</u>").

(iii)     *Additional Prepetition Secured Note Liens*. The Additional Prepetition Secured Note Obligations are secured by continuing, legal, valid, binding, properly perfected, enforceable, non- avoidable liens on and security interests in (the "<u>Additional Prepetition Secured Note Liens</u>" and, together with the Prepetition ABL Liens, the Prepetition Second Lien Note Liens, the Prepetition Superpriority Liens and the Prepetition Secured Notes Liens, the "<u>Prepetition Liens</u>") all of the "Collateral" as such term is defined in the Additional Prepetition Secured Note (the "<u>Additional Prepetition Secured Note Collateral</u>" and, together with the Prepetition ABL Collateral, the Prepetition Second Lien Collateral, the Prepetition Superpriority Collateral and the Prepetition Secured Notes Collateral, the "<u>Prepetition Collateral</u>"), including all of the Debtors' cash proceeds of such Collateral that constitutes Cash Collateral (as defined below) (the "<u>Additional Prepetition Secured Note Cash Collateral</u>").

(iv) *Validity, Perfection, and Priority of Additional Prepetition Secured Note Liens and Additional Prepetition Secured Note Obligations.* The Additional Prepetition Secured Note Liens on the Additional Prepetition Secured Note Collateral (i) are valid, binding, and enforceable in accordance with the terms of the applicable Additional Prepetition Secured Note Loan Documents, non-avoidable and properly perfected and were granted to, or for the benefit of, the Additional Prepetition Secured Note Secured Party for fair consideration and reasonably equivalent value; and (ii) are senior in priority to any and all other liens on and security interests in the Additional Prepetition Secured Note Collateral, subject only to (x) the Carve-Out (as defined below), (y) the Prepetition Superpriority Liens and the Prior Prepetition Secured Notes Liens (as defined in <u>Exhibit B</u>), and (z) valid, perfected and unavoidable liens permitted under Section 3.6 of the Prepetition Secured Notes Indenture to the extent that such liens or security interests are senior to the Prepetition Secured Notes Liens (including, for the avoidance of doubt, valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (any such lien, a "<u>Permitted Additional Secured Note Encumbrance</u>" and, together with the Permitted ABL Encumbrances, Permitted Superpriority Encumbrances, Permitted Second Lien Note Encumbrances and Permitted Secured Notes Encumbrances, the "<u>Permitted Prior Liens</u>"). The Additional Prepetition Secured Note Obligations constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the applicable Additional Prepetition Secured Note Loan Documents. No portion of the Additional Prepetition Secured Note Obligations or any payments made to the Additional Prepetition Secured Note Secured Party or applied to or paid on account of the obligations owing under the Additional Prepetition Secured Note Loan Documents prior to the Petition Date is subject to any contest, avoidance, reduction, recharacterization, subordination (whether equitable, contractual or otherwise), recovery, reduction, recoupment, disallowance, impairment, rejection, attack, effect, counterclaim, cross-claim, set-off, offset, defense or any other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any other challenge of any kind or nature under the Bankruptcy Code or any other applicable law or regulation or otherwise.

6. *Cash Collateral.* For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the applicable Prepetition Secured Party or Parties have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests), and shall include, without limitation, all Prepetition Collateral that is cash of the Debtors' estates

and all cash equivalents, whether in the form of negotiable instruments, documents of title, securities, deposit accounts, commodity accounts, securities accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody or control (or persons in privity with any of the Debtors) or which represent income, proceeds, products, rents, or profits of any of the Prepetition Collateral, including to the extent the Debtors obtain an interest in such funds after the Petition Date in the case of each of the foregoing, except for any Excluded Property (as defined in the applicable Prepetition Loan Document). The Prepetition Agents have, for the benefit of the applicable Prepetition Secured Parties, perfected liens in the Cash Collateral pursuant to the applicable provisions of the Prepetition Documents, sections 363(a) and 552(b) of the Bankruptcy Code, and this Interim Order.

7.  *Findings Regarding the DIP Facility and Debtors' Use of Cash Collateral and Prepetition Collateral.*

    a.  Good cause has been shown for the entry of this Interim Order.

    b.  The Debtors have an immediate need to use, on an interim basis, the Prepetition Collateral, including Cash Collateral, and to obtain credit on an interim basis pursuant to the DIP Facility, to, among other things, maintain, administer and preserve their businesses, pay their operating expenses, and maximize the value of the Debtors' estates.

    c.  The terms of the use of the Prepetition Collateral, including Cash Collateral, pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

    d.  The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral, all of which constitute Prepetition Collateral under the Prepetition Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Documents.

    e.  To the extent consent is required, the Prepetition Secured Parties have consented or are deemed under that certain Superpriority Intercreditor Agreement, dated as of May 3, 2021, that certain Intercreditor Agreement, dated as of October 15, 2020 (collectively, the "**Prepetition Intercreditor Agreements**"), or any other applicable Prepetition Documents, to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the DIP Secured Parties' entry

into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

f.      The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange solely for the grant of a superpriority administrative expense, or liens on property of the estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtors assert in the Motion and the Supporting Declarations that the postpetition financing required by the Debtors is not available on terms more favorable, taken as a whole, than the financing offered by the DIP Secured Parties pursuant to the DIP Loan Documents.  In light of the foregoing, the Debtors have reasonably and properly concluded, in the exercise of their business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their estates, and all of their stakeholders.

g.      The terms of the use of the Prepetition Collateral pursuant to this Interim Order have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the Prepetition Agents, and the other Prepetition Secured Parties and, pursuant to sections 105, 361, and 363 of the Bankruptcy Code, the Prepetition Agents and the other Prepetition Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Interim Order, and each is entitled to the protections provided under section 363(m) of the Bankruptcy Code.

h.      The terms of the DIP Facility have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent and the other DIP Secured Parties  and, pursuant to sections 105 and 364 of the Bankruptcy Code, the DIP Agent and the other DIP Secured Parties are hereby found to be entities that have acted in "good faith" in connection with the negotiation of the DIP Loan Documents and the entry of this Interim Order, and each is entitled to the protections provided under section 364(e) of the Bankruptcy Code.

i.      The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (d) and the Complex Case Procedures. Absent granting the interim relief in this Interim Order, the Debtors' estates could be immediately and irreparably harmed. Access to the DIP Facility and use of the Prepetition Collateral in accordance with this Interim Order is in the best interest of the Debtors' estates.

j.      The Debtors have an immediate and critical need to obtain credit pursuant to the DIP Facility and to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, make payroll, satisfy other working capital and operational needs and fund the Chapter 11 Cases, in each such case in accordance with the terms of this Interim Order, including in accordance with the Approved Budget (as defined below). The Debtors' access to sufficient working capital and liquidity, including through access to the DIP Facility and the use of Cash Collateral

and other Prepetition Collateral, is necessary to preserve and maintain the value of the Debtors' estates. Without the credit available under the DIP Facility and use of Cash Collateral, the Debtors would likely not have sufficient liquidity to continue to operate their businesses. Entry of this Interim Order will preserve the assets of each Debtor's estate and their value and is in the best interests of the Debtors, their creditors, and their estates.

k.  Upon entry of the Interim Order, use of the DIP Loans to refinance dollar-for-dollar and discharge all of the Prepetition Superpriority Obligations under the Prepetition Superpriority Loan Documents reflects the Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.  The DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the DIP Loan Parties thereunder without the refinancing of the Prepetition Superpriority Obligations.  Such refinancing will benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations.

8.  *Use of Proceeds of DIP Facility and Cash Collateral*.

(a)  The Debtors have prepared and delivered to the DIP Secured Parties and the Prepetition Secured Parties an initial budget (the "Initial Budget"), a copy of which is attached hereto as **Exhibit C**.  The Initial Budget reflects the Debtors' anticipated cash receipts and disbursements for the 8-week period following the Petition Date (the Initial Budget and each subsequent budget approved by (i) the DIP Lenders in accordance with the DIP Loan Agreement, (ii)  the Prepetition ABL Agent, and (iii) the Ad Hoc Group (as defined herein) (or the advisors to the Ad Hoc Group) then in effect, an "Approved Budget").  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances of these Cases.  The DIP Secured Parties, the Ad Hoc Group, and the Prepetition ABL Agent are relying upon the Debtors' agreement to comply with the terms set forth in the DIP Loan Documents, the Approved Budget (subject to Permitted Variances), and this Interim Order in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral and to the priming of certain Prepetition Liens.

(b)  Subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents, the Debtors are hereby authorized, until the occurrence of a Termination Event (as defined below) and the expiration of the Remedies Notice Period (as defined below), if applicable, pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6003, and 9014, to incur indebtedness under the DIP Facility and use the proceeds thereof and use Cash Collateral on an interim basis.  The Debtors are authorized to use the proceeds of the DIP Facility and use Cash Collateral solely and exclusively in a manner consistent with this Interim Order and the DIP Loan Documents, and as set forth in the Initial Budget or any subsequent Approved Budget, subject to any Permitted Variance (as defined in the DIP Loan Agreement as of the date of the entry of this Interim Order, without giving effect to any further modifications or amendments, unless entered into with the consent of the Prepetition ABL Agent and the Ad Hoc Group).  The Debtors' compliance with the Approved Budget shall be tested every Variance Test Period (as set forth in the DIP Loan Agreement as of the date of the entry of this Interim Order, without giving effect to any further modifications or amendments, unless entered into with the consent of the Prepetition ABL Agent and the Ad Hoc Group).  Any transfer or use of any DIP Facility Proceeds or Cash Collateral by the Debtors shall be conditioned upon the Debtors' compliance with the DIP Loan Agreement (including section 1(d) thereof) and the Approved Budget, including any Permitted Variances.

9.    *Certain Conditions to DIP Facility*.  The DIP Secured Parties' willingness to make the DIP Loans is conditioned upon, among other things:  (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the DIP Secured Parties being granted, as security for the

prompt payment of the DIP Facility and all other obligations of the Debtors under the DIP Loan Documents, subject to the Carve-Out and Permitted Prior Liens and the priorities described in **Exhibit B** annexed hereto, superpriority perfected security interests in and liens upon all property and assets of the Debtors, including, but not limited to, a valid and perfected security interest in and lien upon all of the now existing or hereafter arising or acquired: (i) assets constituting Prepetition Collateral and (ii) any assets of the Debtors that, as of the Petition Date, were not otherwise subject to a valid, perfected, enforceable, and unavoidable security interest, including the Escrow Account (as defined in the DIP Loan Agreement) and any assets comprising Excluded Property (under any of the Prepetition Loan Documents), subject to any exclusions set forth in the DIP Loan Documents (collectively hereinafter referred to as the "DIP Collateral," and for avoidance of doubt, the DIP Collateral shall include, subject to the entry of the Final Order, the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")), in accordance with the priorities set forth on Exhibit B. Notwithstanding anything to the contrary herein, the DIP Liens shall not prime the Prepetition ABL Liens, the Prepetition Second Lien Note Liens, the First Priority ABL Adequate Protection Liens, and the Second Lien Note Adequate Protection Liens (as defined below) on, as applicable, the Prepetition ABL Collateral, the First Priority ABL Adequate Protection Collateral, the Second Lien Prepetition Collateral, and the portion of the Second Lien Adequate Protection Collateral that is also the Second Lien Prepetition Collateral.

10.     *Adequate Protection.*   Subject to the challenge rights set forth in paragraph 32 below, each of the Prepetition Secured Parties is entitled to receive adequate protection pursuant

to sections 361, 362 and 363 of the Bankruptcy Code to the extent of any Diminution in Value (as defined below).

11.    *Good Cause.*  Good cause has been shown for the entry of this Interim Order.  The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses and on-going operations, (2) preserve and maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.  The terms of the DIP Facility and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are supported by reasonably equivalent value and fair consideration.

12.    *Immediate Entry.*  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-1(b).  Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.  Absent granting the relief set forth in this Interim Order, the Loan Parties' estates will be immediately and irreparably harmed.

13.    *Interim Hearing.*  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties (defined in the Motion) and as provided for in the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required for the relief to be granted in this Interim Order.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing, and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

14.   *Motion Approval*.

    a.   <u>Interim Approval of Motion</u>.  The Debtors are authorized to incur post-petition secured debt and to use Cash Collateral on an interim basis as set forth in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, are hereby denied and overruled on the merits.

15.   *DIP Facility Authorization*.

    a.   <u>Authorization of DIP Facility; Payment of Prepetition Superpriority Credit Agreement Obligations</u>.

      (i)   The Debtors are hereby authorized and empowered to immediately execute and deliver the DIP Loan Documents and to incur and perform the DIP Obligations, pursuant to the terms and conditions of the DIP Loan Agreement and this Interim Order, in an aggregate principal amount not to exceed $35 million, which amount, for the avoidance of doubt, includes the Upfront Fee (as defined below) in the amount of $1,750,000, with the DIP Loan to be made upon entry of this Interim Order and satisfaction (or waiver) of other conditions set forth in the DIP Loan Documents and the proceeds thereof disbursed in accordance with the DIP Loan Agreement.

      (ii)   The Debtors are hereby authorized to use proceeds of the DIP Facility, in an amount not to exceed $27,000,000 in the aggregate,  (i) in accordance with, and for the purposes permitted by, the DIP Loan Documents, the Interim Order and the Approved Budget (subject to Permitted Variances) and (ii)  to pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Agreement and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the DIP Loan Agreement, and the other DIP Loan Documents, in each case during the period commencing on the date of this Interim Order through and including the earlier to occur of (x) entry of the Final Order and (y) a Termination Event.  The Initial Budget is hereby approved in all respects. The Debtors shall use the proceeds of the DIP Facility solely in a manner consistent with the Approved Budget (subject to Permitted Variances and other exclusions set forth in the DIP Loan Documents) and the terms and conditions of the DIP Loan Documents and this Interim Order.

(iii)     Subject to the terms and conditions of this Interim Order, the Debtors are authorized to enter into, execute, and perform all obligations under a payoff letter (the "Payoff Letter") with the Prepetition Superpriority Secured Parties, pursuant to which the Debtors shall be authorized to use proceeds from the DIP Loans to satisfy in full all obligations outstanding under the Prepetition Superpriority Credit Agreement.   In furtherance of the foregoing, and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for the Credit Parties to implement the terms of, perform their obligations under, or effectuate the purposes of and transactions contemplated by this Interim Order and the Payoff Letter.  Upon the use of proceeds from the DIP Loans to pay in full all obligations outstanding under the Prepetition Superpriority Credit Agreement, the Prepetition Superpriority Obligations shall be deemed to be indefeasibly, and irrevocably, paid in full, and such payment shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

b.     Financing Documents.

(i)     *Authorization*.  The Debtors are hereby authorized to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents.  No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or common law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

(ii)     *Approval; Evidence of Borrowing Arrangements*.  All terms, conditions, and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Loan Agreement) are approved.   All such terms, conditions, and covenants shall be sufficient and conclusive evidence of (i) the borrowing arrangements by and among the Debtors, the DIP Agent, and the DIP Lenders, and (ii) each Debtor's assumption and adoption of, and agreement to comply with, all the terms, conditions, and covenants of the DIP Loan Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees, and other expenses, including, without limitation, all of the DIP Agent's and DIP Lender's closing, arranger, and

administrative fees, professional fees, attorney's fees and legal expenses, as more fully set forth in the DIP Loan Documents.  Upon effectiveness thereof, the DIP Loan Documents shall evidence the DIP Obligations, which DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(iii)    *Payment of DIP Fees and Expenses*.  In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to pay all fees and expenses in connection with or that may be reasonably required, necessary, or desirable for the Loan Parties' performance of their obligations under or related to the DIP Facility, including, without limitation the non-refundable payment to the DIP Agent and the DIP Lenders, as the case may be, of all fees, including amendment fees, servicing fees, audit fees, liquidator fees, administrative agent's or collateral agent's fees, upfront fees, closing fees, exit fees, closing date fees, prepayment fees or agency fees, and professional fees (which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether or not the fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification and expense reimbursement obligations, in each case referred to in and payable pursuant to the DIP Loan Agreement or DIP Loan Documents (or in any separate letter agreements between any or all Loan Parties, on the one hand, and any of the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Facility) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by, or on behalf of, any of the DIP Agent or DIP Lenders (including Davis Polk & Wardwell LLP, Rapp & Krock, PC, Ducera Partners LLC, and any other advisors as are permitted under the DIP Loan Documents), in each case, as provided for in and payable pursuant to the DIP Loan Documents (the "<u>DIP Fees and Expenses</u>"), without the need to file retention motions or fee applications.

c.    <u>Indemnification</u>.  The Debtors are authorized to indemnify and hold harmless the DIP Agent, each DIP Lender, and, solely in their capacities as such, each of their respective affiliates, and each such person's representatives, agents, attorneys, officers, directors, and employees (each, an "<u>Indemnified Party</u>"), in accordance

with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

d.    <u>Postpetition Liens</u>.

(i)    *Postpetition DIP Lien Granting*.  To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "<u>DIP Liens</u>") upon all DIP Collateral, subject to the rankings and priorities set forth in paragraph 5(d)(ii) below and as set forth on **Exhibit B** hereto.

(ii)    *DIP Lien Priority in DIP Collateral*.  The DIP Liens on the DIP Collateral securing the DIP Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided*, *however*, that the DIP Liens on (A) the Prepetition ABL Collateral[4] and the Prepetition Second Lien Collateral (whether in existence on the Petition Date, hereafter arising, or which, but for the commencement of these Cases, would have constituted Collateral (as defined in the Prepetition ABL Security Agreement or the Prepetition Second Lien Note, as applicable) and all proceeds, products, profits and rents thereof, including, but not limited to, any accounts and accounts receivable generated from and after the Petition Date) shall be subject and subordinate to the Carve-Out, the Permitted Prior Liens, the Prepetition ABL Liens, the ABL Adequate Protection Liens, the Second Lien Adequate Protection Liens, and the Prepetition Second Lien Note Liens; (B) the Prepetition Superpriority Collateral, the Prepetition Secured Notes Collateral and the Additional Prepetition Senior Notes Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject and subordinate solely to the Carve-Out and Permitted Prior Liens (it being understood that the liens in favor of the Prepetition Secured Notes Secured Parties and the Additional Prepetition Secured Note Party shall be "primed"

---

[4]    For the avoidance of doubt, for purposes of defining the priority of the DIP Liens, the term Prepetition ABL Collateral shall exclude (a) any Prepetition ABL Collateral that would also constitute Prepetition Secured Notes Collateral, (b) the Escrow Account, (c) the DIP Holding Account (d) any Designated Asset Sale Agreement, and (e) all proceeds and products of any and all of the foregoing  (items (b) through (d) as defined in the DIP Loan Agreement as of the date of the entry of this Interim Order, without giving effect to any further modifications or amendments), <u>provided, however,</u> any proceeds from the sale of any Prepetition ABL Collateral arising from any transaction under a Designated Asset Sale Agreement shall be included in the definition of Prepetition ABL Collateral.

by the DIP Liens granted to the DIP Agent for the benefit of the DIP Lenders hereunder), and (C) any unencumbered assets as of the Petition Date shall be subject and subordinate to the Carve-Out, in each case as such priorities are set forth in **Exhibit B**.

e.   Additional DIP Lenders' Rights.

(i)   So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding Commitments (as defined in the DIP Loan Documents) (the "DIP Commitments") under the DIP Loan Documents, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the  DIP  Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Interim Order other than, (x) solely as to this clause (iii), the DIP Agent filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or court-approved disposition.  For purposes of this paragraph, any reference to the DIP Collateral shall not apply to any DIP Collateral that is also Prepetition ABL Collateral, the First Priority ABL Adequate Protection Collateral, the Prepetition Second Lien Collateral, or the portion of the Second Lien Adequate Protection Collateral that is also Prepetition ABL Collateral.

(ii)   To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent

and DIP Lenders, and it shall comply with the instructions of the DIP Agent with respect to the exercise of such control.  For purposes of this paragraph, any reference to the DIP Collateral shall not apply to any DIP Collateral that is also Prepetition ABL Collateral, First Priority ABL Adequate Protection Collateral, Prepetition Second Lien Collateral, or portion of the Second Lien Adequate Protection Collateral that is also Prepetition ABL Collateral

(iii)    So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments, any proceeds of Prepetition Collateral subject to liens primed by the DIP Liens received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any of the Prepetition Agents, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements.  The DIP Agent is hereby authorized to make any such endorsements as agent for each of the Prepetition Agents or any such Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

16.    *Superpriority Administrative Expenses*.    Subject to the Carve-Out, all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted an allowed superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364,, 365 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, or 1114 of the Bankruptcy Code (including, without limitation, the ABL Adequate Protection Superpriority Claim, the Second Lien Adequate Protection Superpriority Claim, the Secured Notes Adequate Protection Superpriority Claim, and the Additional Prepetition Secured Notes Adequate Protection Superpriority Claim), which allowed superpriority administrative claim shall be payable from and have recourse to all

prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim, the "DIP Superpriority Claim"); provided, that the DIP Superpriority Claims may not recover from the Prepetition ABL Collateral, First Priority ABL Adequate Protection Collateral, Prepetition Second Lien Collateral, or portion of the Second Lien Adequate Protection Collateral that is also Prepetition ABL Collateral, unless and until the Prepetition ABL Obligations, the ABL Adequate Protection Obligations, the Prepetition Second Lien Note Obligations, and the Second Lien Adequate Protection Obligations (as defined below) are satisfied in full from such assets.

17.     *Prepetition ABL Secured Parties' Entitlement to Adequate Protection*. Subject in all respects to the challenge rights set forth in paragraph 32 below (but subject to the limitations thereon contained herein), pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition ABL Secured Parties are entitled to adequate protection of their interests in the Prepetition ABL Collateral, including the ABL Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition ABL Secured Parties' interests in the Prepetition ABL Collateral (including Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease, or use by the Debtors of the Prepetition Collateral (including ABL Cash Collateral, whether pursuant to the Approved Budget or otherwise), the subordination of their (a) liens on the Prepetition ABL Collateral and First Priority ABL Adequate Protection Collateral, and (b) ABL Adequate Protection Superpriority Claims (as defined below), to the Carve-Out pursuant to this Interim Order, or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, collectively, the "ABL Diminution in Value").

18.     *Prepetition Superpriority Secured Parties' Entitlement to Adequate Protection*. Subject in all respects to the challenge rights set forth in paragraph 32 below (but subject to the limitations thereon contained herein), pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, until the indefeasible payment of the Prepetition Superpriority Obligations from the proceeds of the DIP Loans, the Prepetition Superpriority Secured Parties are entitled to adequate protection of their interests in the Prepetition Superpriority Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Superpriority Secured Parties' interests in the Prepetition Superpriority Collateral (including Superpriority Cash Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease, or use by the Debtors of the Prepetition Superpriority Collateral (including Superpriority Cash Collateral, whether pursuant to the Budget or otherwise), the subordination of their (a) liens on the Prepetition Superpriority Collateral, and (b) Superpriority Adequate Protection Superpriority Claims (as defined below), to the Carve Out pursuant to this Interim Order, or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the foregoing, collectively, the "Superpriority Diminution in Value").

19.     *Prepetition Secured Notes Secured Parties' Entitlement to Adequate Protection*. Subject in all respects to the challenge rights set forth in paragraph 32 below (but subject to the limitations thereon contained herein), pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition Secured Notes Secured Parties are entitled to adequate protection of their interests in the Prepetition Secured Notes Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Secured Notes Secured Parties' interests in the Prepetition Secured Notes Collateral (including Secured Notes Cash

Collateral) from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease, or use by the Debtors of the Prepetition Secured Notes Collateral (including Secured Notes Cash Collateral, whether pursuant to the Approved Budget or otherwise), the subordination of their (a) liens on the Prepetition Secured Notes Collateral, and (b) Secured Notes Adequate Protection Superpriority Claims (as defined below) to the Carve-Out, the DIP Liens, and the DIP Superpriority Claims pursuant to this Interim Order, or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the foregoing, collectively, the "Secured Notes Diminution in Value").

20.     *Prepetition Second Lien Secured Party's Entitlement to Adequate Protection*. Subject in all respects to the challenge rights set forth in paragraph 32 below (but subject to the limitations thereon contained herein), pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Prepetition Second Lien Secured Party is entitled to adequate protection of its interests in the Prepetition Second Lien Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Second Lien Secured Party's interests in the Prepetition Second Lien Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease, or use by the Debtors of the Prepetition Second Lien Collateral, the subordination of their liens on the Prepetition Second Lien Collateral to the Carve-Out pursuant to this Interim Order, or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the foregoing, collectively, the "Second Lien Diminution in Value").

21.     *Additional Prepetition Secured Note Secured Party's Entitlement to Adequate Protection*. Subject in all respects to the challenge rights set forth in paragraph 32 below (but

30

subject to the limitations thereon contained herein), pursuant to sections 361, 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Additional Prepetition Secured Note Secured Party is entitled to adequate protection of its interests in the Additional Prepetition Secured Note Collateral, in an amount equal to the aggregate diminution in the value of the Additional Prepetition Secured Note Secured Party's interests in the Additional Prepetition Secured Note Collateral from and after the Petition Date, if any, for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease, or use by the Debtors of the Additional Prepetition Secured Note Collateral, the subordination of their liens on the Prepetition Secured Note Collateral to the Carve-Out, the DIP Liens, and the DIP Superpriority Claims pursuant to this Interim Order, or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the foregoing, collectively, the "Additional Prepetition Secured Note Diminution in Value" and, together with the ABL Diminution in Value, the Secured Notes Diminution in Value, the Superpriority Diminution in Value, and the Second Lien Diminution in Value, the "Diminution in Value").

22.    *ABL Adequate Protection Claims and Liens*. The Prepetition ABL Agent is hereby granted, for and on behalf of the Prepetition ABL Lenders, the following (collectively, the "ABL Adequate Protection Obligations"), to the extent of any ABL Diminution in Value; *provided* that the collateral set forth in this paragraph 22 shall not include assets or property (other than assets or property that constitute Prepetition ABL Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Interim Order is not allowed by applicable nonbankruptcy law, but shall include the proceeds thereof.

    a.    ABL Adequate Protection Liens. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection against any actual ABL Diminution in Value (if any) of the Prepetition ABL Collateral, including ABL Cash Collateral, the Prepetition ABL Agent is hereby granted for the ratable benefit of the

Prepetition ABL Lenders, as security for the payment of the ABL Adequate Protection Obligations, effective as of the Petition Date and perfected without the need for execution by the Debtors or the recordation or other filing by the Prepetition ABL Agent of security agreements, control agreements, pledge agreements, mortgages or other Collateral Documents (as defined in the Prepetition ABL Credit Agreement) or financing statements or other similar documents, or the possession or control by the Prepetition ABL Agent of any ABL Adequate Protection Collateral (as defined below), subject only to the Carve-Out and any Permitted ABL Encumbrances, the following security interests and liens (all such liens and security interests, the "ABL Adequate Protection Liens," and all property identified in clauses (i) - (ii) below being collectively referred to as the "ABL Adequate Protection Collateral"):

(i)     *First Priority ABL Adequate Protection Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, binding, continuing, enforceable, fully perfected, first priority senior replacement liens on and security interests in and upon (a) all Prepetition ABL Collateral, (b) all postpetition property in which the Debtors have or obtain an interest, whether existing on or as of the Petition Date or thereafter acquired, which, but for the commencement of these Cases, would have constituted Collateral (as defined in the Prepetition ABL Security Agreement), including, but not limited to, any inventory, accounts and accounts receivable generated from and after the Petition Date, and (c) all products, proceeds, rents, and profits of each of the foregoing (the foregoing liens being collectively referred to as the "First Priority ABL Adequate Protection Liens," and the assets subject to the foregoing liens being collectively referred to as the "First Priority ABL Adequate Protection Collateral").

(ii)    *ABL Adequate Protection Liens Junior to Certain Existing Liens and DIP Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority liens on, and junior security interests in, all tangible and intangible assets, including without limitation, all prepetition and post-petition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired, other than those assets and properties that are described in paragraph 22(a)(i)(a) or (b) above, that (x) constitute DIP Collateral, (y) from and after the Petition Date, is not or ceases to be subject to any lien or security interest in effect as of the Petition Date (the "Unencumbered Assets"), if any, including, upon entry of the Final Order, the proceeds of any claims and causes of action of the Debtors (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and any other avoidance or similar actions under the Bankruptcy Code or similar state law (collectively, the "Avoidance Actions"), and (z) is subject to (i) valid, perfected, and unavoidable liens in existence as of the Petition Date, or (ii) valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the

Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Prepetition ABL Agent (the foregoing liens being collectively referred to as the "Junior ABL Adequate Protection Liens").

b.   Status of the ABL Adequate Protection Liens. Subject in all respects to the Carve-Out, the ABL Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) except as otherwise set forth in clauses (a)(i)-(ii) of this paragraph 22, any lien or security interest arising after the Petition Date, or (ii) except as otherwise set forth in clauses (a)(i)-(ii) of this paragraph 22, subordinated to or made *pari passu* with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

c.   Enforceability. Subject in all respects to the Carve-Out, the ABL Adequate Protection Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The ABL Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Debtors' Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Debtors' Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (each, a "Successor Case").

d.   Adequate Protection Superpriority Claims. The ABL Adequate Protection Obligations due to the Prepetition ABL Agent shall constitute allowed superpriority administrative expense claims against the Debtors in the amount of any ABL Diminution in Value of the Prepetition ABL Collateral, including ABL Cash Collateral, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, but shall be *subject and subordinate* in right of payment to the Carve-Out and the DIP Superpriority Claim (as defined below), and *pari passu* in right of payment with the other Adequate Protection Superpriority Claims granted hereunder, and shall at all times be senior to the rights of the Debtors and any successor trustee or creditor in these Chapter 11 Cases or any Successor Case (the "ABL Adequate Protection Superpriority Claims").

e.   Commitments. No commitments to make loans or issue Letters of Credit (as defined in the Prepetition ABL Credit Agreement) shall remain in effect under the Prepetition ABL Credit Agreement from and after the Petition Date, and the only obligations of the Prepetition ABL Secured Parties under the Prepetition ABL

Credit Agreement after the Petition Date shall be solely with respect to the drawings under Letters of Credit in existence immediately prior to the Petition Date.

23. *ABL Additional Adequate Protection*. As additional adequate protection to the Prepetition ABL Agent and the other Prepetition ABL Secured Parties:

a. <u>Payment of Prepetition and Postpetition Interest and Letter of Credit Fees</u>. The Debtors shall pay to the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders in cash all accrued and unpaid interest with respect to any drawings under the Letters of Credit (including, for the avoidance of doubt, interest accruing and becoming due after the Petition Date), Letter of Credit Fees (as defined in the ABL Credit Agreement), and fronting fees payable to L/C Issuers, in each case at the rates in effect on the Petition Date and consistent with the ordinary course interest payment dates set forth in the Prepetition ABL Credit Agreement and other provisions of the Prepetition ABL Credit Agreement (the "<u>ABL Adequate Protection Payments</u>").

b. <u>Payment of Prepetition ABL Agent Fees and Expenses</u>. As additional adequate protection, the Prepetition ABL Agent shall receive from the Debtors, for the benefit of the Prepetition ABL Lenders, current cash payments of all reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition ABL Secured Parties under the Prepetition ABL Loan Documents, including, but not limited to, the reasonable and documented out-of-pocket prepetition and postpetition fees and disbursements of one primary and one local counsel, financial advisors, and other consultants (the "<u>ABL Adequate Protection Fees and Expenses</u>"). Payment of all such professional fees and expenses shall be subject to compliance with the procedures set forth in paragraph 35.

c. <u>Sales of Prepetition ABL Collateral or the First Priority ABL Adequate Protection Collateral</u>. Notwithstanding any other provision in this Interim Order, upon any sale or disposition of any of the Prepetition ABL Collateral or the First Priority ABL Adequate Protection Collateral, other than in the ordinary course of business, the Debtors shall immediately deposit in a segregated account with the Prepetition ABL Agent, on behalf of the Prepetition ABL Secured Parties, the net cash proceeds received by the Debtors on account of such sales or disposition (the "<u>ABL Collateral Sale Proceeds Payment</u>"). The deposit of the ABL Collateral Sale Proceeds Payment shall not reduce the outstanding amount of the Prepetition ABL Obligations and the ABL Adequate Protection Obligations. The transfer of cash out of the deposit account shall occur only upon order of the Bankruptcy Court authorizing such disbursement.  In no event shall the Debtors be entitled to use the ABL Collateral Sale Proceeds Payment, until after indefeasible payment to the Prepetition ABL Agent of the Prepetition ABL Obligations and the ABL Adequate Protection Obligations in full. The Prepetition ABL Agent, the Debtors and the DIP Agent agree that any dispute regarding the amount of the net cash proceeds received by the Debtors on account of any such sale or disposition shall be determined by the Bankruptcy Court at a hearing held on an expedited basis.

d.  <u>Other Covenants</u>. The Debtors shall maintain their cash management system in a manner consistent with this Interim Order, and any order of this Court approving the maintenance of the Debtors' cash management system. The Debtors shall not use, sell, or lease any material assets of the Prepetition ABL Collateral outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without prior consultation with the Prepetition ABL Agent at least seven (7) days prior to the date on which the Debtors seek authority of this Court for such use, sale, or lease. The Debtors shall comply with the covenants contained in section 6.07 of the Prepetition ABL Credit Agreement regarding the maintenance and insurance of the Prepetition ABL Collateral and the ABL Adequate Protection Collateral.

24.  *Second Lien Adequate Protection Claims and Liens*. The Prepetition Second Lien Secured Party is hereby granted the following (collectively, the "<u>Second Lien Adequate Protection Obligations</u>"), solely to the extent of any Second Lien Diminution in Value; <u>provided</u> that the collateral set forth in this paragraph 24 shall not include assets or property (other than assets or property that constitute Prepetition Second Lien Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Interim Order is not allowed by applicable nonbankruptcy law, but shall include the proceeds thereof.

a.  <u>Second Lien Adequate Protection Liens</u>. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection against any actual Second Lien Diminution in Value (if any) of the Prepetition Second Lien Collateral, including Second Lien Note Cash Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or the recordation or other filing by the Prepetition Second Lien Secured Party of security agreements, control agreements, pledge agreements, mortgages or other Loan Documents (as defined in the Prepetition Second Lien Note) or financing statements or other similar documents, or the possession or control by the Prepetition Second Lien Secured Party of any Second Lien Adequate Protection Collateral (as defined below), the Prepetition Second Lien Secured Party is hereby granted, subject and subordinate to the Carve-Out and Permitted Prior Liens, as security for the payment of the Second Lien Adequate Protection Obligations, the following security interests and liens (all such liens and security interests, the "<u>Second Lien Adequate Protection Liens</u>," and all property identified in clauses (i) – (ii) below being collectively referred to as the "<u>Second Lien Adequate Protection Collateral</u>").

(i)  *Junior Priority Second Lien Note Adequate Protection Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, binding, continuing, enforceable, fully perfected, replacement liens on and security interests in

and upon all Prepetition Second Lien Collateral, junior to the First Priority ABL Adequate Protection Liens and the Prepetition ABL Liens.

(ii) *Second Lien Note Adequate Protection Liens Junior to Certain Existing Liens, Junior to DIP Liens and Junior to ABL Adequate Protection Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority liens on, and junior security interests in, all tangible and intangible assets, including without limitation, (a) Unencumbered Assets, and (b) all prepetition and post-petition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired, that is subject to (i) valid, perfected, and unavoidable liens in existence as of the Petition Date, including, without limitation the assets subject to the ABL Adequate Protection Liens or (ii) valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Prepetition Second Lien Secured Party.

b. <u>Status of the Second Lien Adequate Protection Liens</u>. The Second Lien Adequate Protection Liens shall be junior to the Carve-Out and the ABL Adequate Protections Liens in all respects and shall not otherwise be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) except with respect to any ABL Adequate Protection Liens granted hereunder, any lien or security interest arising after the Petition Date, or (ii) except as otherwise set forth clauses (a)(i)-(ii) in this paragraph 23, subordinated to or made *pari passu* with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

c. <u>Enforceability</u>. The Second Lien Adequate Protection Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The Second Lien Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Debtors' Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Debtors' Chapter 11 Cases, or in any Successor Case.

d. <u>Adequate Protection Superpriority Claims</u>. The Second Lien Adequate Protection Obligations due to the Prepetition Second Lien Secured Party shall constitute allowed superpriority administrative expense claims against the Debtors in the amount of any Second Lien Diminution in Value of the Prepetition Second Lien Collateral as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362,

363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, and shall at all times be *subject and subordinate* in right of payment to the Carve-Out, and the DIP Superpriority Claim (defined below) (only in so far as such claim can recover from the Prepetition Superpriority Collateral, Prepetition Secured Notes Collateral, and Unencumbered Assets), and *pari passu* in right of payment with the other Adequate Protection Superpriority Claims granted hereunder, and senior to the rights of the Debtors and any successor trustee or creditor in these Chapter 11 Cases or any Successor Case (the "Second Lien Adequate Protection Superpriority Claims"), subject and subordinate only to the DIP Superpriority Claim (only in so far as such claim can recover from the Prepetition Superpriority Collateral, Prepetition Secured Notes Collateral, and Unencumbered Assets) and the Carve-Out.

25.     *Superpriority Adequate Protection Claims and Liens*.   Prior to the indefeasible payment in full of all Prepetition Superpriority Obligations, the Prepetition Superpriority Agent is hereby granted, for and on behalf of the Prepetition Superpriority Lenders, the following (collectively, the "Superpriority Adequate Protection Obligations"), to the extent of any Superpriority Diminution in Value:

a.      Superpriority Adequate Protection Liens. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection against any actual Superpriority Diminution in Value (if any) of the Prepetition Superpriority Collateral, including Superpriority Cash Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or the recordation or other filing by the Prepetition Superpriority Agent of security agreements, control agreements, pledge agreements, mortgages or other Collateral Documents (as defined in the Prepetition Superpriority Credit Agreement) or financing statements or other similar documents, or the possession or control by the Prepetition Superpriority Agent of any Superpriority Adequate Protection Collateral (as defined below), the Prepetition Superpriority Agent is hereby granted for the ratable benefit of the Prepetition Superpriority Lenders, as security for the payment of the Superpriority Adequate Protection Obligations, subject and only to the Carve Out, the following security interests and liens (all such liens and security interests, the "Superpriority Adequate Protection Liens," and all property identified in clauses (i) - (iii) below being collectively referred to as the "Superpriority Adequate Protection Collateral"):

(i)     *First Priority Superpriority Adequate Protection Liens*.   Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, binding, continuing, enforceable, fully perfected, first priority senior replacement liens on and security interests in and upon (a) all Prepetition Superpriority Collateral and (b) all products, proceeds, rents, and profits of the foregoing (the foregoing liens being collectively referred to as the "First Priority Superpriority

Adequate Protection Liens" and the assets subject to the foregoing liens being collectively referred to as the "First Priority Superpriority Adequate Protection Collateral").

    (ii)    *Superpriority Adequate Protection Liens Junior to Certain Existing Liens and DIP Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority liens on, and junior security interests in, all tangible and intangible assets and all prepetition and post-petition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired, other than those assets and properties that are Unencumbered Assets, if any, including, upon entry of the Final Order, the proceeds of any Avoidance Action, and is subject to valid, perfected, and unavoidable liens in existence as of the Petition Date, or valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Prepetition Superpriority Agent (the foregoing liens being collectively referred to as the "Junior Superpriority Adequate Protection Liens").

b.    Status of the Superpriority Adequate Protection Liens. Subject in all respects to the Carve Out, the Superpriority Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any lien or security interest arising after the Petition Date, or (ii) except as otherwise set forth in clauses (a)(i)-(ii) of this paragraph 25, subordinated to or made *pari passu* with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

c.    Enforceability. Subject in all respects to the Carve Out, the Superpriority Adequate Protection Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The Superpriority Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Debtors' Chapter 11 Cases, or any Successor Case.

d.    Adequate Protection Superpriority Claims. The Superpriority Adequate Protection Obligations due to the Prepetition Superpriority Agent shall constitute allowed superpriority administrative expense claims against the Debtors in the amount of any Superpriority Diminution in Value of the Prepetition Superpriority Collateral, including Superpriority Cash Collateral, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections

105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, but shall be subject and subordinate in right of payment to the Carve-Out, and *pari passu* in right of payment with the other Adequate Protection Superpriority Claims granted hereunder, and shall at all times be senior to the rights of the Debtors and any successor trustee or creditor in these Chapter 11 Cases or any Successor Case (the "Superpriority Adequate Protection Superpriority Claims").

26.   *Superpriority Additional Adequate Protection.* Until the indefeasible payment in full of the Prepetition Superpriority Obligations, as additional adequate protection to the Prepetition Superpriority Agent and the other Prepetition Superpriority Secured Parties:

a.   Payment of Prepetition and Postpetition Interest. The Debtors shall pay in kind to the Prepetition Superiority Agent for the benefit of the Prepetition Superpriority Lenders all accrued and unpaid interest with respect to any Prepetition Superpriority Loans (including, for the avoidance of doubt, interest accruing and becoming due after the Petition Date) at the applicable contract rate and consistent with the ordinary course interest payment dates set forth in the Prepetition Superpriority Credit Agreement and other provisions of the Prepetition Superpriority Credit Agreement (the "Superpriority Adequate Protection Payments").

b.   Payment of Prepetition Superpriority Agent and Ad Hoc Group Fees and Expenses. As additional adequate protection, the Prepetition Superpriority Agent and that certain ad hoc group of Prepetition Secured Noteholders represented by Davis Polk & Wardwell LLP (the "Ad Hoc Group") shall receive from the Debtors current cash payments of the reasonable and documented prepetition and postpetition fees and disbursements of Davis Polk & Wardwell LLP, Rapp & Krock, PC, and Ducera Partners LLC, and other legal and other professional advisors to the Prepetition Superpriority Agent and the Ad Hoc Group, and all other reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Superpriority Secured Parties under the Prepetition Superpriority Loan Documents (the "Superpriority Adequate Protection Fees and Expenses"). Payment of all such professional fees and expenses shall be subject to compliance with the procedures set forth in paragraph 35.

c.   Other Covenants. The Debtors shall maintain their cash management system in a manner consistent with this Interim Order, and any order of this Court approving the maintenance of the Debtors' cash management system. The Debtors shall not use, sell, or lease any material assets of the Prepetition Superpriority Collateral outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without prior consultation with the Ad Hoc Group at least seven (7) days prior to the date on which the Debtors seek authority of this Court for such use, sale, or lease. The Debtors shall comply with the covenants contained in

section 6.07 of the Prepetition Superpriority Credit Agreement regarding the maintenance and insurance of the Prepetition Superpriority Collateral and the Superpriority Adequate Protection Collateral.

27. *Secured Notes Adequate Protection Claims and Liens*. The Prepetition Secured Notes Trustee is hereby granted, for and on behalf of the Prepetition Secured Noteholders, the following (collectively, the "<u>Secured Notes Adequate Protection Obligations</u>"), to the extent of any Secured Notes Diminution in Value; *provided* that the collateral set forth in this paragraph 27 shall not include assets or property (other than assets or property that constitutes Prepetition Secured Notes Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Interim Order may not be allowed by applicable non bankruptcy law, but shall include the proceeds thereof:

a. <u>Secured Notes Adequate Protection Liens</u>. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection against any actual Secured Notes Diminution in Value (if any) of the Prepetition Secured Notes Collateral, including Secured Notes Cash Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or the recordation or other filing by the Prepetition Secured Notes Trustee of security agreements, control agreements, pledge agreements, mortgages or other Security Documents (as defined in the Prepetition Secured Notes Indenture) or financing statements or other similar documents, or the possession or control by the Prepetition Secured Notes Trustee of any Secured Notes Adequate Protection Collateral (as defined below), the Prepetition Secured Notes Trustee is hereby granted for the ratable benefit of the Prepetition Secured Noteholders, subject and subordinate to the Carve-Out and Permitted Prior Liens, as security for the payment of the Secured Notes Adequate Protection Obligations, subject and subordinate only to the DIP Liens and the Carve-Out, the following security interests and liens (all such liens and security interests, the "<u>Secured Notes Adequate Protection Liens</u>," and all property identified in clauses (i) - (ii) below being collectively referred to as the "Secured Notes Adequate Protection Collateral"):

(i) *Junior Priority Secured Notes Adequate Protection Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, binding, continuing, enforceable, fully perfected, replacement liens on and security interests in and upon all Prepetition Secured Notes Collateral, junior to the DIP Liens (the foregoing liens being collectively referred to as the "<u>Junior Priority Secured Notes Adequate Protection Liens</u>").

(ii) *Secured Notes Adequate Protection Liens Junior to Certain Existing Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority liens on, and junior security interests in, all tangible and intangible assets, including without limitation, (a) Unencumbered Assets, and (b) all prepetition and post-petition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired, that is subject to (i) valid, perfected, and unavoidable liens in existence as of the Petition Date, including, without limitation the assets subject to the ABL Adequate Protection Liens, or (ii) valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Prepetition Secured Notes Trustee (the foregoing liens being collectively referred to as the "<u>Junior Secured Notes Adequate Protection Liens</u>").

b. <u>Status of the Secured Notes Adequate Protection Liens</u>. Subject in all respects to the DIP Liens and the Carve-Out, the Secured Notes Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any lien or security interest arising after the Petition Date, or (ii) except as otherwise set forth in clauses (a)(i)-(ii) of this paragraph 27, subordinated to or made *pari passu* with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise.

c. <u>Enforceability</u>. Subject in all respects to the DIP Liens and the Carve-Out, the Secured Notes Adequate Protection Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The Secured Notes Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Debtors' Chapter 11 Cases, or any Successor Case.

d. <u>Adequate Protection Superpriority Claims</u>. The Secured Notes Adequate Protection Obligations due to the Prepetition Secured Notes Trustee shall constitute allowed superpriority administrative expense claims against the Debtors in the amount of any Secured Notes Diminution in Value of the Prepetition Secured Notes Collateral, including Cash Collateral, as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, but shall be *pari passu* in right of payment with the other Adequate Protection Superpriority Claims granted hereunder, and shall at all times

be *subject and subordinate* in right of payment to the Carve-Out and the DIP Superpriority Claim (defined below), and senior to the rights of the Debtors and any successor trustee or creditor in these Chapter 11 Cases or any Successor Case (the "Secured Notes Adequate Protection Superpriority Claims"), subject and subordinate only to the DIP Superpriority Claim and the Carve-Out.

e.     Payment of Prepetition Secured Notes Trustee and Ad Hoc Group Fees and Expenses. As additional adequate protection, and subject to paragraph 45 of this Interim Order, the Prepetition Secured Notes Trustee and the Ad Hoc Group shall receive from the Debtors current cash payments of the reasonable and documented prepetition and postpetition fees and disbursements of (x) the Prepetition Secured Notes Trustee ("UMB Fees"), and (y) (i) Kelley Drye & Warren LLP ("Kelley Drye"), counsel to the Prepetition Secured Notes Trustee, and (ii) Davis Polk & Wardwell LLP, Rapp & Krock, PC, and Ducera Partners LLC, and any other legal and other professional advisors to the Ad Hoc Group (the "Ad Hoc Group Professional Advisors"), and all other reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Secured Notes Secured Parties under the Prepetition Secured Notes Documents (the "Secured Notes Adequate Protection Fees and Expenses"). Payment of all such professional fees and expenses shall be subject to compliance with the procedures set forth in paragraph 35. In addition, the Secured Notes Adequate Protection Fees and Expenses of the Ad Hoc Group Professional Advisors, to the extent unpaid, shall be paid by the Prepetition Secured Notes Trustee prior to any payments made to the holders of Prepetition Secured Notes, shall be deemed to be fees and expenses of the Prepetition Secured Notes Trustee for purposes of the order in which the proceeds of Prepetition Secured Notes Collateral are distributed, and shall be paid solely out of recoveries in respect of the Prepetition Secured Notes actually received and held by the Prepetition Secured Notes Trustee over which the Prepetition Secured Notes Trustee could assert a charging lien in accordance with the Prepetition Secured Notes Indenture, *provided* that such recoveries shall first be applied to payment of all unpaid UMB Fees and unpaid fees and expenses of Kelley Drye.

28.     *Additional Prepetition Secured Note Adequate Protection Claims and Liens.* The Additional Prepetition Secured Note Secured Party is hereby granted the following (collectively, the "Additional Prepetition Secured Note Adequate Protection Obligations," and together with the ABL Adequate Protection Obligations, the Second Lien Adequate Protection Obligations, the Superpriority Adequate Protection Obligations, and the Secured Notes Adequate Protection Obligations, the "Adequate Protection Obligation(s)"), solely to the extent of any Additional Prepetition Secured Note Diminution in Value; provided that the collateral set forth in

this paragraph 28 shall not include assets or property (other than assets or property that constitute Additional Prepetition Secured Note Collateral) upon which, and solely to the extent that, the grant of an Adequate Protection Lien as contemplated in this Interim Order is not allowed by applicable nonbankruptcy law, but shall include the proceeds thereof.

     a.    <u>Additional Prepetition Secured Note Adequate Protection Liens</u>. Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection against any actual Additional Prepetition Secured Note Diminution in Value (if any) of the Additional Prepetition Secured Note Collateral, including Additional Prepetition Secured Note Cash Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or the recordation or other filing by the Additional Prepetition Secured Note Secured Party of security agreements, control agreements, pledge agreements, mortgages or other Loan Documents (as defined in the Additional Prepetition Secured Note) or financing statements or other similar documents, or the possession or control by the Additional Prepetition Secured Note Secured Party of any Additional Prepetition Secured Note Adequate Protection Collateral (as defined below), the Additional Prepetition Secured Note Secured Party is hereby granted, as security for the payment of the Additional Prepetition Secured Note Adequate Protection Obligations, subject and subordinate only to the Carve-Out and the DIP Liens, the following security interests and liens (all such liens and security interests, the "<u>Additional Prepetition Secured Note Adequate Protection Liens</u>," and together with the ABL Adequate Protection Liens, the Second Lien Adequate Protection Liens, the Superpriority Adequate Protection Liens, and the Secured Note Adequate Protection Liens, the "<u>Adequate Protection Lien(s)</u>," and all property identified in clauses (i) – (ii) below being collectively referred to as the "<u>Additional Prepetition Secured Note Adequate Protection Collateral</u>," and together with the ABL Adequate Protection Collateral, Second Lien Adequate Protection Collateral, the Superpriority Adequate Protection Collateral, and the Secured Notes Adequate Protection Collateral, the "<u>Adequate Protection Collateral</u>"):

    (i)    *Junior Priority Additional Prepetition Secured Note Adequate Protection Liens.* Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, binding, continuing, enforceable, fully perfected, replacement liens on and security interests in and upon all Additional Prepetition Secured Note Collateral, junior to the DIP Liens and the Carve-Out.

    (ii)    *Additional Prepetition Secured Note Adequate Protection Liens Junior to DIP Liens and Junior to Certain Existing Liens*. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority liens on, and junior security interests in, all tangible and intangible assets, including without limitation, (a) Unencumbered Assets, and (b) all prepetition and post-petition property of the Debtors' estates, and all products and proceeds

thereof, whether now existing or hereafter acquired, that is subject to (i) valid, perfected, and unavoidable liens in existence as of the Petition Date, including, without limitation the assets subject to the ABL Adequate Protection Liens, or (ii) valid and unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens in favor of the Additional Prepetition Secured Note Secured Party.

b.  Status of the Additional Prepetition Secured Note Adequate Protection Liens. The Additional Prepetition Secured Note Adequate Protection Liens shall be junior to the Carve-Out, DIP Liens and the Superpriority Adequate Protection Liens in all respects and shall not otherwise be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) except with respect to any Adequate Protection Liens granted hereunder, any lien or security interest arising after the Petition Date, or (ii) except as otherwise set forth in clauses (a)(i)-(ii) of this paragraph 28, subordinated to or made pari passu with any other lien or security interest, now or hereafter existing and whether authorized under sections 363 or 364 of the Bankruptcy Code or otherwise. The Additional Prepetition Secured Note Adequate Protection Liens on the Prepetition ABL Collateral and the ABL Adequate Protection Collateral are subject to the Prepetition ABL Liens and the ABL Adequate Protection Liens.

c.  Enforceability. The Additional Prepetition Secured Note Adequate Protection Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code. The Additional Prepetition Secured Note Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Debtors' Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Debtors' Chapter 11 Cases, or in any Successor Case.

d.  Adequate Protection Superpriority Claims. The Additional Prepetition Secured Note Adequate Protection Obligations due to the Additional Prepetition Secured Note Secured Party shall constitute allowed superpriority administrative expense claims against the Debtors in the amount of any Additional Prepetition Secured Note Diminution in Value of the Additional Prepetition Secured Note Collateral as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, but shall be *pari passu* in right of payment with the other Adequate Protection Superpriority Claims granted hereunder and shall at all times be *subject and subordinate* in right of payment to the Carve-Out

44

and the  DIP Superpriority Claim (defined below), and senior to the rights of the Debtors and any successor trustee or creditor in these Chapter 11 Cases or any Successor Case (the "Additional Prepetition Secured Note Adequate Protection Superpriority Claims" and together with the ABL Adequate Protection Superpriority Claims, the Second Lien Adequate Protection Superpriority Claims, the Superpriority Adequate Protection Superpriority Claims, and the Secured Notes Adequate Protection Superpriority Claims, the "Adequate Protection Superpriority Claim(s)").

e.    Payment of Additional Prepetition Secured Note Fees and Expenses.    The Additional Prepetition Secured Note Secured Party, represented by Fried, Frank, Harris, Shriver and Jacobson LLP and McKool Smith, P.C. and any financial advisor to Ascribe (collectively, the "Ascribe Advisors"), shall receive from the Debtors current cash payments of the reasonable and documented prepetition and postpetition fees and disbursements of the Ascribe Advisors incurred solely and directly in connection with the DIP Orders or the DIP Facility; provided, such payments shall in no event exceed $100,000 in the aggregate; provided further that the foregoing shall be without limitation of any rights of Ascribe under paragraph 54.  Payment of all such professional fees and expenses shall be subject to compliance with the procedures set forth in paragraph 35.

29.    *Relative Priority of Liens and Superpriority Administrative Expense Claims.* Notwithstanding anything to the contrary in this Interim Order or in the Prepetition Loan Documents, the relative priority of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claim(s) shall be as set forth in **Exhibit B** attached hereto; provided, that, for the avoidance of doubt, each such Lien shall be subject and subordinate to the Carve-Out in all respects.

30.    *Reporting.* As additional adequate protection for the Debtors' use of the Prepetition Collateral (including Cash Collateral), the Debtors shall contemporaneously provide (a) the Prepetition Agents, Ascribe, and the Ad Hoc Group (to the extent any such party does not otherwise receive such reporting) with all financial and other reports provided to the DIP Agent pursuant to the terms of the DIP Loan Agreement (without giving effect to any amendment or modification of the DIP Loan Agreement after the date of entry of this Interim Order), which obligation shall survive the termination of the DIP Loan Agreement and payment in full of the DIP

Obligations; and (b) the Prepetition ABL Agent and DIP Agent with the financial reports and borrowing base certificates pursuant to Sections 6.01(d) and (f) of the Prepetition ABL Credit Agreement, including supplemental daily reporting as follows: (i) reports on daily billed A/R transaction data, (ii) a billed A/R aging, and (iii) unbilled WIP detail (the reporting in this clause (b), collectively, the "Borrowing Base Reporting").  The Borrowing Base Reporting shall be provided to the Ad Hoc Group and Ascribe contemporaneously with it being provided to the Prepetition ABL Agent.

31.    *Provisions Common to DIP Facility and Use of Cash Collateral.*

    a.    Postpetition Lien Perfection.

        (i)    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral or Adequate Protection Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement or other depository account consisting of DIP Collateral or Adequate Protection Collateral, or requirement to register liens on any certificates of title (a "Perfection Act"). Notwithstanding the foregoing, if the DIP Agent or any Prepetition Agent, as applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Agent or Prepetition Agent, as applicable, is authorized to perform such act, and the Debtors are authorized and directed to perform such act, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Agent or any Prepetition Agent, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Agent or any Prepetition Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity,

enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(ii)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided*, *however*, that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that the DIP Agent or any Prepetition Agent, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action by the DIP Agent or any Prepetition Agent, a applicable.

b.     <u>Amendments to DIP Loan Documents and Budget</u>. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document or the Approved Budget, and the DIP Agent and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Court; <u>provided</u> that any amendments, modifications, or supplements to any DIP Loan Documents that are material, including those that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "<u>Material DIP Amendments</u>"), shall be filed with the Court in advance of the effective date of such Material DIP Amendments, and the Debtors shall provide prior written notice of and an opportunity to object to the Material DIP Amendment to (i) counsel for each of the Prepetition Agents, (ii) counsel to the Creditors' Committee, if any, (iii) parties on the Master Service List, and (iv) counsel to the Ad Hoc Group, and (v) the U.S. Trustee; <u>provided</u>, <u>further</u>, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment subject to a timely and unresolved objection must be approved by the Court. Notwithstanding the foregoing, any modification to any Approved Budget shall require the consent of the Prepetition ABL Agent and the Ad Hoc Group prior to such budget constituting an Approved Budget.

c.     The occurrence of one or more of the following shall constitute a "<u>Termination Event</u>" (subject to the waiver or expiration of any applicable cure period, unless

waived in writing by the DIP Secured Parties and the applicable Prepetition Agents or the Ad Hoc Group):

(i)      any "Event of Default" as that term is defined in the DIP Loan Agreement, provided, however, if an Event of Default under the DIP Loan Agreement results in an acceleration of the DIP Obligations or termination of the DIP Lender's commitments under the DIP Facility, or a suspension of more than five (5) days of the Debtors' ability to obtain loan proceeds under the DIP Facility, then the Prepetition ABL Agent and the Ad Hoc Group shall each have an independent right to assert a Termination Event;

(ii)     the occurrence of the Maturity Date under the DIP Loan Agreement, which may only be triggered by the DIP Secured Parties;

(iii)    the failure to obtain entry of the Final Order on or before thirty (35) days after the entry of this Interim Order;

(iv)    the failure to comply with any milestone set forth in section 14(h) of the DIP Loan Agreement (without giving effect to any extension thereof; provided that the Prepetition ABL Agent, the Prepetition Agents, and the Ad Hoc Group may agree to extend any milestone);

(v)     the failure of the closing date under the DIP Loan Agreement, and failure of the indefeasible payment in full of the Prepetition Superpriority Obligations, to occur within three (3) days of entry of the Interim Order;

(vi)    any Debtor's failure to comply with any of the material terms or conditions of this Interim Order, including, but not limited to, (A) the use of Cash Collateral for any purpose other than as permitted in this Interim Order, (B) failure to comply with the Approved Budget (subject to Permitted Variances), or (C) failure to comply with the reporting requirements set forth in this Interim Order and such failure shall have continued for five (5) business days;

(vii)   the failure of the Debtors to make any payment required under this Interim Order;

(viii)  this Interim Order ceases, for any reason (other than by the supersession of this Interim Order by the Final Order), to be in full force and effect in any material respect, or any Debtor so asserts in writing, or the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens or Adequate Protection Superpriority Claims created by this Interim Order cease in any material respect to be enforceable and of the same effect and priority purported to be created hereby or any Debtor so asserts in writing;

(ix)    the Court shall have entered an order reversing, amending, supplementing, staying, vacating, or otherwise modifying this Interim Order in a manner adverse to the DIP Secured Parties or the Prepetition Secured Parties

without their prior written consent, which consent may be provided by electronic mail;

(x) the date an application, motion, or other pleading is filed by the Debtors for the approval of, or the date the Court shall have entered an order recognizing or granting, any superpriority claim or any lien in these Chapter 11 Cases that is *pari passu* with or senior to the DIP Liens, the DIP Superpriority Claims, Adequate Protection Superpriority Claims or the Adequate Protection Liens, other than the Carve-Out, without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders (as defined in the DIP Loan Agreement)) or applicable Prepetition Agent;

(xi) the date any of the Debtors files any pleading or commences any action against the Prepetition Secured Parties challenging the validity or enforceability of the Prepetition Obligations or the Prepetition Liens or seeking to avoid, disallow, subordinate, or recharacterize any claim, lien, or interest held by any of the Prepetition Secured Parties arising under or related to the Prepetition Obligations (or if the Debtor supports any such motion, pleading, application or adversary proceeding commenced by any third party), other than any action commenced by the Independent Director (as defined below);

(xii) except as provided in this Interim Order or the Final Order, or in any asset purchase agreement entered into by the Debtors and to which the Prepetition ABL Agent and the Ad Hoc Group have consented, the settlement, release, waiver, or discharge by the Debtors of any (i) material claims or causes of action held by the Debtors against any party outside of the ordinary course, or (ii) claims or causes of action held by the Debtors against an affiliated party, in each case, without the consent of the Prepetition ABL Agent or the Ad Hoc Group;

(xiii) the date any of the Debtors file or otherwise support any motion, pleading, or other document, including a chapter 11 plan, that (i) seeks to amend, modify, or supplement this Interim Order, or (ii) otherwise materially, negatively affects the DIP Secured Parties or Prepetition ABL Secured Parties, without the prior written consent of the DIP Agent or the Prepetition ABL Agent, respectively; provided, that the consent of the DIP Agent or Prepetition Agents shall not be required if, pursuant to a chapter 11 plan, the DIP Obligations, Prepetition ABL Obligations and the ABL Adequate Protection Obligations are to be indefeasibly paid in full in cash on the effective date of such plan;

(xiv) the date any of the Debtors file a motion seeking an order, or the date any court of competent jurisdiction enters an order, dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, appointing a trustee, responsible officer, or examiner with expanded powers relating to the operation of the organization in the

Chapter 11 Cases, or terminating the Debtors' exclusivity under section 1121 of the Bankruptcy Code;

(xv)   the filing of any pleading by any Debtor in support of (in any such case by way of any motion or other pleading filed with the Court or any other writing to another party in interest executed by or on behalf of any such Debtor) any other person's opposition to any motion filed in the Court by the Prepetition Secured Parties (other than Ascribe) seeking confirmation of the amount of its claims or the validity or enforceability of the Prepetition Liens or the Adequate Protection Liens, except with regard to good faith disputes over the payment of expenses and fees;

(xvi)   the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed *in lieu* of foreclosure or the like) on (i) any of the Prepetition Collateral or Adequate Protection Collateral on which the Prepetition Secured Parties have a first-priority security interest, or (ii) any other property of the Debtors' estates which has an aggregate value in excess of $1,000,000; provided however, that to the extent such lien can be satisfied by amounts contemplated to pay prepetition liens in the Approved Budget, any relief granted on account of such liens shall not trigger a Termination Event;

(xvii)   if the Debtors fail to maintain an adjusted Borrowing Base (as defined in and calculated pursuant to the Prepetition ABL Credit Agreement, but without including any deduction for the accounts payable lien offset reserve, the "Adjusted Borrowing Base") such that the percentage ratio of the Adjusted Borrowing Base compared to the Outstanding Amount (as defined in the Prepetition ABL Credit Agreement) tested as of Monday of each calendar week (commencing with August 23, 2021), during the Interim Period, is less than 132.5% for each such week during the Interim Period;   provided, that, for no more than one (1) weekly testing period during the Interim Period, such percentage may be less than 132.5% but no less than 130% for such one (1) week period; provided further, that no new reserves may be imposed, and no existing reserve amounts increased or decreased by the Prepetition ABL Agent affecting the calculation of the Adjusted Borrowing Base (the foregoing, a "Borrowing Base Termination Event"), which Borrowing Base Termination Event may only be triggered by the Prepetition ABL Agent; without limiting the Prepetition ABL Agent's rights and remedies with respect to any Borrowing Base Termination Event, the Debtors shall have the right to cure such Borrowing Base Termination Event during the Remedies Notice Period by depositing cash into the ABL Segregated Cash Collateral Account (as defined below) in an amount sufficient to cure such Borrowing Base Termination Event;

(xviii)  if the Debtors fail to provide any Borrowing Base Reporting required by paragraph 30(b) above, subject to one (1) business day cure period, which may only be triggered by the Prepetition ABL Agent;

(xix)  if the Debtors amend or modify in any material respect in a manner adverse to the Debtors any stalking horse purchase agreement with the Stalking Horse Bidders (as defined below) without the consent of the Prepetition ABL Agent or the Ad Hoc Group;

(xx)  if, no later than forty-five (45) days after the Petition Date the Debtors, the Ad Hoc Group, and the Prepetition ABL Agent (unless the Prepetition ABL Obligations and the ABL Adequate Protection Obligations have been indefeasibly paid or cash collateralized in full) have not agreed in writing on the manner by which the assets of the estates will be distributed, and the estates will be resolved, following the sale of the Debtors' assets to the Stalking Horse Bidders, or any other successful bidder;

(xxi)  if, no later than forty-five (45) days after the Petition Date, the Debtors, the Prepetition ABL Agent (unless the Prepetition ABL Obligations and the ABL Adequate Protection Obligations have been indefeasibly paid or cash collateralized in full), and the Ad Hoc Group have not agreed in writing on the allocation of any costs associated with the administration of the estates following the sale of the Debtors' assets to the Stalking Horse Bidders, or any other successful bidder; and

(xxii)  receipt by BES of notice from the Required Lenders that no revised Budgeted Professional Fee Amounts (defined in the DIP Loan Agreement) proposed by BES within fourteen (14) days after the effectiveness of the DIP Loan Agreement in accordance with the DIP Orders are acceptable to the Required Lenders.

d.  <u>Rights and Remedies upon a Termination Event</u>.  During the period covered by this Interim Order, after five (5) business days following the delivery of a written notice (a "<u>Default Notice</u>") (A) by the DIP Agent and the Prepetition Agent (unless further specified below) of the occurrence of and during the continuance of a Termination Event, other than a Termination Event set forth in clauses (xii), (xvii), (xviii), or (xx) in paragraph 31(c), (B) by the Prepetition ABL Agent, of the occurrence of and during the continuance of a Termination Event, other than a Termination Event set forth in clause (xxii) or (C) by counsel to the Ad Hoc Group of the occurrence of and during the continuance of a Termination Event, other than a Termination Event set forth in clauses (xvii) or (xviii) in paragraph 31(c) (in each case, the "<u>Remedies Notice Period</u>"), (a) except as set forth below, the DIP Agent (acting at the direction of the Required Lenders) shall be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional

credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (v) stop lending; (b) except as stated in this paragraph below, the Debtors' right to use Cash Collateral immediately ceases and (c) upon notice and hearing, which hearing can be on an emergency basis, the DIP Agent and Prepetition Agents can request a Court order permitting immediate relief from the automatic stay with respect to the DIP Collateral and Prepetition Collateral (and with regards to the Prepetition ABL Agent, the Prepetition ABL Collateral and the First Priority ABL Adequate Protection Collateral) (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available under the DIP Loan Documents, Prepetition Loan Documents and the Interim Order (as applicable) and applicable nonbankruptcy law, and, upon Court order, the Debtors shall surrender the DIP Collateral, Prepetition Collateral, the First Priority ABL Adequate Protection Collateral and otherwise cooperate with the DIP Agent and Prepetition Agents in the exercise of their rights and remedies.  The exercise of rights and remedies by the DIP Agent and any Prepetition Agent shall be consistent with the lien priorities with respect to DIP Collateral, Prepetition Collateral, and the First Priority ABL Adequate Protection Collateral set forth herein and in **Exhibit B**, and no junior lien creditor shall in any way interfere with or impair the rights of any senior lien creditor with respect to any such exercise of rights and remedies, except with the prior written consent of such senior lien creditor.  Upon the delivery of a Default Notice, the Debtors, the DIP Agent, the applicable Prepetition Agent, and each Prepetition Secured Party consents to a hearing on an expedited basis to consider whether (a) a Termination Event has occurred and (b) any other appropriate relief (including, without limitation, the Debtors' non-consensual use of Cash Collateral). During the Remedies Notice Period, the Debtors shall be entitled to continue to use the Cash Collateral, solely to make payroll and pay expenses necessary to the survival of the Debtors' business, in accordance with the terms of the Approved Budget and this Interim Order; provided, however, in the event of a Borrowing Base Termination Event, or a default under paragraph 31(c)(xviii), subject to the applicable cure period therein, with respect to any weekly borrowing base certificate required to be provided under the Borrowing Base Reporting, the Debtors shall not be entitled to continue to use the Cash Collateral during the Remedies Notice Period and shall immediately cease to use Cash Collateral. Notwithstanding anything to the contrary herein, upon a Termination Event, the delivery of a Default Notice, the expiration of the Remedies Notice Period, or the occurrence of the Termination Date, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order shall survive. Except as otherwise provided herein or ordered by the Court, neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any rights, benefits, privileges and remedies set forth in this paragraph.

32.    *Effect of Stipulations on Third Parties*. Each of the Debtors' Stipulations and each of the Debtors' other admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 5 of this Interim Order, shall be binding upon the Debtors and all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these cases (including a Creditors' Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors (a "Trustee"), in all circumstances and for all purposes unless:

    a.    any party in interest (including any Trustee), including the Debtors, acting at the direction of Alan J. Carr as the sole disinterested independent member of the special committee of the board of directors of BES ("the Independent Director") in respect of the investigation or pursuit of any claims or causes of action within the mandate of the Independent Director, which investigation shall not include any claims or causes of action, or any of the Debtors' Stipulations, with respect to any party other than Ascribe or its affiliates (the "Independent Investigation"), has duly filed an adversary proceeding or contested matter under the Bankruptcy Rules (subject in either case to the limitations contained herein, including without limitation, in paragraph 32), or a motion seeking standing to file an adversary proceeding or contested matter challenging the validity, enforceability, priority, or extent of the Prepetition Obligations, the liens on the Prepetition Collateral securing the Prepetition Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against a Prepetition Agent, any of the other Prepetition Secured Parties, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Documents, the Prepetition Obligations, or the Prepetition Collateral, by no later than the date that is (i) the earlier of (A) with respect to any party other than Ascribe or its affiliates or any party acting in concert with or at the direction of, or abetting Ascribe, sixty (60) days after the date of entry of this Interim Order (or, in the case of any official committee appointed in these Cases, sixty (60) days from the date such committee is appointed (the "Committee Challenge Deadline")), or (B) with respect to Ascribe or its affiliates or any party acting in concert with, abetting, or at the direction of Ascribe, (x) solely with respect to the Debtors, acting at the direction of the Independent Director in respect of the Independent Investigation, the earlier of (1) the date the Independent Director concludes in writing that no valid challenge exists in respect of the matters subject to the Independent Investigation and the Court authorizes the release or abandonment of such challenge, (2) the date of a final order addressing

the settlement or adjudication of any claims or causes of action addressed by the Independent Investigation, and (y) with respect to any other any party in interest (including any Trustee), one hundred eighty (180) days from the date of entry of this Interim Order, or such later date that has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a challenge or (C) any such later date as may be agreed to in writing by the applicable Prepetition Agent (such time period, the "Challenge Period"), and

b.     an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided, that, as to the Debtors (other than the Independent Director in respect of the Independent Investigation), all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date; provided further that, for the avoidance of doubt, the Debtors' rights to pursue any such Claims and Defense acting solely at the direction of the Independent Director are fully reserved. If no such adversary proceeding or contested matter (or motion seeking standing) is timely filed prior to the expiration of the Challenge Period, then, without further order of this Court: (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case; (y) the Prepetition Agents' liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 5, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the Prepetition Obligations, the Prepetition Agents' liens on the Prepetition Collateral, and the Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors) shall not be subject to any other or further challenge by any party in interest, and any such party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding or contested matter (or motion seeking standing) is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 5 of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any person, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding or contested matter. Nothing in this Interim Order vests or confers on any person, including a Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates. In the event that there is a timely successful challenge brought pursuant to this paragraph 32, the Court shall retain jurisdiction to fashion an appropriate remedy.

33.     *Limitation on Use of Collateral*. Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Loan, Cash Collateral or Prepetition Collateral, and no proceeds, products, or offspring of any of the foregoing or any portion of the Carve-Out may be used to (except to the extent otherwise expressly agreed in writing by the DIP Agent, Prepetition ABL Agent, and the Ad Hoc Group in response to a written request from the Debtors specifying the proposed use) pay any claims for services rendered by any of the professionals retained by the Debtors, any creditor or party in interest, any committee (including any Creditors' Committee), any Trustee, or any other person, party, or entity (or to pay any professional fees and disbursements in connection therewith) to: (a) apply to the Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral, Prepetition Collateral or Cash Collateral, or any portion thereof, that are senior to, or on parity with, the DIP Liens, Prepetition Liens or Adequate Protection Liens, except as permitted by this Interim Order, unless the DIP Obligations or Prepetition Obligations, and claims granted to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order, as applicable, have been indefeasibly paid in full, or as may otherwise be agreed to in writing by the DIP Agent or applicable Prepetition Agent; (b) prevent, hinder or otherwise delay the DIP Secured Parties or Prepetition Secured Parties' assertion, enforcement or realization on the DIP Collateral or Prepetition Collateral, including Cash Collateral, and liens, claims and rights granted to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order, in accordance with the DIP Loan Documents, the Prepetition Documents and this Interim Order; (c) seek to modify any of the rights and remedies granted to the DIP Agent, the DIP Secured Parties, the Prepetition Agents or the other Prepetition Secured Parties under this Interim Order, the DIP Loan Documents or the Prepetition Documents; (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are

provided for in the Approved Budget and approved by an order of this Court that is in form and substance reasonably satisfactory to the DIP Agent and the Prepetition Agents; (e) subject to paragraph 33, investigate, assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against the DIP Secured Parties or Prepetition Secured Parties (other than Ascribe or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, or successors) or their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any avoidance actions or other actions arising under chapter 5 of the Bankruptcy Code, (ii) any action relating to any act, omission, or aspect of the relationship between the DIP Secured Parties or Prepetition Secured Parties, on the one hand, and the Debtors or any of their affiliates, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations or Prepetition Obligations (other than Prepetition Obligations held by Ascribe or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, or successors), or the validity, extent, and priority of the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, Prepetition Liens or the Adequate Protection Liens granted under this Interim Order (other than Prepetition Liens granted to Ascribe or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, or successors), (v) except to contest the occurrence of a Termination Event as permitted in paragraph 31(d), and as otherwise provided therein, any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Secured Parties or the Prepetition Secured Parties in respect of their liens and security interests in the DIP Collateral or the Prepetition Collateral, (vi)

pay any fees or similar amounts to any person to purchase any of the Debtors' assets without the prior written consent of the DIP Agent and the Prepetition Agents, or (vii) use or seek to use Cash Collateral unless otherwise permitted hereby, without the prior written consent of the DIP Agent and Prepetition Agents; or (g) for objecting to, contesting, delaying, preventing, hindering or otherwise interfering in any way with the exercise of rights or remedies by the DIP Secured Parties or Prepetition Secured Parties with respect to any DIP Collateral or Prepetition Collateral, including Cash Collateral, after the occurrence of a Termination Event, except as otherwise permitted hereby; provided that, notwithstanding anything to the contrary in this paragraph, any Creditors' Committee may use DIP Loans and/or Prepetition Collateral, including Cash Collateral, and the proceeds thereof, solely to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise challenge (i) the claims and liens of the Prepetition Secured Parties and (ii) potential claims, counterclaims, causes of action, or defenses, including the Claims and Defenses, against the Prepetition Secured Parties; provided, further, that no more than an aggregate of $50,000 of the DIP Loans and/or Prepetition Collateral, including Cash Collateral, and the proceeds thereof may be used by any Creditors' Committee, in respect of the investigations set forth in the preceding proviso (the "Investigation Budget").

34.     *Carve-Out.*

    a.    Notwithstanding anything to the contrary in this Interim Order, the Debtors' obligations to the DIP Secured Parties and the Prepetition Secured Parties, and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents and the Prepetition Documents, including, without limitation, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Obligations, the Adequate Protection Liens, and Adequate Protection Obligations shall be subject in all respects and subordinate to the Carve-Out. For the avoidance of doubt, after the occurrence of a Termination Event or repayment of the DIP Obligations in full, the Carve-Out shall remain in effect as to the DIP Obligations (if any outstanding) and the Prepetition Obligations.

    b.    As used in this Interim Order, the "Carve-Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States

Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses, including (only when and to the extent actually earned) any restructuring, sale, success, or other transaction fee (each, a "Success Fee") of any investment bankers or financial advisors of the Debtors or any Creditors' Committee, provided that any Success Fee arising out of the consummation of any sale transaction (but not the DIP Financing) shall be subject to the DIP Liens and subordinate to the repayment of the DIP Obligations (collectively, the "Allowed Professional Fees"), incurred or earned by persons or firms retained by the Debtors' estates or any such Creditors' Committee pursuant to section 327 or 328 of the Bankruptcy Code (the "Estate Professionals") at any time before or on the date of delivery by the DIP Agent or any Prepetition Agent of a Carve-Out Trigger Notice (as defined below) (the "Termination Declaration Date"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals (which shall not include any professionals retained by a chapter 7 trustee or chapter 11 trustee in these Chapter 11 Cases or in any Successor Cases) in an aggregate amount not to exceed $1,000,000 incurred following the Termination Declaration Date, to the extent allowed at any time, whether by interim order, procedural order, or otherwise; provided, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any other grounds (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or any Prepetition Agent or the Ad Hoc Group to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to each Prepetition Agent that is not the issuer of the Carve-Out Trigger Notice, the DIP Agent (if such notice is issued by any Prepetition Agent), counsel to the Ad Hoc Group, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of a Termination Event, the occurrence of which would give such party the right to commence the Remedies Notice Period, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

c.     Starting with the first full calendar week following the Petition Date, each Estate Professional shall deliver to the Debtors, the DIP Agent, the Ad Hoc Group, the Prepetition ABL Agent, and Ascribe, a statement (each such statement, a "Weekly Statement") setting forth a good-faith estimate (the "Estimated Fees and Expenses") of the amount of unpaid fees and expenses incurred during the preceding week by such Estate Professional (through Saturday of such week, the "Calculation Date"), along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (the "Cumulative Total Unpaid Fees and

Expenses"). No later than one (1) business day after the delivery of a Carve-Out Trigger Notice, each Estate Professional shall deliver one additional statement (the "<u>Final Statement</u>") to the Debtors, the Ad Hoc Group, and Ascribe setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has already been delivered and concluding on the Termination Declaration Date, and the Debtors shall transfer such amounts, including from the DIP Proceeds Account, to the Professional Fees Escrow Account (as defined herein). The Debtors shall on a weekly basis, transfer cash proceeds from cash on hand, with respect to the ABL Cash Collateral, so long as a Borrowing Base Termination Event under paragraph 31(c)(xvii) shall not have occurred or shall not arise after giving effect to such transfers, or if cash on hand is not sufficient, from the DIP Proceeds Account, in an amount equal to the Cumulative Total Unpaid Fees and Expenses included in the most recent Weekly Statement timely received by the Debtors less the amount of cash already deposited in the Professional Fees Escrow Account (as defined below), which shall be reported to the DIP Agent and the Prepetition ABL Agent, or if an estimate is not provided, the total budgeted weekly fees of Estate Professionals for the prior week set forth in the Approved Budget, into a segregated account not subject to the control of the DIP Agent, the Prepetition ABL Agent, any Prepetition ABL Lender, any Prepetition ABL Secured Party, the Prepetition Second Lien Secured Party, or any other secured or unsecured creditor (the "<u>Professional Fees Escrow Account</u>"). The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; *provided* that the Debtors' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fees Escrow Account. Funds transferred to the Professional Fees Escrow Account shall be held in trust for and exclusively available for the payment of any fees and expenses of the Estate Professionals, including with respect to obligations arising out of the Carve-Out; <u>provided, however</u>, that when all Allowed Professional Fees have been paid in full, any funds remaining in the Professional Fees Escrow Account shall be paid to the Prepetition ABL Agent and the DIP Agent, *pro rata* in accordance with the total amount of the Professional Fees Escrow Account funded by the Prepetition ABL Collateral and/or the First Priority ABL Adequate Protection Collateral and the DIP Proceeds Collateral. If the DIP Obligations have been indefeasibly paid in full, then the portion of the Professional Fee Escrow Account that would be payable to the DIP Agent shall be paid to the Prepetition Secured Notes Trustee for the benefit of the Prepetition Secured Noteholders. If the Prepetition ABL Obligations and the ABL Adequate Protection Obligations have been paid in full, then the portion of the Professional Fee Escrow Account that would be payable to the Prepetition ABL Agent shall be paid to the Second Lien Secured Parties.

d.     Delivery of the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash in the DIP Proceeds Account as of the Termination Declaration Date, and if such cash is not sufficient, then any available cash on hand held by any

Debtor (with respect to the ABL Cash Collateral, so long as a Borrowing Base Termination Event under paragraph 31(c)(xvii) shall not have occurred or shall not arise after giving effect to such transfers), to fund the Professional Fees Escrow Account in an amount equal to (i) the difference between the aggregate amount of unpaid Allowed Professional Fees in each timely delivered Final Statement and the amount of cash already funded into the Professional Fees Escrow Account as of the Termination Declaration Date, plus (ii) the Post-Carve-Out Trigger Notice Cap to the extent not already funded (including upon entry of the Final Order as set forth above) (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Professional Fees Escrow Account, the "Carve-Out Reserves") prior to any and all other claims. For the avoidance of doubt, the Carve-Out Reserves shall be inclusive of the Professional Fees Escrow Account, and any Allowed Professional Fees already included in the Professional Fees Escrow Account shall not be entitled to additional funding. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph 31, then any excess funds in the Professional Fees Escrow Account following the payment of Allowed Professional Fees pursuant to clause (iii) of the definition of Carve-Out, and the Post-Carve-Out Trigger Notice Reserve following the payment of the Allowed Professional Fees pursuant to clause (iv) of the definition of Carve-Out, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 31, prior to making any payments to the DIP Agent, the Prepetition ABL Agent, or the Prepetition Second Lien Secured Party, or any other creditor, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded to the Professional Fee Escrow Account.

e.      Notwithstanding anything to the contrary in this Interim Order, (i) the failure of the Professional Fees Escrow Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (ii) in no way shall the Approved Budget, Carve-Out, Post-Carve-Out Trigger Notice Cap, Professional Fees Escrow Account, or any of the foregoing be construed as a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors. Moreover, all parties' rights to object to the allowance of any fees of Estate Professionals are reserved in all respects and no action taken in connection with the Approved Budget, Carve-Out, or otherwise shall be construed as a waiver of such rights.

f.      For the avoidance of doubt, the Carve-Out Reserves shall include, apply to, and be available for fees and expenses (including professional fees incurred and to be deposited on a weekly basis into the Professional Fee Escrow Account before a Carve-Out Trigger Notice) incurred in connection with the investigation or pursuit (the "Independent Investigation") of any claims or causes of action within the mandate of Alan J. Carr as the sole disinterested independent member of the special committee of the board of directors of BES (the "Independent Director"), in each

case solely by the Debtors acting at the direction of the Independent Director. Notwithstanding anything to the contrary herein, the Independent Director's advisors shall not be paid with any funds from the Prepetition ABL Collateral or the First Priority ABL Adequate Protection Collateral.

g.    <u>No Direct Obligation to Pay Allowed Professional Fees</u>. None of the DIP Secured Parties, Prepetition Secured Parties or the Prepetition Second Lien Secured Party shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties, Prepetition Secured Parties or the Prepetition Second Lien Secured Party, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

h.    <u>Payment of Carve-Out On or After the Termination Declaration Date</u>. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

35.    *DIP and Other Expenses; Procedures for Payment of DIP Agents' and Prepetition Secured Parties' Professional Fees and Expenses*. Payment of postpetition fees and expenses by the Debtors to the professionals retained by the DIP Agent, the Prepetition ABL Agent, the Prepetition Secured Notes Trustee, the Ad Hoc Group, or Ascribe shall not be subject to allowance by the Court, but shall be subject to compliance with the procedures set forth in this paragraph 35. Starting with the first full calendar week following the Petition Date, each such professional shall deliver to the Debtors, the DIP Agent and the Prepetition ABL Agent, a statement setting forth a good-faith estimate of the amount of unpaid fees and expenses incurred during the preceding week by such professional (through Saturday of such week) along with a good faith estimate of the cumulative total amount of unreimbursed fees and expenses. The Debtors shall set aside and reserve cash in an amount that shall at all times be sufficient to pay such fees and expenses in full. Any time that a professional for the DIP Agent or any Prepetition Agent seeks payment of postpetition fees and expenses from the Debtors, such professional shall provide copies of invoices

for such fees and expenses to counsel for the Debtors, the DIP Agent, the Prepetition ABL Agent, the Ad Hoc Group, Ascribe, a Creditors' Committee, and the office of the United States Trustee (the "U.S. Trustee"). The invoices for such fees and expenses shall not be required to comply with any U.S. Trustee guidelines related to the payment of fees and expenses of retained estate professionals, may be in summary form only, and shall not be subject to application or allowance by the Court. Any objections raised by the Debtors, the U.S. Trustee, the DIP Agent, the Prepetition ABL Agent , the Ad Hoc Group, Ascribe (subject to the Prepetition Intercreditor Agreements), or the Creditors' Committee with respect to such invoices within ten (10) days of receipt thereof (the "Invoice Review Period") will be resolved by the Court (absent prior consensual resolution thereof).  Pending such resolution, the undisputed portion of any such invoice shall be paid by the Debtors within three (3) days of the expiration of the Invoice Review Period. Except as otherwise ordered by the Court in the event an objection is timely filed, such fees and expenses shall not be subject to any setoff, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

36.     *Break Up Fees for Stalking Horse Bidders.*  Notwithstanding anything to the contrary set forth in this Interim Order, the DIP Superpriority Claim and the Prepetition Superpriority Adequate Protection Claims shall be subject and subordinate to any break-up fee ("Break-Up Fee") payable to a stalking horse bidder (each, a "Stalking Horse Bidder" and together, the "Stalking Horse Bidders") pursuant to an order of this Court authorizing the Debtors' entry into an asset purchase agreement with the applicable Stalking Horse Bidder *provided that* (a) any such Break-Up Fee shall be payable solely from the proceeds of a superior transaction in respect of the assets subject to such approved asset purchase agreement, and (b) the subordination of the DIP Superpriority Claim and Prepetition Adequate Protection Superpriority Claims shall be

limited to the proceeds of a superior transaction in respect of the assets subject to such approved asset purchase agreement.

37. *Modification of Automatic Stay*. The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Secured Parties or Prepetition Secured Parties may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order; (d) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, any payments made in accordance with the terms of this Interim Order; and (e) permit the DIP Secured Parties and Prepetition Secured Parties, subject to the terms of this Interim Order, to exercise all rights and remedies provided for hereunder; provided that, during the Remedies Notice Period, unless otherwise ordered by the Court, the automatic stay under section 362 of the Bankruptcy Code shall remain in effect.

38. *Limitation on Charging Expenses Against Collateral*. Except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral), solely with respect of the DIP Lenders or Prepetition Secured Notes Collateral solely with respect of the Prepetition Secured Notes Secured Parties, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the

prior written consent of the DIP Agent or Prepetition Secured Notes Trustee, as applicable.  No such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, the DIP Secured Parties, the Prepetition Secured Notes Trustee, or the Prepetition Secured Notes Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agent, the DIP Secured Parties, the Prepetition Secured Notes Trustee, or the Prepetition Secured Notes Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.  The foregoing waiver shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order.

39.     *Charging Expenses Against Prepetition ABL Collateral*.  The Prepetition ABL Agent and Prepetition Second Lien Secured Party reserve the right to request, upon entry of the Final Order or otherwise, that no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against (i) the Prepetition ABL Secured Parties, the Prepetition ABL Obligations, the Prepetition ABL Collateral (including Cash Collateral), (ii) the Prepetition Second Lien Secured Party, the Prepetition Second Lien Note Obligations, the Prepetition Second Lien Collateral, or (iii) the Adequate Protection Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Prepetition ABL Agent or the Prepetition Second Lien Secured Party, as applicable.  Nothing contained in this Interim Order shall be deemed a consent by the Prepetition ABL Agent or the Prepetition Second Lien Secured Party to any charge, lien, assessment, or claim against the Prepetition ABL Collateral, Prepetition Second Lien Collateral, or the Adequate Protection Collateral, or otherwise, and no action, inaction or acquiescence by the Prepetition ABL

Agent or the Prepetition Second Lien Secured Party shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the Prepetition ABL Secured Parties or the Prepetition Second Lien Secured Party, the Prepetition ABL Obligations, the Prepetition ABL Collateral, the Prepetition Second Lien Note Obligations, the Prepetition Second Lien Collateral, or the Adequate Protection Collateral.  The Debtors reserve the right to object to any such requests for a waiver.

40.   *Section 552(b) of the Bankruptcy Code.*

a.   Without prejudice to any provisions of a Final Order with respect to costs or expenses incurred following the entry of such Final Order, the Prepetition Secured Notes Secured Parties and the Prepetition Superpriority Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the Prepetition Secured Notes Secured Parties and the Prepetition Superpriority Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Secured Notes Collateral; provided that the foregoing shall be without prejudice to any provisions of the Final Order with respect any such proceeds generated.

b.   Except as set forth in paragraph 40(a), subject to entry of a Final Order with respect to costs or expenses incurred following the entry of such Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the such Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of the Prepetition ABL Collateral, the Prepetition Second Lien Collateral, the Prepetition Superpriority Collateral, or the Additional Prepetition Secured Note Collateral.

41.   *Payments Free and Clear.* Any and all proceeds remitted to the DIP Agent or any Prepetition Agent or other party pursuant to the terms of this Interim Order or any subsequent order of this Court shall be irrevocable (subject to paragraph 34 of this Interim Order), received free and clear of any claim, charge, assessment, or other liability, including, without limitation, but subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, the "equities of the case" exception of section 552(b) of the Bankruptcy Code.

42.     *ABL Segregated Cash Collateral Account.* Notwithstanding anything to the contrary contained herein, nothing in this Interim Order shall constitute approval or authorization for the Debtors' use of any funds held in that certain segregated Cash Collateral account, BofA Account No. (x6131), established with and pledged to the Prepetition ABL Agent, which has a balance of approximately $9 million as of the Petition Date (the "ABL Segregated Cash Collateral Account"). Furthermore, notwithstanding anything to the contrary herein, the ABL Segregated Cash Collateral Account shall not be subject to the DIP Liens, the DIP Superpriority Claims, the Carve-Out, or any Break-Up Fee.

43.     *Credit Bidding.* The DIP Lenders' and Prepetition Secured Parties' rights to credit bid are expressly reserved and preserved by this Interim Order under and pursuant to applicable bankruptcy and non-bankruptcy law.

44.     *Recharacterization.* All parties reserve their rights to argue that, to the extent that any cash payment of interest, fees, and expenses as adequate protection to the Prepetition Secured Parties is not allowed under section 506(b) of the Bankruptcy Code and not allowed on any other basis (including, without limitation, (i) on account of the Debtors' use of Prepetition Collateral and (ii) that there has been Diminution in Value, as applicable), such payments should be recharacterized and applied as payments of principal toward the applicable secured claim owed under the applicable Prepetition Document.

45.     *Reservation of Rights regarding Allocation.* Notwithstanding anything to the contrary in this Interim Order, the entry of this Interim Order shall not impact any Prepetition Secured Party's rights with respect to contesting the distribution and allocation of the proceeds from the Prepetition Collateral.  Further, the Additional Prepetition Secured Note Secured Party reserves all rights to assert that, following repayment of the DIP Superpriority Claim and the

Carve-Out, all proceeds of the Additional Prepetition Secured Note Collateral must be used first to satisfy the Additional Prepetition Secured Note Obligations.

46.     *Debtors' Reservation of Rights*. Notwithstanding anything to the contrary in this Interim Order, the entry of this Interim Order and the grant of adequate protection to the Prepetition Secured Parties and the Prepetition Agents pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to seek authority (at any time) to use Cash Collateral and the Prepetition Collateral without the consent of the Prepetition Secured Parties, and the Prepetition Secured Parties reserve all of their respective rights with respect to contesting any such motion or request by the Debtors or any other person.

47.     *Unsold Prepetition ABL Collateral and Prepetition Second Lien Collateral.* Other than with respect to the Debtors' A/R and inventory assets that are sold at auction to purchasers that intend to continue certain operations of the Debtors as a going concern, subject to their fiduciary duties, the Debtors intend, with respect to any A/R (whether billed or unbilled) or inventory that is not the subject of such a going concern sale, to continue to seek to maximize value for the benefit of the Prepetition ABL Secured Parties and the Prepetition Second Lien Secured Party, including to administer and collect upon the value of such unsold Prepetition ABL Collateral and Prepetition Second Lien Collateral in the ordinary course of business.  All parties rights with respect to the foregoing are fully preserved.

48.     *No Marshaling*. Except as provided in this Interim Order, including with respect to the Prepetition Second Lien Collateral and as provided in paragraph 24 of this Interim Order, and subject only to and effective upon entry of the Final Order, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and proceeds

of the DIP Collateral and Prepetition Collateral shall be received and applied pursuant to this Interim Order, the DIP Loan Documents and the Prepetition Loan Documents notwithstanding any other agreement or provision to the contrary. Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or Prepetition Collateral after a Termination Event.

49.    *Release*. Subject to paragraph 32 of this Order, the release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph shall be deemed effective upon entry of the Final Order and subject only to the challenge rights set forth in paragraph 32 above.  The Debtors forever and irrevocably: (a) release, discharge, and acquit the Prepetition ABL Secured Parties and the Prepetition Superpriority Secured Parties (only in such capacity) and their affiliates and each of their and their affiliates' respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors in interest (each, a "Prepetition Releasee") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type arising prior to the Petition Date, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between any of the Prepetition ABL Secured Parties and the Debtors (or the Prepetition Superpriority Secured Parties (only in such capacity) and the Debtors), and their affiliates including any equitable subordination claims or defenses, with respect to or relating to the Prepetition ABL Obligations, the Prepetition ABL Liens, the Prepetition ABL Loan Documents, the Prepetition Superpriority Obligations, the Prepetition Superpriority Liens, the Prepetition Superpriority Loan Documents, the Debtors' attempts to restructure the Prepetition

ABL Obligations, or the Prepetition Superpriority Obligations, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition ABL Secured Parties or the Prepetition Superpriority Secured Parties (only in such capacity) in respect of events that occurred on or prior to the date hereof; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Prepetition ABL Obligations, the Prepetition ABL Liens the Prepetition Superpriority Obligations, and the Prepetition Superpriority Liens; provided, however, that notwithstanding the foregoing or any other provision in this Interim Order, the Debtors do not release, discharge, and acquit any affiliates, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors in interest from any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations.  Nothing in this Interim Order shall release any claims against a Prepetition Releasee that a court of competent jurisdiction determines, pursuant to a final, non-appealable order, results primarily from the actual fraud, gross negligence, or willful misconduct of such Prepetition Releasee.

50.     *Prohibition on Granting of Additional Liens and Interests, Use of Prepetition Collateral.*   Except as otherwise provided in this Interim Order with respect to the DIP Liens, no liens, claims, interests or priority status, other than the Carve-Out and the Permitted Prior Liens and the liens, claims, interests or priority status granted hereunder, having a lien or administrative priority, as applicable, superior to or *pari passu* with that of the Adequate Protection Superpriority Claims, the Prepetition Liens, or the Adequate Protection Liens shall be granted while any portion

of the Prepetition Obligations remain outstanding, or any commitment under the Prepetition Documents remains in effect, without the prior written consent of the Prepetition Agents. Nothing in this Interim Order shall authorize, other than in the ordinary course of the Debtors' business, the sale, transfer, lease, encumbrance, or other disposition of any assets that constitute Prepetition Collateral of the Debtors or their estates without the prior written consent of the applicable Prepetition Agent (and no such consent or direction shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured Party or any order of this Court).

51.   *Binding Effect of Interim Order*. Subject to paragraph 32, immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of the Debtors, any Creditors' Committee, and each of their respective successors and assigns (including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed in a case for any Debtor under any chapter of the Bankruptcy Code) and shall inure to the benefit of the Debtors, the DIP Secured Parties, Prepetition Secured Parties and their respective successors and assigns.

52.   *Survival*. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any chapter 11 plan in any of these Chapter 11 Cases; (b) converting any of these cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of these cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing any of the cases or any Successor Case. Notwithstanding the entry of any such order, the terms and provisions of this Interim Order, including the claims, liens, security

interests and other protections granted to the DIP Secured Parties and Prepetition Secured Parties pursuant to this Interim Order, shall continue in these cases, in any Successor Case, or following dismissal of these cases or any Successor Case, and shall maintain their priority as provided by this Interim Order and not be modified, altered or impaired in any way, whether by act or omission, until all of the Prepetition Obligations and Adequate Protection Obligations have been Paid in Full, notwithstanding the occurrence of a Termination Event or any earlier termination of the Debtors' authorization to use the Prepetition Collateral, including Cash Collateral.

53.     *Limitation of Liability*. In determining to provide the DIP Loans and permit the use of Cash Collateral, making and administering the loans and financial accommodations extended under the DIP Loan Documents and the Prepetition Documents, extending other financial accommodations to the Debtors under this Interim Order, the DIP Loan Documents and the Prepetition Documents, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Loan Documents or the Prepetition Documents, as applicable, the DIP Secured Parties or Prepetition Secured Parties (in their capacity as such, other than Ascribe or any Affiliate of Ascribe), as applicable, or any successor of any of the foregoing shall not (a) be deemed to be in "control" of the operations of the Debtors or any of their affiliates; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors or any of their affiliates (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Loan Documents or the Prepetition Documents or any other documents related thereto shall in any way be construed or interpreted to impose or allow the

imposition upon the DIP Secured Parties or Prepetition Secured Parties, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

54.     *506(b)*. If any Prepetition Secured Party is oversecured, such party shall be entitled to receive postpetition interest, reasonable fees, costs, or charges in accordance with section 506(b) of the Bankruptcy Code accrued from the Petition Date through the date of repayment.  Except as expressly provided herein, any such interest shall be paid in kind.  For the avoidance of doubt, all parties' rights to contest whether any Prepetition Secured Party is oversecured are fully preserved.

55.     *Allocation of Proceeds of Asset Sales*.  Notwithstanding anything to the contrary in this Interim Order, all parties' rights as to allocation of the proceeds of any sale of the Debtors' assets are fully reserved.

56.     *No Waiver*. Other than as provided in this Interim Order, nothing in this Interim Order shall be construed in any way as a waiver or relinquishment of any rights that the Debtors, the DIP Secured Parties or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

57.     *Exculpation*.   Nothing in this Interim Order, the DIP Loan Documents, the Prepetition Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.   In addition, (a) the DIP Secured Parties (in such capacity) shall not, in any way or manner, be liable or responsible for: (i) the safekeeping of the

DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral and Prepetition Collateral shall be borne by the Debtors; provided that this paragraph 57 shall apply to Ascribe and any of its agents, affiliates, employees, subsidiaries, directors, officers, representatives, attorneys or advisors solely in Ascribe's capacity as a creditor.

58.     *Effectiveness*. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable, *nunc pro tunc* to the Petition Date, immediately upon entry hereof. Notwithstanding any Bankruptcy Rule, any Bankruptcy Local Rule, any Federal Rule of Civil Procedure, or other applicable law, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

59.     *Insurance*.  To the extent that any of the Prepetition Agents is listed as loss payee under the DIP Loan Parties' insurance policies, the DIP Agent is also deemed to be the loss payee under the insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the payment in full of the DIP Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted, or (ii) Prepetition ABL Collateral or First Priority ABL Adequate Protection Collateral), and to the payment of the applicable Prepetition Obligations (consistent with the Prepetition Intercreditor Agreements and the lien priorities described Exhibit B).

60.     *Proofs of Claim*. The Prepetition Agents and the other Prepetition Secured Parties shall not be required to file proofs of claim in any of the Debtors' Chapter 11 Cases or a Successor

Case for any claim allowed herein. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Agents and the other Prepetition Secured Parties with respect to the Prepetition Obligations upon approval of this Interim Order, and the Prepetition Agents and the other Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim in the Debtors' Chapter 11 Cases or any Successor Case. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Debtors' Chapter 11 Cases or a Successor Case to the contrary, the Prepetition Agents and the other Prepetition Secured Parties are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or a Successor Case for any claim allowed herein.

61.    *No Third Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any party, creditor, equity holder, other entity or any direct, indirect or incidental beneficiary other than (a) the Prepetition Secured Parties and their respective representatives, (b) the Debtors, and (c) the respective successors and assigns of each of the foregoing.

62.    *Headings*. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

63.    *Payments Held in Trust.*  Except as expressly permitted in this Interim Order or the DIP Loan Documents, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents, and termination of

the Commitments in accordance with the DIP Loan Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over the proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents and this Interim Order.  For purposes of this paragraph, any reference to the DIP Collateral shall not apply to any DIP Collateral that is also Prepetition ABL Collateral or First Priority ABL Adequate Protection Collateral.

64.     *Rights Reserved.* Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the Prepetition Secured Parties' rights to pursue any and all rights and remedies under the Bankruptcy Code, the Prepetition Documents or any other applicable agreement or law, or seek any other or supplemental relief in respect of the Debtors, including the right to seek new, different or additional adequate protection, as applicable, or the Debtors' or any other party in interest's rights to oppose such relief, or (b) any of the rights and remedies of the Debtors, the Prepetition Secured Parties, or any other party in interest under the Prepetition Documents or other applicable agreement, the Bankruptcy Code or applicable nonbankruptcy law.

65.     *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

66.     *Necessary Action*. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

67.     *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this Court shall retain jurisdiction over all matters pertaining

to the implementation, interpretation and enforcement of this Interim Order, including following confirmation and consummation of any chapter 11 plan for any one or more of the Debtors.

68.     *Final Hearing*. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on **September 14, 2021**, at 3:00 p.m., prevailing Central Time.  The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice.  The Motion and this Interim Order are available at the Debtors' claims and noticing agent's website: https://cases.primeclerk.com/basicenergy.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon the Notice Parties and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Central Time), on September 7, 2021.


**Signed:  August 17, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT A

## Form of DIP Loan Agreement

**DEBTOR IN POSSESSION SECURED**
**MULTI-DRAW TERM PROMISSORY NOTE**

$35,000,000                                                                                  New York, New York
                                                                                              August [18], 2021

On August [18], 2021 (the "<u>Petition Date</u>"), BASIC ENERGY SERVICES, INC., a Delaware corporation (the "<u>Borrower</u>") and certain of its Subsidiaries commenced Chapter 11 Cases, which cases are being jointly administered under Chapter 11 Case No. [___] (each a "<u>Chapter 11 Case</u>" and collectively, the "<u>Chapter 11 Cases</u>") by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of Texas Houston Division (the "<u>Bankruptcy Court</u>").  The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that the lenders (the "<u>DIP Lenders</u>") from time to time party to this Debtor in Possession Secured Multi-Draw Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "<u>Note</u>") make Term Loans (as defined herein) evidenced by this Note on the dates and subject to the terms and conditions of this Note.  Certain Subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "<u>Guarantors</u>"), and are simultaneously executing Guarantees in favor of Guggenheim Credit Services, LLC, as agent (in such capacity, the "<u>Agent</u>") for the DIP Lenders.  The Borrower intends to utilize the Term Loans, subject to the Financing Orders, to (i) repay in full the Super Priority Credit Agreement (as defined herein), (ii) fund general corporate needs, including without limitation working capital and other needs, (iii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals, and (iv) to provide for adequate protection for certain Prepetition Secured Parties (as defined herein), in each case in accordance with the Budget (as defined herein), subject to any Permitted Variance (as defined herein).  Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

1.      <u>Term Loans</u>.

(a)      Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with Term Loans on the Closing Date in the principal amount of up to $35,000,000 (the "<u>Term Loans</u>").  Subject to the terms and conditions hereof, to the extent the Interim Order does not permit the full amount of the Term Loans to be incurred by the Borrower on the Closing Date, the DIP Lenders shall advance any remainder amount of the Term Loans that are authorized in the Final Order in one draw on the date or during the period permitted by the Final Order (any such Term Loans, the "<u>Final Order Term Loans</u>").  The Final Order Term Loans shall be Term Loans for all purposes of this Note.  The Borrower may request the Term Loans pursuant to written notice (which may be by email) (a "<u>Borrowing Request</u>") delivered to the Agent no later than 3:00 p.m. one (1) Business Day prior to the proposed borrowing date of the Term Loans (or such shorter period as the Agent may agree) or, with respect to any Final Order Term Loans, three (3) Business Days prior to the proposed borrowing day of the Final Order Term Loans (or such shorter period as the Agent may agree).  The Borrowing Request shall be in a form reasonably satisfactory to the Agent.  Each DIP Lender shall provide each Term Loan in an aggregate amount not to exceed its Commitment with respect to such Term Loan and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several.  Upon receipt of a Borrowing Request with respect to any Term Loan, subject to the satisfaction (or waiver) of the conditions hereof, each DIP Lender shall simultaneously and proportionately to its Pro Rata Share of its Commitment with respect to such Term Loan, make the proceeds of such Term Loan available to the Borrower or the Agent on the applicable date of funding of the Term Loan by transferring immediately available funds equal to such proceeds to the Escrow Account (or to the Agent, which will then transfer such proceeds to the Escrow Account); <u>provided</u> that on the Closing Date (x) up to $6,500,000 of the proceeds of the Term Loans will be transferred directly to the Borrower and (y) the portion of the proceeds of the Term Loans allocated to the repayment of the obligations outstanding

under the Super Priority Credit Agreement shall be remitted to the administrative agent under the Super Priority Credit Agreement in accordance with the Super Priority Credit Agreement Payoff Letter. The relevant Commitment of each DIP Lender shall be permanently reduced upon the making of the relevant Term Loan in an amount equal to such Term Loan advanced by such DIP Lender. The Borrower may request Withdrawals from the Escrow Account in accordance with Section 2 of this Note; provided that, until entry of the Final Order, the Borrower may not withdraw more than $27,000,000 from the Escrow Account. Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(b)     The aggregate principal amount of Terms Loans outstanding shall not exceed $35,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c)     The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine. The Agent may assume that each Person executing and/or delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d)     The Borrower shall utilize the proceeds of Term Loans, subject to the Financing Orders, to (i) repay in full the Super Priority Credit Agreement, (ii) fund general corporate needs, including without limitation working capital and other needs, (iii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals (including funding of the Carve-Out in accordance with the Financing Orders), and (iv) to provide for adequate protection for certain Prepetition Secured Parties, in each case in accordance with the Budget, subject to any Permitted Variance); provided, that, unless otherwise provided in the Budget, subject to any Permitted Variance, or approved by the Required Lenders, no portion of any Term Loans shall be used, directly or indirectly: (a) except as permitted by Section 15(d), to make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders or to finance or make any Restricted Payment, (b) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (c) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

(e)     The Borrower shall not transfer any amounts from the DIP Holding Account other than to the ABL Holding Account, and in no event shall any amounts transferred from the DIP Holding Account to the ABL Holding Account exceed, for any day or the immediately succeeding Business Day, the positive difference of (x) the amount of disbursements required to be paid on such day (the "Disbursement Amount") minus (y) the amount of funds in the ABL Holding Account on such day before giving effect to any such transfer. Any amounts transferred from the DIP Holding Account to the ABL Holding Account on any day shall be used to pay the Disbursement Amount for such day or the immediately succeeding Business Day).

(f)     If cash on deposit in the DIP Holding Account as of 5:00 p.m. on each Friday after the Closing Date exceeds Anticipated Net Disbursements for the week immediately following such Friday, then on or before the immediately following Monday, the Borrower shall transfer the amount of such excess from the DIP Holding Account to the Escrow Account, which amount shall be available for withdrawal subject to Section 2; provided that if the amount of such excess exceeds the remaining amount then held in the DIP Holding Account, the Borrower shall only be required to transfer the remaining amount then held in the DIP Holding Account.

2.     Certain Conditions to Making Term Loans and Withdrawals from the Escrow Account.

(a)     The effectiveness of this Note and the obligation of each DIP Lender to fund the Term Loans requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver) of each of the conditions precedent set forth in this clause (a):

(1)     the Borrower shall have paid any Obligations then payable hereunder (including the reasonable and documented out-of-pocket fees and expenses of counsel to the Agent) or under any other DIP Document;

(2)     the Loan Parties shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(3)     the Escrow Agreement shall be in full force and effect and each of the Escrow Account and the DIP Holding Account shall not be subject to any Liens or claims, except as permitted herein or by the Financing Order;

(4)     the Loan Parties shall have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to the Required Lenders with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(5)     the Loan Parties shall have delivered fully executed copies of all other DIP Documents, each in form and substance reasonably satisfactory to the Required Lenders;

(6)     any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(7)     (i) with respect to the Term Loan made on the Closing Date, (A) the Bankruptcy Court shall have entered the Interim Order; or (B) the Interim Order shall not have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent or (ii) with respect to the Final Order Term Loan, (A) the Bankruptcy Court shall have entered the Final Order; or (B) the Final Order shall have not been stayed, vacated, reversed, modified or amended without the Required Lenders' consent;

(8)     no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the Term Loans and the transactions contemplated herein;

(9)     after giving effect to the making of the Term Loans, the outstanding principal amount of all Term Loans would not exceed the Maximum Amount;

(10)     the Agent shall have received and approved the Budget in accordance with this Note and the Financing Orders; provided that if the Budgeted Professional Fee Amounts included in the Budget are not acceptable to the Required Lenders as of the Closing Date, then this clause (10) may be deemed satisfied for purposes of the Closing Date provided that (i) the Borrower shall consult with the Required Lenders regarding revised Budgeted Professional Fee Amounts and (ii) not later than fourteen (14) days after the effectiveness of this Note in accordance with the Financing Orders such revised Budgeted Professional Fee Amounts shall be acceptable to the Required Lenders;

WEIL:\98111924\8\22010.0009
#94861471v15

(11)     the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Required Lenders, authorizing the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget;

(12)     Borrower shall have delivered to Agent and DIP Lenders fully executed sale agreements, in form and substance and with purchasers satisfactory to the Required Lenders, with respect to the sale of the Designated Assets [for an aggregate purchase price attributable to the Collateral on which the Agent and DIP Lenders have the first lien of at least $60,000,000][1] (the "Designated Asset Sale Agreements");

(13)     the Loan Parties shall have delivered to the Agent a termination, release and payoff letter (the "Super Priority Credit Agreement Payoff Letter") with respect to the Super Priority Credit Agreement, duly executed by the administrative agent and collateral agent under the Super Priority Credit Agreement (the "Super Priority Agent"), together with forms of a termination of security interest in intellectual property for each assignment for security recorded in favor of the Super Priority Agent and UCC-3 termination statements for all UCC-1 financing statements filed in favor of the Super Priority Agent; and

(14)     all "first day" orders intended to be entered by the Bankruptcy Court at or immediately after the Debtors' "first day" hearing shall be in form and substance reasonably acceptable to the Required Lenders and shall have been entered by the Bankruptcy Court.

(b)     The Borrower shall not request a Withdrawal (and no Withdrawal will be permitted), if, in each case, as of the date thereof:

(1)     any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(2)     the Interim Order shall have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent;

(3)     after the entry of the Final Order, the Final Order shall have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent;

(4)     the Withdrawal Liquidity Condition shall not have been satisfied;

(5)     the proceeds of such Withdrawal shall not have been directed to be deposited in the DIP Holding Account;

(6)     any Default or Event of Default shall have occurred and be continuing or would result after giving effect to the advance of the Final Order Term Loans or any release of proceeds of the Term Loans from the Escrow Account; and

(7)     the Agent shall have not received from the Borrower at least two (2) Business Days (or such shorter period as the Required Lenders may agree) prior to the date of such

---

[1] NTD: To be confirmed.

WEIL:\98111924\8\22010.0009
#94861471v15

Withdrawal, a Withdrawal Notice and a calculation evidencing satisfaction of the Withdrawal Liquidity Condition, which calculation shall be in form satisfactory to the Required Lenders.

Upon receipt of the Withdrawal Notice and satisfaction of the conditions set forth in this Section 2, the Agent shall promptly direct the Escrow Agent to disburse funds on the funding date set forth in the applicable Withdrawal Notice immediately following such Withdrawal Notice. Notwithstanding the foregoing, if the Agent determines in its sole discretion that the Borrower has failed to satisfy the conditions precedent set forth in this Section 2 for a Withdrawal Notice, the Agent shall decline to fund such Withdrawal and communicate the same to the Escrow Agent.

The request and acceptance in the Escrow Account by the Borrower of the proceeds of the Term Loans and the request of a Withdrawal shall, in each case, be deemed to constitute, as of the date of such request, acceptance or incurrence, a representation and warranty by the Borrower that (A) with respect to the request and acceptance in the Escrow Account by the Borrower of the proceeds of the Term Loans, the conditions in Section 2(a) have been satisfied and (B) with respect to the request of a Withdrawal, the conditions in Section 2(a) and 2(b) have been satisfied.

3. <u>Payment of Principal</u>. FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the benefit of the DIP Lenders, the lesser of (x) $35,000,000 and (y) the unpaid principal amount of all Term Loans, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent required by this Note.

4. <u>Payment of Interest</u>.

(a) Subject to the terms of this Note, the Term Loans or any portion thereof shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loans until repaid, at a rate per annum equal to LIBOR Rate <u>plus</u> 9.00%.

(b) Interest on the Term Loans shall be payable monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month in which the applicable Term Loans is made. If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c) All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable (including the first day and last day). Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d) So long as an Event of Default shall have occurred and be continuing, and at the election of the Required Lenders, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "<u>Default Rate</u>"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived (notwithstanding when the election by the Required Lenders was made) and shall be payable upon demand.

(e) It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document

or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower).  If at any time and from time to time (x) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)     If, after the date hereof, the DIP Lenders determine that (1) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (2) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

5.     <u>Payments</u>.  All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower.  Each payment made hereunder shall be credited first to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.  The Borrower shall make each payment required under this Note prior to 2:00 p.m. New York City time on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the sole discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

6.     <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders, the Borrower shall have the right at any time and from time to time to prepay the Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent by 1:00 p.m. New York City time (or such shorter time as the Required Lenders may agree); <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds or the consummation of certain transactions which are not received or consummated.

Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment. Any prepayment made pursuant to this Section 6 shall be applied (i) first to the Term Loans on a Pro Rata Basis until paid in full and (ii) second, to any remaining Obligations as the Required Lenders shall determine in their sole discretion.

7.    <u>Mandatory Prepayments</u>. In each case, subject to the terms and conditions of the Financing Orders and the Budget, upon not less than one (1) Business Day prior written notice by the Borrower to the Agent by 1:00 p.m. New York City time:

(a)    No later than one (1) Business Day upon receipt by any Loan Party of cash proceeds of any asset disposition in excess of $250,000 in the aggregate with all other asset dispositions, unless the Required Lenders agree otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (1) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), (2) taxes reasonably expected to be payable by the Borrower in connection with such sale, and (3) with respect to proceeds from the disposition of assets securing obligations owed to a third party, which Lien is senior to the Liens securing the Obligations under this Note, the amount of such proceeds required by an order of the Bankruptcy Court to repay such third party obligations; <u>provided</u> that, in no event shall the proceeds of any Prepetition ABL Collateral be required to prepay the Term Loans until the Prepetition ABL Credit Facility is paid in full.

(b)    No later than one (1) Business Day upon receipt by any Loan Party of cash proceeds of any debt securities or other indebtedness not permitted under this Note, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

(c)    No later than one (1) Business Day upon receipt by any Loan Party of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of (x) any expenses (including reasonable broker's fees or commissions and legal fees) incurred in connection with such Extraordinary Receipts, (y) any taxes paid or reasonably estimated to be payable by the Loan Parties in connection therewith and (z) with respect to Extraordinary Receipts from assets securing obligations owed to a third party, which Lien is senior to the Liens securing the Obligations under this Note, the amount of such Extraordinary Receipts required by an order of the Bankruptcy Court to repay such third party obligations; <u>provided</u> further, in no event shall the proceeds of any Prepetition ABL Collateral be required to prepay the Term Loans until the Prepetition ABL Credit Facility is paid in full.

(d)    Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of this Note or the other DIP Documents.

(e)    Any prepayment made pursuant to this Section 7 shall be applied (i) first to the Term Loans on a Pro Rata Basis until paid in full, (ii) second, to any remaining Obligations as the Required Lenders shall determine in their sole discretion and (iii) third, any excess remaining to the Borrower.

8.    <u>Fees</u>. Borrower shall pay to the Agent the following fees:

(a)    <u>Upfront Fee</u>. The Borrower shall pay to the Agent, for the account of the DIP Lenders, an upfront fee in an aggregate amount equal to 5.0% of the aggregate principal amount of the Term Loans, which fee shall be fully earned upon the entry of the Interim Order and non-refundable when paid and which shall be capitalized upon the funding of each Term Loan when funded and treated as principal of the Term Loans for all purposes.

(b)     Administration Fee.  On or prior to the Closing Date, the Borrower shall pay to the Agent an administration fee equal to $175,000, which shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(c)     Exit Fee.  On the earlier of (1) the date that all the Obligations under this Note are paid in full in cash and (2) the Maturity Date, the Borrower shall pay to the Agent for the benefit and account of the DIP Lenders, an exit fee equal to $350,000, which shall be fully earned upon the entry of the Final Order and non-refundable when paid.

9.     Indemnity.  The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited to the legal fees and reasonable and documented out-of-pocket costs and expenses of one legal counsel (and one local counsel in each relevant jurisdiction)) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Loan Parties on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence, bad faith or willful misconduct or material breach of the DIP Documents as determined in a final nonappealable judgment by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.     Adjustments for Withholding, Capital Adequacy Etc.  All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any

governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Agent to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

11.   Priority of Obligations and DIP Lenders' Liens.

(a)   To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders (including with respect to the Carve-Out), having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and, except as set forth in the Financing Orders (including with

respect to the Carve-Out), shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, and (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and subject to clause (b) below, Liens on, and security interests in, the Collateral; provided that no Liens shall be permitted on the Escrow Agreement or either of the Escrow Account or DIP Holding Account or amounts held therein or proceeds thereof other than the lien of the Agent and the Carve-Out.  The security interests and Liens granted to the Agent hereunder pursuant to Sections 364(c)(2) shall not be (i) subject to any Lien or security interest which is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders, subordinated to or made pari passu with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

(b)     The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders.

(c)     Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the Carve-Out and Permitted Prior Liens (provided that the Escrow Agreement or either of the Escrow Account or DIP Holding Account or amounts held therein or proceeds thereof shall not be subject to Permitted Prior Liens), and (ii) no Person entitled to the Carve Out shall be entitled to sell, or otherwise dispose, or seek or object to the sale or other disposition of, such Collateral, subject to any such Person's fiduciary obligations.

(d)     Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331,361, 362, 363, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

12.     Further Assurances.  The Borrower agrees that it shall, at the Borrower's expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duly executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.     [Reserved].

14.     Affirmative Covenants.

The Borrower agrees that until the Commitments shall have expired or been terminated and the Obligations payable under the DIP Documents shall have been paid in full:

(a)     Upon reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants. The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business

-10-

hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law, subject to confidentiality restrictions or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)      (i) The Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect, except as executed by, or otherwise prohibited by, the provisions of the Bankruptcy Code or as a result of the Chapter 11 Cases and (ii) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget, the Bid Procedures Motion or the Financing Orders.

(c)      The Borrower and its Subsidiaries will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary or (2) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)      (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget, the Bid Procedures Motion or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)      The Borrower and its Subsidiaries will:

(1)      Maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A, unless otherwise approved by the Required Lenders in their discretion) satisfactory to the Required Lenders.  All proceeds under each policy covering Collateral shall be payable to the Agent as a lender loss payee/mortgagee, other than proceeds required by an order of the Bankruptcy Court to be applied to the repayment of debt secured by a Lien on the related assets that is senior to the Liens securing the Obligations under this Note; provided that, in no event shall the proceeds in respect of any Prepetition ABL Collateral be required to prepay the Term Loans until the Prepetition ABL Credit Facility is paid in full.  From time to time upon request, the Borrower shall deliver to the Agent the originals or certified copies of its insurance policies.  Unless the Required Lenders shall agree otherwise and subject to Section 14(k), each policy shall include satisfactory endorsements that (i) provide for not less than 30 days prior notice to the Agent of termination, lapse or cancellation of such insurance, (ii) with respect to insurance covering Collateral, name the Agent as loss payee/mortgagee and additional insured, and (iii) specify that the interest of the Agent shall not be impaired or invalidated by any act or negligence of any Loan Party or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy.  If the Borrower fails to provide and pay for any insurance, the Agent may, at its option, but shall not be required to, procure the insurance and charge the Borrower therefor.  The Borrower agrees to deliver to the Agent, promptly as rendered, copies of all reports made to insurance companies.  While no Event of Default exists, the Loan Parties may settle, adjust or compromise any insurance claim, as

-11-

long as the proceeds are delivered to the Agent. If an Event of Default exists, only the Agent shall be authorized to settle, adjust and compromise such claims.

(2)     In addition to the insurance required under clause (e)(1) with respect to Collateral, maintain insurance with insurers (with a Best's Financial Strength Rating of at least A, unless otherwise approved by the Required Lenders in their sole discretion) satisfactory to the Agent, with respect to the properties and business of the Loan Parties, of such type (including product liability, workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are at the time of placing such insurance customary for companies similarly situated and which are available at commercially reasonable rates.

(f)     The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget, the Bid Procedures Motion or the Financing Orders or as permitted hereunder.

(g)     The Borrower and its Subsidiaries shall at all times provide reasonable access for, and reasonable cooperation with, any financial advisors to the Agent.

(h)     The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur:

(1)     no later than 2 days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)     no later than 3 days following the Petition Date, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all of the Designated Assets (the "Bid Procedures Motion"), in form and substance reasonably acceptable to the Required Lenders;

(3)     no later than 35 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(4)     no later than 21 days after the Petition Date the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Required Lenders, granting the relief requested in the Bid Procedures Motion (including, if appropriate, approval of stalking horse and related protections);

(5)     no later than 55 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all of the Designated Assets pursuant to one or a series of related or unrelated sale transactions; and

(6)     no later than 65 days after the Petition Date the sale of all of the Designated Assets pursuant to one or a series of related or unrelated sale transactions shall have been consummated in full.

(i)     The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Annex A attached hereto no later than the times specified therein (or such later time as the Required Lenders may agree). No less than once per week, the Borrower shall make its senior management and its advisors available at reasonable times and upon reasonable notice to the Agent and DIP Lenders to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

-12-

(j)        The Borrower and its Subsidiaries shall cause all (i) proposed material "second day" orders to be reasonably satisfactory to the Required Lenders and (ii) pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, to be reasonably satisfactory in form and substance to the Required Lenders.

(k)        Within thirty (30) days after the Closing Date (or such longer period as the Required Lenders may agree), the Borrower shall deliver or cause to be delivered to the Agent certificates of insurance and related endorsements that satisfy the requirements of Section 14(e).

(l)        Within fourteen (14) days after the Closing Date (or such longer period as the Required Lenders may agree), the Borrower shall deliver or cause to be delivered to the Agent an updated franchise tax account status with respect to Indigo Injection #3, LLC reflecting active status.

15.    Negative Covenants.

So long as any DIP Lender shall have any Commitment hereunder, any Term Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall not, nor shall it permit any Subsidiary to, without the consent of the Required Lenders:

(a)        Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Required Lenders (which consent shall not be unreasonably withheld), other than, in each case, any such action approved by an order of the Bankruptcy Court  in form and substance satisfactory to the Required Lenders.

(b)        Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)        Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(d)        Neither the Borrower nor any of its Subsidiaries shall make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower.

(e)        Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business; provided that, until satisfaction of the requirement of Section 14(l), no Debtor shall assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations (including any Indebtedness) of Indigo Injection #3, LLC.

(f)        Neither the Borrower nor any of its Subsidiaries will convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sale of inventory in the ordinary course of business, (ii) the sale or disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the Required Lenders, (iv) the consummation of the Ongoing Sales and (v) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders, including the sale of the Designated Assets; provided that, until satisfaction of the requirement of Section 14(l), no Debtor shall convey,

-13-

sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets to Indigo Injection #3, LLC.

(g)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (i) the Financing Orders or (ii) the Prepetition Obligations.  Except for (A) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, and (B) payments permitted by the Financing Orders and the Budget, subject to Permitted Variance, neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Required Lenders in writing.

(h)     Neither the Borrower nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise; provided that, until satisfaction of the requirement of Section 14(l), no investment, loan or advance shall be made to Indigo Injection #3, LLC.

(i)     Neither the Borrower nor any of its Subsidiaries shall change its fiscal year.

(j)     For each most recently ended Variance Testing Period, the Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period, and (y) the aggregate amount of Actual Operating Disbursement Amounts and Actual Professional Fee Amounts to exceed the aggregate amount of Budgeted Operating Disbursement Amounts and Budgeted Professional Fee Amounts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance.

(k)     Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, use the Term Loans or the proceeds of the Term Loans, or lend, contribute or otherwise make available the Term Loans or the proceeds of the Term Loans to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as DIP Lender, Agent or otherwise) of Sanctions.

16.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     The Borrower (i) shall fail to make any payment of principal of, or interest on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment.

(b)     Any Loan Party shall fail to comply with any of the provisions of Sections 1(d), 1(e),1(f), 14(f), 14(g), 14(h), 14(i) and 15 of this Note.

(c)     Any Loan Party shall fail to comply with any of other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the

-14-

earlier of the date a senior officer or any Loan Party becomes aware of such failure and the date written notice of such default shall have been given by the Agent to such Loan Party.

(d)     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any agreement, document or instrument to which any Loan Party is a party (other than agreements, documents and instruments evidencing Prepetition Obligations) that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $50,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(e)     Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

(f)     Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note, (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to repay in full all of the Obligations under this Note or (iii) to authorize any other action or actions materially adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral .

(g)     The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under this Note on or before the effective date of such plan or plans.

(h)     The filing of any motion by the Borrower or any Loan Party against the DIP Lenders seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(i)     [Reserved].

(j)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

(k)     The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

(l)     The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

(m)     The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders), unless (i) consented to by the Required Lenders or (ii) the Obligations are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

-15-

(n)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $100,000.

(o)     The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Required Lenders prior written consent.

(p)     There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases, in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

(q)     Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

(r)     Termination of the use of Cash Collateral pursuant to the terms of the Financing Orders.

(s)     Assets of any Loan Party with a fair market value of $200,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

(t)     A breach by any Loan Party of the terms of the Financing Orders.

(u)     The failure of the Loan Parties to maintain, at any time, Liquidity in an amount in excess of $500,000.

(v)     Any Designated Asset Sale Agreement or any provision thereof (i) shall fail to be in full force and effect or binding upon and enforceable against any Loan Party (subject to entry of a sale order applicable to such Designated Asset Sale Agreement) or any other party thereto in accordance with its terms, (ii) has been amended or modified without the consent of the Required Lenders, or (iii) has been breached due to the action or inaction of any Loan Party or any other party thereto.  Any party to a Designated Asset Sale Agreement shall have notified any other party to a Designated Sale Agreement of its intent to terminate such Designated Sale Agreement or any other event shall occur, or shall fail to occur, which, subject to a notice requirement or passage of time, would result in the termination of any Designated Asset Sale Agreement.

(w)     Entry of an order authorizing and/or directing the reclamation of goods pursuant to section 546(c) of the Bankruptcy Code in excess of $50,000.

(x)     Receipt by the Borrower of notice from the Required Lenders that no revised Budgeted Professional Fee Amounts proposed by the Borrower within fourteen days (14) after the effectiveness of this Note in accordance with the Financing Orders are acceptable to the Required Lenders.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon written

-16-

notice to the Borrower and subject to the terms of the Financing Orders: (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents (including, without limitation, termination of the Escrow Account) or at law or in equity, all in accordance with the Financing Orders. Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition. On any date on which the Term Loans shall have been accelerated, subject to the Financing Orders, any amounts remaining in either the Escrow Account or the DIP Holding Account (other than with respect to amounts to fund the Carve-Out) may be applied by the Agent to reduce the Term Loans and other Obligations then outstanding. None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in either the Escrow Account or the DIP Holding Account upon the occurrence and continuance of any Default or Event of Default.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

Any amount or payment received by the Agent or any DIP Lender from any Loan Party or from the proceeds of Collateral (subject to the terms of the Financing Orders) following (i) any acceleration of the Obligations under this Note or (ii) at the direction of the Required Lenders after any Event of Default, shall be applied to the Obligations as determined by the Agent (acting at the direction of the Required Lenders in their sole discretion) and once paid in full, any excess shall be paid to the Borrower or as otherwise required by applicable law.

17.     Reference Agreements. This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $35,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

-17-

18. <u>Definitions</u>. The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>ABL Holding Account</u>" shall mean account number x2510 at Bank of America, N.A.

"<u>Actual Cash Receipts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Receipts" as determined by reference to the Budget as then in effect.

"<u>Actual Net Operating Cash Flow</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"<u>Actual Operating Disbursement Amounts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operational Disbursements" in the Budget as then in effect.

"<u>Actual Outstanding Debt</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Ending Balance" in the section titled "DIP Balance Rollforward" in the Budget as then in effect.

"<u>Actual Professional Fee Amounts</u>" shall mean, with respect to any period, the actual amount of Professional Fees described in the supporting materials provided with the Budget as then in effect.

"<u>Anticipated Net Disbursements</u>" shall mean, with respect to Friday of any week, the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the week immediately following such Friday as set forth in the Budget (subject to Permitted Variance), minus (b) the sum of (x) the amount of cash receipts expected to be received by the Loan Parties during such week as set forth in the Budget (subject to Permitted Variance) and (y) estimated cash in the ABL Holding Account as of such Friday.

"<u>Approved Budget Variance Report</u>" shall mean a report provided by the Borrower to the Agent and the DIP Lenders (a) showing, in each case, on a line item by line item and a cumulative basis, the Actual Cash Receipts, the Actual Operating Disbursement Amounts, the Actual Professional Fee Amounts, the Actual Net Operating Cash Flow and the Actual Outstanding Debt, in each case as of the last day of the Variance Testing Period then most recently ended, noting therein (i) all variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Operating Disbursement Amounts, the Budgeted Professional Fee Amounts, the Budgeted Net Operating Cash Flow and the Budgeted Outstanding Debt for such period as set forth in the Approved Budget as in effect for such period and (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (iii) certifying compliance or non-compliance in such Variance Testing Period with the Permitted Variances and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intend to take with respect thereto and (b) which such reports shall contain supporting information, satisfactory to the Required Lenders in their sole discretion.

"<u>Bankruptcy Code</u>" shall have the meaning given such term in the recital to this Note.

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note.

"<u>Bid Procedures Motion</u>" shall have the meaning given such term in Section 14 of this Note.

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Budget</u>" shall mean a rolling eight (8) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive eight (8) weeks after the date of

-18-

delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the Required Lenders and shall be approved by the foregoing Required Lenders, in the Required Lenders' sole discretion.  The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Budgeted Cash Receipts" shall mean with respect to any period, the amount that corresponds to the line item "Total Operating Receipts" in the Budget, as then in effect.

"Budgeted Net Operating Cash Flow" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"Budgeted Operating Disbursement Amounts" shall mean with respect to any period, the amount that corresponds to the line item "Total Operational Disbursements" in the Budget.

"Budgeted Outstanding Debt" shall mean with respect to any period, the actual amount that corresponds to the line item "Ending Balance" in the section titled "DIP Balance Rollforward" in the Budget as then in effect.

"Budgeted Professional Fee Amounts" shall mean, with respect to any period, the amount of Professional Fees described in the supporting materials provided with the Budget as then in effect.

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close, and with respect to all notices, determinations, fundings and payments in connection with LIBOR, any day that is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Carve-Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall have the meaning given to such term in the Financing Orders.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" shall mean the Business Day when each of the conditions applicable to the funding of the Term Loans (other than any Final Order Term Loans) and listed in Section 2(a) of this Note shall have been satisfied or waived in a manner satisfactory to the Required Lenders.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations.  Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean the Security Agreement and each agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" shall mean, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on Schedule I hereto, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

-19-

"<u>Davis Polk</u>" shall mean Davis Polk & Wardwell LLP.

"<u>Debtors</u>" shall have the meaning given to such term in the Financing Orders.

"<u>Default</u>" shall mean an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall have the meaning given such term in Section 4(d) of this Note.

"<u>Designated Assets</u>" shall mean the assets of the Loan Parties more fully described on <u>Annex B</u> and <u>Annex C</u> attached hereto.

"<u>Designated Asset Sale Agreements</u>" shall have the meaning given such term in Section 2(a)(10).

"<u>Designated Jurisdiction</u>" shall mean any country or territory that is the target of a Sanction.

"<u>DIP Documents</u>" shall mean the Note, the Collateral Documents, the Guaranty, the Escrow Agreement and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of the Agent in connection with this Note.  Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, amendments and restatements supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"<u>DIP Holding Account</u>" shall mean account number x0091 at J.P. Morgan Chase & Co.

"<u>DIP Lenders</u>" shall have the meaning given such term in the recital to this Note.

"<u>DIP Lender Advisor</u>" shall mean Davis Polk or such other advisor as the DIP Lenders may designate in writing to the Borrower.

"<u>Dollars</u>" or "<u>$</u>" shall mean lawful currency of the United States of America.

"<u>Ducera</u>" shall mean Ducera Partners LLP.

"<u>Equity Interests</u>" shall mean, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination (<u>provided</u>, however, that debt securities that are or by their terms may be convertible or exchangeable into or for Equity Interests shall not constitute Equity Interests prior to conversion or exchange thereof).

"<u>Escrow Account</u>" shall mean an escrow account with the Escrow Agent into which the proceeds of the Term Loans (and amounts described in Section 1(f)) shall be deposited and retained subject to withdrawal thereof by the Borrower pursuant to the terms hereof for use in accordance with the terms hereof and of the Budget (subject to any Permitted Variance) or return thereof to the DIP Lenders upon the occurrence of the Maturity Date.

"<u>Escrow Agent</u>" shall mean U.S. Bank National Association.

-20-

"Escrow Agreement" shall mean an Escrow Agreement dated as of the Closing Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) among the Borrower, the Escrow Agent and the Agent (for and on behalf of the DIP Lenders) relating to the Escrow Account in form and substance reasonably satisfactory to the DIP Agent and the Borrower.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in Term Loans or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Extraordinary Receipts" shall mean any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Sections 7(a) and (b) hereof) from (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" shall mean Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Note (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, in form and substance satisfactory to the Required Lenders, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Final Order Term Loan" shall have the meaning given such term in Section 1(a).

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order, as applicable.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Agent.

"Indebtedness" shall have the meaning given such term in the Prepetition ABL Credit Agreement (and the defined terms used in such definition and defined in the Prepetition ABL Credit Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Closing Date.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest Period" means, with respect to each Term Loan, a period commencing on the date of the making of such Term Loan and ending on the last Business Day of the then current  month and thereafter commencing on the last day of the previous Interest Period and ending 1 month thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1 month after the date on which the Interest Period began, as applicable.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Required Lenders, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"LIBOR" means, with respect to any Term Loan for any Interest Period, the London interbank offered rate as calculated by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) and obtained through a nationally recognized service such as Bloomberg or Reuters (or on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion; in each case, the "Screen Rate"), or a comparable or successor rate that has been approved by the Agent, at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided, that, if the Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time.  "Interpolated Rate" means, at any time, the rate per annum determined by the Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which that Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the Screen Rate for the shortest period (for which that Screen Rate is available for Dollars) that exceeds the Impacted Interest Period, in each case, at such time. Notwithstanding anything herein to the contrary, if "LIBOR" shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"LIBOR Rate" means, for each Interest Period for each Term Loan, the greater of (a) the rate per annum determined by the Agent (rounded upwards if necessary, to the next 1/100%) by dividing (i) LIBOR for such Interest Period by (ii) 100% minus the Reserve Percentage and (b) 1.00%.  The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Liquidity" shall mean, as of any time of determination, the sum of (x) actual amounts of unrestricted cash of the Loan Parties deposited in the ABL Holding Account and the DIP Holding Account and (y) the amount on deposit in the Escrow Account.

"Loan Party" shall mean the Borrower and any Guarantor.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any DIP Document, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral; provided, however that "Material Adverse Effect" shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases.

"Maturity Date" shall mean the earliest to occur of (i) November __[2], 2021, or if such date is not a Business Day the immediately following Business Day, (ii) September __[3], 2021, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (iii) the consummation of both Trigger Sales; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Agent and DIP Lenders arising under the Note or any of the other DIP Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the Note or any of the other DIP Documents. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of

---

[2] NTD: Date to be 120 days after Closing Date.

[3] NTD: Date to be 35 days after Petition Date.

the Treasury.

"Ongoing Sales" shall mean the sale of the assets of the Loan Parties more fully described on Annex D attached hereto.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" shall mean such account, office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Permitted Encumbrances" shall mean the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (i) Liens in favor of the Prepetition Secured Parties and other Liens granted pursuant to the Financing Orders (including, to the extent constituting a Lien, the Carve-Out); and (j) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements; provided that no encumbrance (other than the Liens described in clause (g) above and the Carve-Out) on the Escrow Agreement or either of the Escrow Account or DIP Holding Account or amounts held therein or proceeds thereof shall be a Permitted Encumbrance.

"Permitted Indebtedness" shall mean:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) Prepetition Obligations; (d) deferred taxes and other expenses incurred in the ordinary course of business; (e) any Indebtedness existing on the Petition Date; and (f) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth in the Financing Orders.

"Permitted Variance" shall mean, with respect to any Variance Testing Period, (a) in respect of the aggregate amount of Actual Operating Disbursement Amounts and Actual Professional Fee Amounts, (x) 15% for the Initial Two Week Disbursements Period, (y) 12.5% for the Initial Three Week Disbursements Period, and (z) 10% for the Initial Four Week Disbursements Period and each Four Week Disbursements Period and (b) in respect of Actual Cash Receipts, (x) 12.5% for the Initial Three Week Receipts Period and (y) 10% for the Initial Four Week Receipts Period and each Four Week Receipts Period.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or

-24-

otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Prepetition ABL Credit Agreement" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Collateral" shall have the meaning given such term in the Financing Orders.

"Prepetition ABL Credit Facility" shall have the meaning given such term in the Financing Orders.

"Prepetition Obligations" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Professional Fees" shall mean the fees and expenses of all professionals retained by the Debtors or any committee appointed by the Office of the United States Trustee (including, without limitation, fees and expenses of counsel, financial advisors and investment bankers, but excluding any success or transaction based fee), in each case to the extent included in the Carve Out.

"Pro Rata Share" shall mean with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Rapp & Krock" shall mean Rapp & Krock, PC.

"Recipient" shall mean the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 21 of this Note.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective managers, administrators, trustees, partners, investors, directors, officers, employees, agents, advisors, sub-advisors or other representatives of such Person and such Person's affiliates.

"Required Lenders" shall mean, at any time, two or more unaffiliated DIP Lenders whose aggregate Pro Rata Shares exceed 50%; provided, that, any approval of the "Required Lenders" may be communicated via email by the DIP Lender Advisor.

"Reserve Percentage" means, on any day, for any DIP Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that DIP Lender, but so long as such DIP Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Resignation Effective Date" shall have the meaning given such term in Section 20(g)(1).

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Sanction" shall mean any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"Security Agreement" shall mean  the Security Agreement, dated the date hereof, among the Borrower, the Guarantors and the Agent.

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Super Priority Credit Agreement" shall mean the Super Priority Credit Agreement, dated as of May 3, 2021, among the Borrower, Cantor Fitzgerald Securities, as Administrative Agent, and the lenders party thereto, as amended, restated, amended and restated, modified, or supplemented from time to time prior to the Closing Date.

"Super Priority Credit Agreement Payoff Letter" shall have the meaning given such term in Section 2(a)(11).

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Trigger Sales" shall mean the disposition through one or more transactions of the assets described on Annex C attached hereto.

"Variance Testing Period" shall mean each of (a) in respect of Actual Operating Disbursement Amounts and Actual Professional Fee Amounts, (w) the two week period ending on August 28, 2021 ("Initial Two Week Disbursements Period"), (x) the three week period ending on September 4, 2021 ("Initial Three Week Disbursements Period"), (y) the four week period ending on September 11, 2021 ("Initial Four Week Disbursements Period"), and (z) thereafter the rolling four week period ending on each Saturday (each a, "Four Week Disbursements Period")  and (b) in respect of Actual Cash Receipts, (w) the three week period ending on August 28, 2021 ("Initial Three Week Receipts Period"), (y) the four week period ending on September 11, 2021 ("Initial Four Week Receipts Period"), and (z) thereafter the rolling four week period ending on each Saturday (each a, "Four Week Receipts Period").

 "Withdrawal" means a withdrawal from the Escrow Account made in accordance with Section 2.

"Withdrawal Date" means the date of the making of any Withdrawal.

"Withdrawal Liquidity Condition" shall mean, with respect to any Withdrawal, that on the related Withdrawal Date the amount of such requested Withdrawal does not exceed the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the period from such Withdrawal Date to the last Business Day of the week following such Withdrawal Date as set forth in the Budget (subject to Permitted Variance), minus (b) the sum of (x) the amount of cash receipts reasonably expected to be received by the Loan during the period from such Withdrawal Date to the last Business Day of the week following such Withdrawal Date as set forth in the Budget (subject to Permitted Variance), (y) estimated cash in the ABL Holding Account as of such Withdrawal Date and (z) cash in the DIP Holding Account as of such Withdrawal Date.

"Withdrawal Notice" shall mean a written notice substantially in the form of the Form of Written Direction attached as Exhibit A to the Escrow Agreement delivered by the Borrower to the Escrow Agent and the Agent from time to time to request a Withdrawal from the Escrow Account.

19.    Representations and Warranties.  The Borrower and each of the other Loan Parties represents as follows:

(a)    the Borrower and each of the Loan Parties are duly formed and/or organized and validly existing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable material law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Financing Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(e)    other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Borrower and the Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)    no written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note (other than any projections, the Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

(g)    upon entry of the Financing Orders, the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have

such priority under the Financing Orders;

(h)     except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)     each Loan Party is in compliance in all material respects with the requirements of all laws and regulations and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of law or regulation or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(j)     none of the Loan Parties is an "investment company", "affiliated person", "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended;

(k)     no Loan Party, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is, (a) currently the subject or target of any Sanctions or (b) located, organized or resident in a Designated Jurisdiction;

(l)     since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect; and

(m)     the Borrower and its Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, and have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable other than those not yet delinquent or are being contested in good faith by appropriate proceedings.

20.     Agent.

(a)     Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise, and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to

carry out the purposes hereof and thereof.  The Agent may perform any of its duties hereunder or under the other DIP Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Agent.  The Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions set forth in this Section 20 shall apply to any such sub-agent or attorney-in-fact and the Related Parties of the Agent, any such sub-agent and any such attorney-in-fact and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(b)      Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)      Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction.

(d)      Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)      Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)      Collateral Matters.

(1)      The DIP Lenders hereby irrevocably authorize the Agent, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable; or constituting property being sold or disposed of in the ordinary course of the Borrower's business or otherwise in compliance with or as permitted by the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)      Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in

-29-

the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

(g)      Successor Agent.

(1)      The Agent may at any time give at least 30 days prior written notice of its resignation to the DIP Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent which is reasonably acceptable to the Borrower.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the DIP Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(2)      With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents (except that in the case of any Collateral held by such Agent on behalf of the DIP Lenders under any of the DIP Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each DIP Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Documents.  After the retiring Agent's resignation hereunder and under the other DIP Documents, the provisions of this Article, Section 9 and Section 21(b) shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

21.      Miscellaneous.

(a)      All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | Basic Energy Services, Inc.<br>801 Cherry Street, Suite 2100<br>Fort Worth, TX 76102<br>Attn: Adam Hurley and Robby Reeb<br>Email: AHurley@BasicES.com<br>    RReeb@BasicES.com |
| with copies to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn:  Ray Schrock, Sunny Singh and Vynessa Nemunaitis<br>Email: Ray.Schrock@weil.com<br>    sunny.singh@weil.com<br>    Vynessa.nemunaitis@weil.com |
| If to Agent or any Lender: | Guggenheim Credit Services, LLC<br>330 Madison Avenue, 10th Floor<br>New York, NY 10017 |

-30-

Attn: GI Ops NY Loan Agency
Email: GIOpsLoanAgency@guggenheimpartners.com

with copies to:          Guggenheim Credit Services, LLC
330 Madison Avenue, 10th Floor
New York, NY 10017
Attn: GI Legal
Email: GILegalTransactionsGroup@guggenheimpartners.com

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:  Damian S. Schaible and Adam Shpeen
Email: damian.schaible@davispolk.com
        adam.shpeen@davispolk.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)      The Borrower shall reimburse the Agent and the DIP Lenders for all reasonable and documented out-of-pocket expenses incurred in connection with the negotiation and preparation of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court, including the reasonable and documented fees, costs and expenses of (i) Davis Polk, (ii) Ducera, (iii) Rapp & Krock and (iv) any other advisors.  Subject to the foregoing, the Borrower shall reimburse the Agent and DIP Lenders for all reasonable and documented out-of-pocket fees, costs and expenses of (i) Davis Polk, (ii) Ducera (iii) Rapp & Krock and (iv) any other advisors, in connection with:

(1)      any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)      the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)      any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)      any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

-31-

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral and (D) monitor any sales;

all of which shall be payable within 10 Business Days of the Borrower's receipt of an invoice.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Orders). To the extent that the Borrower fails to pay any amount required to be paid under Section 9 hereof and this Section 21(b) to the Agent or any of its Related Parties, each DIP Lender severally agrees to pay to the Agent or such Related Party, as the case may be, such DIP Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such or against any of its Related Parties acting for the Agent in connection with such capacity. For purposes hereof, a DIP Lender's "Pro Rata Share" shall be determined based upon its share of the sum of the outstanding Term Loans and unused Commitments at the time. The obligations of the DIP Lenders under this subsection (b) are subject to the provisions of Section 10 hereof.

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)     Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

(g)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its

property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h)     **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.** The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i)     The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the DIP Lenders.  The DIP Lenders may, with the prior written consent of the Agent and to the extent no Event of Default then exists the Borrower (which consent of the Agent or Borrower shall not be required for any assignment to the Agent, a DIP Lender, a Related Fund or an affiliate of the Agent or a DIP Lender or which consent shall not be unreasonably conditioned, withheld or delayed), assign to one or more entites all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder.  An assigning DIP Lender shall deliver to the Agent (and notify the Borrower thereof) an assignment agreement in a form approved by the Agent, which shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee, together with a processing and recordation fee of $3,500 and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations.

(j)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at one of its offices, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior written notice.

(k)     Upon receipt by the Agent of an assignment notice, subject to the consent rights in clause (i) above, the Agent shall accept such assignment and record the information contained therein in the

Register.

(l)     A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register.  Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register.  Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(m)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register.  Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(n)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower and the Required Lenders (or the Agent at the direction of the Required Lenders); provided that, without the consent of each adversely affected DIP Lender, no amendment, waiver or consent may (i) extend or increase the Commitment of any DIP Lender, (ii) postpone any date fixed by this Note or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to any DIP Lender, (iii) reduce the principal of, or the rate of interest specified herein on, any Term Loan or any fees or other amounts payable hereunder or under any other Loan Document (including interest accruing at the Default Rate pursuant to Section 4(d)), (v) change any provisions in this Note that would alter the pro rata sharing of payments of each DIP Lender, (vi) change any provision of this Section 21(n) or the definition of "Required Lenders" herein, (vii) release all or substantially all of the Collateral in any transaction or series of related transactions or (viii) release all or substantially all of the value of the Guaranty; provided further, that no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the DIP Lenders required above, affect the rights and duties of the Agent under this Note or any other Loan Document.

(o)     This Note may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument. Execution of this Note via facsimile or electronic mail shall be effective, and signatures received via facsimile or electronic mail shall be binding upon the parties hereto and shall be effective as originals. The parties hereto irrevocably and unreservedly agree that this Note may be executed by way of electronic signatures and the parties agree that neither this Note, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record.

(p)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective permitted assigns, transferees and endorsees.  The Liens created by this Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file

financing statements or otherwise perfect its security interests or Liens under applicable law.

(q)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(r)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*     *     *     *     *

IN WITNESS WHEREOF, the Borrower have caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BASIC ENERGY SERVICES, INC., as Borrower

By: _____
    Name:
    Title

Acknowledged and Agreed

GUGGENHEIM CREDIT SERVICES, LLC, as Agent

By: _____
    Name:
    Title: Authorized Signer


_____, as DIP Lender

By: _____, its _____

By: _____, its _____

By: _____
    Name:
    Title: Authorized Signer

<u>Schedule I</u>

Commitments

| [                    ] | [____]% | [$_____] |
| [                    ] | [____]% | [$_____] |
| [                    ] | [____]% | [$_____] |
| Total | 100.00% | [$_____] |

<u>EXHIBIT A</u>

Budget

See attached.

<u>Annex A</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the monthly reports and quarterly reports and other information required by Section 6.01(b) (commencing with the fiscal quarter ending June 30, 2021) and (d) (whether or not a Monthly Financial Reporting Triggering Period is in effect), 6.02(d), (g), (h) and (i) of the Prepetition ABL Credit Agreement (and the defined terms used in such sections and defined in the Prepetition ABL Credit Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) (whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Closing Date unless the Required Lenders shall otherwise agree) and each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Required Lenders:

| | |
|---|---|
| on September 2, 2021 and every Thursday of each week ending thereafter | (a)     a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders (i) certifying that the Loan Parties are in compliance with the covenants contained in <u>Section 15(j)</u> and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto the Approved Budget Variance Report which shall be prepared by the Borrower as of the last day of the most recently ended Variance Testing Period, |
| on September 2, 2021 and every second Thursday of each week ending thereafter | (b)     a revised proposed budget (it being understood that upon written approval of such proposed budget by the Required Lenders (and not before such written approval), in their sole discretion, such proposed budget shall become the "<u>Budget</u>") and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (c)     copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within five (5) Business Days after Borrower has knowledge of any event or condition that constitutes a Default, | (d)     notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, |
| upon the reasonable request of the Required Lenders, | (e)     any other information relating to the business, financial, legal or corporate affairs of the Borrower or its Subsidiaries. |

<u>Annex B</u>

Designated Assets – Part One[4]

---

[4] NTD: To describe the Select assets.

Annex C

Designated Assets – Part Two[5]

_____

[5] NTD: To describe the Berry and Axis assets.

<u>Annex D</u>

Ongoing Sales

| Address | City | County | State |
|---|---|---|---|
| 8388 W State Highway 21 | Bryan | Brazos | TX |
| 1171 State Hwy 83 | Denver City | Yoakum | TX |
| 100 Panel Rd | Elk City | Beckham | OK |
| 132928 LOVINGTON HIGHWAY | Loco Hills | Eddy | NM |
| 2180 S I-35 | Pearsall | Frio | TX |
| No Address - SWC of CR 423 & 424 | Lolita | Jackson | TX |
| No Address - Hwy 179 Behind Fee SWD | Dew | Freestone | TX |

## EXHIBIT B

| Prepetition ABL Collateral,[5]  Prepetition Second Lien Collateral, and First Priority ABL Adequate Protection Collateral |
| --- |
| 1) • Carve-Out |
| 2) • ABL Adequate Protection Liens |
| 3) • Prepetition ABL Liens |
| 4) • Second Lien Adequate Protection Liens |
| 5) • Prepetition Second Lien Note Liens |
| 6) • DIP Liens |
| 7) • Superpriority Adequate Protection Liens |
| 8) • Junior Secured Notes Adequate Protection Liens |
| 9) • Junior Additional Prepetition Secured Note Adequate Protection Liens |

---

[5]   For the avoidance of doubt, for purposes of defining the priority of the DIP Liens, the term Prepetition ABL Collateral shall exclude (a) any Prepetition ABL Collateral that would also constitute Prepetition Secured Notes Collateral, (b) the Escrow Account, (c) the DIP Holding , (d) any Designated Asset Sale Agreement and (e) all proceeds and products of any and all of the foregoing  (items (b) through (d) as defined in the DIP Loan Agreement as of the date of the entry of this Interim Order, without giving effect to any further modifications or amendments), provided, however, any proceeds from the sale of any Prepetition ABL Collateral arising from any transaction under a Designated Asset Sale Agreement shall be included in the definition of Prepetition ABL Collateral.

| | Prepetition Superpriority Collateral, Prepetition Notes Collateral, and Additional Prepetition Secured Note Collateral |
|---|---|
| 1) | • Carve-Out |
| 2) | • DIP Liens (senior only to the Superpriority Adequate Protection Liens and Superpriority Liens upon the indefeasible payment in full of the Superpriority Obligations) |
| 3) | • Superpriority Adequate Protection Liens, subject to the Super Priority Intercreditor Agreement dated as of May 3, 2021, among Cantor Fitzgerald Securities, as Priority Lien Collateral Agent, UMB Bank, N.A., as Junior Lien Collateral Agent, as a Junior Lien Representative, and Ascribe III Investments LLC as a Junior Lien Representative (the "Superpriority Intercreditor Agreement"). |
| 4) | • Superpriority Liens, subject to the Superpriority Intercreditor Agreement |
| 5) | • Junior Priority Secured Notes Adequate Protection Liens (senior to the Additional Prepetition Secured Note Adequate Protection Liens in respect of (i) the Control Prepetition Secured Notes Collateral (as defined in Annex 1 to this Exhibit B) and (ii) the Prepetition Secured Notes Collateral (excluding the Control Prepetition Secured Notes Collateral) which constitutes Additional Prepetition Secured Note Collateral and owned by certain Debtors as listed in, and in the priorities set forth in, Annex 1 to this Exhibit B); and <br> • Additional Prepetition Secured Note Adequate Protection Liens (senior to the Junior Priority Secured Notes Adequate Protection Liens and the Prepetition Secured Notes Liens only with respect to the Additional Prepetition Secured Note Collateral which constitutes Prepetition Secured Notes Collateral (excluding the Control Prepetition Secured Notes Collateral) and owned by certain Debtors as listed in Annex 1 to this Exhibit B) |
| 6) | • Prepetition Secured Notes Liens (senior to the Additional Prepetition Secured Note Liens and Additional Prepetition Secured Notes Adequate Protection Liens in respect of (i) the Control Prepetition Secured Notes Collateral (as defined in Annex 1 to this Exhibit B) and (ii) and the Prepetition Secured Notes Collateral (excluding the Control Prepetition Secured Notes Collateral) which constitutes Additional Prepetition Secured Note Collateral and owned by certain Debtors as listed in, and in the priorities set forth in, Annex 1 to this Exhibit B); and <br><br> • Additional Prepetition Secured Note Liens (senior to the Prepetition Secured Notes Liens in respect of the Additional Prepetition Secured Note Collateral which constitutes Prepetition Secured Notes Collateral (excluding the Control Prepetition Secured Notes Collateral) and owned by certain Debtors as listed in Annex 1 to this Exhibit B) |
| 7) | • ABL Adequate Protection Liens |
| 8) | • Second Lien Adequate Protection Liens |

| Unencumbered Assets | |
|---|---|
| 1) | • Carve-Out |
| 2) | • DIP Liens |
| 3) <br><br> (*pari passu*) | • ABL Adequate Protection Liens; and <br><br> • First Priority Superpriority Adequate Protection Liens |
| 4) <br><br> (*pari passu*) | • Second Lien Adequate Protection Liens; <br><br> • Secured Notes Adequate Protection Liens; and <br><br> • Additional Prepetition Secured Note Adequate Protection Liens |

| Relative Priorities of Adequate Protection Superpriority Claims | |
|---|---|
| 1) | • Carve-Out |
| 2) | • DIP Superpriority Claim |
| 3) (*pari passu*) | • Adequate Protection Superpriority Claim(s) |

**Annex 1**

- <u>Prior Prepetition Secured Notes Liens</u>: The Prepetition Secured Notes Liens are senior to the Additional Prepetition Secured Note Liens in respect of (i) the Control Prepetition Secured Notes Collateral (as defined below) and (ii) the Prepetition Secured Notes Collateral which constitutes Additional Prepetition Secured Note Collateral and owned by the following Debtors (such senior liens the "<u>Prior Prepetition Secured Notes Liens</u>"):

| <u>Debtor</u> |
| --- |
| Agua Libre Midstream LLC |
| Basic Energy Services GP, LLC |
| Basic Energy Services LP, LLC |
| Basic Energy Services, Inc. |
| Basic Energy Services, L.P. |
| Basic ESA, Inc. |
| SCH Disposal, L.L.C. |
| Taylor Industries, LLC |

- <u>Prior Additional Prepetition Secured Note Liens</u>: The Additional Prepetition Secured Note Liens are senior to the Prepetition Secured Notes Liens in respect of the Additional Prepetition Secured Note Collateral which constitutes Prepetition Secured Notes Collateral and owned by the following Debtors (such senior liens, the "<u>Prior Additional Prepetition Secured Note Liens</u>"); <u>provided</u>, that, notwithstanding the foregoing, the Prior Additional Prepetition Secured Note Liens shall not cover any Prepetition Secured Notes Collateral which is perfected by means other than a UCC-1 financing statement, including by a mortgage filed in favor of the Prepetition Secured Notes Trustee or the "control" (within the meaning of Section 8-106 of the Uniform Commercial Code as in effect in the State of New York, as amended from time to time) by the Prepetition Secured Notes Trustee (such collateral, the "<u>Control Prepetition Secured Notes Collateral</u>"):

| <u>Entity</u> |
| --- |
| Agua Libre Asset Co LLC |
| Agua Libre Holdco LLC |
| C&J Well Services, Inc. |
| Indigo Injection #3, LLC |

- The Additional Prepetition Secured Note Liens and the Prepetition Secured Notes Liens are *pari passu* in respect of the Additional Prepetition Secured Note Collateral which is also Prepetition Secured Notes Collateral owned by the following Debtor:

| **<u>Debtor</u>** |
| --- |
| KVS Transportation, Inc. |

# EXHIBIT C

**Initial Budget**

**Basic Energy Services, Inc.**
**Weekly Cash Forecast**
*$ in thousands*
**As of: Tues 8/17/21**

CONFIDENTIAL DRAFT – SUBJECT TO MATERIAL CHANGE AND FURTHER REVIEW
PREPARED AT REQUEST OF COUNSEL

| | Illustrative August 15th Filing Date | | | | | Illustrative Sept 25th 363 Sale Completion | | | |
|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | Estimate Week 1 | Forecast Week 2 | Forecast Week 3 | Forecast Week 4 | Forecast Week 5 | Forecast Week 6 | Forecast Week 7 | Forecast Week 8 | Total Forecast |
| Week Ending (Sat) | 08/14/21 | 08/21/21 | 08/28/21 | 09/04/21 | 09/11/21 | 09/18/21 | 09/25/21 | 10/02/21 | |
| **Operating Receipts:** | | | | | | | | | |
| Customer Receipts | $ 8,790 | $ 6,725 | $ 7,263 | $ 7,211 | $ 8,190 | $ 6,192 | $ 7,829 | $ 8,062 | $ 60,261 |
| Asset Sales | - | - | 267 | 801 | - | 801 | - | - | 2,669 |
| Other Receipts | 33 | - | - | - | - | - | - | - | 33 |
| **Total Operating Receipts** | $ 8,823 | $ 6,725 | $ 7,530 | $ 8,012 | $ 8,190 | $ 6,993 | $ 7,829 | $ 8,863 | $ 62,963 |
| **Payroll and Employee Related** | | | | | | | | | |
| Bi-weekly Payroll & Payroll Taxes | $ (27) | $ (7,900) | $ - | $ (7,950) | $ - | $ (7,950) | $ - | $ (7,950) | $ (31,777) |
| Incentive Compensation | - | - | - | - | - | (350) | - | - | (350) |
| Benefits & Other Employee Related Vendors | (1,304) | (1,309) | (1,393) | (960) | (1,513) | (704) | (1,627) | (508) | (9,318) |
| **Total Payroll and Employee Related** | $ (1,331) | $ (9,209) | $ (1,393) | $ (8,910) | $ (1,513) | $ (9,004) | $ (1,627) | $ (8,458) | $ (41,445) |
| **Operating Disbursements (non-payroll)** | | | | | | | | | |
| Operating Expenses (Materials, Supplies & Services) | $ (1,394) | $ (433) | $ (658) | $ (726) | $ (896) | $ (931) | $ (852) | $ (852) | $ (6,742) |
| Fuel & Fuel Transportation | (794) | (401) | (28) | (950) | (386) | (514) | (428) | (55) | (3,556) |
| ARI, Equipment Rental, and Logistics and Related | - | (370) | (21) | (125) | (57) | (754) | (57) | (125) | (1,509) |
| Utilities Category | (60) | - | - | - | (284) | (152) | (152) | (152) | (801) |
| Rent | - | - | - | (364) | - | - | - | - | (364) |
| P-Card | (1,000) | (200) | (1,079) | (100) | (500) | (500) | (500) | (932) | (4,811) |
| **Total Operating Disbursements (non-payroll)** | $ (3,248) | $ (1,403) | $ (1,786) | $ (2,265) | $ (2,123) | $ (2,852) | $ (1,990) | $ (2,117) | $ (17,783) |
| **Other Operating Disbursements** | | | | | | | | | |
| Insurance | $ - | $ (1,951) | $ (25) | $ (593) | $ (142) | $ (500) | $ - | $ - | $ (3,211) |
| Taxes | - | (783) | (1,073) | (58) | (58) | (58) | (608) | (58) | (2,696) |
| Professional Services (IT, Audit, Tax, Legal) | (766) | (30) | (512) | (558) | (488) | (389) | (268) | (203) | (3,214) |
| Other | - | (196) | (141) | (132) | (182) | (287) | (182) | (182) | (1,301) |
| **Total Other Operating Disbursements** | $ (766) | $ (2,960) | $ (1,751) | $ (1,340) | $ (870) | $ (1,234) | $ (1,058) | $ (443) | $ (10,422) |
| **Total Operational Disbursements** | $ (5,345) | $ (13,573) | $ (4,930) | $ (12,515) | $ (4,506) | $ (13,089) | $ (4,674) | $ (11,018) | $ (69,650) |
| **Total Cash Flow from Operations** | $ 3,478 | $ (6,848) | $ 2,600 | $ (4,504) | $ 3,684 | $ (6,096) | $ 3,154 | $ (2,155) | $ (6,687) |
| **Non-Operating Disbursements:** | | | | | | | | | |
| Debt Service & Fees | $ (288) | $ (5) | $ - | $ - | $ - | $ - | $ (613) | $ - | $ (905) |
| Professional Fees | (3,482) | (1,650) | (1,161) | (2,356) | (1,374) | (1,274) | (1,923) | (965) | (14,184) |
| Payment of Prepetition AP & 503(b)(9) | - | - | - | - | - | - | - | - | - |
| Settlements Paid at Emergence | - | - | - | - | - | - | - | - | - |
| Capex | - | - | - | - | - | - | - | - | - |
| Other Non-Operating | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Disbursements** | $ (3,770) | $ (1,655) | $ (1,161) | $ (2,356) | $ (1,374) | $ (1,274) | $ (2,536) | $ (965) | $ (15,089) |
| **Net Cash Flow** | $ (292) | $ (8,503) | $ 1,439 | $ (6,860) | $ 2,310 | $ (7,370) | $ 618 | $ (3,120) | $ (21,777) |
| **Change in Cash** | | | | | | | | | |
| Beginning Cash Balance (Book) | $ 2,446 | $ 2,154 | $ 1,000 | $ 2,172 | $ 1,000 | $ 3,310 | $ 1,000 | $ 1,618 | $ 2,446 |
| Net Cash Flow | (292) | (8,503) | 1,439 | (6,860) | 2,310 | (7,370) | 618 | (3,120) | (21,777) |
| LC Cash Collateral Drawdown/(Paydown) | - | - | - | - | - | - | - | - | - |
| Debt Proceeds | - | 7,349 | - | 6,488 | - | 5,860 | - | 3,004 | 22,701 |
| Debt Paydown | - | - | (267) | (801) | - | (801) | - | (801) | (2,669) |
| Adjustments | - | - | - | - | - | - | - | - | - |
| **Ending Cash Balance (Book)** | $ 2,154 | $ 1,000 | $ 2,172 | $ 1,000 | $ 3,310 | $ 1,000 | $ 1,618 | $ 701 | $ 701 |