## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **BASIC ENERGY** | § | **Case No. 21-90002 (DRJ)** |
| **SERVICES, INC.,** *et al.,* | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

### MOTION OF DEBTORS FOR ENTRY OF AN ORDER
### APPROVING DEBTORS' (I) KEY EMPLOYEE INCENTIVE
### PROGRAM AND (II) KEY EMPLOYEE RETENTION PROGRAM

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Basic Energy Services, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Debtors**" and, together with their non-Debtor affiliates, "**Basic**" or the "**Company**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Preliminary Statement

1. The Debtors commenced these chapter 11 cases with a clear strategy for the benefit of all stakeholders, including over 2,400 employees, by continuing their prepetition

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic Energy Services, L.P. (1819); Basic Energy Services, Inc. (1194); C&J Well Services, Inc. (5684); KVS Transportation, Inc. (4882); Indigo Injection #3, LLC (7657); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Taylor Industries, LLC (7037); SCH Disposal, L.L.C. (8335); Agua Libre Holdco LLC (3092); Agua Libre Asset Co LLC (1409); Agua Libre Midstream LLC (6701); and Basic ESA, Inc. (2279). The Debtors' headquarters and service address for the purposes of these chapter 11 cases is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

marketing process, at the conclusion of which any and all bids for the Debtors' assets will be evaluated by the Debtors and pursued in accordance with the Court-approved bidding procedures (the "**Marketing Process**").

2.      The Debtors are on their way to successfully executing the Marketing Process.  For example, the Debtors have (i) obtained interim approval of debtor-in-possession financing to fund the Marketing Process and these chapter 11 cases, (ii) obtained approval of bidding procedures and stalking-horse bid protections, (iii) communicated with over fifty (50) strategic and financial buyers regarding their interest in participating in the sale, and (iv) secured three stalking horse bids for the Debtors' assets (the "**Stalking Horse Bids**").  The Debtors also have obtained other "first day" relief necessary to stabilize their business and preserve ongoing operations and longstanding vendor and customer relationships, which are critical to maximizing value for all stakeholders.

3.      Notwithstanding the Debtors' progress to date, significant work remains to be done to effectuate the Marketing Process and maximize recoveries for stakeholders. Specifically, among other things, the Debtors must:

    i.   execute the Marketing Process on a compressed timeline, with an auction scheduled for September 2021, including responding to and facilitating due diligence demands, including extensive site visits and management meetings with potential bidders, coordinating with advisors and key stakeholders, and negotiating bids and purchase agreements;

    ii.   as they market their assets, focus on maintaining operations, including engaging with key vendors, meeting customer needs, and satisfying other requirements to maintain operations at a high level in order to incentivize potential purchasers to make bids for the business as a going concern;

    iii.   closely monitor and control costs to ensure compliance with DIP and cash collateral covenants;

    iv.   prepare for and coordinate the transition of three businesses to three separate purchasers;

    v.   prepare for and coordinate the separation of the Debtors' business segments, including those subject to the Stalking Horse Bids, depending on the outcome of the Marketing Process;

    vi.   negotiate with their key constituents in connection with the sales and otherwise;

    vii.   implement "first day" and other relief to stabilize the Debtors' businesses and operations;

    viii.   satisfy reporting and other requirements under the Bankruptcy Code and of the United States Trustee's office; and

    ix.   coordinate with constituents, including the Ad Hoc Group, ABL Lenders, Ascribe, and the Creditors' Committee (once appointed), regarding, among other things, the Marketing Process and the administration of the chapter 11 cases.

*See* Hurley Decl. 5.

4.    None of this can be achieved without the continued efforts, dedication, and support of certain of the Debtors' key employees (collectively, the "**Key Employees**"), who must perform these remaining tasks—many of which are outside the scope of the Key Employees' ordinary duties.  The Debtors' employees—led by their Key Employees—have been asked to deliver far more than is ordinarily required of them.  Needless to say, operating a company in chapter 11 is not an easy task in and of itself.  Adding a sale process that contemplates the breakup and separation of the Debtors' business into three separate transactions on top of ordinary chapter 11 operations and obligations is even more challenging.

5.    Prior to and since the Petition Date,[2] there has been a significant degree of uncertainty among the Debtors' employees concerning their job security and the future of the Debtors' business.  Hurley Decl. ¶ 8.  The Company has lost 114 employees since April 2021,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the *Declaration of Adam L. Hurley in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* [ECF No. 3] (the "**First Day Declaration**").

including voluntary resignations of 6 key employees, who likely would have been included in the KERP (defined below). *Id.* These recent employee departures make retaining the remaining Key Employees and providing appropriate incentives all the more essential to the continuation of the Debtors' business and the success of the Marketing Process.

6.      To that end, the Debtors, led by their independent director, Alan Carr, and with input from their independent compensation consultant, have developed two narrowly tailored and relatively modest programs: (i) a key employee retention program (the "**KERP**") for thirty (30) non-insider Key Employees (the "**KERP Participants**"), which provides for the payment of cash amounts in two installments; and (ii) a key employee incentive plan (the "**KEIP**" and, together with the KERP, the "**Employee Programs**") for certain Key Employees who are "insiders" (as such term is defined in section 101(31) of the Bankruptcy Code) (the "**KEIP Participants**"), tied to the achievement of predetermined goals for proceeds of the Marketing Process.  The aggregate award under the KERP is $1.4 million.  The aggregate awards under the KEIP at the threshold and target levels are $600,000 and $850,000, respectively.

7.      As detailed below, the Employee Programs were designed by the Debtors in consultation with their legal advisors and an independent compensation consultant, Pearl Meyer & Partners, LLC ("**Pearl Meyer**"), with input from the Debtors' management team as to personnel and business needs.  Carr Decl. ¶ 7.  After carefully evaluating the need for retention and incentive plans and running a selection process to ensure that the Employee Programs would include only those employees essential to the Debtors' Marketing Process, the Debtors calculated the proposed amounts to be paid and the criteria and metrics for payment based upon market precedent and creditor input.  Carr Decl. ¶ 13.  Specifically, the Debtors'

compensation consultant evaluated the reasonableness of the Employee Programs, including their scope and cost, by comparing them to incentive and retention plans implemented in comparable chapter 11 cases to ensure that the Employee Programs are consistent with market practices.

8.      The Employee Programs were reviewed and approved by the independent special committee (the "**Special Committee**") of Basic Energy Services, Inc.'s Board of Directors (the "**Board**") and the Board.  The Debtors also consulted with the Ad Hoc Group regarding the Employee Programs, including the scope, costs, and participants.  Carr Decl. ¶ 13.  The Ad Hoc Group is not opposed to the proposed Employee Programs.  The Debtors also intend to engage with the Creditors' Committee (when appointed) to seek its support for the Motion.  *Id.*

9.      The implementation of the Employee Programs is reasonable, well within the Debtors' business judgment, and satisfies the requirements for approval under the Bankruptcy Code.  The Key Employees have extensive industry expertise and knowledge of the Debtors' businesses, assets, liabilities, counterparties, and operations, and they are vital to the Debtors' execution of the Marketing Process and the success of these chapter 11 cases.  Hurley Decl. ¶¶ 9-10.  It would be difficult, if not impossible, to replace the Key Employees at this juncture.  Moreover, the success of the chapter 11 cases, including the execution of the Marketing Process, is by no means guaranteed and will turn in large part on the performance and productivity of the Key Employees, who have been called upon to undertake additional responsibilities and to work significantly longer hours than contemplated under the normal terms of their employment.  Certain of the Key Employees have extensive personal relationships with potential buyers, customers, and vendors that cannot be replicated and have been

instrumental to the success of the Marketing Process to date.  Under these circumstances, promoting morale and providing appropriate incentives are critical to the Marketing Process and maximizing recoveries to creditors.  Accordingly, the Debtors respectfully request that the Court approve the Employee Programs.

## Background

10.     On August 17, 2021 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

12.     On August 27, 2021, the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these chapter 11 cases.  No trustee or examiner has been appointed in these chapter 11 cases.

13.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the First Day Declarations, which were filed with the Court on the Petition Date.

## Jurisdiction

14.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

15.     By this Motion, pursuant to sections 363(b) and 503(c) of title 11 of the Bankruptcy Code, the Debtors request entry of an order approving and authorizing the Employee Programs.

16.     In support of this Motion, the Debtors submit the declaration of Alan Carr, an independent director of the Company and member of the Special Committee, annexed hereto as **Exhibit A** (the "**Carr Declaration**"), the declaration of Adam L. Hurley, the Debtors' Chief Financial Officer, annexed hereto as **Exhibit B** (the "**Hurley Declaration**"), and the declaration of Wes Hart, managing director at Pearl Meyer, annexed hereto as **Exhibit C** (the "**Hart Declaration**").

17.     A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit D** (the "**Proposed Order**").

**Development of the Employee Programs**

18.     The Company has been focused on avoiding attrition by key employees and aligning employee incentives, given the enormous additional burdens that have been placed upon the Company's Key Employees leading up to the chapter 11 filing, and the continued demand on such Key Employees anticipated during these chapter 11 cases.  In response to these challenges, prior to the Petition Date, the Special Committee and Board approved the following Employee Programs subject to Bankruptcy Court approval: (i) a KEIP for three Key Employees and (ii) a KERP for 30 Key Employees, to ensure that such employees remain with the Company and align their interests with the Company to execute the Marketing Process in these chapter 11 cases to maximize value for all stakeholders.  No payments have been made under the Employee Programs.

## I.      Selection of the KEIP Participants

19.     The Debtors, with input from their advisors, selected three Key Employees—the Chief Executive Officer and President; the Executive Vice President and Chief Financial Officer, and the Executive Vice President of Operations—with responsibility for operating of the Debtors' business and assisting in facilitating the Marketing Process to participate in the KEIP.  Carr Decl. ¶ 8.

20.     These KEIP Participants have played, and will continue to play, a central role and are critical to the overall success of the Marketing Process.  *Id.*  Specifically, the KEIP Participants are expected to meaningfully contribute to the success of the Marketing Process and recoveries to creditors by taking the following actions, among others:

  i.  leverage longstanding relationships and personal credibility to foster strong bids and a robust auction;

  ii.  lead or support negotiations with vendors, customers, and other key constituents in connection with the sales and otherwise;

  iii.  review and respond to diligence and other information requests;

  iv.  conduct site visits and management meetings with the Stalking Horse Bidders as well as the other potential bidders;

  v.  proactively develop a transition plan and budgets to assist in the transition of the operations of the Debtors to the successful buyers;

  vi.  implement "first day" and other relief to stabilize the Debtors' businesses and operations;

  vii.  educate bidders about operating the acquired assets as a going concern and potential upside opportunities with respect to operational cost savings;

  viii.  comply with DIP covenants; and

  ix.  assist with transition and wind down planning.

*See* Hurley Decl. ¶ 5.

## II.     Development of the Sale Metric

21.     Beginning in May 2021, prior to the development of the Employee Programs, the Company, through its investment banker, Lazard Freres & Co. LLC, undertook an extensive marketing effort and solicited indications of interest ("**IOIs**") from strategic and financial buyers with the financial and operational wherewithal to complete a transaction. Through July 2021, the Company received submissions of initial bids for certain of the Company's assets.  Carr Decl. ¶ 11.  By mid-July, the Company had executed two non-binding IOIs with an aggregate purchase price of $70 million for the assets subject to the Stalking Horse APAs, which IOIs were subject to diligence and definitive documentation (the "**Initial Bids**"). *Id*.  This amount became the basis for the Special Committee's consideration of the Threshold Sale Metric, as it provided the best indication of a potential floor price for those assets at an auction.  *Id.*  The Special Committee and the Board determined that pursuing the Initial Bids was in the best interest of the Debtors and their stakeholders.  *Id.*

22.     As the Company was advancing the Initial Bids, it was clear that a program to incentivize and align the interests of Key Employees was essential to maximize value and critical to the success of the Marketing Process.  Carr Decl. ¶ 12.  To that end, the Company began to develop a construct for the Employee Programs based on the Initial Bids.  *Id.* However, due to the Company's severe liquidity constraints at the time and uncertainty regarding the ultimate transaction structure, the Special Committee determined to revisit the adoption of any employee programs when the Company had more clarity on its ability to fund and implement the Marketing Process.  *Id.*

23.     For the next several weeks, senior management, with the support of the KERP Participants and the Debtors' advisors, worked tirelessly to convert the Initial Bids into

binding purchase agreements.  Carr Decl. ¶ 13.  As these negotiations progressed, Mr. Carr previewed a construct of the Employee Programs with the Ad Hoc Group, who provided input regarding the size and payout structure of the programs.  *Id.*  These communications resulted in the Ad Hoc Group's indication that it was not opposed to programs with an overall cost of $2 million to $2.25 million.  Originally, the Debtors had contemplated a $1.25 million KERP Program and a $750,000 to $1 million KEIP Program.  *Id.*  In Mr. Carr's discussions with the KEIP Participants following the Ad Hoc Group's feedback to the Employee Programs, the KEIP Participants volunteered to reallocate $150,000 of the KEIP Program to the KERP to promote the Company's ability to retain Key Employees through the execution of the Marketing Process and sale closing.  *Id.*

24.    In the days leading up to the Petition Date, the Debtors—in large part due to the continued efforts of senior management and the KERP Participants to market the Debtors' assets—secured higher and better bids from two of the Stalking Horse Bidders as compared to one of the Initial Bids, which resulted in an aggregate purchase price of $72 million.  Carr Decl. ¶ 14.  The Debtors, led by the efforts of the KEIP Participants, progressed the Stalking Horse APAs to near final form in a matter of days, and on August 16, 2021, the Company convened the Special Committee and Board to request authorization to commence these chapter 11 cases and adopt the Employee Programs.  *Id.*  The Special Committee and the Board resolved to adopt the Employee Programs on the terms described in the Motion, including a Threshold Sale Metric of $70 million.  *Id.*  Although the Stalking Horse Bids provided an aggregate purchase price of $72 million, the Special Committee and the Board determined that increasing the Threshold Sale Metric to $72 million or higher would have unfairly penalized the KEIP Participants for securing a higher aggregate sales price under

extremely difficult and challenging circumstances.  *Id.*  In addition, such a change would have been detrimental to employee morale and undermined the significant work that remained to be done to actually consummate the Stalking Horse APAs while simultaneously marketing the assets for higher or better bids.  *Id.*

25.     In addition to providing an aggregate amount of $600,000 (or $200,000 for each KEIP Participant) if the $70 million Threshold Sale Metric is achieved, the aggregate KEIP payment amount increases to $850,000 (or $283,333.33 for each KEIP Participant) if the $77.5 million Target Sale Metric is achieved.  The KEIP amounts are payable solely from the proceeds of the sale transactions following repayment of the DIP Facility.  Importantly, all of the KEIP payments are subject to clawback should an employee be terminated for cause or voluntarily terminate their employment prior to 30 days after the closing of the KEIP Transaction.

### III.    Selection of the KERP Participants

26.     To select the KERP Participants, the Debtors' management undertook a "bottoms up" analysis of their business segments and identified the 30 non-insider employees that it determined are critical for continued and uninterrupted operations.  Hurley Decl. ¶¶ 9-10.  Although the KERP Participants are among the many employees essential to the Debtors' business generally, the KERP Participants were selected based on their experience, skill set, position, uniqueness, and the extent to which they are indispensable to their respective business segment.  *Id.*  The KERP Participants perform a variety of important business functions for the Debtors—including legal, accounting, business administration, engineering, finance, and operational work—that are vital to the Debtors' ability to maintain operational stability and preserve and enhance stakeholder value.  *Id.*  The KERP Participants are critical to the

consummation of the Stalking Horse APAs and the Debtors' compliance with various financial, reporting, operational covenants in the three Stalking Horse APAs and the DIP Facility.  *Id.*

27.     The KERP Participants were selected because each has a difficult to replace skillset, with specialized, technical, or institutional knowledge that other employees working for the Debtors do not possess.  *Id.*  Losing any of the KERP Participants would challenge the Debtors' operational stability during these chapter 11 cases and the Marketing Process.  *Id.*  If lost, the KERP Participants either (i) would not be able to be replaced at all or (ii) the cost of seeking to replace the KERP Participants would far outweigh the amounts they are contemplated to be paid under the KERP.  Hurley Decl. ¶ 8.

28.     In order to maintain confidentiality, information regarding each of the KERP Participants, including their job title and job responsibilities, will separately be provided by the Debtors to the U.S. Trustee and the Creditors' Committee and will be made available to the Court upon request.

## IV.    Non-Insider Status of the KERP Participants

29.     None of the KERP Participants is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. Hurley Decl. ¶ 11.  As is typical for an organization of the size and scope of the Debtors, the Debtors operate pursuant to an organizational structure that ensures the efficient development and execution of corporate strategy across their various entities.  *Id.*  The Debtors' senior management team—which includes the Chief Executive Officer and President; the Executive Vice President and Chief Financial Officer, and the Executive Vice President of Operations—is responsible for overseeing and managing the various functional groups critical to the operation of the Debtors' business.  *Id.*  Members of the Debtors' senior management team all report directly to the Board or Special Committee and

dictate corporate strategy. *Id.* For that reason, no member of the senior management team was eligible to be a member in the KERP. *Id.*

30.     The employees who sit below the senior management team in the Debtors' organizational structure, which include, among others, the KERP Participants, must report regularly to a senior manager within their respective department, to a member of the senior management team, or to another KERP Participant who reports to a member of the senior management team. Hurley Decl. ¶ 11. Moreover, although certain of the KERP Participants hold titles such as "vice president" or "director," they do not take part in the strategic management of the Debtors, must obtain approval from senior management before taking any action with respect to the disposition of significant assets, and do not have the ability to dictate Company policy. *Id.* Moreover, none of the KERP Participants was appointed by the Board of Directors, is a member of the Debtors' Board of Directors, or reports to the Board of Directors or Special Committee (although certain KERP Participants do attend Special Committee and Board meetings and support senior management in their presentations to the Special Committee and Board). *Id.* Finally, none of the KERP Participants had any say or input on any aspect of the Employee Programs or their proposed compensation. *Id.*

## **Employee Programs**

### I.     **Terms of the KEIP**

31.     As set forth above, the KEIP is designed to incentivize the Debtors' most senior Key Employees during the chapter 11 cases to execute the Marketing Process and align the interests these three employees to maximize recoveries. The Special Committee established the metrics for the KEIP Award by considering, among other things, the objectives of the Marketing Process and their ongoing business needs to ensure that the metrics are challenging and drive enhanced performance by the KEIP Participants. Carr Decl. ¶ 16. The Special

Committee and Board determined that the KEIP was in the best interests of the Debtors and their stakeholders and that it appropriately addresses the Debtors' objectives.  *Id.*

32.     The KEIP contemplates a single payment to be made to the KEIP Participants tied to the aggregate consideration received by the Debtors in connection with the transactions consummated in the Marketing Process (the "**Sale Metric**").   The aggregate amount of the KEIP Awards is $600,000 if the Sale Metric is achieved at the threshold amount of $70 million (the "**Threshold Sale Metric**"), and $850,000 if the Sale Metric is achieved at the target amount of $77.5 million (the "**Target Sale Metric**").[3]  Individual amounts range from 31% to 49% of such employees' annual salary at the Threshold Sale Metric.  Importantly, all of the KEIP payments are subject to clawback should an employee be terminated for cause or voluntarily terminate their employment prior to 30 days after the closing of the KEIP Transaction.[4]

33.     A summary of the other key terms of the KEIP is as follows:

   i.   <u>KEIP Participants.</u>  The KEIP Participants are three of the Debtors' Key Employees—the President and Chief Executive Officer, Executive Vice President and Chief Financial Officer, and Executive Vice Presidents and Operations—who have played and will continue to play significant roles in running the Debtors' business and implementing the Marketing Process.

---

[3]    For the avoidance of doubt, the aggregate amount of the KEIP Awards is $600,000 for a KEIP Transaction of aggregate consideration between $70 million and $77.5 million.

[4]    The "**KEIP Transaction**" means the earliest to occur of (i) the sale or disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company and its subsidiaries (taken as a whole) to any person; (ii) a transaction or series of related transactions in which any person (including an existing stockholder of the Company) acquires, directly or indirectly, more than 50% of the total voting power of the voting equity of the Company, including by way of merger, consolidation or otherwise; (iii) the consummation of a confirmed chapter 11 plan of the Company; or (iv) any other transaction determined to be pursued by the Special Committee of the Board of Directors of Basic Energy Services, Inc.  For the avoidance of doubt, the sale transactions announced by the Company with Axis Energy Services Holdings, LLC, Berry Corporation (bry), and Select Energy Services, Inc., which aggregate to aggregate consideration of $72,000,000 (or any higher or better bidders, as determined in accordance with the Bidding Procedures and approved by the Bankruptcy Court) constitute a "KEIP Transaction" hereunder.

ii. <u>Effect on Severance and Other Compensation.</u>  To receive the KEIP payments, each KEIP Participant has agreed that the KEIP is in lieu of any other cash incentive (whether short-term or long-term), retention or severance payment (whether specified in an employment agreement or otherwise) to be paid, and each KEIP Participant has waived any right to receive any such payments.

iii. <u>KEIP Award Cost.</u>  The KEIP provides for a total KEIP Award pool of $600,000 if the Threshold Sale Metric is met and $850,000 in the aggregate if the Target Sale Metric is met.  The KEIP Awards will be divided equally between the KEIP Participants.

iv. <u>Payment.</u>  The KEIP Award, if any, will be paid to the KEIP Participants as soon as administratively practicable (but in all events, within 30 days) upon the closing of the KEIP Transaction, subject to the prior repayment in full of the DIP Facility.

v. <u>Eligibility to Receive KEIP Award.</u>

    (a) Except as noted below, each KEIP Participant shall only be eligible to receive a KEIP Award if such participant is employed as of the payment date of such KEIP Award.

    (b) If a KEIP Participant is terminated by the Debtors either (i) by reason of death or permanent disability (as determined by the Debtors), or (ii) by the Debtors other than for cause, such KEIP Participant will remain eligible to receive any KEIP Award as if such participant was still employed by the Debtors on the payment date of such KEIP Award.

vi. <u>Clawback</u>.  If a KEIP Participant voluntarily terminates their employment with the Company (other than for good reason or as a result of death or disability), or if their employment is terminated by the Company for cause, prior to the end of the Incentive Period (as defined below), the KEIP Participant will be required to repay to the Company the total gross amount of each KEIP payment paid prior to such termination and forfeit all rights to payment of any remaining KEIP payments.  The Company's ability to claw back any portion of the KEIP payments shall automatically cease 30 days after the closing of the KEIP Transaction (such period, the "**Incentive Period**"); *provided that* the Incentive Period shall automatically expire upon (i) the date in which the Court enters an order of conversion, (ii) the dismissal of these chapter 11 cases, or (iii) the KEIP Participant's commencement of employment with a purchaser in a KEIP Transaction.

## II.     Terms of the KERP

34.     The KERP is designed to retain certain non-insider Key Employees while the Debtors implement the Marketing Process and administer the chapter 11 cases.  The Debtors, with input from management, reviewed the Debtors' anticipated needs during these chapter 11 cases, the necessary features of a retention plan, and the limitations of the Bankruptcy Code.  With this guidance, the Debtors designed the KERP to enhance the Debtors' ability to maintain the continued dedication and support of the KERP Participants throughout the implementation of the Marketing Process.  The Special Committee has approved the KERP as a necessary and appropriate means of ensuring the continued support of the KERP Participants—all of whom will play a critical role in the success of the Debtors' Marketing Process and chapter 11 cases.

35.     The KERP contemplates an aggregate maximum payout of $1.4 million across 30 Key Employees.  Awards under the KERP (the "**KERP Awards**") will be made in cash to KERP Participants payable in two installments.  The first installment, which represents 25% of the KERP Award, is payable as soon as administratively practical upon the Court's approval of the KERP program.  The second installment represents 75% of the KERP Award and is payable upon the consummation of the KERP transaction; *provided that* KERP Participants who receive an offer of comparable employment from one of the purchasers in the Marketing Process shall be deemed to waive 50% of their total KERP Award (whether or not such offer is accepted).

36.     The details of the KERP can be summarized as follows:

i.  <u>KERP Participants.</u>  The KERP includes a total of 30 non-insider Key Employees.[5]

ii.  <u>KERP Awards.</u>  The maximum total cost of the KERP is approximately $1.4 million, with individual amounts ranging from 18% to 35% of each KERP Participant's annual salary.

iii.  <u>Clawback:</u>  If a KERP Participant voluntarily terminates their employment with the Company (other than for good cause or as a result of death or disability), or if their employment is terminated by the Company for cause prior to the end of the Retention Period (as defined below), the KERP Participant will be required to repay to the Company the total amount of each KERP payment paid prior to such termination on a gross basis (*i.e.*, the amount of such unvested portion that was paid before tax withholding), and the KERP Participant will forfeit all of their rights to payment of any remaining KERP payments.  The Company's ability to claw back any portion of the KERP payments shall automatically cease upon the payment date for the second KERP installment (the period between execution of the individual KERP agreement and such payment date, the "**Retention Period**"); provided that the Retention Period shall automatically expire upon either (i) the date in which the Court enters an order of conversion or (ii) the dismissal of these chapter 11 cases, or (iii) the KERP Participant's commencement of employment with one of the purchasers in the Marketing Process.

iv.  <u>Effect on Severance and Other Compensation:</u>  To receive the KERP payments, each KERP Participant has agreed that the KERP is in lieu of any other cash incentive (whether short-term or long-term), retention or severance payment (whether specified in an employment agreement or otherwise) to be paid, and each KERP Participant has waived any right to receive any such payments.

### **Market Analysis of the Employee Programs**

37.  The Debtors retained Pearl Meyer in 2003 to, among other things, provide the Company and its other professionals with independent compensation consulting services.  Hart Decl. ¶ 1.  Pearl Meyer is an international professional service firm that offers a wide variety of services to its clients, including expert analysis of executive and management compensation issues.  Hart Decl. ¶ 5.  Pearl Meyer has access to a broad range of market

---

[5]  The Debtors reserve the right to reallocate KERP Awards, in their business judgment, to additional non-insider Key Employees

compensation data, including data related to companies in chapter 11 proceedings.  *Id.*  Pearl Meyer also has substantial expertise in designing such programs for companies undergoing restructuring or bankruptcy.  *Id.*

38.     Pearl Meyer reviewed relevant market data on incentive and retention payments in chapter 11 cases and analyzed whether the Employee Programs are consistent with typical competitive practice.  Based on its analysis, Pearl Meyer concluded that Employee Programs are reasonable and consistent with competitive practice and available market data for comparable companies in chapter 11.  Hart Decl. ¶ 25.

I.      **Market Analysis of the KEIP**

39.     To ensure that the KEIP is market-based, Pearl Meyer reviewed the KEIP Award in comparison with the target awards levels and metrics used in comparable chapter 11 cases.  Hart Decl. ¶ 21.  Pearl Meyer determined, based on its review and depth of industry experience, that even if the KEIP Participants receive the maximum aggregate KEIP Award, the individual KEIP Award to KEIP Participants would still be within the range of payout amounts provided in comparable chapter 11 cases.  Hart Decl. ¶ 25.

40.     As set forth in Table I(A) below, the number of participants in the KEIP is below the 25th percentile of its comparable peers, and the total KEIP payout is between the 25th percentile and the 50th percentile of the range in terms of cost as a percentage of revenue. Hart Decl. ¶ 15-18.  Pearl Meyer also compared the KEIP Participant's total compensation package against market data.  More specifically, Pearl Meyer considered the following elements of compensation: (a) base salary; (b) target bonus as a percentage of base salary; (c) target total cash compensation (*i.e.*, base salary plus target bonus); (d) annualized expected grant value of long-term incentives; and (e) target total direct compensation (*i.e.*, target total cash

compensation plus incentive compensation) and found, as set forth in Table I(B) below, that the KEIP Participants' total compensation package, including target KEIP Awards, is in line with the market, falling below the 25th percentile for two of the KEIP Participants and between the 50th and 75th percentile for the third KEIP Participant.  *Id.*

41.     Further, as set forth in Table I(C) below, because no 2021 annual bonus or long-term incentive compensation will be awarded to the KEIP Participants, Pearl Meyer concluded that, without the compensation opportunity from the proposed KEIP, target total direct compensation levels of the KEIP Participants are, in aggregate, below the market's 10th percentile levels.  Accordingly, Pearl Meyer concluded that the cost and size of the KEIP are reasonable in comparison with these other key employee incentive plans.

**Table I(A): Peer Comparison of the KEIP Cost**

| Summary Statistics | Prepetition Revenue ($M) | Number of Participants | KEIP Cost as % of Revenue | |
|---|---|---|---|---|
| | | | Threshold Total Cost | Target Total Cost |
| 25th Percentile | $330 | 5 | 0.10% | 0.24% |
| 50th Percentile | $674 | 6 | 0.26% | 0.42% |
| 75th Percentile | $1,737 | 11 | 0.56% | 0.74% |
| **Basic** | **$377** | **3** | **0.16%** | **0.23%** |
| | | *Percentile Rank* | *33%* | *24%* |

**Table I(B): KEIP Participant Target Compensation vs. Market**

| Title | TDC at Target ($K) | Market Data | | | Percentile Rank at Target |
|---|---|---|---|---|---|
| | | 25th Percentile | 50th Percentile | 75th Percentile | |
| President & CEO | $2,535 | $2,636 | $3,185 | $4,144 | *21%* |
| EVP & CFO | $1,440 | $1,110 | $1,301 | $1,662 | *60%* |
| EVP, Region Ops | $1,306 | $1,632 | $1,862 | $2,359 | *<10%* |

**Table I(C): KEIP Participant Actual Compensation vs. Market**

| Title | TDC at Threshold ($K) | Market Data | | | Percentile Rank at Target |
|---|---|---|---|---|---|
| | | 25th Percentile | 50th Percentile | 75th Percentile | |
| President & CEO | $850 | $2,636 | $3,185 | $4,144 | *<10%* |
| EVP & CFO | $650 | $1,110 | $1,301 | $1,662 | *<10%* |
| EVP, Region Ops | $608 | $1,632 | $1,862 | $2,359 | *<10%* |

42.     According to Pearl Meyer, the absence of any meaningful incentive opportunity for the KEIP Participants would further erode the current competitiveness of the Debtors' compensation programs, which could impact the Debtors' ability to motivate the KEIP Participants to maximize the total value of the sale. Hart Decl. ¶ 17.  Without the availability to provide incentive grants consistent with typical market practice for these KEIP Participants, the Debtors' ongoing compensation structure would be significantly below market and could result in the loss of the focus and devotion necessary from these critical employees in order to achieve a successful sale.  *Id.*

## II.     Market Analysis of the KERP

43.     The Debtors designed the KERP to ensure that its terms were competitive within the industry.  To further ensure its reasonableness, Pearl Meyer conducted a study to assess the Debtors' salary and total cash compensation levels as compared to market peers. Pearl Meyer reviewed the retention plans authorized and approved in the chapter 11 cases of the following 10 companies (collectively, the "**KERP Chapter 11 Comparables**") that filed petitions from 2015-2020 and had annual revenues between $153 million and $3.2 billion:

| | |
|---|---|
| Bristow Group Inc. | Patriot Coal Corporation |
| Exide Holdings, Inc. | Stage Stores, Inc. |
| Fred's, Inc. | Tidewater Inc. |
| LSC Communications, Inc. | Ultra Petroleum Corp. |
| Maxus Energy Corp. | Westmoreland Coal Company |

Hart Decl. ¶ 21.

44.     The analysis confirmed that the KERP is in line with market terms and is a reasonable, cost-effective way to provide the appropriate incentives and to retain the KERP Participants, who are essential to the Debtors' Marketing Process.  Hart Decl. ¶ 25.

45.     Compared to the retention programs in comparable chapter 11 cases, Pearl Meyer found that the aggregate total cost and terms of the KERP are generally in line with the terms of the key employee retention plans approved in other recent chapter 11 cases.  *Id.* As provided in <u>Table II(A)</u>, <u>Table II(B)</u>, and <u>Table II(C)</u> below, the number of participants in the KERP is below 25th percentile of its comparable peers, the total payout is between the 25th percentile and the 50th percentile of the range, and the payout per participant is between the 50th percentile and the 75th percentile of the range.  Accordingly, Pearl Meyer concluded that the cost and size of the KERP are reasonable in comparison with these other key employee retention plans.  Hart Decl. ¶ 24.

**Table II(A): Peer Comparison of the KERP Total Cost**

|  | **KERP Total Cost ($K)** |
|---|---|
| 25th Percentile | $1,323 |
| 50th Percentile | $3,340 |
| 75th Percentile | $4,515 |
| **Basic** | **$1,400** |

**Table II(B): Peer Comparison of the KERP Per Participant Cost**

|  | **Per Participant Cost ($K)** |
|---|---|
| 25th Percentile | $23 |
| 50th Percentile | $41 |
| 75th Percentile | $50 |
| **Basic** | **$47** |

**Table II(C): Peer Comparison of the Total KERP Participants**

|  | **Total KERP Participants** |
|---|---|
| 25th Percentile | 48 |
| 50th Percentile | 70 |

|  | Total KERP Participants |
|---|---|
| 75th Percentile | 112 |
| **Basic** | **30** |

46.     Based on the foregoing, and as set forth in the Hart Declaration, Pearl Meyer concluded that the cost and scope of the KERP are reasonable and market-competitive.

**Relief Requested Should Be Granted**

47.     The Court should grant the relief requested because (i) the implementation of the proposed Employee Programs reflects a reasonable exercise of the Debtors' business judgment and, therefore, is appropriate under section 363(b) of the Bankruptcy Code; and (ii) the KEIP and KERP both satisfy section 503(c) of the Bankruptcy Code because (a) the KEIP is not a retention bonus due to its incentive-based structure, (b) the proposed KERP does not provide for payments to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code, and (c) the KEIP and KERP are justified by the facts and circumstances of these chapter 11 cases.

**I.      Implementation of the Employee Programs Is a Reasonable Exercise of the Debtors' Business Judgment**

48.     The Employee Programs constitute a sound exercise of the Debtors' business judgment and should be approved under section 363(b)(1) of the Bankruptcy Code. Section 363(b)(1) provides that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). *In re Viking Offshore (USA), Inc.*, 08-31219-H3-11, 2008 WL 1930056, at *2 (Bankr. S.D. Tex. Apr. 30, 2008) (applying the business judgment rule to determine whether the debtors' proposed bonuses were justified outside the ordinary course of business); *In re Mesa Air Grp., Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept.

24, 2010) (approving employee bonus programs as "valid exercise of their business judgment" under section 363(b)).

49.     The Debtors and their advisors undertook a careful selection process to determine the specific employees who should be eligible for the Employee Programs, and they designed the Sale Metric to achieve desired objectives that will benefit all stakeholders.  The Employee Programs are appropriately designed and narrowly tailored to incentivize the KEIP Participants to create and maximize value for the benefit of the Debtors' economic stakeholders and to motivate and retain the KERP Participants while the Debtors implement the Marketing Process and administer the chapter 11 cases.  The Employee Programs also are consistent with market practices and reasonable based on a comparative review.  Further, implementation of the Employee Programs will benefit the Debtors' estates generally by reducing administrative claims for severance and incentive plan payments that many of the Key Employees have in exchange for the certainty and accelerated timing of the payments under the Employee Programs.

## II.     The Employee Programs Satisfy Sections 503(c) of the Bankruptcy Code

50.     Both the KEIP and the KERP satisfy section 503(c) of the Bankruptcy Code because the KEIP is not a retention bonus due to its incentive-based structure, and the proposed KERP does not provide for payments to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.   Moreover, the KEIP and KERP are justified by the facts and circumstances of these chapter 11 cases.

### A.     The KEIP Is an Incentive-Based Program to Which Section 503(c)(1) Does Not Apply

51.     Section 503(c)(1) of the Bankruptcy Code imposes substantial limitations on retention-based insider compensation programs, but section 503(c)(1) does not

apply to performance-based incentive plans. *See, e.g.*, *In re Velo Holdings, Inc.*, 472 B.R. 201, 209–10 (Bankr. S.D.N.Y. 2012) (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *In re Borders Grp. Inc.*, 453 B.R 459, 471 (Bankr. S.D.N.Y. 2011) (finding that the debtors met the burden to establish that the incentive plan was incentivizing, "thereby alleviating the need for a section 503(c)(1) analysis").   In determining whether an employee bonus plan is incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  This analysis further recognizes that all compensation, to some degree, has a retentive element. *See In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance.").  Rather, the focus is on whether the plan is, on the whole, truly incentivizing in nature by demanding a "stretch" before an award opportunity is achieved. *In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006); *accord Glob. Home Prods.*, 369 B.R. at 785 ("The entire analysis changes if a bonus plan is not primarily motivated to retain personnel or is not in the nature of severance.").

52.     The KEIP does not provide bonuses for retention, but rather, allocates payments to the three employees who are most critical to maximizing the value of the Debtors' business and consummating sales.  The KEIP has been crafted with great care to ensure it directly incentivizes participants to meet the objectives of the Marketing Process.

53.     The KEIP encourages the KEIP Participants to achieve the highest possible sale value, including at or above the Threshold Sale Metric.  The KEIP Participants will receive the KEIP Award only if the Company consummates one or more sale that generates

$70 million or greater in proceeds. Although the Stalking Horse APAs provide for aggregate consideration exceeding the Threshold Sale Metric, their consummation is by no means a guarantee. Converting the Stalking Horse APAs into consummated transaction requires a tremendous amount of work, including (i) the consummation of three separate sales with three separate buyers, (ii) negotiations with vendors, customers, and other key constituents in connection with each Stalking Horse APA, (iii) reviewing and responding to diligence and other information requests, (iv) conducting site visits and management meetings, (v) developing a transition plan and budget, (vi) educating bidders, and (vii) assisting with transition and wind-down planning. *Supra*, at ¶ 3.

54.     In addition, the KEIP Participants must ensure compliance with a multitude of covenants under the DIP Facility and the purchase agreements entered into in connection with the Stalking Horse Bids (the "**Stalking Horse APAs**"). Carr Decl. ¶ 17. The DIP Facility, for example, requires the Debtors to (i) provide daily reporting of information related to accounts receivables, (ii) hold weekly meetings with lenders under the DIP Facility to discuss the Debtors' financial position and the status of the chapter 11 cases, and (iii) deliver weekly borrowing base certificates (and remain within adjusted requirements), compliance certificates, and budgets, among other items. *Id.* The Stalking Horse APAs provide another set of responsibilities: the KEIP Participants must (i) ensure that the business operates in the ordinary course of business and that the assets subject to the Stalking Horse APAs are preserved, (ii) act as a liaison between the purchasers and the Debtors' employees regarding potential employment opportunities, (iii) design and implement a break-up of the Debtors' businesses into three separate transactions, (iv) negotiate and execute transition services agreements which cover necessary operational and financial services that only the Debtors can facilitate,

(v) deliver documentation necessary to transfer title to wells, vehicles, intellectual property, and other assets, and (vi) deliver various schedules and statements necessary to consummate the Stalking Horse APAs. *Id.*

55.     The KEIP Participants will be required, as outlined above, to make substantial efforts to achieve the Threshold Sale Metric while continuing to operate the Company.  Achieving the Threshold Sale Metric will be particularly demanding in light of the Debtors' already razor-thin margin of performance under the DIP Budget, increased operational costs associated with difficulties retaining customers due to the negative publicity attendant to the chapter 11 filings, and challenges related to vendors as a result of the chapter 11 cases, employee attrition, operating a business in chapter 11, and a declining volume of customer orders. *See* Carr Decl. ¶ 18.

56.     Moreover, although the KEIP was not designed with the goal of retaining the KEIP Participants, the fact that the KEIP may encourage the KEIP Participants to remain employed with the Debtors throughout the chapter 11 cases should not bar implementation of the KEIP.  Indeed, all successful incentive plans have the indirect benefit of incentivizing an employee to remain with the company. *See In re Alpha Natural Resources, Inc.*, 546 B.R. at 356 ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1).").  As discussed herein and in the Hart and Carr Declarations, payouts under the KEIP require more than merely remaining employed; they require that the consummate three Stalking Horse APAs on a compressed timeline.  Accordingly, there is no guarantee that the KEIP Participants will receive any payouts.

57.     In view of the foregoing, the Debtors submit that section 503(c)(1) of the Bankruptcy Code does not bar approval of the KEIP.

**B.      Section 503(c)(1) Also Does Not Apply to the KERP**

58.      Section 503(c)(1) is not applicable in evaluating the KERP either, because none of the KERP Participants are "insiders" as such term is defined in section 101(31) of the Bankruptcy Code.  The Bankruptcy Code defines an "insider" to include, among other things, an "officer of the debtor" and a "person in control of the debtor."  11 U.S.C. § 101(31). Courts have also concluded that an employee may be an "insider" if such employee has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."  *Velo Holdings*, 472 B.R. at 208.  It is well-established that an employee's job title, alone, does not make such employee an "insider" as defined by the Bankruptcy Code.  *Borders Grp.*, 453 B.R. at 469 (noting that "[c]ompanies often give employees the title 'director' or 'director level,' but do not give them decision-making authority akin to an executive" and concluding that certain "director level" employees in that case were not insiders).

59.      First, none of the KERP Participants has discretionary control over any substantial budgetary amounts or the ability to dictate company policy.  Hurley Decl. ¶¶ 11-13. Second, although certain of the KERP Participants hold titles such as "director", "senior vice president", or "head," such employees must obtain approval from senior management before taking any action with respect to the disposition of significant assets.  *Id.*  Third, none of the KERP Participants is a member of the Board of Directors of Basic Energy Services, Inc. or participates in the Debtors' corporate governance.  *Id.*  Finally, none of the KERP Participants had any say or input whatsoever on any aspect of the KERP or its ultimate formulation.  *Id*. Accordingly, Section 503(c)(1) is inapplicable in evaluating the KERP.

C.     **The Employee Programs Are Justified by the Facts and Circumstances of the Case**

60.     Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  Courts consider several factors in determining whether a particular program is justified under the facts and circumstances of a particular case, including: (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence with respect to creating and authorizing the plan. *See Glob. Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77.  No single factor is dispositive, and the Court has discretion to weigh each of these factors based on the specific facts and circumstances before it.  *See Dana Corp.*, 358 B.R. at 576 ("[S]ection 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance.").  As set forth below, the Employee Programs satisfy all of these factors:

- *Employee Programs are Structured to Achieve the Desired Performance*.

  The KEIP incentivizes the Debtors' senior management to drive a successful Marketing Process.  Achievement of the Sale Metrics will require substantial efforts from the KEIP Participants in the midst of a challenging financial situation and operating environment. *Supra*, at ¶ [51-53].  The KEIP Participants "simply showing up" will not result in achievement of the Sale Metrics, and, therefore, no award will be earned without substantial outperformance by the KEIP Participants. *Id.*

  The KERP was designed to avoid the loss of personnel key to ongoing operations and motivate and reward the KERP Participants for their

significant efforts given the increased demands placed upon them in connection with the chapter 11 and sale process.  Hurley Decl. ¶ 5.  A failure to retain the KERP Participants would likely cause the Debtors' financial performance to suffer. *Id.*  It would also cause the Debtors to incur significant time and expense to hire and train replacement employees (assuming they could be found), which would, in turn, be detrimental to their efforts to quickly and efficiently effectuate the KEIP Transaction. *Id.*

- ***Scope of the Employee Programs is Fair and Reasonable***.

  The KEIP Participants were carefully selected and limited to a set of three of the most senior individuals at the Company who drive performance and are critical to ensuring a successful outcome to the Marketing Process. Carr Decl. ¶ 8.  The KEIP is reasonably limited to key employees whose efforts are absolutely critical to these chapter 11 cases and its cost is reasonable in comparison to the KEIP Transaction.

  The KERP was thoughtfully limited to only 30 employees who were identified as near-irreplaceable, and the amount of the KEIP is reasonable in light of the Debtors' assets, liabilities, and sale proceeds and is consistent with, and within the range of reasonableness of, similar programs implemented in chapter 11 cases with debtors of similar size. Out of the Debtors' total employee base of approximately 2,400, the Debtors selected a narrowly-defined group of 30 Key Employees to participate in the KERP.  Hurley Decl. ¶ 9.  The KERP Participants, who work across a wide variety of disciplines and carry out vital operational function, are essential to the Debtors' operations and to the success of the Marketing Process.  Hurley Decl. ¶ 10.

- ***Debtors Developed the Employee Programs with Independent Advice and Oversight***.

  The Debtors actively sought input from their legal, financial, and compensation advisors during the development process. Carr Decl. ¶ 13. This process included Pearl Meyer's specific compensation-related expertise and analysis and oversight and approval of the independent Special Committee. *Id.*

- ***Debtors Were Duly Diligent***.

  The Special Committee, led by Alan Carr, with the support of the Debtors' advisors worked with management to evaluate the Debtors' existing compensation structure and business needs and develop employee compensation programs to retain and properly incentivize employees critical to realizing the maximum value for the Company's assets in a chapter 11 marketing and sale process. *Id.*

- ***Cost of the Employee Programs is Reasonable***.

  The cost of the Employee Programs falls within the range of costs of programs implemented in comparable chapter 11 cases. *Supra*, at ¶ [44]. As stated above, at most, the KEIP will cost $850,000 assuming the Target Sale Metric is achieved. As described above, the costs of the KEIP as a percentage of prepetition revenue is 0.23% at target, which is at the 24th percentile of annualized target KEIP costs in 15 comparable cases. *Supra*, at ¶ 18. Further, even with the KEIP, the KEIP Participants' total direct compensation will be below the 10th percentile of market pay. *Supra*, at ¶ 39.

  The KERP is reasonable in light of the Debtors' assets, liabilities, and revenues and is consistent with, and within the range of reasonableness of, similar programs implemented in chapter 11 cases with debtors of similar size. As discussed above and in the Hart Declaration, the Debtors' advisors engaged in a comprehensive benchmarking analysis to assist the Debtors with the design of the KERP. *Supra*, at ¶ 20.

61.     Accordingly, the Employee Programs satisfy section 503(c)(3) of the Bankruptcy Code and are justified under the facts and circumstances of these chapter 11 cases.

## Notice

62.     Notice of this Motion will be served upon any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 27, 2021
      Houston, Texas

/s/ Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Stephanie N. Morrison (admitted *pro hac vice*)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email: Alfredo.Perez@weil.com
       Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Sunny Singh (admitted *pro hac vice*)
Jared R. Friedmann (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that, on August 27, 2021, a true and correct copy of the foregoing document was served as provided by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*     
Alfredo R. Pérez
