## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BASIC ENERGY | § | |
| SERVICES, INC., *et al.,* | § | Case No. 21-90002 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

**ASCRIBE III INVESTMENTS LLC'S OBJECTION TO EMERGENCY
MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) (A) APPROVING
GLOBAL SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019; (B)
AUTHORIZING FINAL RESOLUTION OF DEBTORS' CHAPTER 11 CASES;
AND (C) GRANTING RELATED RELIEF; OR, IN THE ALTERNATIVE (II)
<u>CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CHAPTER 7 CASES</u>**
**[Relates to ECF No. 606]**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Basic ESA, Inc. (2279); Basic Energy Services, Inc. (1194); C&J Well Services, Inc. (5684); KVS Transportation, Inc. (4882); Indigo Injection #3, LLC (7657); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Basic Energy Services, L.P. (1819); Taylor Industries, LLC (7037); SCH Disposal, L.L.C. (8335); Agua Libre Holdco LLC (3092); Agua Libre Asset Co LLC (1409); and Agua Libre Midstream LLC (6701). The Debtors' headquarters and service address for the purposes of these chapter 11 cases is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

## TABLE OF CONTENTS

SUMMARY OF OBJECTION .................................................................................. 1

BACKGROUND ................................................................................................. 3

OBJECTION TO EMERGENCY CONSIDERATION .................................................. 9

OBJECTION TO MOTION .................................................................................. 12

I.  The Debtor's Proposal is not a "Global Settlement" Approvable under Bankruptcy
    Rule 9019 and is Instead an Impermissible *Sub Rosa* Plan ..................................13

    A.  The Debtors have not met their burden under Bankruptcy Rule 9019 ................. 13

    B.  The proposal is an impermissible *sub rosa* plan .......................................... 16

II.  Structured Dismissals are Not Permitted by the Bankruptcy Code ...................17

III.  The Structured Dismissal Also Violates the Absolute Priority Rule ................18

IV.  Numerous Additional Aspects of the Proposal Are Impermissible and Compel
     Denial ....................................................................................................23

    A.  The proposed releases and exculpations are impermissible ............................ 23

    B.  "Irrevocable" interim distributions are not permitted .................................... 27

    C.  The structure runs afoul of Bankruptcy Code section 349 .............................. 28

    D.  The proposed reserve for Ascribe is insufficient ........................................ 29

    E.  The claims resolution process detailed in the Debtors' structure is impermissible 30

    F.  Despite the structured "dismissal," these cases will live long into the future ........ 30

    G.  The Debtors are not authorized to use Ascribe's cash collateral ............................ 31

    H.  The Debtors really propose substantive consolidation ............................................ 31

V.  Conversion of These Cases is the Only Appropriate and Rational Result ....................32

RESERVATION OF RIGHTS ............................................................................... 34

CONCLUSION...................................................................................................... 34

Ascribe III Investments LLC ("<u>Ascribe</u>"), a substantial creditor and equity holder in the above-referenced cases, files this objection (the "<u>Objection</u>") to the *Emergency Motion of Debtors for Entry of an Order (I) (A) Approving Global Settlement Pursuant To Bankruptcy Rule 9019; (B) Authorizing Final Resolution of Debtors' Chapter 11 Cases; and (C) Granting Related Relief; or, in the Alternative (II) Converting the Debtors' Chapter 11 Cases to Chapter 7 Cases* (the "<u>Motion</u>"),[2] and in support hereof respectfully states as follows:

## SUMMARY OF OBJECTION

1.      The processes, structures, and overarching relief sought by the Debtors' Motion amount to the bankruptcy equivalent of a classic Rube Goldberg device—a complex and convoluted structure designed to achieve an end result for which there already exists a simple, straightforward, and in this case, legally permissible device.  That "device" in the present situation is chapter 7 of the Bankruptcy Code.  The Debtors' proposal seeks a result that is simply without precedent in this District or Circuit, and is devoid of any statutory support in the Bankruptcy Code. Through their Motion, the Debtors seek the Court's blessing of the Structured Dismissal and the laundry list of legally impermissible benefits to be conveyed as part of a purported "global" settlement, all on four days' notice, without affording a modicum of due process.[3]

2.      The Motion makes clear that the Debtors have virtually no chance of successfully confirming a plan or obtaining authority for continued use of cash collateral, the only two issues that Debtors' Proposal professes to being "settled."  It is also apparent to Ascribe that the Debtors (and presumably their professionals) are driven by a desire to (i) obtain broad releases and the payment of professional fees in these administratively insolvent cases, and (ii) avoid the stigma of

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings set forth in the Motion.

[3] Debtors' "Global Settlement" is a misnomer and will hereinafter be referred to as the "<u>Debtors' Proposal</u>."

a conversion.   The Debtors found willing participants in pursuing these goals in the Ad Hoc Group and the Creditors' Committee, obtaining their support by giving (a) the Ad Hoc Group a wholly inappropriate irrevocable interim distribution in the estimated amount $12 million and the opportunity to seek to "extract a pound of flesh" from Ascribe over the next several years (notwithstanding the fact that, after a full and complete investigation that commenced pre-petition, the only claim the Debtors brought against Ascribe was a statutory preference claim that alleges no wrongdoing on the part of Ascribe and to which valid defenses exist), and (b) the Creditors' Committee continued existence going forward for no rational purpose.   Further sweetening the pot, the Debtors have also earmarked a nominal gift in violation of strict adherence to the absolute priority rule—to be shared pro rata among its unsecured creditors.

3.   The Structured Dismissal itself is equally pointless as it is illegal.   These cases should be converted. Each and every ongoing or deferred matter identified by the Debtors is well within the purview, capabilities, and experience of a chapter 7 trustee. Chapter 7 will avoid any concerns as to the abilities, duties, and most importantly, loyalties of the proposed Wind Down Director who will be appointed by, and thus presumably beholden to, the Ad Hoc Group.   A completely independent chapter 7 trustee will bring these cases to a prompt conclusion.   If there are causes of action to bring against Ascribe,[4] these can be brought expeditiously, without enabling the Ad Hoc Group to use the mere threat of litigation coupled with the indefinite withholding of Ascribe's claim distributions to be used as a bludgeon against Ascribe (as will certainly be done under the Debtors' proposal).

4.   If the Debtors prevail here, then one must fear that the floodgates will open to future debtors that seek to implement the "Basic Energy process": (i) negotiate a sweetheart deal for one

---

[4] To be clear, Ascribe vigorously denies that any plausible claims exist against it relating to these Debtors.

or two creditor groups, (ii) slap the "Global Settlement" misnomer upon the structure and seek approval under Rule 9019, (iii) confess "cause" for dismissal under § 1112, and (iv) add chapter 11 plan "bells and whistles" (including improper broad releases) and seek approval as a "structured dismissal" that does not end the case but does effectively end court oversight.  All of this on just a handful of days' notice.  Why would any future debtor trouble itself with the pesky protections embedded throughout the Bankruptcy Code's plan confirmation provisions when it can ignore due process, ignore various Bankruptcy Code provisions, and "restructure" via the Basic Energy path? The Court should decline the invitation to open these floodgates and thus deny the Debtors' Motion.

## BACKGROUND

5.      On August 17, 2021 (the "Petition Date"), the Debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' chapter 11 cases are jointly administered for procedural purposes only.

6.      On September 14, 2021, the Court entered the Final Order Pursuant to Sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to the Prepetition Secured Parties for the Use Thereof; and (IV) and Granting Related Relief [Doc. No. 344] (the "Final DIP Order").  Pursuant to the Final DIP Order, the Court approved the Debtors' Stipulations (as defined therein).[5]

7.      As described and defined in the Final DIP Order, Ascribe holds debt obligations of

---

[5] See Final DIP Order ¶ 5.

the Debtors throughout the Debtors' capital structure as follows: (i) Ascribe is the Prepetition Second Lien Secured Party with a principal amount due of $15,000,000; (ii) Ascribe is the Additional Prepetition Secured Note Secured Party with a principal amount due of $15,000,000; and (iii) Ascribe is a Prepetition Secured Noteholder. Ascribe is also the owner of a majority of the Debtors' equity interests.  The Final DIP Order contains stipulations by the Debtors specifically relating to Ascribe and establishing the validity, enforceability, and priority of its claims and liens at paragraphs 5(b)(i)-(iv) and 5(e)(i)-(iv).

8.       Ascribe's "Prepetition Second Lien Note Obligations" (as defined in the Final DIP Order) are secured by continuing, legal, valid, binding, properly perfected, enforceable, non-avoidable second priority liens on and security interests in all of the Prepetition Second Lien Note Collateral (as defined in the Final DIP Order), which generally includes, among other things, all of the Debtors' cash (including the cash in their deposit accounts and other accounts), wherever located, whether as original collateral or proceeds of other Collateral except for certain excluded property (as specified in the prepetition loan documents) that constitutes cash collateral, accounts receivable, customer contracts, and inventory.

9.       Ascribe's Additional Prepetition Secured Note Obligations (as defined in the Final DIP Order) are secured by continuing, legal, valid, binding, properly perfected, enforceable, non-avoidable liens on and security interests in all of the Additional Prepetition Secured Note Collateral (as defined in the Final DIP Order), which generally consists of substantially all of the Debtors' tangible assets and properties (including assets sold in the Sale Transactions).

10.      The Additional Prepetition Secured Note Collateral is substantially identical to the Collateral that secures the Prepetition Secured Notes Obligations; however, as to certain of such Collateral the liens that secure the obligations owing to Ascribe are senior to the liens that secure

the Prepetition Secured Notes Obligations. *See* Final DIP Order, Exhibit B, Annex 1.  This senior position relative to the Prepetition Secured Notes Obligations (*i.e.*, the Ad Hoc Group) is the result of prepetition lien filing missteps by parties unrelated to Ascribe and is a source of considerable consternation on the part of the Ad Hoc Group at Ascribe.

11.     On August 31, 2021, and effective May 3, 2021, the Debtors appointed Alan Carr ("Mr. Carr") to be an "independent director" to the Board of Directors of Basic.  Mr. Carr engaged Ropes & Gray to assist him in his duties as Independent Director, specifically including to conduct an extensive investigation of Ascribe's relationships with Basic and potential causes of action that may exist against Ascribe.  Through the *Response of Alan Carr, Member of the Special Committee of the Board of Directors of Basic Energy Services Inc., in Support of Debtors' Emergency Motion Seeking Approval of Global Settlement*[6] (the "Carr Response"), dated November 3, 2021 it is known that Ropes & Gray's investigation resulted in a 216-page report (the "Ropes Report") that assesses and sets forth conclusions and recommendations as to potential causes of action against Ascribe.  Based upon certain disclosures, Ascribe understands that the Debtors paid Ropes & Gray in excess of millions of dollars in fees associated with its investigation and the Ropes Report. Despite multiple requests, to date the Debtors have not publicly filed the Ropes Report or shared it with Ascribe.[7]

12.     On October 8, 2021, Mr. Carr filed the Independent Director Adversary Proceeding against Ascribe, a straightforward statutory preference action seeking to avoid liability under the Make-Whole Notes (*i.e.*, increase the recovery to other secured parties by reducing Ascribe's

---

[6] ECF No. 634.

[7] Ascribe assumes that the Ropes Report and/or the conclusions stated in the report have been shared with the Ad Hoc Group and with the Creditors' Committee.

secured claim[8]).  The time for Ascribe to file an answer or motion to dismiss has been extended by agreement of the parties to December 13, 2021 and Ascribe plans to vigorously answer and defend against the Independent Director Adversary Proceeding and will do so.  No other claims or causes of action have been asserted or even specifically threatened as to Ascribe, thus casting substantial doubt upon the substance of the conclusions contained in the Ropes Report.

13.     The tightrope that the Carr Response attempts to walk in support of the Debtors' Motion is breathtaking.  The Debtors and Mr. Carr rely heavily on the Ropes Report as a sword in support of the Debtors' Motion and the granting of releases (even though, as the Carr Response freely admits in paragraph 20, the "Proposed Releases are not providing economic consideration in favor of the releases"), thereby waiving any supposed claim of privilege over its contents.

14.     From the moment that Ascribe made its March 2020 investment in the company, any and all transactions pursued and consummated by the company were done under the auspices of counsel for the company, Weil Gotshal. Part and parcel therewith, it was determined by Weil Gotshal as part of the March 2020 transaction that any company matters involving Ascribe would be handled and overseen by a special committee and independent directors.[9]  Indeed, the evidence showed that the Debtors' counsel advised the independent board members with respect to ***every transaction*** the Debtors entered into with Ascribe, and that the independent board members on the advice of Debtors' counsel approved every single transaction with Ascribe.  The evidence also showed that Ascribe was the *only* party that was prepared to provide the Debtors with liquidity at crucial junctures.  In addition, and perhaps ironically, given the Motion before the Court, the March

---

[8] The Debtors concede that "administrative and prepetition general unsecured creditors will likely recover nothing if the cases are converted to chapter 7 ***given the enormous amount of secured debt that will not be satisfied in full***." Mot. ¶ 9 (emphasis added); *see also id.* ¶ 35.

[9] For the avoidance of doubt, the opportunity that was reflected in the March 2020 transaction was presented to Ascribe by the company and its professionals.

2020 transaction that Ascribe facilitated provided the largest source of economic recovery to all stakeholders in connection with the 363 sales consummated by the Debtors.

15.     Indeed, after expounding upon the virtues of the process that the Debtors' counsel undertook with independent and disinterested directors of the Debtors that obtained the expert advice of experienced financial and legal advisors,[10] the Carr Response then goes on to note that the Ropes Report carefully evaluated all potential claims.[11]   And, after an investigation that spanned nearly half a year, the sole product of the Ropes Report was a narrow preference claim that Mr. Carr filed on October 8, 2021; a straightforward statutory preference action seeking to avoid liability under the Make-Whole Notes (*i.e.*, increase the recovery to other secured parties by reducing Ascribe's secured claim).[12]   A statutory preference claim does not and cannot suggest any wrongdoing on the part of Ascribe.  Indeed, there is not even a whiff of same, but in order to advance their unsupportable narrative, the Debtors and their collaborators baselessly vilify and besmirch Ascribe's constructive and supportive role throughout.  That is why the Debtors have suppressed the Ropes Report and kept it from Ascribe and this Court.

16.     Left with no other justifiable narrative, the Carr Response then tries to inappropriately insinuate that while Ascribe cooperated with Mr. Carr's investigation, it somehow did not fully so do.  Nothing could be further from the truth. Ascribe voluntarily made its Chief Investment Officer, Mr. Lawrence First, available for an unfettered interview with Ropes & Gray (Mr. Carr chose not to participate), who answered all of Mr. Carr's counsel's questions fully and

---

[10] Carr Resp. ¶ 16

[11] *Id.* ¶¶ 13-15.

[12] The Debtors concede that "administrative and prepetition general unsecured creditors will likely recover nothing if the cases are converted to chapter 7 ***given the enormous amount of secured debt that will not be satisfied in full***." Mot. ¶ 9 (emphasis added); *see also id.* ¶ 35.

completely.[13]

17.    No relief should be granted in response to the Debtors' Motion until the Ropes Report is disclosed.  Indeed, it is hard to imagine how this Court could pass upon permitting releases in favor of any party without having the Ropes Report in the evidentiary record.

18.    On September 23, 2021, the Court entered the Sale Orders.  Each of the Sale Transactions approved pursuant to the Sale Orders has closed, with the most recent closing occurring over a month ago. Since that time, there has been no meaningful activity in the Debtors' cases.

19.    Just prior to midnight on Sunday, October 31, 2021, the Debtors filed the Motion. The Motion lays out a poorly-described and disingenuously-labeled "global settlement" and proposed structured dismissal and makes a half-hearted attempt to justify approval of the same. Among other things, the Motion requests that the Court:

- Dismiss the Chapter 11 Cases with the exception of the Lead Case.

- Authorize the Debtors and the Ad Hoc Group to create pools of funds from Collateral proceeds and make "gift" distributions to unsecured creditors (including professionals, other administrative creditors, employee-related obligations, and trade vendors), and fund a Wind Down Reserve.

- Grant broad releases, discharges, and exculpation to the Debtors, the Ad Hoc Group, the Creditors' Committee, their professionals, and related persons.

- Authorize the Ad Hoc Group to appoint a Wind Down Director to perform non-complex tasks (akin to those of a post-confirmation trustee) and otherwise continue the Lead Case.

- Authorize the Ad Hoc Group to make distributions expressly contrary to the Supreme Court's edict in *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017) that a bankruptcy

---

[13] To be clear, while Mr. Carr now suggests that Ascribe provided only "limited" cooperation, that is false and misleading. Ascribe both produced documents and made its most senior investment professional available for an interview.  Mr. Carr neglects to mention that he only sought informal discovery from Ascribe on the eve of the Debtors' bankruptcy filing, and the primary reason was to confirm that the *Debtors' counsel*, which had advised the Debtors' independent directors on every transaction with Ascribe, had not somehow engaged in wrongdoing.  Mr. Carr's counsel also acknowledged that, given the voluminous production made by the Debtors related to the transactions that Mr. Carr has evaluated, they did not need or require Ascribe to make a production that would be more voluminous but duplicative.

court may not approve a structured dismissal, over the objection of an affected creditor, that violates the strict priority structures of the Bankruptcy Code.

- Afford blanket, on-going vitality to all prior orders and rulings of the Court notwithstanding dismissal.

- Continue in existence the Creditors' Committee and the administrative expense priority of its professionals' fees.

- Appoint the Wind Down Director (who has not been identified to the Court) to be the plaintiff in the Independent Director Adversary Proceeding, and the continued prosecution of that action.

20.    Notwithstanding the statement made on page 22 of the Motion that the Debtors, the Creditors' Committee and the Ad Hoc Group all agree to engage in good faith settlement negotiations with Ascribe after filing the Motion and prior to the hearing on the Motion, Ascribe has yet to receive a phone call.

21.    On November 3, 2021, counsel for Mr. Carr filed the Carr Response.

22.    The Debtors have requested "emergency" consideration of the Motion with a hearing to occur beginning at 10:00 A.M. (Central Time) on Friday, November 5, 2021, just four full days from the time that the Motion was filed and served via the Court's ECF system.

23.    The Motion makes clear that the Ad Hoc Group is content to proceed to the conversion of these cases, and, as an alternative requested relief in the Motion, even the Debtors seek conversion of the cases to chapter 7.

### OBJECTION TO EMERGENCY CONSIDERATION

24.    As an initial matter, Ascribe objects to the Debtors' request for emergency consideration of the Motion on a mere four days' notice.  Quite simply, the Debtors have not even attempted to comply with Bankruptcy Local Rule 9013-1(i).  There is no true emergency, rather only a contrived "emergency' manufactured by the requested relief.  The request for emergency consideration must be denied.

25.     Bankruptcy Local Rule 9013-1(i) sets forth three requirements for emergency motions.  The Motion meets none of these requirements.

26.     *First*, an emergency motion "***must include*** a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency." (emphasis added).  The Debtors' dedicate just a single sentence to the request, explaining that they "are requesting emergency relief to facilitate the Debtors' access to cash collateral and a swift resolution of the Chapter 11 Cases that will maximize value for all stakeholders."[14]  The Debtors do not explain how hearing the Motion in the ordinary course would in any way impair their access to cash collateral or diminish value for stakeholders.  Nor do the Debtors explain how hearing the Motion on the arbitrarily selected hearing date, November 5, 2021, will help avoid the consequences of the emergency.  Ascribe suspects that the answer will be: "the Ad Hoc Group required this emergency consideration."   But, as further discussed below, the Ad Hoc Group cannot be permitted to hijack control of these cases in such a manner (nor can the Debtors simply cede control to these non-fiduciaries).   There is no emergency other than the self-created emergency that the Debtors now find themselves in.  The Ad Hoc Group's threatened ramification of failure of emergency consideration should actually prevail and the cases should convert to chapter 7.

27.     *Second*, Bankruptcy Local Rule 9013-1(i) requires that "[t]he motion seeking an emergency hearing . . . be certified for its accuracy by the party seeking the emergency relief or by its counsel." The Debtors have failed to provide such certification in any way.  *Third*, the movant must include a paragraph in the notice of motion containing the specific language quoted in Bankruptcy Local Rule 9013-1(i) that explains the implication of the movant's request for

---

[14] Mot. ¶ 73.

emergency consideration.  The Debtors did not include the required language in the Motion's notice (or anywhere else).

28.     Even had the Debtors met the procedural requirements, emergency consideration would still be inappropriate under the circumstances.  In the two-and-a-half months since their misguided decision to pursue chapter 11 (rather than chapter 7), the Debtors have not progressed the Chapter 11 Cases toward a reorganization.  The Sale Hearing concluded, and the Sales Orders were entered on, September 23, 2021, six full weeks ago.  Nothing precluded the Debtors from bringing the Motion during this period.

29.     Given the lack of a true emergency, consideration of the motion on an emergency basis would be unjust and will only serve to limit Ascribe's and other parties' ability to meaningfully respond to the extraordinary relief sought by the Debtors, including with respect to the ability of the parties to have a full and complete evidentiary hearing.  Notably, the Fifth Circuit has found in a similar case that strategic time pressure can diminish the parties'—and a court's— ability to observe and enforce proper standards.  *Matter of Aweco, Inc*., 725 F.2d 293, 299-300 (5th Cir. 1984) (reversing bankruptcy court's approval of a settlement agreement where "time pressure functioned as a shotgun" leading the bankruptcy court to approve a settlement agreement "without sufficient factual information to determine if the settlement was fair and equitable" and therefore "the circumstances . . . surrounding approval of th[e] settlement, called for a pause.").

30.     The simple fact is that there is no emergency other than the one artificially created by the Ad Hoc Group.  While all parties, including Ascribe, would like to see the outrageous expenses of these chapter 11 cases come to an end, nevertheless this is not the proverbial "melting ice cube."   The Sales Transactions have closed and the estate has deposited the proceeds in one

or more accounts.[15]  To the extent that on-going costs compel the emergency, there is a simple solution: Estate Professionals go "pens down" and stop the expense drain.  Because the Debtors have not demonstrated their entitlement to emergency consideration, the Debtors are essentially asking the Court to commit reversible error.  If this Motion is to be heard, the Court should hear the Motion in the normal course and in accordance with the Federal Rules of Bankruptcy Procedure.

## OBJECTION TO MOTION

31.     Under compulsion of the request for emergency consideration, Ascribe sets forth the following opposition points to the substantive relief sought by the Motion.  Ascribe reserves the right to (i) amend or supplement this Objection, including at any hearing to consider the merits of the Motion, and (ii) raise additional issues on appeal of any order of this court granting the Motion.

32.     The Motion must be denied for several reasons.  *First*, the Debtors have failed to satisfy the requirements of Bankruptcy Rule 9019 and, in any event, seek approval of an improper *sub rosa* plan.  *Second*, the Bankruptcy Code prohibits non-consensual structured dismissals. *Third*, the Structured Dismissal violates of the Supreme Court's holding in *Jevic*.  *Finally*, several other factors weigh in favor of denial including (a) impermissible releases and exculpations, (b) improper interim distributions, (c) statutory violations of Bankruptcy Code section 349, (d) setting aside insufficient reserves to satisfy Ascribe's claims, (e) the likelihood of protracted litigation in the Lead Case, and (f) non-consensual use of Ascribe's cash collateral.

---

[15] The Court need look no further than the hearing transcript in the *A&P* case submitted by the Debtors with the Motion to see that Debtors have not provided sufficient time to respond.  In that transcript, Bankruptcy Judge Drain heard from debtor's counsel—the same counsel as in these cases—who argued that consideration of the proposed structured dismissal was appropriate because the notice "gave everyone 36 days to object" and "54 days total notice of [the] hearing."  Mot. Ex. 3 (*In re The Great Atlantic & Pacific Tea Co.*, May 11, 2021 Hr'g Tr. (the "A&P Hr'g Tr.")) at 12:6-9.

I.     **The Debtors' Proposal is not a "Global Settlement" Approvable under Bankruptcy Rule 9019 and is Instead an Impermissible *Sub Rosa* Plan**

33.     Through the Motion, the Debtors request that the Court approve the Debtors' Proposal and grant the Structured Dismissal, dismissing the Chapter 11 Cases and authorizing the Ad Hoc Group to make a distribution to creditors that are junior to Ascribe notwithstanding the absolute priority rule.  This so-called "Global Settlement," however, is neither "global" (the only apparent parties to the "settlement" are the Debtors and the Ad Hoc Group) nor a "settlement" (as nothing is being settled) approvable under Rule 9019, but instead is a poorly disguised *sub rosa* plan that is impermissible under Fifth Circuit precedent.

A.     <u>The Debtors have not met their burden under Bankruptcy Rule 9019</u>

34.     Bankruptcy Rule 9019(a) provides a court with the authority to approve a compromise or settlement of a pending bankruptcy dispute.  *See* 11 U.S.C. § 9019(a).  Such a settlement may be approved "only when the [it] is fair and equitable and in the best interest of the estate." *Off. Comm. of Unsecured Creditors v. Moeller (In re AGE Refin. Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (citing *In re Foster Mortg. Corp.,* 68 F.3d 914, 917 (5th Cir. 1995)).  The Fifth Circuit has made clear that a factual determination by the bankruptcy court establishing reasonable assurances that the settlement accords with the fair and equitable standard is necessary prerequisite to approving a settlement under Bankruptcy Rule 9019. *Matter of AWECO, Inc.*, 725 F.2d 293, 298 (5th Cir. 1984).  The Debtors have made it impossible for the Court to make such a determination here.

35.     In an apparent attempt to conceal the true terms of the purported "global" settlement from both the Court and its creditors, the Debtors chose not to attach the Debtors' Proposal (or any

settlement agreement for that matter) to the Motion.[16]  Instead, all the Debtors provide is a summary of the purported terms and the Debtors' unsubstantiated declaration that the settlement that "is in the best interests of all parties."  Without the complete agreement (if there is one, or indeed, anything beyond the terms of a proposed order included with the Motion), the Court and Ascribe are left to guess what the actual terms of the Debtors' Proposal are, let alone whether the parties to the alleged agreement have actually consented to those terms.[17]  The Debtors' failure to include the complete Debtors' Proposal undermines a central requisite Bankruptcy Rule 9019, and for that reason, cannot be approved.

36.    Even assuming, *arguendo*, that the Debtors' summary of the Debtors' Proposal is sufficient for Bankruptcy Rule 9019 purposes—it is not—or constitutes the entire agreement, which the Debtors disclaim, the terms of that agreement (as summarized by the Debtors) are not fair and equitable and are not in the best interest of the estate.  A bankruptcy court evaluates fairness and equity by applying the three-part *Jackson Brewing* test, which seeks to compare "the terms of the compromise with the likely rewards of litigation."  *AGE Ref.*, 801 F.3d at 540 (quoting *In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir. 1980)).  The test requires that the bankruptcy court weigh (i) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (iii) all other factors bearing on the wisdom of the compromise."  *Id.*  The "other factors," also known as the *Foster Mortgage* factors, include (a) "the best interests of the creditors, with proper deference to their reasonable views"; and (b) "the extent to which the settlement is truly the product of arms-length bargaining,

---

[16] The Motion includes a bullet point list of *some* of the terms allegedly contained in the Global Settlement, Mot. ¶ 7, and a chart "intended to be a summary of the Global Settlement," [*id.* ¶ 36 n.14].

[17] The record is devoid of any indication of assent from those allegedly party to the agreement.

14

and not of fraud or collusion." *AGE Ref.*, 801 F.3d at 540 (quoting *In re Cajun Elec. Power Coop., Inc.,* 119 F.3d 349, 356 (5th Cir. 1997)) (internal quotation marks omitted).

37.     Each of the *Jackson Brewing* and *Foster Mortgage* factors weigh heavily in favor of rejecting the so-called settlement.  While Ascribe concedes, at this point, that the Debtors are unable to propose a confirmable plan of reorganization and thus unlikely to succeed in chapter 11,[18] the Debtors cannot reasonably dispute that this case would be orderly resolved through a chapter 7 process.  The Debtors instead seek to cram through the Structured Dismissal that will all but assure that the administrative expense claims will grow to an untenable level by inexplicably keeping in place the Creditors' Committee and giving the Ad Hoc Group, through their appointed Wind Down Director, full reign to continue the unnecessary and costly pursuit of claims against Ascribe.  Claims that the Bankruptcy Code requires to be unwound upon the eventual dismissal of the Lead Case.  11 U.S.C. § 349(b)(2).

38.     Chapter 7 is indefinitely less complex than chapter 11, and without the exorbitant fees likely to be charged by the Wind Down Director's professionals and the continued existence of the Creditors Committee.  Moreover, the likelihood that the Lead Case is strung along for years is dramatically increased as the Ad Hoc Group will continue to hold the threat of litigation over Ascribe with no real obligation to bring claims in addition to those raised in the Independent Director Adversary Proceeding.

39.     The Debtors' Proposal also ignores "the wisdom of compromise."  *AGE Ref.*, 801 F.3d at 540.  That is, to the extent the proposed dismissal seeks to earmark certain distributions for unsecured creditors and thus capping reserves for potentially oversecured priority creditors, the Debtors cannot claim to have reached compromise (or even sought good-faith negotiations for

---

[18] *See, e.g.*, Mot. ¶¶ 5, 56.

compromise) with regard to all parties of interest to the proceedings. Notwithstanding the self-serving representations otherwise, the Debtors decision to not seek compromise with Ascribe also exemplifies the failure of the Debtors' Proposal under the *Foster Mortgage* factors.  In particular, though it is utterly unclear from what little information is set forth in the Debtors' Proposal whether fraud or collusion took place, it is undebatable that the Debtors have failed to consider the best interest of the creditors. *AGE Ref.*, 801 F.3d at 540.  *Certain* creditors have assented to the Debtors' Proposal, but Ascribe, a priority creditor which has contributed as much as any party to both the Debtors and the disposition of this chapter 11, has been deliberately excluded, and as drafted, it is not only clear that Ascribe's and others' interest have been disregarded, but that Ascribe's and other's interests are actually threatened were this case not to convert to chapter 7.

B.    The proposal is an impermissible *sub rosa* plan

40.    It has long been the rule that a debtor is not permitted to enter into transactions that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization.  *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722**,** 812 (Bankr. S.D.N.Y. 2020) (citing *Iridium*, 478 F.3d at 466; *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)). "The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of Chapter 11 for confirmation of a reorganization plan.'"  *Iridium*, 478 F.3d at 466 (quoting *Braniff,* 700 F.2d at 940).  In that same vein, courts will not approve structured dismissals where *sub rosa* issues are implicated.  *See In re Positron Corp.,* 556 B.R. 291, 295-96 (Bankr. N.D. Tex. 2016); *see also In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in chapter 11.'" (quoting *Braniff,* 700 F.2d at 940) ("The debtor and the Bankruptcy Court should not

be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets.")).

41.     The Debtors' Frankenstein-esque "Global Settlement" and "Structured Dismissal" is merely an attempt to circumvent the requirements of chapter 11. For instance, it: (i) provides for expansive releases for all parties except for Ascribe,[19] (ii) it institutes a "Wind Down Director" to administer the "wind down estates"[20] with "Case Resolution Procedures", and (iii) it violates the absolute priority rule by setting aside proceeds of Ascribe's collateral for distribution to unsecured creditors.  Here, the terms of the "Global Settlement" are neither fair nor reasonable and reflect an attempt to circumvent the plan confirmation requirements of section 1129 through a *sub rosa* plan. Thus, the "Global Settlement" must be rejected under *Braniff*.

## II.     Structured Dismissals are Not Permitted by the Bankruptcy Code

42.     A chapter 11 case has three possible results: the court can confirm a chapter 11 plan; the case may be converted to chapter 7; or a case may be dismissed. *Jevic*, 137 S. Ct. at 979. As relevant here, dismissal of a bankruptcy case is governed by section 349 of the Bankruptcy Code.  The aim of section 349 is to "undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." *Matter of Lopez*, 897 F.3d 663, 670 (5th Cir. 2018) (quoting *Wells Fargo Bank v. Oparaji (In re Oparaji)*, 698 F.3d 231, 238 (5th Cir. 2012)).  Such restoration of rights cannot be completed upon a structured dismissal.

43.     To be certain, while the *Jevic* court did rule that structured dismissal are unavailable to contravene the strict confines of the absolute priority rule, the panel "express[ed] no view about

---

[19] Mot. ¶ 21.

[20] *Id.*

the legality of structured dismissals in general." 137 S. Ct. at 985.  Were the Supreme Court to address the legality issue however, it is apparent that it would find that bankruptcy courts lack the authority to enter structured dismissal orders.

44.     Prior to *Jevic*, some courts began approving ancillary "bells and whistles" relief under the guise of a "structured dismissal."  The use of structured dismissals as a way out of chapter 11 is exceedingly rare and counsels' research has not located any significant structured chapter 11 dismissals in this District or the Fifth Circuit (nor have the Debtors cited to any in their Motion).

45.     Multiple Circuit Courts have held that a section 105(a) of the Bankruptcy Code does not permit a bankruptcy judge to legislate from the bench to create this fourth way to exit chapter 11. *See In re Combustion Engineering, Inc.,* 391 F.3d 190, 236 (3d Cir. 2004) (equitable power afforded by Section 105(a) "cannot trump specific provisions of the Bankruptcy Code," "must be exercised within the parameters of the Code itself," and "is cabined by the Code"); *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993) ("[W]hen a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code.") (citing *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir. 1989)); *see also United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986) (holding that section 105 does "not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.").

### III.    The Structured Dismissal Also Violates the Absolute Priority Rule

46.     As noted *supra*, the Supreme Court in *Jevic* held that a bankruptcy court may not approve a structured dismissal that—absent the consent of senior interest holders—does not follow the Bankruptcy Code's strict priority scheme. 137 S.Ct. at 983–84.  That is exactly what the Debtors seek to do here.

47.     Ascribe is the holder of no less than $111.85 million of aggregate secured claims

against the Debtors. As part of the Structured Dismissal, the Debtors' Proposal contemplates funding several recovery pools (collectively, the "Recovery Pools") from the Prepetition Secured Notes Collateral (*i.e.*, collateral held by more than just the Ad Hoc Group, the holders only 66.7% of the outstanding Prepetition Secured Notes).[21]   Among the envisioned Recovery Pools is $250,000 to be set aside on behalf of unsecured claimants.[22]   Therefore, if approved, the money used to pay unsecured creditors will be funded entirely from Prepetition Secured Notes Collateral, and correspondingly reduce the recovery to ***all*** Prepetition Secured Note holders, including Ascribe.

48.      "The [Bankruptcy] Code's priority system constitutes a basic underpinning of business bankruptcy law," *Jevic*, 137 S.Ct. at 983, and indeed, "has long been considered fundamental to the Bankruptcy Code's operation," *id.* at 984 (citing H.R.Rep. No. 103–835, p. 33 (1994)).   While the priority system is somewhat more flexible in the chapter 11 context than chapter 7 in that it gives creditors the ability to consent to violations of the absolute priority rule, impaired, senior creditor consent is ***always*** required to confirm a chapter 11 plan that proposes to pay junior creditors at the expense of senior ones. *Jevic*, 137 S.Ct. at 983 ("[A] priority-violating plan . . . cannot be confirmed over the objection of an impaired class of creditors").   For similar reasons, the Supreme Court in *Jevic* expressly rejected an attempt to contravene the strict priority system through a structured dismissal.  *Id.* at 983-84.

49.      The Debtors acknowledge these principles and even concede that "[g]iven the strict priority of distributions in a chapter 7 scenario and the approximately $444 million of secured indebtedness that is significantly impaired, ***administrative, priority, or general unsecured***

---

[21] Mot. ¶ 36.

[22] *Id.*

***creditors are unlikely to receive any recovery on account of their respective claims if the cases are converted to chapter 7.***"[23]  Indeed, the Chapter 11 Cases are administratively insolvent and the Debtors lack sufficient collateral to satisfy its secured claims in full.  For that reason, *Jevic* requires that the Debtors obtain Ascribe's (and any other Prepetition Secured Noteholder's) consent prior to the entry of the Structured Dismissal.  Thus, despite the Debtors' misnomer of a "Global Settlement," because Ascribe (and presumably other impaired noteholders that are not members of the Ad Hoc Group) have not consented to the violative distributions, the Court should deny the Debtors' Proposal.

50.    In an effort to avoid the flat prohibition against a priority-violating structured dismissals, the Debtors disingenuously argue that the Proposal does not violate *Jevic* and the absolute priority rule because "the Debtors are only seeking to pay general unsecured creditors out of funds deposited into an escrow account constituting proceeds of Prepetition Secured Notes Collateral, only after distributions to the Ad Hoc Group are made."[24]  The Debtors' argument simply puts form before substance and does nothing to escape the holdings of *Jevic*.

51.    It is notable that the Debtors have not cited a single published opinion from this Circuit supporting their argument.  *Compare In re Fleestar LLC,* 614 B.R. 767, 786-87 (Bankr. E.D. La. 2020) (ordering conversion of the case rather than the structured dismissal because "to the extent the proposed 'dismissal with terms' provides for distributions that disturb the absolute priority rule designated in the Bankruptcy Code without the consent of all affected creditors, this Court is prohibited by the Supreme Court's holding in *Jevic* from approving such proposal.") *and In re Positron Corp.,* 556 B.R. 291, 294-96 (Bankr. N.D. Tex. 2016) (holding that there was "no

---

[23] Mot. ¶ 35 (emphasis added).

[24] Mot. ¶ 53.

authority under the Bankruptcy Code to authorize" the structured dismissal where a creditor objected and raised *sub rosa* concerns) *with In re Buffet Partners, L.P.,* No. 14-30699-HDH-11, 2014 Bankr. LEXIS 3204, at *10-11 (Bankr. N.D. Tex. July 28, 2014) ("While the proposed dismissal does have certain plan aspects, it does not cut off the rights of any parties without giving them the chance to voice an objection and it does not violate the absolute priority rule. Therefore, this sort of structured dismissal is well within the parameters established by the Fifth Circuit and the Bankruptcy Code.").

52.     Lacking legal support for the Proposal in the Fifth Circuit, the Debtors cite the Third Circuit's opinion in *In re ICL Holding Co., Inc.,* 802 F.3d 547 (3d Cir. 2015) to argue that the Bankruptcy Code permits violations of the absolute priority rule so long as the assets are no longer property of the estate.[25]  This is not what *ICL Holding* stands for.

53.     There, the unsecured creditors committee launched objections to the winning bid at a § 363 auction. *ICL Holding Co., Inc.,* 802 F.3d at 551.  ***Prior to the sale's closing***, the purchaser and unsecured creditors' committee agreed that the latter would withdraw its objection in exchange for the former's agreement to fund a trust account for the benefit of unsecured creditors.  *Id.*  At the later hearing to approve the settlement between the unsecured creditors committee and the purchaser, the United States Government raised an objection on the basis that the funding of the trust account was violative of the absolute priority rule.  *Id.* at 552.

54.     Overruling the objection, the *ICL Holding* court found that:

> [alt]hough it is true that the secured lenders paid cash to resolve objections to the sale of [debtors'] assets, ***that money never made it into the estate. Nor was it paid at [debtors'] direction.*** In this context, we cannot conclude here that when the secured lender group, using that group's own funds, made payments to unsecured creditors, the monies paid qualified as estate property.

---

[25] *Id.*

*Id.* at 555 (emphasis added).  Based on these facts, the Third Circuit held that "the settlement sums paid by the purchaser were not proceeds from its liens, did not at any time belong to [debtors'] estate, and will not become part of its estate even as a pass-through."  *Id.* at 556.

55.     The Structured Dismissal and related distributions that the Debtors are requesting that the Court approve in the Debtors' Proposal is nothing like the settlement and payment scheme in *ICL Holdings*.  The Sale Transactions closed over a month ago and the proceeds are undeniably estate assets.[26]  Further distinguishing itself from *ICL Holdings*, the Debtors' Proposal seeks to dictate exactly how estate assets are distributed.

56.     What the Debtors are actually requesting here is for the Court's authorization to dodge the absolute priority rule simply by transferring assets to a third party for subsequent distribution.  Adopting the Debtors' position would render the priority provisions of the statute virtually meaningless.

57.     As the *Jevic* court acknowledges, "[t]he importance of the priority system leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure." 137 S.Ct. at 984 (citing *Whitman v. American Trucking Assns., Inc.,* 531 U.S. 457, 468 (2001)).  Accordingly, "***we would expect to see some affirmative indication of intent if Congress actually meant to make structured dismissals a backdoor means to achieve the exact kind of nonconsensual priority-violating final distributions that the Code prohibits in Chapter 7 liquidations and Chapter 11 plans***."  *Jevic*, 137 S.Ct. at 984 (emphasis added).  Nothing in the Bankruptcy Code, the legislative history, or anywhere else has indicated such Congressional intent. *Id.*

---

[26] *See* Mot. ¶ 33(i) ("As of the date of this Motion, the Debtors have approximately $47 million in cash, which includes approximately . . .  $45 million in a JPMorgan Chase Bank, N.A. account holding sale proceeds of Prepetition Secured Notes and Additional Prepetition Secured Note Collateral.").

58.     *Jevic* makes absolutely no distinction between structured dismissals funded directly by debtors and those funded by its creditors.  There is none.  Rather, the Debtors' Proposal is exactly the "backdoor means" of confirming a nonconsensual, priority-violating plan that the *Jevic* court sought to foreclose.  The Debtors unprecedented attempt to undermine both legislative requirements of the Bankruptcy Code and judicial mandates of the Supreme Court must be rejected.

## IV.     Numerous Additional Aspects of the Proposal Are Impermissible and Compel Denial

### A.     The proposed releases and exculpations are impermissible

59.     The Debtors' Proposal seeks to provide broad releases and exculpation in favor of the Debtors, the Ad Hoc Group, the Creditors' Committee, their professionals, and related persons. According to the Motion, the releases are "in consideration of" previously-completed work and efforts during the Chapter 11 Cases.[27] These release and exculpation provisions are impermissible for several reasons.[28]

60.     *First*, to the extent the release provisions purport to release or discharge the Debtors from any claim, the release provisions are flatly prohibited by Bankruptcy Code section 1141(d)(3), which provides that corporate debtors do not obtain a discharge under a liquidating plan (the only possible plan in these cases).  *Second*, non-debtor releases remains one of the most hotly contested issues in chapter 11 plan confirmation proceedings (and now in the halls of Congress).[29]  In fact, the Fifth Circuit generally prohibits such releases in chapter 11 plan contexts.

---

[27] *See* Mot. ¶ 63.

[28] Even Bankruptcy Judge Drain, during the A&P argument—again, submitted by Debtors here—made clear that releases would be inappropriate in a structured dismissal even where exculpation clauses for the transactions approved by the court would not.  *See* A&P Hr'g Tr. 57:11-61:20, 91:1-6.

[29] *See In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 881 (Bankr. S.D.N.Y. Apr. 15, 2021) (exploring circuit split on third-party releases, noting that Second Circuit permits such releases under specific circumstance in rare cases, and that the Fifth, Ninth, and Tenth Circuits "do not permit third-party releases in bankruptcy cases."); *see also Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136

*See Ad Hoc Group of Vitro Noteholders v. Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F.3d 1031, 1059 (5th Cir. 2012) ("[A] non-consensual, non-debtor release through a bankruptcy proceeding, is generally not available under United States law. Indeed, this court has explicitly prohibited such relief.") (citing *In re Pac. Lumber Co.*, 584 F.3d 229, 251-52 (5th Cir. 2009)).

61.     *Third*, even if non-consensual, non-debtor agreements to release were permissible under the Bankruptcy Code, the proposed Structured Dismissal purports to include releases which are not backed by lawful consideration and are therefore invalid.   Specifically, the stated consideration underlying the releases is remuneration for various persons having performed their duties throughout these Chapter 11 Cases "diligently,"[30] and nothing else.   Because such parties conducted their duties, according to the Motion, "the Creditor's Committee has determined that the proposed releases being provided are fair and in exchange for fair consideration provided by the released parties."[31]   It bears repeating that even the Carr Response acknowledged there is a "lack of economic consideration" for the proposed releases.[32]

62.     As a result of this scheme of ostensible consideration, the law cannot recognize the settlement set forth in the proposed structured dismissal as a workable agreement.   Indeed, in

---

(2d Cir. 2005) (exploring propriety of non-debtor release and various authority on the subject, and finding that "[w]hile none of our cases explains when a nondebtor release is 'important' to a debtor's plan, it is clear that such a release is proper only in rare cases.") (citing *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657-58 (6th Cir. 2002) ("Such an injunction is a dramatic measure to be used cautiously . . . ."); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 212-13 (3d Cir. 2000) (recognizing that nondebtor releases have been approved only in "extraordinary cases")); *see also In re Patriot Place, Ltd.,* 486 B.R. 773*,* 815 n.20 (Bankr. W.D. Tex. 2013) (noting that certain PPL Plan, under certain circumstances, may have been confirmable if non-debtor release/exculpation provisions had been removed); *Warren, Nadler, Durbin, Blumenthal, Maloney Announce Legislation to Eliminate Non-Debtor Releases, Prevent Corporations and Private Entities From Escaping Accountability In Bankruptcy Proceedings*, House Committee on Oversight and Reform, Press Release (Jul. 28, 2021) https://oversight.house.gov/news/press-releases/rren-nadler-durbin-blumenthal-maloney-announce-legislation-to-eliminate-non (last accessed Nov. 3, 2021).

[30] *See* Mot. ¶ 63.

[31] *Id.* ¶ 64.

[32] Carr Resp. ¶ 21.

Texas, an agreement is not formed where one party's consideration is a pre-existing duty or alleged *past* consideration. *In re See*, No. 11-11770-CAG, 2013 WL 1897855, at *6 (Bankr. W.D. Tex. Apr. 25, 2013) ("Any modification to an existing contract must be supported by new consideration … [t]his concept, known as the 'pre-existing duty rule,' applies to all modifications, supplements, and new contracts" and "[i]n such cases, merely offering the pre-existing duty [a party] had already contracted to perform cannot serve as consideration for the change.") (citing *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 93 (5th Cir. 1995) (consideration from an original contract cannot constitute consideration for a subsequent modification)) (internal quotations and citations omitted); *In re HDD Rotary Sales, LLC*, 512 B.R. 877, 887 (Bankr. S.D. Tex. 2014) (citing *Castranova v. Teknekron Infoswitch, Inc.*, 2003 WL 22143793 (N.D. Tex. Aug. 18, 2003) (holding that a promise is not supported by consideration when the promise was made in exchange for the counterparty conducting his or her duty to perform his or her job)).[33]

63.     Particularly applicable to the case at bar, the Fifth Circuit has analyzed this precept in the context of an agreement offering indemnification for the performance, or "consideration," of prior work.  In *Hawkins v. AM/Growmark River Sys., Inc.*, the court found that "past purchase orders, work orders or other consideration cannot provide the necessary cause for a subsequent contract, because past consideration was given as inducement for past performance."  157 F.3d 903, 1998 WL 611711, at *3 (5th Cir. 1998).  Moreover, the court found that "[a]ny future work

---

[33] *See also His Co., Inc. v. Stover*, 202 F. Supp. 3d 685, 700 (S.D. Tex. 2016), vacated on other grounds, No. 4:15-CV-00842, 2016 WL 6134939 (S.D. Tex. Sept. 8, 2016) ("past consideration cannot be considered consideration for a present contract …."); *Thompson v. Chase Bank USA*, No. CIV.A. H-07-1642, 2009 WL 290186, at *2, n.2 (S.D. Tex. Feb. 5, 2009) ("Delaware courts reject the notion, as presumably courts in all states do, that a pre-existing duty can be consideration.") (citing *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch. 2000) ("Past consideration, as opposed to true consideration, however, cannot form the basis for a binding contract. A party cannot rely on a pre-existing duty as his legal detriment in an attempt to formulate a contract.")).

orders or purchase orders are not cause for [a] promise to indemnify, because there is no obligation

… to ever contract … again.  In short, [third-party complainant] promised nothing at all in the

future and made no contemporaneous promise which would amount to a mutual obligation under

the indemnity agreement, and therefore, *that agreement is not a valid contract*."  *Id.* (emphasis

added).

64.     It is important to note that the Release and Exculpation section of the Motion

centers around the ostensible "consideration" of work performed to explain the selective Releases

of certain parties from claims under the proposed structured dismissal.  However, many cases cited

for the proposition that such releases may be permissible under the law do not involve stated

"consideration" in the form of *past* consideration, as this proposal does, or were part of inapposite

agreements not similar to the current dispute or featured no objection by relevant parties.[34]

Moreover, all but one such cases predate the new judicial conception of structured dismissals

originating in *Jevic*,[35] and the case that does not, *CBL & Assocs. Properties*, is inapplicable.  Case

No. 20-35226 (DRJ) (Bankr. S.D. Tex.) (ECF No. 1417); *see also* ECF No. 606 ¶ 65).

65.     While the Debtors rely on this Court's order in *CBL & Assocs. Properties* in support

over their overbroad release provisions, that case concerned a consensual joint motion for the entry

---

[34] *In re Buffet Partners*, 2014 Bankr. LEXIS 3204, 59 Bankr. Ct. Dec. 232 (Bankr. N.D. Tex. Jul. 28, 2014) (short opinion not addressing consideration and approving of a settlement in part because "[n]o party with an economic stake objects to the proposal …, no non-consenting creditors in the present case."); *In re Coach AM Grp. Holdings Corp.*, Case No. 12-10010 (KG) (Bankr. D. Del. May 31, 2013) (ECF 1520, 1567, 1568) (permitting certain releases in the context of a proposed trust agreement after the court ordered Debtor to revise the proposed order multiple times to address concerns raised by objecting parties); *In re ICL Holding Co.*, Case No. 12-13319 (KG) (Bankr. D. Del. May 8, 2014) (ECF 1103, 1133, 1254, 1255) (approving certain partially mutual releases for certain parties and an enumerated list of claims and dismissing case where Debtor certified that there were no objections to proposed order (ECF 1333) or appeals and, inter alia, completion of claims reconciliation (ECF 1254)); *In re Dawahare's of Lexington, LLC*, Case No. 08-51381 (Bankr. E.D. Ky. Dec. 30, 2008) (ECF 224, 316) (approving agreed settlement "with no objections thereto," and exculpating certain parties in connection with dismissal).

[35] *See Buffet Partners*, 2014 Bankr. LEXIS 3204; *In re Coach AM Grp. Holdings*, Case No. 12-10010; *In re ICL Holding*, Case No. 12-13319; *In re LTV Steel Co.*, Case No. 00-43866; *In re Dawahare's of Lexington*, Case No. 08-51381; *In re New Weathervane Retail*, Case No. 04-11649.

of a settlement agreement that resulted from a mediation of the debtors, lender, ad hoc group, and creditors' committee. *CBL & Assocs. Properties*, Case No. 20-35226 (DRJ) (Bankr. S.D. Tex.) (ECF No. 1332). The settlement agreement there was universally supported by the debtors' stakeholders, and no objections were filed. *Id*. (ECF No. 1412). The order does not stand for the proposition that expansive release and exculpation provisions are proper in cases where a structured settlement is nonconsensually sought.

66.     Here, the issue is simple. The Debtors have proposed broad releases to certain parties and have admitted that such releases are predicated entirely upon previously performed services and are not based on any economic consideration. Lacking any consideration, the releases are absolutely unnecessary giveaways that cannot be included in a crammed through settlement. The Motion must be denied because of the illegal release provisions.

B.     "Irrevocable" interim distributions are not permitted

67.     The Debtors' proposal calls for an irrevocable Interim Notes Distribution in an undetermined amount to be paid out "on or promptly after the Dismissal Date."[36] The Supreme Court has acknowledged the occasion of permissible interim distributions, even such distributions which violate ordinary priority, but also noted that such distributions must serve Bankruptcy Code-related objectives, such as critical vendor orders that allow payment of essential supplier's prepetition invoices. *Jevic*, 137 S. Ct. at 985-86. Even more importantly, the Supreme Court found the very similar distribution in question as a means to circumvent the Code's procedural safeguard, stating "in a structured dismissal like the one ordered below, the priority-violating distribution is attached to a final disposition; it does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a

---

[36] *See* Mot. ¶ 36.

confirmable plan; it does not help to restore the status quo ante; and it does not protect reliance interests." *Id*.

68.     The interim distribution contemplated in the proposed Structured Dismissal is no different—it promotes no possibility of a confirmable plan; indeed, there is no plan, and the attempt by the Debtors to articulate one is riddled in nebulous terms and statements of "TBD" on the critical figures vital to understanding the proposal.[37]  Moreover, it makes restoration of the status quo ante impossible, and is irrevocable as to the distribution to the Ad Hoc Group,[38] and offers no more protection of *any* interest than would be protected in event of a chapter 7 conversion.

C.     The structure runs afoul of Bankruptcy Code section 349

69.     By the proposed structure, the Debtors seek a "blanket" ruling that "[a]ll releases, stipulations, settlements, liens, rulings, orders, and judgments . . . shall remain in full force and effect and survive [] dismissal . . . ."[39]  This Motion flies in the face of the Bankruptcy Code section 349(b), which requires a showing of cause as to each enumerated order that the Debtors ask to survive a dismissal. 11 U.S.C. § 349(b) (Unless the court, "for cause," orders otherwise, a dismissal of a case vacates any order, judgment, or transfer ordered, under 11 U.S.C. §§ 522(i)(1), 542, 550, or 553).  "Cause" has a somewhat illusive meaning in this circuit,[40] and where "cause" *has* been interpreted, the cases generally involve inequity or bad faith, *see In re Demery*, 570 B.R. 220, 224-

---

[37] *See* ECF No. 607, p. 8, ¶ 18.  Indeed, other than conclusory statements in the Motion and the introduction of the aforementioned "TBD" chart contained in paragraph 18 of the Mesterharm Declaration (and that contains very little by way of detail), the Debtors introduce no other evidence that creditors will fare better than under chapter 7.  In the context of a plan, such detail would fall woefully short of a more typical liquidation analysis that Debtors routinely include as part of the disclosure statement in a chapter 11 plan process.

[38] *See* Mot. ¶ 42

[39] *Id.*  ¶ 37(F)(ii).

[40] *Viegelahn v. Lopez (In re Lopez)*, 897 F.3d 663, 672 (5th Cir. 2018) ("The Bankruptcy Code does not appear to define what constitutes 'cause' under § 349(b).").

25 (Bankr. W.D. La. 2017) ("The cases this Court has found dealing with the 'for cause' exception generally involve some kind of inequity or bad faith, which does not exist in this case.") (citing *Viegelahn v. Lopez*, 570 B.R. 51, 2017 U.S. Dist. LEXIS 32841 (W.D. Tex. 2017)), though it is unclear whether inequity or bad faith is required to invoke the exception, *Viegelahn v. Lopez (In re Lopez)*, 897 F.3d 663, 672 (5th Cir. 2018) ("We need not decide whether a finding of "cause" under § 349(b) must be based on evidence of bad faith or whether other considerations may also justify such a finding.").  In any event, here, Debtors have made no legitimate showing of cause at all, and the blanket, unparticularized ruling Debtor seeks is inappropriate under any existing interpreting of § 349(b).

        D.     <u>The proposed reserve for Ascribe is insufficient</u>

        70.     Under the Debtors' proposal, an Ascribe Disputed Claims Reserve will be established to hold Ascribe distribution amounts presumably pending conclusion of the Ascribe litigation. While not explicitly stated, it appears that the reserve will be based upon the face principal amount of certain of Ascribe's note holdings.  As the Court was made aware from statements during the hearing for final approval of the DIP Order, the parties have spent a lot of time and effort to make it clear to the Court that the DIP Order did not resolve important outstanding issues concerning the appropriate allocation of sale proceeds, and neither does the Debtors' Proposal resolve same.  As there has not yet been any allocation of the Sale Transaction proceeds (in Ascribe's case, relative to Ascribe's Additional Prepetition Secured Note Collateral and Ascribe's Prepetition Second Lien Note Collateral), full monetization of the bulk of Ascribe's Prepetition Second Lien Note Collateral, or any analysis put forward by any party as to whether, owing to its seniority, Ascribe's Additional Prepetition Secured Note Collateral is oversecured), it is as yet unknown whether Ascribe is oversecured in its capacity as the Additional Prepetition Secured Note Secured Party or the Prepetition Second Lien Note Secured Party (as each is defined

in the Final DIP Order).  It is in fact quite possible that Ascribe is oversecured in one or both positions and thus entitled to postpetition interest and attorney fees pursuant to Bankruptcy Code section 506(b).  The Motion and proposed order are unclear as to which secured claims of Ascribe are covered by the reserve, and failure for the reserve to cover and account for all of Ascribe's secure claims in the Ascribe Disputed Claims Reserve mandates denial of the Motion.

        E.      The claims resolution process detailed in the Debtors' structure is impermissible

        71.     The Debtors' proposed structure includes a detailed process for "Resolution of Claims" that affords significant latitude to the Wind Down Director to compromise, settle, and resolve claims against the Debtors without seeking or obtaining Court approval.  Ascribe is not even a notice party on such potential settlements to be orchestrated by the Wind Down Director notwithstanding the fact that any settlement entered into by the Wind Down Director will have a direct impact on Ascribe's recovery.  The proposed process simply ignores the fact that (1) the Lead Case will remain open as a pending chapter 11 case, and (2) Bankruptcy Rule 9019 will remain applicable as to any proposed Debtor compromises.  While the described process may be appropriate for a post-confirmation trust, it is not appropriate for a chapter 11 debtor.  Accordingly, the Motion must be denied for this reason.

        F.      Despite the structured "dismissal," these cases will live long into the future

        72.     The absurdity of the proposed structure is further highlighted by the fact that the structure will not come close to bringing finality to the Chapter 11 Cases.  Ordinarily, (1) a "global settlement" brings with it finality, and (2) a "structured dismissal" in fact dismisses and brings to a conclusion pending chapter 11 cases.  This proposal does neither.  Instead it presents an odd hybrid of "on-going case/post-confirmation trust/continuing committee" that is nonsensical and unprecedented.  This structure does not bring any finality, nor will it for many years.  Make no mistake, the aggrieved Ad Hoc Group will hold Ascribe (and correspondingly this Court and other

parties) hostage to these cases for years to come.  The Ad Hoc Group will (i) never allow the Ropes Report to see the light of day; (ii) likely never cause further claims to be brought against Ascribe because (x) none exist, and (y) the Ropes Report likely concludes that none exist; (iii) continue the threat of litigation for years to come; and (iv) withhold from Ascribe the collateral proceeds distributions that Ascribe is entitled to.

73.     Conversely, a chapter 7 trustee will get down to the business of administrating and concluding these cases.  If there are claims to be pursed against Ascribe, a trustee can pursue them. Otherwise, these cases can be expeditiously wrapped up under the control of a truly independent fiduciary and without the exertion of improper influence and leverage.  Equitable considerations demand that the only appropriate case resolution process be instituted here: the immediate conversion to chapter 7.

G.     The Debtors are not authorized to use Ascribe's cash collateral

74.     As noted, the Debtors assert that one issue that is resolved by the "Global Settlement" is their ability to use the Ad Hoc Group's cash collateral.  To be clear, the Ad Hoc Group's interest in cash collateral is generally identical, and as to certain claims **junior,** to Ascribe's interest in cash collateral, Ascribe does not consent to the use of its cash collateral going forward. The Debtors' motion does not even request authority for the non-consensual use of Ascribe's cash collateral, much less layout any grounds upon which this Court could award such non-consensual use.  Accordingly, any order of this Court must explicitly deny the Debtors' ability to use Ascribe's cash collateral either in furtherance of the Debtors 'proposal or in any continuation of one or more of the chapter 11 cases.

H.     The Debtors really propose substantive consolidation

75.     As the U.S. Trustee correctly argues, Debtors' Proposal also ultimately seeks to have all assets and liabilities merged into one debtor entity, which makes it a proposed substantive

consolidation. ECF No. 653 ¶ 29. Substantive consolidations are an "extreme and unusual remedy" which result in asset and liability pooling and stand to substantially affect the rights of Ascribe and other creditors. *See In re Pacific Lumber Co.*, 584 F.3d 229, 249 (5th Cir. 2009); *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), cert. denied 547 U.S. 1123 (2006).

76.     To consolidate these cases, the Debtors *must* file an appropriate motion acknowledging the intention of the proposal, allow for fair and just notice to *all* creditors, and meet the standards imposed on substantive consolidations. *See, e.g., In re Auto Train Corp.*, 810 F.2d 270, 278 (D.C. Cir. 1987) (consolidation motion required reasonable notice and opportunity for hearing). This would also require confirmation of a plan, something they cannot, and have admitted they cannot, do.  Further, to the extent that the Debtors are seeking to use substantive consolidation to abandon the lien priorities with respect to Ascribe's claims (as memorialized in the DIP Order), this too is inappropriate and impermissible.

## V.     Conversion of These Cases is the Only Appropriate and Rational Result

77.     The unnecessarily convoluted and illegal process proposed by the Debtors is utterly pointless given the existence of chapter 7 of the Bankruptcy Code.  This situation – a liquidated debtor with no prospect of a confirmable plan – fits precisely into the construct and purposes of chapter 7.  In fact, from the face of the Motion it is clear that ***none*** of the primary stakeholders in these cases have stated opposition to conversion to chapter 7, including (i) conversion is an alternative relief sought *by the Debtors*; (ii) the Ad Hoc Group initially pushed for conversion (*see* Motion, ¶ 5), and even today is calling for conversion as its "emergency" threat[41]; and (iii) Ascribe

---

[41] *See* Mot. ¶ 70.

fully supports conversion as the only appropriate and lawful course.[42]   Conversion is the only appropriate conclusion for these cases.

78.     Each of the tasks, duties and matters that the Debtors assert as remaining and/or propose to assign to the Wind Down Director can and should be handled by a chapter 7 trustee, including, but not limited to, (i) distributions to creditors, (ii) claims administration process, (iii) the establishment of reserves, and (iv) pursuit of estate cause of action.

79.     This is especially true in regards to the Independent Director Adversary Proceeding and any other potential causes of action against Ascribe. Presumably, one of the very first acts of a chapter 7 trustee will be an analysis of the Independent Director Adversary Proceeding and the Ropes Report. A trustee can assess the conclusions and recommendations expressed in the Ropes Report and, with the benefit of extensive experience in assessing the viability and economics of estate claims, quickly determine whether or not to bring further claims against Ascribe.  And, it can do so without being hamstrung by the broad releases Debtors seek of potential claim targets.

80.     To be clear, Ascribe's equity position has not benefited from a single penny of cash. To the contrary, Ascribe was historically the primary (and frequently only) person that stepped up to support the Debtors' continued vitality and existence. In other words, there are no further viable claims that exist as against Ascribe.  Indeed, the surrounding circumstances support this view – (i) upon extensive and costly investigation, the **only** litigation claims that have been asserted against Ascribe are straightforward statutory preference claims solely relating to the issuance of the Make-Whole Notes, and (ii) the Ropes Report has purposely "never seen the light of day" most likely because the report is a big, fat (expensive) dud.

---

[42] It is assumed the Creditors' Committee does not favor conversion as a conversion will result in adherence to the absolute priority rule and strip it of the benefits promised to it and its professionals in exchange for Creditors' Committee support for the Debtors' proposal.

81.     All of that said, Ascribe *welcomes* and *desires* a claim analysis by a disinterested chapter 7 trustee. If a trustee determines to bring additional claims, Ascribe stands ready to engage in litigation and defend the entirety of its actions. A chapter 7 trustee can and will bring the issues to a prompt resolution, whether by walking away from nonsense "claims" or by commencing litigation. What is exceedingly unfair and improper about the Debtors' proposal is that the Debtors wish to give this control to a grievance-driven group (the Ad Hoc Group) that will likely insert a puppet (as yet identified to this Court) as the Wind Down Director who will act unconstrained by any fiduciary obligations. One or more persons on the noteholder side—whether it be members of the Ad Hoc Group, an indenture trustee, or professionals for any of same—have egg on their face in connection with the Lien priority matter stated at paragraph 10 above. For this (and whatever other contrived reasons that may be propounded), the Ad Hoc Group is unduly hostile towards Ascribe. The Ropes Report will continue to be hidden from the world, and thus, coupled with the hostage-holding of Ascribe's claim distributions, will be improperly used as a bludgeon against Ascribe to assert illicit bargaining pressure against Ascribe.

## RESERVATION OF RIGHTS

82.     In the event that the Court considers the Motion on an emergency basis on barely four days' notice, Ascribe reserves the right to raise and assert (i) at the hearing additional or supplemental facts, issues, arguments and objections, and (ii) on appeal new and/or further issues, arguments, and objections.

## CONCLUSION

83.     For the reasons stated herein, the Debtors' Motion should be denied.

WHEREFORE, Ascribe respectfully request that the Court (i) deny emergency consideration of the Motion and establish a briefing and hearing schedule that affords due process to parties, (ii) upon any ultimate consideration of the substantive relief sought by the Motion, (a)

34

deny the primary "structured dismissal" relief sought by the Motion, and (b) grant the alternative conversion relief sought by the Motion, and (iii) grant such other and further relief as to which Ascribe is entitled, specifically including the immediate conversion of these cases.

Dated: November 4, 2021

Respectfully submitted,

**MCKOOL SMITH, PC**

*/s/ John J. Sparacino*
John J. Sparacino (SBN 18873700)
Joshua J. Newcomer (SBN 24060329)
Thomas J. Eiseweirth (SBN 24121614)
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile (713) 485-7344
jsparacino@mckoolsmith.com
jnewcomer@mckoolsmith.com
teisweirth@mckoolsmith.com

***Counsel for Ascribe III Investments LLC***

## <u>CERTIFICATE OF SERVICE</u>

  This is to certify that a true and correct copy of the foregoing document was served by electronic delivery on all persons and entities receiving ECF notice in this case on November 4, 2021.

<u>/s/ John J. Sparacino</u>   

John J. Sparacino
