**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BASIC ENERGY SERVICES, INC., *et al.*,[1] | ) Case No. 21-90002 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

<u>AMENDED</u> COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF
LIQUIDATION OF BASIC ENERGY SERVICES, INC. AND ITS AFFILIATED DEBTORS
<u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>

**JACKSON WALKER LLP**
Bruce J. Ruzinsky (TX Bar No. 17469425)
Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com
Email: vpolnick@jw.com

*Counsel for the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic Energy Services, L.P. (1819); Basic Energy Services, Inc. (1194); C&J Well Services, Inc. (5684); KVS Transportation, Inc. (4882); Indigo Injection #3, LLC (7657); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Taylor Industries, LLC (7037); SCH Disposal, L.L.C. (8335); Agua Libre Holdco LLC (3092); Agua Libre Asset Co LLC (1409); Agua Libre Midstream LLC (6701); and Basic ESA, Inc. (2279). The Debtors' headquarters and service address for the purposes of these chapter 11 cases is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102

## TABLE OF CONTENTS

Article I

        DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .......... 1

    A.    Defined Terms ............................................................................................................................... 1

    B.    Rules of Interpretation and Computation of Time ......................................................... 12

        1.    Rules of Interpretation ...................................................................................... 12

        2.    Computation of Time ........................................................................................ 12

        3.    Controlling Document ....................................................................................... 12

Article II

        DEBTOR HISTORY AND THE BANKRUPTCY CASE ............................................. 12

    A.    Debtor History ............................................................................................................. 12

        1.    Debtors' Background ......................................................................................... 12

        2.    Corporate Structure and Operations.................................................................. 12

        3.    The Debtors' Prepetition Capital Structure...................................................... 13

        4.    Events Leading to the Chapter 11 Cases........................................................... 14

        5.    Debtors in Possession Financing ...................................................................... 15

    B.    Main Bankruptcy Events............................................................................................. 15

        1.    First Day Orders ............................................................................................... 15

        2.    Employment Applications ................................................................................ 17

        3.    Negotiation with the Committee, the U.S. Trustee, the DIP Lenders, and the Prepetition Secured Parties ............................................................................... 17

        4.    Schedules and Statements ................................................................................. 18

        5.    Final DIP Order ................................................................................................ 18

        6.    The Sale Process ............................................................................................... 19

    C.    Remaining Assets of the Estate ................................................................................... 19

        1.    Potential Litigation Claims ............................................................................... 19

Article III

        Summary of Treatment of Claims and Estimated recoveries ......................................... 20

    A.    Summary of Treatment of Claims and Interests and Estimated Recoveries ................... 20

Article IV

        CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .............................. 22

    A.    Unclassified Claims ..................................................................................................... 22

        1.    Payment of Administrative Expense Claims ..................................................... 22

        2.    Payment of Tax Claims..................................................................................... 23

    B.    Classification of Claims and Interests ......................................................................... 24

        1.    General............................................................................................................... 24

    C.    Treatment of Claims and Interests ............................................................................... 24

        1.    ABL Claims (Class 1)....................................................................................... 24

|  |  | 2. | Prepetition Second Lien Note (Class 2) | 25 |
|  |  | 3. | Additional Prepetition Secured Note (Class 3) | 25 |
|  |  | 4. | Non-Ascribe Secured Notes Claims (Class 4) | 25 |
|  |  | 5. | Ascribe Secured Notes Claims (Class 5) | 25 |
|  |  | 6. | Non-Tax Priority Unsecured Claims (Class 6) | 26 |
|  |  | 7. | Secured Notes Deficiency Claims (Class 7) | 26 |
|  |  | 8. | General Unsecured Claims (Class 8) | 26 |
|  |  | 9. | Interests in the Debtors (Class 9) | 27 |
|  | D. | Reservation of Rights Regarding Claims | | 27 |
|  | E. | Postpetition Interest on Claims | | 27 |
|  | F. | Insurance | | 27 |
|  | G. | Confirmation Without Acceptance by All Impaired Classes | | 27 |
|  | H. | Class Without Voting Claim Holders | | 28 |
| Article V | | MEANS FOR IMPLEMENTATION OF THE PLAN | | 28 |
|  | A. | Corporate Existence | | 28 |
|  | B. | Dissolution Transactions | | 28 |
|  |  | 1. | Dissolution Transactions Generally | 28 |
|  |  | 2. | Recourse Solely to Liquidation Trust Assets | 28 |
|  | C. | Liquidation Trust | | 29 |
|  |  | 1. | Liquidation Trust Generally | 29 |
|  |  | 2. | Liquidation Trust Governance | 29 |
|  |  | 3. | Funding of and Transfer of Assets Into the Liquidation Trust | 29 |
|  |  | 4. | Liquidation Trustee | 30 |
|  |  | 5. | Liquidation Trust Agreement | 30 |
|  |  | 6. | Reports to be Filed by the Liquidation Trustee | 30 |
|  |  | 7. | Fees and Expenses of the Liquidation Trust | 30 |
|  |  | 8. | Indemnification | 30 |
|  |  | 9. | Tax Treatment; No Successor in Interest | 30 |
|  |  | 10. | Settlement of Claims | 31 |
|  |  | 11. | Abandonment of Assets by Liquidation Trust | 32 |
|  | D. | Corporate Governance; Directors and Officers | | 32 |
|  |  | 1. | Constituent Documents of the Debtors | 32 |
|  |  | 2. | Directors and Officers | 32 |
|  |  | 3. | Corporate Action | 32 |
|  | E. | No Revesting of Assets | | 32 |
|  | F. | Creation and Maintenance of Trust Accounts | | 32 |

|  | 1. | Creation of Trust Accounts | 32 |
|  | 2. | Additional Funding of Trust Accounts | 33 |
|  | 3. | Closure of Trust Accounts | 33 |
| G. | | Preservation of Causes of Action | 33 |
| H. | | Cancellation and Surrender of Instruments, Securities and Other Documentation | 33 |
| I. | | Release of Liens | 34 |
| J. | | Effectuating Documents; Further Transactions | 34 |
| K. | | Substitution in Pending Legal Actions | 34 |
| L. | | Substantive Consolidation | 34 |
| Article VI | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 35 |
| A. | | Assumption and Rejection of Executory Contracts and Unexpired Leases | 35 |
| B. | | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 35 |
| C. | | Contracts and Leases Entered Into After the Petition Date | 36 |
| D. | | Insurance Policies | 36 |
| E. | | Reservation of Rights | 36 |
| Article VII | | PROVISIONS REGARDING DISTRIBUTIONS | 38 |
| A. | | Distributions for Claims Allowed as of the Effective Date | 38 |
| B. | | Method of Distributions to Holders of Claims | 38 |
| C. | | Disbursing Agent | 38 |
|  | 1. | Powers of the Disbursing Agent | 38 |
|  | 2. | Expenses Incurred on or After the Effective Date | 38 |
|  | 3. | No Liability | 38 |
| D. | | Disputed Claims Reserves | 39 |
|  | 1. | Establishment of Disputed Claims Reserves | 39 |
|  | 2. | Maintenance of Disputed Claims Reserves | 39 |
| E. | | Investment of Trust Accounts | 39 |
| F. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 39 |
|  | 1. | Delivery of Distributions | 39 |
|  | 2. | Undeliverable Distributions Held by Disbursing Agents | 40 |
| G. | | Distribution Record Date | 40 |
| H. | | *De Minimis* Distributions | 40 |
| I. | | Compliance with Tax Requirements | 40 |
| J. | | Manner of Payment Under the Plan | 41 |
| K. | | Time Bar to Cash Payments | 41 |
| L. | | Setoffs | 41 |

#95872667v6

M.     Allocation Between Principal and Accrued Interest ......................................................... 41

N.     Distributions to Holders of Disputed Claims ................................................................ 42

O.     Claims Paid or Payable by Third Parties ...................................................................... 42

     1.     Claims Paid by Third Parties .................................................................................. 42

     2.     Claims Payable by Insurance .................................................................................. 42

**Article VIII**     **DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS** ..................................... 42

A.     Allowance of Claims ...................................................................................................... 42

B.     Prosecution of Objections to Claims ............................................................................. 42

     1.     Authority to Prosecute and Settle Claims .............................................................. 43

     2.     Pending Objections ................................................................................................. 43

     3.     Application of Bankruptcy Rules ............................................................................ 43

     4.     Authority to Amend Schedules .............................................................................. 43

C.     Estimation of Claims ..................................................................................................... 43

D.     Claims Subject to Pending Actions ............................................................................... 43

E.     Offer of Judgment .......................................................................................................... 43

**Article IX**     **CONFIRMATION OF THE PLAN** ................................................................................. 44

A.     Conditions Precedent to Confirmation .......................................................................... 44

     1.     The Confirmation Order shall be entered by the Bankruptcy Court, which Confirmation Order shall be in form and substance satisfactory to the Debtors, the Ad Hoc Group, and the Committee. ..................................................................... 44

     2.     Any exhibits or schedules incorporated as part of the Plan and Disclosure Statement shall be acceptable in form and substance to the Debtors, the Ad Hoc Group, and the Committee. ........................................................................................ 44

B.     Conditions Precedent to the Effective Date ................................................................... 44

C.     Waiver of Conditions to Confirmation or the Effective Date ........................................ 44

D.     Notice of Occurrence of Effective Date ........................................................................ 45

E.     Effect of Nonoccurrence of Conditions to the Effective Date ....................................... 45

F.     Effect of Confirmation ................................................................................................... 45

     1.     Binding Effect ......................................................................................................... 45

     2.     Comprehensive Settlement of Claims and Controversies ...................................... 45

     3.     Exculpation ............................................................................................................. 45

     4.     Releases by Releasing Parties ................................................................................ 46

     5.     Injunction ................................................................................................................ 46

G.     Votes Solicited in Good Faith ....................................................................................... 47

**Article X**     **RETENTION OF JURISDICTION** ................................................................................. 47

Article XI

    MISCELLANEOUS PROVISIONS ........................................................................ 48

    A.    Modification of the Plan ............................................................................... 48

    B.    Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date ............ 49

    C.    Reservation of Rights Regarding Certain Matters ........................................ 49

    D.    Exhibits and Schedules ................................................................................ 49

    E.    Severability ................................................................................................. 49

    F.    Successors and Assigns ............................................................................... 49

    G.    Service of Documents .................................................................................. 49

Article XII

    CONFIRMATION OF THE PLAN .................................................................... 50

    A.    VOTING PROCEDURES AND REQUIREMENTS .................................... 50

Ballots will be accepted by via the internet through the Claims and Noticing Agent's website and regular mail to the Claims and Noticing Agent only. ...................................................................................... 51

    B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ........................... 51

        1.    The Best Interest of Creditors Test ............................................... 52

        2.    Liquidation Analysis ...................................................................... 52

        3.    Feasibility ....................................................................................... 53

        4.    Acceptance by an Impaired Class .................................................. 53

        5.    Confirmation Without Acceptance by All Impaired Classes .......... 53

Article XIII

    PLAN-RELATED RISK FACTORS .................................................................. 55

    A.    GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS ................. 55

        1.    Parties in Interest May Object to the Classification of Claims and Interests ................. 55

        2.    Failure to Satisfy Vote Requirement .............................................. 55

        3.    The Proponents May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed ....................................................... 55

        4.    Nonconsensual Confirmation - "Cramdown" ................................ 56

        5.    Proponents May Object to the Amount or Classification of a Claim ............................ 56

        6.    Risk of Nonoccurrence of the Effective Date ................................ 56

        7.    Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes ................ 56

    B.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS ................... 56

    C.    DISCLOSURE STATEMENT DISCLAIMER ............................................ 56

        1.    Information Contained Herein Is for Soliciting Votes ................... 56

        2.    This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission ............................................ 56

        3.    This Plan and Disclosure Statement May Contain Forward Looking Statements .......... 57

        4.    No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement ......... 57

#95872667v6

| | 5. | No Admissions Made .................................................................................. | 57 |
| | 6. | Failure to Identify Litigation Claims or Projected Objections ...................... | 57 |
| | 7. | No Waiver of Right to Object or Right to Recover Transfers and Assets .................... | 57 |
| | 8. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' and Committee's Advisors............................................................. | 57 |
| | 9. | **Potential Exists for Inaccuracies, and the Proponents Have No Duty to Update** ..................................................................................................... | 58 |
| | 10. | No Representations Outside the Plan and Disclosure Statement are Authorized .......... | 58 |
| D. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............. | 58 |
| | 1. | Alternative Plan(s) of Liquidation ............................................................... | 58 |
| | 2. | Liquidation Under Chapter 7 ....................................................................... | 58 |
| | 3. | Dismissal of the Chapter 11 Cases............................................................... | 58 |
| Article XIV | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................ | 59 |
| A. | | General Tax Considerations......................................................................... | 59 |
| B. | | Federal Income Tax Consequences to the Debtors ....................................... | 59 |
| C. | | FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.................................................................................... | 60 |
| | 1. | Consequences to Holders of Claims ............................................................ | 60 |
| | 2. | Consequences to Holders of Interests ......................................................... | 62 |
| | 3. | Information Reporting and Backup Withholding .......................................... | 62 |
| D. | | Reservation or Rights.................................................................................. | 62 |
| | | CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST ................................... | 62 |

**TABLE OF EXHIBITS**

Exhibit A                  Leave-Behind Assets

Exhibit B                  Liquidation Analysis

Exhibit C                  Wind-Down Budget

## INTRODUCTION AND DISCLAIMERS

Basic Energy Services, Inc. and its affiliated debtors (collectively, the "Debtors," the "Company" or "Basic") in the above-captioned cases propose the following Combined Disclosure Statement and Joint Plan of Liquidation of Basic Energy Services, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code (this "Disclosure Statement" "Plan and Disclosure Statement" or "Plan") for the resolution of the outstanding claims against and equity interests in the Debtors.  The Debtors are the proponents of this Plan within the meaning of § 1129 of the Bankruptcy Code (the "Proponents").  Other agreements and documents supplement this Plan and have been or will be filed with the Bankruptcy Court.  These supplemental agreements and documents are referenced in this Plan and Disclosure Statement and will be available for review prior to the Voting Deadline.

The Plan is a liquidating plan.  Pursuant to prior orders of the Bankruptcy Court, the Debtors sold substantially all of their assets.  The Plan provides for the distribution of certain proceeds from such sales, as well as the distribution of other cash, and the creation of a liquidating trust that will administer and liquidate all remaining property of the Debtors, including Causes of Action (which includes the D&O Actions, the Avoidance Actions, and the Other Litigation Matters), not sold, transferred or otherwise waived or released before the Effective Date of the Plan.  The Plan further provides for the substantive consolidation of all of the Debtors, the termination of all Equity Interests in the Debtors, the dissolution and wind-up of the affairs of the Debtors, and the transfer of any remaining Assets to the liquidating trust referred to as the "Liquidation Trust."  The Plan also provides for distributions to certain Holders of Administrative Expense Claims and Priority Claims and to other Holders of Claims and the funding of the Liquidation Trust.

This Plan and Disclosure Statement contains certain statutory provisions and describes certain events in these Chapter 11 Cases and certain documents related to the Plan and Disclosure Statement that may be attached and are incorporated by reference.  Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions or every detail of such events.  The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement.  There can be no assurances that the statements contained herein will be correct at any time after this date.

This Plan and Disclosure Statement has been prepared in accordance with §§ 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws.  This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.  No other governmental or other regulatory agency approvals have been obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit the Disclosure Statement, as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to all of the Debtors' known Creditors and Interest Holders entitled to vote on the Plan.

The purpose of this Disclosure Statement is to provide adequate information to enable Creditors and Interest Holders who are entitled to vote on the Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan. All section references in this Plan and Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fairly summarize the Plan and to inform Creditors and Interest Holders how various aspects of the Plan affect their respective positions. If any questions arise, the Debtors urge you to contact the Debtors' counsel.  These attorneys will attempt to resolve your questions.  You are also encouraged to consult with your own counsel. The Debtors' counsel is unable to give you legal advice about your claims or how you should vote on the Plan. The counsel for the Debtors are available to answer any questions that your counsel may have regarding the Plan and Disclosure Statement.

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions regarding the Debtors' business.  Although the Debtors believe that such financial information fairly reflects the

1

financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business and their future results and operations. Except where specifically noted, the financial information contained in this Plan and Disclosure Statement and in the related exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver.  A party with standing may object to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted.  Although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.  Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed.  Information contained herein is subject to completion or amendment.  The Debtors reserve the right to file an amended plan and disclosure statement.

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Section IX.A and IX.B of the Plan.  There is no assurance that the Plan will be confirmed or, if confirmed, that such material conditions precedent will be satisfied or waived.  You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to Section XIII of this Plan and Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.

The Debtors have not authorized any entity to give any information about or concerning the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of its property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated thereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each creditor or Holder of an Interest should consult their own legal counsel and accountant as to legal, tax and other matters concerning their Claim or Interest.  This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Plan Proponents or on holders of Claims or Interests.

**The Debtors, the Ad Hoc Group, and the Unsecured Creditors Committee support confirmation of the Plan and recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan.**

# ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.**      **Defined Terms**

Capitalized terms used in this Plan have the meanings set forth in Section I.A.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "503(b)(9) Claim" means a Claim pursuant to § 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

2.      "ABL Credit Agreement" means the ABL Credit Agreement dated October 2, 2018 (as amended, restated, supplemented, or modified).

3.      "ABL Claims" means the outstanding Claims in respect of the Prepetition ABL Credit Facility.

4.      "Ad Hoc Group" means that certain ad hoc group formed by certain holders of Secured Notes and advised by Davis Polk & Wardwell LLP and Rapp & Krock, PC.

5.      "Additional Prepetition Secured Note" means that certain senior secured promissory note (as amended, restated, amended and restated, supplemented or modified) entered into on March 9, 2020 by and among Basic and Ascribe.

6.      "Additional Prepetition Secured Note Collateral" means all of the "Collateral" as such term is defined in the Additional Prepetition Secured Note.

7.      "Administrative Expense Bar Date" means the date by which a request for payment of post-GSO administrative expenses must be filed and is thirty (30) days after the Effective Date.

8.      "Administrative Expense Claim" means a Claim against the Debtors or its Estate for costs or expenses of administration of the Estate pursuant to §§ 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under  §§ 330(a) or 331 of the Bankruptcy Code, including Professional Fee Claims; (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) 503(b)(9) Claims.

9.      "Affiliate" has the meaning set forth in § 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were the Debtors.

10.      "Allowed" means with respect to Claims:  (a) any Claim (i) for which a proof of Claim has been timely filed on or before the applicable Bar Date (or for which a proof of Claim is not required to be filed pursuant to the Bankruptcy Code or a Final Order); or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no proof of Claim has been timely Filed; provided that, in each case, any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been filed or such an objection has been filed and the Claim thereafter has been Allowed by a Final Order; or (b) any Claim expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court).  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims.

11.      "Ascribe" means Ascribe III Investments LLC.

1

12.     "Ascribe 9019 Order" means the *Order Granting Debtors' Emergency Motion For Entry Of An Order Approving The Settlement Between The Debtors And Ascribe III Investments, LLC, et al* entered on May 20, 2022 [Docket No. 1231].

13.     "Ascribe-Related Directors" means Lawrence First, Derek Jeong, and Ross Solomon.

14.     "Asset Sales" means the sale of any Assets.

15.     "Assets" means all of the Debtors' property, rights and interest that are property of the Estate pursuant to § 541 of the Bankruptcy Code.

16.     "Assumed Liabilities" shall have the meaning ascribed to it in any Sale Order.

17.     "Avoidance Actions" means, any claim, right, or cause of action arising under chapter 5 of the Bankruptcy Code, including claims brought pursuant to sections 541, 542, 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, and any analogous state law claims.

18.     "Ballot" means the applicable form or forms of ballot(s) distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

19.     "Bankruptcy Code" means Title 11 of the United States Code, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

20.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the District Court.

21.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

22.     "Bar Date" means the applicable bar date by which a proof of Claim or request for payment of an administrative claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Confirmation Order.

23.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.     "Cash" means legal tender of the United States of America and equivalents thereof.

25.     "Causes of Action" means the Avoidance Actions, the D&O Actions and any other action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to § 362 or Chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in § 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim.

26.     "<u>Chapter 11 Cases</u>" means the bankruptcy cases commenced in the Bankruptcy Court by the Debtors under chapter 11 of the Bankruptcy Code and jointly administered under the caption *In re Basic Energy Services, Inc.*, 21-90002 (DRJ) (Bankr. S.D. Tex.).

27.     "<u>CJWS</u>" means C&J Well Services, Inc.

28.     "<u>Claim</u>" has the meaning set forth in § 101(5) of the Bankruptcy Code.

29.     "<u>Claims and Noticing Agent</u>" means Kroll Restructuring Administration, LLC in its capacity as Bankruptcy Court-appointed claims, noticing, and solicitation agent in the Chapter 11 Cases.

30.     "<u>Class</u>" means a class of Claims, as described in Article III of this Plan and Disclosure Statement.

31.     "<u>Committee</u>" means the Official Committee of Unsecured Creditors of Basic Energy Services, Inc. appointed on August 27, 2021 by the Office of the United States Trustee in the Chapter 11 Cases [Docket No. 217].

32.     "<u>Confirmation</u>" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

33.     "<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

34.     "<u>Confirmation Hearing</u>" means the hearing held by the Bankruptcy Court on Confirmation of this Plan, as such hearing may be continued.

35.     "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to § 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement pursuant to § 1125 of the Bankruptcy Code.

36.     "<u>Creditor</u>" means a "creditor," as defined in section 101(10) of the Bankruptcy Code.

37.     "<u>Cure Amount Claim</u>" means a Claim based upon the Debtors' defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors under § 365 of the Bankruptcy Code to the extent such Claim is required to be cured by § 365 of the Bankruptcy Code.

38.     "<u>D&O Actions</u>" means any and all claims against any of the Ascribe-Related Directors or the Former D&Os, as reserved in the Ascribe 9019 Order, including claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty or aiding and abetting breach of fiduciary duty, fraud, gross negligence and/or reckless mismanagement, and any claim against or any recoveries from all D&O Liability Insurance Policies, including Causes of Action against current or former insurance carriers, reinsurance carriers, insurance brokers, underwriters occurrence carriers, or surety bond insurers, relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract or any other matters relating to, arising from, or based in whole or in part on, the D&O Liability Insurance Policies.

39.     "<u>D&O Liability Insurance Policies</u>" means all Insurance Policies that provide directors' and officers' liability insurance coverage for the Debtors.

40.     "<u>Debtors</u>" means Basic Energy Services, Inc., Basic Energy Services, L.P., C&J Well Services, Inc., KVS Transportation, Inc., Indigo Injection #3, LLC, Basic Energy Services GP, LLC, Basic Energy Services LP, LLC, Taylor Industries, LLC, SCH Disposal L.L.C., Agua Libre Holdco LLC, Agua Libre Asset Co LLC, Agua Libre Midstream LLC, and Basic ESA, Inc.

41.     "<u>DIP Orders</u>" means the Interim DIP Order and the Final DIP Order.

3

42.    "Disbursing Agent" means: (a) the Liquidation Trustee, in its capacity as disbursing agent hereunder; and (b) the Debtors solely with respect to Distributions that are required to be made on or before on the Effective Date by the Debtors under this Plan and Disclosure Statement; *provided* that the Disbursing Agent for all Claims under the Secured Notes shall be the Prepetition Secured Notes Trustee.

43.    "Disputed Claim" means:

     a.    a Claim that is listed on the Debtors' Schedules as either disputed, contingent or unliquidated, whether or not a proof of Claim has been Filed;

     b.    a Claim that is listed on the Debtors' Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

     c.    a Claim that is not listed on the Debtors' Schedules;

     d.    a Claim as to which the Debtors or, prior to the Confirmation Date, any other party in interest, has Filed an objection and such objection has not been withdrawn or denied by a Final Order; or

     e.    a Claim for which a proof of Claim or request for payment of Administrative Expense Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Expense Claim is or was timely Filed.

44.    "Disputed Claims Reserves" means any reserve fund(s) established pursuant to Section VII.D of this Plan.

45.    "Dissolution Transactions" means the transactions that the Liquidation Trustee deems to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of the Debtors.

46.    "Distribution" means a distribution under the Plan of property to a Holder of a Claim on account of such Claim.

47.    "Distribution Date" means a date selected by the Debtors or the Liquidation Trustee in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

48.    "Distribution Record Date" means the Confirmation Date.  For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities,which shall receive distributions in accordance with the applicable procedures of The Depository Trust Company.

49.    "District Court" means the United States District Court for the Southern District of Texas.

50.    "Document Website" means the internet address https://cases.ra.kroll.com/basicenergy/, at which the Plan and Disclosure Statement and any amendments or supplements thereto shall be available to any party in interest and the public, free of charge.

51.    "DWAC Process" has the meaning ascribed to such term in the Ascribe 9019 Order.

52.    "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date set forth in Section IX.B have been met or waived in accordance with Section IX.C.

53.    "Entity" has the meaning set forth in § 101(15) of the Bankruptcy Code.

4

54.     "Estate" means the estate created for the Debtors in their Chapter 11 Cases pursuant to § 541 of the Bankruptcy Code.

55.     "Exculpated Parties" means, collectively:  (a) the Debtors; (b) the Committee and the members thereof; (c) the Ad Hoc Group and the members thereof; (d) the Prepetition Secured Notes Trustee; and (e) with respect to each of the foregoing, such Entities' Representatives.

56.     "Executory Contract" means a contract to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under § 365 or 1123 of the Bankruptcy Code, as applicable.

57.     "File," "Filed," or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

58.     "Final DIP Order" means the *Final Order Pursuant to §§ 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to the Prepetition Secured Parties for the Use Thereof; and (IV) Granting Related Relief* [Docket No. 344], as may be amended from time to time in accordance with the terms thereof.

59.     "Final Distribution Date" means, with respect to a particular Class of Claims, the Distribution Date upon which final Distributions to claimants in the Class are to be made.

60.     "Final Order" means an order or judgment of the Bankruptcy Court, or any other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move, under Bankruptcy Rule 9023 or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

61.     "Former D&Os" means all of the directors and officers of the Debtors that were not directors or officers on the Petition Date.

62.     "General Unsecured Claim" means any Claim against the Debtors that is (a) unpaid as of the Effective Date, and (b) is not an Administrative Expense Claim, Secured Claim, DIP Facility Claim, Cure Amount Claim, Priority Unsecured Claim, Priority Tax Claim, Secured Notes Deficiency Claim, or Intercompany Claim.

63.     "Governmental Unit" means a "governmental unit," as defined in § 101(27) of the Bankruptcy Code.

64.     "GSO" means the *Order (I) (A) Approving Global Settlement Pursuant To Bankruptcy Rule 9019; (B) Authorizing Final Resolution Of Debtors' Chapter 11 Cases; And (C) Granting Related Relief* entered on November 8, 2021 [Docket No. 686].

65.     "GSO General Unsecured Creditor Reserve" means the GUC Recovery Pool (as defined in the GSO) for the benefit of each holder of an Allowed General Unsecured Claim, comprised of $1,500,000 distributed to the holders of the Prepetition Secured Notes Claims on account of the Secured Notes and currently being segregated and held in escrow by or at the direction of the Prepetition Secured Notes Trustee for the benefit of each holder of an Allowed General Unsecured Claim, pursuant to and in accordance with the GSO.

66.     "Holder" means an Entity holding a Claim against, or an Interest in, the Debtors, as the context requires.

67.     "Impaired" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of § 1124 of the Bankruptcy Code.

68.     "Insurance Policies" means any and all insurance policies, including the D&O Liability Insurance Policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provision of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or its predecessors.

69.     "Insureds" means all persons and Entities that may be an "Insured" as defined in the Insurance Policies (or otherwise entitled to coverage thereunder).

70.     "Insurer" means any company or other entity that issued or entered into an Insurance Policy (including any third party administrator), and any respective predecessors and/or Affiliates of any of the foregoing.

71.     "Intercompany Claim" means any Claim against the Debtors held by a non-Debtor Affiliate.

72.     "Interest" means the rights of the Holders of the partnership interests, membership interests or other equity interests in the Debtors and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in the Debtors and the rights of any Entity to purchase or demand the issuance of any of the foregoing, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

73.     "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* entered by the Bankruptcy Court on October 21, 2021 [Docket No. 527].

74.     "Interim DIP Order" means the *Interim Order Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Authorizing the Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to the Prepetition Secured Parties for the Use Thereof; (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (V) Granting Related Relief* entered by the Bankruptcy Court on August 17, 2021 [Docket No. 41].

75.     "IRS" means the United States Internal Revenue Service.

76.     "Leave-Behind Assets" means the list of real property listed on Exhibit A to the Plan.

77.     "Liabilities" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

78.     "Lien" has the meaning set forth in § 101(37) of the Bankruptcy Code.

79.     "Liquidation Trust" means the trust established pursuant to Section V.C of this Plan to, among other things, hold the Liquidation Trust Assets and make Distributions pursuant to this Plan.

80.     "Liquidation Trust Agreement" means the trust agreement governing the Liquidation Trust, to be included in the Plan Supplement in form and substance acceptable to the Ad Hoc Group and the Committee.

81.     "Liquidation Trust Assets" means all Assets of the Debtors as of the Effective Date, including but not limited to, Retained Causes of Action (including the Avoidance Actions and the D&O Actions to the extent not resolved prior to the Effective Date), any Assets that have not been divested or abandoned by the Debtors as of the Effective Date, and all other property of the Debtors and their Estates, and each of them, which shall be transferred by the Debtors to the Liquidation Trust on the Effective Date, including the Litigation Claims.

82.     "<u>Liquidation Trust Beneficiaries</u>" means the Holders of Allowed Priority Unsecured Claims, Allowed Secured Notes Deficiency Claims, and Allowed General Unsecured Claims of the Estate.

83.     "<u>Liquidation Trust Expenses</u>" means any and all reasonable fees, costs and expenses incurred by the Liquidation Trust or the Liquidation Trustee (or any Third Party Disbursing Agent or any professional or other Person retained by the Liquidation Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

84.     "<u>Liquidation Trust Loan</u>" means the $1.0 million of cash funded by the Liquidation Trust Loan Non-Ascribe 2018 Notes Funding Amount and the Liquidation Trust Loan General Unsecured Creditor Funding Amount, which Liquidation Trust Loan shall be included in the Plan Supplement, on terms acceptable to the Ad Hoc Group and the Committee, and provide, among other things, the Ad Hoc Group and the Liquidation Trust representative appointed by the Committee with consent rights with respect to future debt incurrences by the Liquidation Trust.

85.     "<u>Liquidation Trust Loan Collateral</u>" means Liquidation Trust Loan First Lien Collateral and Liquidation Trust Loan Second Lien Collateral.

86.     "<u>Liquidation Trust Loan First Lien Collateral</u>" means any proceeds of the Liquidation Trust, excluding proceeds that constitute Stipulated Secured Notes Adequate Protection Collateral.

87.     "<u>Liquidation Trust Loan General Unsecured Creditor Funding Amount</u>" means $250,000 of cash loaned by holders of General Unsecured Claims to the Liquidation Trust, which shall be carved out of the portion of the Make-Whole Notes Reserve held on the Effective Date by the Debtors or the Liquidation Trust, as applicable, transferred to the GSO General Unsecured Creditor Reserve , and loaned from the GSO General Unsecured Creditor Reserve  to the Liquidation Trust pursuant to the Liquidation Trust Loan.

88.     "<u>Liquidation Trust Loan Non-Ascribe 2018 Notes Funding Amount</u>" means $750,000 of cash loaned by holders of Non-Ascribe Secured Notes Claims to the Liquidation Trust, the source of which shall be carved out of the portion of the Make-Whole Notes Reserve held on the Effective Date by the Debtors or the Liquidation Trust, as applicable.

89.     "<u>Liquidation Trust Loan Second Lien Collateral</u>" means any proceeds of the Liquidation Trust that constitute Stipulated Secured Notes Adequate Protection Collateral.

90.     "<u>Liquidation Trust Minimum Return</u>" means the face amount of the Liquidation Trust Loan multiplied by 3.0.  The allocable portion of the Liquidation Trust Minimum Return in respect of the Liquidation Trust Loan General Unsecured Creditor Funding Amount shall be paid to the GSO General Unsecured Creditor Reserve  in accordance with the Liquidation Trust Loan definitive documents.

91.     "<u>Liquidation Trustee</u>" means the trustee appointed pursuant to Section V.C of this Plan (or any successor trustee), in his, her or its capacity as the trustee of the Liquidation Trust.

92.     "<u>Litigation Claims</u>" means the Retained Causes of Action, the D&O Actions, and the Avoidance Actions.

93.     "<u>Make-Whole Notes Reserve</u>" means the aggregate $6,506,655 of cash segregated and held in reserve in accordance with the GSO and the Ascribe 9019 Order, consisting of (i) $2,599,939 held by the Prepetition Secured Notes Trustee, and (ii) $3,906,716 held by the Debtors, and derived from Ascribe's waiver of any recovery rights on behalf of its Make-Whole Notes (as defined in the Ascribe 2019 Order) pursuant to the Ascribe 9019 Order. For the avoidance of doubt, the Make-Whole Notes Reserve shall constitute Prepetition Secured Notes Collateral.

94.     "<u>Non-Ascribe Secured Notes</u>" means the Secured Notes issued under the Prepetition Secured Notes Indenture, excluding any Secured Notes issued to or held by Ascribe.

95.     "<u>Notice of Occurrence of Effective Date</u>" means the notice filed in accordance with Section IX.D of this Plan.

96.     "<u>Notice Parties</u>" means, collectively, the parties listed in Section XI.G.

97.     "<u>Objection Deadline</u>" means the deadline to File objections to Confirmation of this Plan, which is August 3, 2022, at 5:00 p.m. (prevailing Central Time), as may be extended by the Debtors with the consent of the Ad Hoc Group, or any other deadline to File objections to Confirmation of this Plan established by the Bankruptcy Court.

98.     "<u>Ordinary Course Professionals Order</u>" means the *Order Authorizing the Debtors to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* entered by the Bankruptcy Court on October 25, 2021 [Docket No. 549].

99.     "<u>Other Litigation Matters</u>" means Causes of Action belonging to the Debtors other than the D&O Actions and the Avoidance Actions which shall be further set forth in the Plan Supplement.

100.     "<u>Person</u>" has the meaning set forth in § 101(41) of the Bankruptcy Code.

101.     "<u>Petition Date</u>" means August 17, 2021, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

102.     "<u>Plan</u>" has the meaning set forth in the introduction hereof.

103.     "<u>Plan Supplement</u>" means the documents, schedules and any exhibits filed prior to the Confirmation Hearing, as amended, supplemented or modified from time to time, including the Liquidation Trust Agreement.

104.     "<u>Prepetition ABL Credit Agreement</u>" means that certain credit agreement (as amended, restated, amended and restated, supplemented, or modified), dated as of October 2, 2018, entered into by and among Basic, Bank of America, N.A. as Administrative Agent, and the lenders party thereto.

105.     "<u>Prepetition ABL Credit Facility</u>" means the revolving credit facility under the Prepetition ABL Credit Agreement.

106.     "<u>Prepetition Second Lien Note</u>" means that certain second lien delayed draw promissory note (as amended, restated, amended and restated, supplemented, or modified), dated as of October 15, 2020, entered into by and among Basic Energy Services, Inc., with the other Debtors, as guarantors, and Ascribe (in such capacity, the "<u>Prepetition Second Lien Secured Party</u>").

107.     "<u>Prepetition Secured Notes Collateral</u>" means all of the "Collateral" as such term is defined in the Prepetition Secured Notes Indenture.

108.     "<u>Prepetition Secured Notes Documents</u>" has the meaning ascribed to such term in the GSO.

109.     "<u>Prepetition Secured Notes Indenture</u>" means that certain indenture, dated as of October 2, 2018 (as amended, supplemented, amended and restated or otherwise modified from time to time) among Basic and the Prepetition Secured Notes Trustee.

110.     "<u>Prepetition Secured Notes Trustee</u>" means UMB Bank, N.A. in its capacity as trustee and collateral agent under the Prepetiton Secured Notes Indenture.

111.     "<u>Prepetition Secured Notes Trustee Charging Lien</u>" has the meaning ascribed to such term in the GSO.

112.     "<u>Prepetition Secured Parties</u>" has the meaning ascribed to such term in the Final DIP Order.

113.    "<u>Priority Unsecured Claim</u>" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Expense Claim or a Priority Tax Claim.

114.    "<u>Priority Tax Claim</u>" means a Claim that is entitled to priority in payment pursuant to § 507(a)(8) of the Bankruptcy Code.

115.    "<u>Pro Rata</u>" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or any other specified group of Claims pursuant to this Plan, proportionately, so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim to the amount of such Claim is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to the amount of all Allowed Claims in such Class or group of Claims.  Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims in such Class.

116.    "<u>Professional</u>" means any Entity (a) employed in the Chapter 11 Cases by the Debtors or the Committee pursuant to a Final Order in accordance with §§ 327, 328, 363 or 1103 of the Bankruptcy Code (other than a professional entitled to receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order) or (b) for which compensation or reimbursement has been Allowed by the Bankruptcy Court in the Chapter 11 Cases for services to the Debtors, and expenses incurred in connection with such services, pursuant to § 503(b)(4) of the Bankruptcy Code.

117.    "<u>Professional Fee Claim</u>" means any Administrative Expense Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

118.    "<u>Professional Fee Escrow Account</u>" means an account funded by the Debtors with Cash from the proceeds of the Liquidation Trust Loan as soon as possible after Confirmation and not later than the Plan Effective Date in an amount equal to the Professional Fee Escrow Amount.

119.    "<u>Professional Fee Escrow Amount</u>" means the reasonable estimate of the aggregate amount of Professional Fee Claims relating to the period prior to the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Section IV.A.1.c of this Plan, and which amount shall be paid from the proceeds of the Liquidation Trust Loan.

120.    "<u>Purchaser</u>" means any Entity that purchased assets of the Estate pursuant to a Sale Order or purchases assets vested in the Liquidation Trust.

121.    "<u>Released Parties</u>" means collectively: (a) the Debtors; (b) the Committee; (c) the members of the Committee; (d) the members of the Ad Hoc Group; (e) the Prepetition Secured Notes Trustee; and (f) any Professional; and (g) with respect to (a) through (f), such Entities' Representatives other than the Ascribe-Related Directors.  For the avoidance of doubt, the Ascribe-Related Directors are not Released Parties.

122.    "<u>Releasing Parties</u>" means collectively:  (a) the Debtors; (b) the Committee; (c) the members of the Ad Hoc Group; (d) the Prepetition Secured Notes Trustee; (e) each holder of a Claim that does not opt-out of the Release provisions herein in accordance with this Plan; and (f) with respect to each Entity in clauses (a) through (d), each such Entity's Representatives.

123.    "<u>Representatives</u>" means, with respect to any Person, any current and former Affiliates, equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals of such Person, in each case, in such capacity.

124.     "Retained Causes of Action" are all Causes of Action of the Debtors, including but not limited to all Avoidance Actions, the D&O Actions, and the Other Litigation Matters including, but not limited to, those actions set forth in the Plan Supplement.

125.     "Sale Motions" mean the *Debtor's Emergency Motion of Debtors for Entry of an Order Approving (I) (A) Bidding Procedures, (B) Stalking Horse Bid Protections, and (C) Assumption and Assignment Procedures; (II) (A) Purchase Agreements and (V) Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; and (III) Granting Related Relief* filed by the Debtors on August 17, 2021 [Docket No. 39]; *Emergency Motion to (A) Authorizing the Sale of the Debtors' Subject Assets to Bill Elliot Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Granting Related Relief* [Docket No. 855]; *Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to 7740 Hwy 21 Joint Venture Free and Clear of Liens, claim, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1169]; *Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Bill Elliot Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1170]; *Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Britco Structures USA LLC Free and Clear of Lien, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1171]; *Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Dixie II Investments, Ltd. Free and Clear of Liens, Claims, Interest, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1172].

126.     "Sale Orders" means the *Order (I) Approving (A) Bidding Procedures, (B) Bid Protections Granted to Certain Stalking Horse Purchasers, (C) Assumption and Assignment Procedures and (II) Granting Related Relief* entered by the Bankruptcy Court on August 25, 2021 [Docket No. 179]; *Order Approving Debtors' Emergency Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Bill Elliot Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 990]; *Amended Order Approving Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to 7740 Hwy 2 Joint Venture Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Granting Related Relief* [Docket No. 1275]; *Amended Order Approving Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Bill Elliot Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1276]; *Order Approving Debtors' Motion (A) Authorizing the Sale of the Debtors; Subject Asset to Britco Structures USA LLC Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Granting Related Relief* [Docket No. 1259]; *Order Approving Debtors' Motion (A) Authorizing the Sale of the Debtors' Subject Assets to Dixie II Investments, Ltd. Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [Docket No. 1260].

127.     "Sale Proceeds" means all Cash proceeds of the Sale Transactions.

128.     "Sale Transaction" means any sale by the Debtors to the Purchasers of their assets pursuant to any Sale Order.

129.     "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors, as required by § 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

130.     "Schedule of Retained Causes of Action" means the schedule of Causes of Action that shall vest in the Liquidation Trust on the Effective Date, which, for the avoidance of doubt, shall not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan, any Sale Order, or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP Orders, the GSO, and the Ascribe 9019 Order), as the same may be amended, modified, or supplemented from time to time by the Debtors.

131.     "Secured Claim" means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to § 553 of the Bankruptcy Code, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to § 506(a) or as Allowed pursuant to the Plan as a Secured Claim.

132.     "Secured Notes" means the 10.75% senior secured notes due 2023 and issued under the Prepetition Secured Notes Indenture.

133.     "Secured Notes Deficiency Claim" means that portion of any Allowed Secured Notes Claims that exceeds the value of the Assets securing such Allowed Secured Notes Claims except that no portion of the secured notes held by or for the benefit of Ascribe shall be entitled to any deficiency claim.

134.     "Secured Tax Claim" means a Secured Claim arising out of the Debtors' liability for any Tax.

135.     "Stipulated Secured Notes Adequate Protection Claim" means a liquidated adequate protection claim in respect of Secured Notes Adequate Protection Obligations on account of Non-Ascribe Secured Notes Diminution in Value, as each is defined and provided for in the Final DIP Order, equal to $7,000,000; provided however, the Stipulated Secured Notes Adequate Protection Claim shall only have recourse against and be secured by a lien on the Stipulated Secured Notes Adequate Protection Collateral.

136.     "Stipulated Secured Notes Adequate Protection Collateral" means the Secured Notes Adequate Protection Collateral (as defined in the Final DIP Order), but excluding all proceeds of the D&O Actions.

137.     "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person.

138.     "Third Party Disbursing Agent" means an Entity designated by the Liquidation Trustee to act as a Disbursing Agent pursuant to Article VII.C of this Plan.

139.     "Third Party Payment" means a payment made to the Holder of a Claim on account of such Claim by an Entity that is not the Debtors or the Liquidation Trust.

140.     "Trust Accounts" means the bank accounts to be held in the name of the Liquidation Trustee that are created pursuant to Section V.F of this Plan.

141.     "U.S. Trustee" means the Office of the United States Trustee for the Southern District of Texas.

142.     "Unexpired Lease" means a lease to which the Debtors are a party that is subject to assumption, assumption and assignment, or rejection under § 365 of the Bankruptcy Code or § 1123 of the Bankruptcy Code, as applicable.

143.     "Unimpaired" means, when used in reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

144.     "Unsecured Claims" means all Priority Unsecured Claims and General Unsecured Claims.

145.     "Voting Classes" means the Classes of Claims entitled to vote on the Plan.

146.     "Voting Deadline" means August 3, 2022, at 4:00 p.m., prevailing Central Time, which is the deadline for submitting ballots to accept or reject this Plan in accordance with § 1126 of the Bankruptcy Code.

147.     "Wind Down Budget" means the budget attached to this Plan as Exhibit C which may be updated or amended from time to time prior to Confirmation of the Plan.

**B.**     **Rules of Interpretation and Computation of Time**

 1. **Rules of Interpretation**

For purposes of this Plan and Disclosure Statement, unless otherwise provided herein: (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) any reference in this Plan and Disclosure Statement to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan and Disclosure Statement to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to this Plan and Disclosure Statement, the Confirmation Order or otherwise; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan and Disclosure Statement; (f) the words "herein," "hereunder" and "hereto" refer to this Plan and Disclosure Statement in its entirety rather than to a particular portion of this Plan and Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan and Disclosure Statement; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with this Plan and Disclosure Statement, the rights and obligations arising under this Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in § 102 of the Bankruptcy Code (other than subsection (5) thereof) shall apply to the extent not inconsistent with any other provision of this Section I.B.l.

 2. **Computation of Time**

In computing any period of time prescribed or allowed by this Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

 3. **Controlling Document**

In the event of any inconsistency among this Plan and Disclosure Statement or any exhibit or schedule hereto, the provisions of this Plan and Disclosure Statement shall govern. In the event of any inconsistency among this Plan and Disclosure Statement and any document or agreement Filed in the Plan Supplement, such document or agreement shall control. In the event of any inconsistency among this Plan and Disclosure Statement or any document or agreement Filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control. For the avoidance of doubt, the Confirmation Order shall control above all other related documents.

# ARTICLE II
# DEBTOR HISTORY AND THE BANKRUPTCY CASE

**A.**     **Debtor History**

 1. **Debtors' Background**

Basic was a leading provider of production-focused services in the United States to oil and natural gas production companies, with a focus on well servicing and water logistics services which are trusted, safe, and reliable. Headquartered in Fort Worth, Texas, the Company's operations supported five primary geomarkets by conducting operations in California, the Permian Basin, South Texas/Eagle Ford, North Texas/Oklahoma, and Rockies/Bakken.

 2. **Corporate Structure and Operations**

Basic was organized as a Delaware corporation in 1992 under the name Sierra Well Service, Inc. and changed to its current name in 2000. The Debtors' full corporate structure is reflected below.



Since its incorporation in 1992, the Debtors grew through both the acquisition of other businesses and the organic expansion of its fleet of equipment. The various businesses acquired were either absorbed as new subsidiaries of Basic, or merged with existing subsidiaries.

3.     **The Debtors' Prepetition Capital Structure**

The Debtors' prepetition indebtedness consisted of: (a) a $10.0 million Prepetition Superpriority Credit Facility (defined below); (b) approximately $347.5 million of Secured Notes; (c) a $36.05 million Prepetition ABL Credit Facility; (d) a $15 million Additional Prepetition Secured Note; and (e) a $15 million Prepetition Second Lien Note. The obligations of Basic under the Prepetition ABL Credit Agreement are secured pursuant to that certain security agreement dated as of October 2, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Security Agreement"), by and among, the Debtors and the ABL Administrative Agent. Pursuant to the ABL Security Agreement, the Debtors each granted a security interest in the Collateral (as defined in the ABL Security Agreement). The Collateral includes, among other things, the Debtors' right, title, and interest in receivables and certain cash and deposit accounts (collectively, the "ABL Collateral").

The Company's liquidity constraints and the fact that the Company was free cash flow negative led the Debtors to negotiate with the Ad Hoc Group on the terms of a term loan bridge facility (the "Prepetition Superpriority Credit Facility"), to allow the Company to make payroll, continue to operate and ensure a smooth transition to chapter 11. This Prepetition Superpriority Credit Facility was executed on May 3, 2021. The Debtors continued discussions with the Ad Hoc Group over the terms of a potential transaction in the weeks following execution of the Prepetition Superpriority Credit Facility. In particular, these negotiations focused on (i) whether to implement a restructuring transaction or a sale transaction under § 363 of the Bankruptcy Code, (ii) the allocation of equity among certain creditors, (iii) the treatment or refinancing of other debt in the Company's capital structure, and (iv) the Company's capital needs during any chapter 11 cases and post-emergence.

As a result of these discussions, the Debtors commenced a sale and marketing process to avoid a fire-sale liquidation of the Debtors' businesses and assets, and protect the jobs of the Debtors' approximately 2,400 employees. To implement this strategy, the Debtors and Lazard Freres & Co. LLC as investment banker ("Lazard"), designed a process to solicit bids for the Debtors' businesses or assets, including for all or parts of the Debtors' businesses or assets, and on a going-concern or liquidation basis. Beginning in May 2021, Lazard began marketing substantially all

of the Debtors' businesses and assets (the "Marketing Process"). Lazard, on behalf of the Debtors, contacted over 30 potential investors, including strategic investors, financial investors, and liquidators, with the aim of attracting multiple proposals to acquire the Debtors' businesses or assets on a cash-free, debt-free basis.

Throughout the Marketing Process, the Debtors coordinated with all of their major stakeholders, allowing such stakeholders to provide input prior to execution of any IOI or purchase agreement.

### 4. Events Leading to the Chapter 11 Cases

#### a. Prior Bankruptcy Filing

This is the Company's second Chapter 11 filing in the last five years. In October 2016, Basic commenced voluntary Chapter 11 cases in Delaware bankruptcy court in cases styled *In re Basic Energy Services, Inc., et al.* Case No. 16-12320 (KJC) (the "2016 Chapter 11 Cases"). In December 2016, the Delaware bankruptcy court confirmed the Company's prepacked plan of reorganization and the Company emerged from the 2016 Chapter 11 Cases with total secured indebtedness of approximately $164 million and approximately $131 million in unsecured indebtedness.

Although the Company's efforts to implement its business plan following its emergence from the 2016 Chapter 11 Cases were generally successful, the Company ultimately faced liquidity and operational challenges that were more persistent and widespread than anticipated.

#### b. Business Realignment

Notwithstanding its significantly deleveraged balance sheet following its emergence from the 2016 Chapter 11 Cases, the Company continued to face significant operational challenges and adverse industry trends that resulted in constrained liquidity. Starting in 2018, the Company approached the market to refinance its secured indebtedness and in October 2018 issued the Secured Notes and entered into the Prepetition ABL Credit Facility. To realign its business plan to focus on its core competencies, the Company divested, during 2018, its contract drilling operations and during the second half of 2019, its pressure pumping services. The Company also began to explore a number of strategic transactions available to it to best reposition the Company for future success. In connection with this process, the Company considered and negotiated with counterparties regarding potential merger and acquisition transactions and in 2020, the Company utilized the proceeds of its divestitures to finance the acquisition of CJWS, as discussed in more detail below.

In 2019, the Company determined it was in its best interest to pursue a synergistic transaction that would allow the Company to strengthen its core business while significantly reducing its leverage on a pro-forma basis. In January 2020, the Company established a special committee of its board of directors to evaluate strategic options to maximize value, which resulted in an additional capital infusion through the Additional Prepetition Secured Note and the acquisition of CJWS and its subsidiaries (the "C&J Transaction"), which was anticipated to improve the Company's liquidity position, business operations, and performance through a multitude of synergies and new business opportunities.

To effect the C&J Transaction, Basic Energy Services, Inc. entered into a purchase agreement dated March 9, 2020 (the "CJWS Purchase Agreement") with Ascribe, NexTier Holding Co., ("NexTier"), and CJWS (a wholly owned subsidiary of NexTier), whereby the Company acquired all of the issued and outstanding shares of capital stock of CJWS, such that CJWS became a wholly-owned subsidiary of the Debtor. In connection therewith, Ascribe also entered into an Exchange Agreement, dated March 9, 2020, with the Company (as amended, the "Exchange Agreement") pursuant to which, among other things, Ascribe contributed $34.4 million of Secured Notes (the "Ascribe Contributed Notes") to Basic Energy Services, Inc., which in turn contributed the notes to NexTier as partial consideration for the C&J Transaction. For its contribution of the Ascribe Contributed Notes and to the C&J Acquisition, Ascribe received (a) 118,805 shares of newly-issued Series A Preferred Stock, (b) an amount in cash for accrued interest on the Ascribe Senior Notes approximately equal to $1.5 million, and (c) a $525,000 closing fee pursuant to the Additional Prepetition Secured Note (the "Exchange Transaction" and, together with the stock purchase and the other transactions contemplated by the Purchase Agreement, the "CJWS Transaction"). Following the C&J Transaction, Ascribe became the controlling owner of approximately 85% of the Company's equity interests.

14

In connection with the CJWS Transaction, pursuant to the CJWS Purchase Agreement, Ascribe agreed that if NexTier held the Ascribe Contributed Notes for a certain period, including a year after consummation of the CJWS Transaction (i.e., through March 9, 2021), then Ascribe would sell the Ascribe Contributed Notes on behalf of NexTier and also "make-whole" NexTier for the difference between the price of the Ascribe Contributed Notes that were so sold and the par value of such notes (such difference, the "Make-Whole Payment")—that is, NexTier would receive 100% of the par value of the Ascribe Contributed Notes. Pursuant to the Exchange Agreement, if Ascribe were required to pay the Make-Whole Payment to NexTier pursuant to the Purchase Agreement, then Basic Energy Services, Inc. would be required to reimburse Ascribe the amount of such Make-Whole Payment (such amount, the "Make-Whole Reimbursement Amount"), to the extent that Basic Energy Services, Inc. was unable to pay the full Make-Whole Reimbursement Amount in cash to Ascribe, in new Senior Secured Notes, based on the market price of such notes.

### c.   The Effects of the 2020 Economic Downturn

The C&J Transaction expanded the Company's geographic footprint and positioned the Company for growth in its core businesses. However, following the March 9, 2020 close of the C&J Transaction, the volatility in the oil and gas market, negative oil prices in April 2020, and the dramatic impact of the COVID-19 pandemic on global markets resulted in unforeseen and prolonged challenges to the Debtors' liquidity and operational performance.

In an effort to reduce the spread of the COVID-19 pandemic, many jurisdictions around the world began, in March 2020, enacting stay-at-home orders, forcing non-essential businesses to close, and restricting air and land travel. Inevitably, global demand for oil and gas declined significantly, contemporaneous to a market share war that led to a surplus oil supply in the face of declining global demand. Decreased demand for the Debtors' services resulting from a decline in oil prices and decreased activity further constrained the Debtors' ability to engage in revenue-generating activities.

In March 2020, international economies and financial markets—particularly, the oil and gas markets—were significantly disrupted by the failure of OPEC and a group of oil-producing nations to reach an agreement as to oil production cuts. Although Russia and the OPEC nations ultimately reached an agreement to reduce the global oil supply by close to 10%, a disparity between the supply and demand of oil nevertheless persisted, leading to depressed prices in oil, mitigated by a gradual recovery. During 2020, the average closing price of West Texas Intermediate Crude Oil declined over 30% relative to 2019. The scope of the negative impact that the oil market share war had on the oil and gas industry is evidenced by, among other things, the fact that many of the Company's peer competitors or customers are also currently availing themselves of the protections afforded by Chapter 11. Oil producers responded to the lower demand for oil and lower oil prices by reducing capital budgets, with the Debtors' customers generally cutting their budgets and cancelling or delaying work. These measures resulted in decreased demand for the Debtors' services evidenced by a $155.9 million decline in total revenue in 2020 relative to 2019 (on a non pro forma basis).

As utilization of the Company's services decreased during the first half of 2020, the Company's borrowing base under its Prepetition ABL Credit Facility decreased significantly. The ongoing disruption in commodity markets and uncertain prospects of a recovery led the Company's customers to limit capital expenditures, leading to a decline in demand for the Company's services and thus decreased generation of receivables upon which the Company could seek additional liquidity. The narrowing of the borrowing base resulted in substantially reduced credit availability under the Company's Prepetition ABL Credit Facility and limited new credit opportunities for the Company.

### 5.   Debtors in Possession Financing

In anticipation of the Chapter 11 filing, the Debtors focused on obtaining financing and the use of cash collateral that would be sufficient to sustain their businesses during the pendency of these Chapter 11 cases.  A summary of the key terms of this financing is included in the Final DIP Order.  The Debtors sought authority to use cash collateral to help fund the administration of these Chapter 11 Cases.

### B.   Main Bankruptcy Events

### 1.   First Day Orders

On August 17, 2021, the Court held hearings on the various first day pleadings filed by the Debtors including:

- **DIP Motion**: *Motion of Debtors for Entry of Orders (I) Authorizing Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Authorizing Debtors' Use of Cash Collateral; (III) Granting Adequate Protection to the Prepetition Secured Parties for the Use Thereof; (IV) Scheduling A Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (V) Granting Related Relief* [Docket No. 4];

- **Cash Management Motion**: *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing (A) Continuation of Existing Cash Management System; (B) Maintenance of Existing Business Forms and Bank Accounts; (C) Continuation of Intercompany Transactions; (D) Payment of Related Prepetition Obligations, and (II) Granting Related Relief* [Docket No. 7];

- **Wages Motion**: *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (C) Pay Contractor Obligations; and (II) Granting Related Relief* [Docket No. 8];

- **Vendor Motion**: *Emergency Motion of Debtors for Interim and Final Orders Authorizing Debtors to (I) Honor Prepetition Obligations to Customers and (II) Pay Certain Prepetition Obligations to Lien Claimants, Fuel Vendors, and Health, Safety, and Environmental Claimants; and (III) Granting Related Relief* [Docket No. 9];

- **Surety Motion**: *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program and (B) Pay Obligations with Respect Thereto; (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program; and (III) Granting Related Relief* [Docket No. 10];

- **Utility Motion**: *Emergency Motion of Debtors for an Order (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 11]

- **Prime Clerk Retention**: *Application of Debtors for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 17]

- **NOL Motion**: *Emergency Motion of Debtors for Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests In, and Claims Against, Debtors and (B) Certain Worthless Stock Deduction Claims; and (II) Granting Related Relief* [Docket No. 20];

- **Taxes Motion**: *Emergency Motion of Debtors for Order (I) Authorizing Payment of Certain Prepetition Taxes; and (II) Granting Related Relief* [Docket No. 21];

- **Creditor Matrix Motion**: *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) a Consolidated List of 30 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information, (II) Waiving the Requirement to File a List of Equity Security Holders, (III) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information, and (IV) Granting Related Relief* [Docket No. 28]

At the first day hearing on August 17, 2021, the Court entered interim orders on the Surety Motion, DIP Motion, Vendor Motion, and Cash Management Motion. The Court entered final orders on all other motions set for hearing on August 17, 2021.

2.    **Employment Applications**

The following employment applications and orders approving employment applications were filed or entered in these Chapter 11 Cases:

- Weil, Gotshal & Manges LLP ("Weil"): On September 10, 2021, the Debtors filed an application to employ Weil as counsel for Debtors. [Docket No. 332]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Weil on October 21, 2021 [Docket No. 526].

- Lazard Freres & Co. LLC ("Lazard"): On September 10, 2021, the Debtors filed an application to retain Lazard as Investment Banker. [Docket No. 333]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Lazard on October 21, 2021. [Docket No. 523].

- AlixPartners, LLP ("AlixPartners"): On September 10, 2021, the Debtors filed an application to retain AlixPartners as the Debtors' Financial Advisor. [Docket No. 334]. The Bankruptcy Court entered an order authorizing the Debtors' employment of AlixPartners on October 21, 2021. [Docket No. 524].

- Ropes & Gray ("Ropes"): On September 15, 2021, the Debtors filed an application to retain Ropes as counsel to Alan J. Carr, as Independent Director of the Special Committee of the Board of Directors of Basic Energy Services, Inc. [Docket No. 360]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Ropes on October 21, 2021. [Docket No. 525].

- Pachulski Stang Ziehl & Jones LLP ("Pachulski"): On September 30, 2021, the Debtors filed an application to retain Pachulski as Texas and conflicts counsel to the Alan J. Carr. [Docket No. 459]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Pachulski on October 25, 2021. [Docket No. 547].

- Deloitte Tax LLP ("Deloitte"): On October 13, 2021, the Debtors filed an application to retain Deloitte as tax services provider [Docket No. 489]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Deloitte on November 8, 2021 [Docket No. 688].

- Daiwa Corporate Advisory LLC ("Daiwa"): On October 13, 2021, the Debtors filed an application to retain Daiwa as financial advisor to Alan J. Carr [Docket No. 494]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Daiwa on November 5, 2021 [Docket No. 667].

- Province, LLC ("Province"): On December 7, 2021, the Debtors filed an application retain Province as Financial Advisor [Docket No. 783]. The Bankruptcy Court entered an order authorizing the Debtors' employment of Province on January 28, 2022 [Docket No. 1028].

- Jackson Walker LLP ("JW"): On December 13, 2021, the Debtors filed an application to retain JW as counsel [Docket No. 809]. The Bankruptcy Court entered an order authorizing the Debtors' employment of JW on January 19, 2022 [Docket No. 997].

3.    **Negotiation with the Committee, the U.S. Trustee, the DIP Lenders, and the Prepetition Secured Parties**

On August 19, 2021, the U.S. Trustee appointed the Committee [Docket No. 217]. After the first day hearings, the Debtors continued to negotiate with key stakeholders including the U.S. Trustee, the Committee, the Prepetition Secured Parties and the DIP Lenders (as such term is defined in the Final DIP Order) regarding the terms of various final orders on the operational motions.

On September 13, 2021, the Court entered final orders on the Cash Management Motion [Docket No. 339]; the Lien Claimant Motion [Docket No. 340]; and the Surety Motion [Docket No. 341]. On September 14, 2021, the Court entered a final order on the DIP Motion [Docket No. 344].

4.      **Schedules and Statements**

On September 10, 2021, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 291-297; 299-304]. Interested parties may review the Schedules and Statements of Financial Affairs and their amendments thereto by visiting the Debtors' Case Information Website (located at https://cases.ra.kroll.com/basicenergy/)

5.      **Final DIP Order**

On September 14, 2021, the Court entered the Final DIP Order, which approved the following (each as defined in the Final DIP Order):

- authorization for the Debtors to obtain up to $35 million in senior secured postpetition financing on a superpriority basis (the "<u>DIP Facility</u>");

- authorization for the Debtors, prior to the entry of the Final DIP Order, to use up to $27,000,000 of the proceeds of the DIP Loans for the purposes set forth in the DIP Loan Documents, the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the DIP Orders, with the remainder of such proceeds to be available to the Debtors upon entry of the Final DIP Order and satisfaction of the other conditions set forth in the DIP Loan Documents;

- authorization for the Loan Parties to enter into the DIP Loan Agreement and the other DIP Loan Documents and to take such other and further acts as may be required in connection with the DIP Loan Documents;

- authorization for the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents;

- authorization for the Debtors, immediately upon the Interim Order Entry Date, to use proceeds of the DIP Loans as expressly provided in the DIP Loan Documents and solely in accordance with the DIP Orders and the applicable Approved Budget (as defined in the Final DIP Order);

- the grant and approval of superpriority administrative expense claim status, pursuant to §§ 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, in respect of all DIP Obligations, subject to the Carve-Out (as defined in the Final DIP Order);

- the grant to the DIP Secured Parties of valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined in the Final DIP Order) in all DIP Collateral (as defined in the Final DIP Order);

- authorization for the Debtors to use the Cash Collateral (as defined in the Final DIP Order) and other Prepetition Collateral of the Prepetition Secured Parties (as defined in the Final DIP Order) in accordance with the terms and conditions set forth in the Final DIP Order;

- the grant to (i) (A) the Prepetition ABL Agent and the Prepetition ABL Secured Lenders (each as defined in the Final DIP Order), (B) the Prepetition Superpriority Agent and the Prepetition Superpriority Secured Parties, and (C) the Prepetition Second Lien Secured Party, of superpriority claims and automatically perfected liens, security interests, and

other adequate protection, as applicable, to the extent of any diminution in value of their interests in the Prepetition ABL Collateral, the Prepetition Superpriority Collateral and the Prepetition Second Lien Collateral (each as defined in the Final DIP Order), as applicable.

6.      **The Sale Process**

On September 23, 2021, the Court entered the following: (i) *Order (I) Approving (A) The Sale of Certain Well Servicing Assets of the Debtors Free and Clear of all Liens, Claims, Interests, and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 436]; (ii) *Order (I) Approving (A) The Sale of the California Business and Certain Other Assets of the Debtors Free and Clear of all Liens, Claims, Interests, and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 437]; and (iii) *Order (I) Approving (A) The Sale of the Water Logistics Business of the Debtors Free and Clear of all Liens, Claims, Interests, and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief* [Docket No. 438] (the "Pre GSO Sale Orders," and such sale transactions, the "Pre GSO Sale Transactions"), pursuant to which the Debtors sold substantially all of their assets.

As a result of the sale process and competitive auction, the aggregate purchase price generated for the Debtors' assets was approximately $100 million (subject to adjustments provided therein) plus other valuable consideration as provided in the Asset Purchase Agreements (as that term is defined in the Pre GSO Sale Orders), including the purchase of certain accounts receivable of approximately $21.5 million, assumption of certain prepetition and postpetition accounts payable of approximately $8 million, commitments to employ employees, and the assumption of certain operating liabilities.

On September 23, 2021, the Court authorized the Debtors' entry into the Asset Purchase Agreements and consummation of the Pre GSO Sale Transactions. The Pre GSO Sale Transactions closed on October 1, 2021. The Debtors repaid the DIP Facility in full with the proceeds from the Pre GSO Sale Transactions on October 4, 2021.

**C.      Remaining Assets of the Estate**

1.      **Potential Litigation Claims**

        a.      D&O Actions

The Debtors retained the D&O Actions pursuant to the Ascribe 9019 Order.  These causes of action include causes of action against the Ascribe-Related Directors, who did not receive releases or exculpation under the Ascribe 9019 Order. These D&O Actions include, but are not limited to, breach of fiduciary duties (including aiding and abetting), aiding and abetting fraudulent transfers, corporate waste, and other common law as well as statutory causes of action, related to their role in as directors, officers, and primary shareholders of the Debtor.

The Debtors believe that the D&O Liability Insurance Policies cover the D&O Actions.  The recovery for these D&O Actions are limited to available D&O Liability Insurance Policies proceeds.  The Debtors currently value the D&O Actions between $50MM and $60MM.  Recovery from the D&O Actions could result in as much as $50 million in incremental distributable value to the Estate and its constituents in the form of recoveries from the D&O Liability Insurance Policies.

        b.      Avoidance Actions

In accordance with § 1123(b) of the Bankruptcy Code, but subject to Article IX hereof, the Liquidation Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Liquidation Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action that are or were settled, released, waived, exculpated, or transferred (i) prior to the Petition Date by any of the Debtors or (ii) pursuant to the Plan or any Order of the Bankruptcy Court entered in these Chapter 11 Cases (including the DIP

Orders, the GSO, and the Ascribe 9019 Order), as the same may be amended, modified, or supplemented from time to time by the Debtors.

The Debtors may have certain chapter 5 causes of action for monetary damages, recovery of assets, or reversal of asset transfers (cash and non-cash) that were transferred by one or more of the debtors to third parties in connection with certain pre-petition transactions (e.g., avoidance actions). Avoidance Actions shall not include any claims transferred to any Purchaser pursuant to any Purchase Agreement (as defined in the applicable Sale Order).

c.     Other Litigation Matters

In their Schedules and Statements of Financial Affairs, the Debtors identified certain pending litigation matters and potential causes of action against third parties. The Debtors believe that there may be other causes of action which will be pursued by the Liquidation Trust. A list of these matters will be included in the Plan Supplement.

# ARTICLE III
# SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

**A.     Summary of Treatment of Claims and Interests and Estimated Recoveries**

The Plan is premised upon the substantive consolidation of the Debtors, as set forth in more detail in this Plan and Disclosure Statement. Accordingly, this Plan and Disclosure Statement serves as a motion for entry of a Bankruptcy Court order approving the substantive consolidation of the Debtors. The following chart provides a summary of treatment of each Class of Claims and Interests (other than Administrative Expense Claims and Priority Tax Claims) on a substantively consolidated basis and an estimate of the recoveries of each Class.[1] The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article IV of this Plan and Disclosure Statement.

---

[1]     These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by Creditors in  proofs of claim or otherwise. The Proponents have not completed their analysis of Claims in the Chapter   11 case and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated. For the avoidance of doubt, the amounts represented below do not include amounts on account of proceeds of D&O Actions nor on account of the Liquidation Trust Loan.

| Class | Estimated Allowed Claims | Treatment / Voting Status | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1— ABL Claims | $28.8 million | Unimpaired/Not Entitled to Vote | 100% |
| Class 2— Prepetition Second Lien Note Claim | $15.76 million | Impaired/Entitled to Vote | 56.2%-68.8% |
| Class 3— Additional Prepetition Secured Note Claim | $15.83 million | Impaired/Entitled to Vote | 14.8%-15.4% |
| Class 4— Non-Ascribe Secured Notes Claims | $288.27 million | Impaired/Entitled to Vote | 16.4%-17% |
| Class 5— Ascribe Secured Notes Claims | $37.28 million | Impaired/Entitled to Vote | 14.8%-15.4% |
| Class 6— Non-Tax Priority Unsecured Claims | $473,378 | Unimpaired/Not Entitled to Vote | 100% |
| Class 7— Non-Ascribe Secured Notes Deficiency Claims | $239.22 million | Impaired/Entitled to Vote | 0.4%-3.8% |
| Class 8— General Unsecured Claims | $157.99 million | Impaired/Entitled to Vote | 0.4%-3.8% |
| Class 9— Interests | Unknown | Impaired/Deemed to Reject | 0% |

# ARTICLE IV
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except for those Claims set forth in Section IV.A below, are classified for voting and Distribution pursuant to this Plan and Disclosure Statement as set forth below. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes.

**A.      Unclassified Claims**

  **1.      Payment of Administrative Expense Claims**

    a.      Administrative Expense Claims in General

Unless otherwise agreed by the Holder of an Administrative Expense Claim and the Debtors or the Liquidation Trustee, or unless an order of the Bankruptcy Court provides otherwise, each Holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Expense Claim, Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made at the Debtors' option (i) in the ordinary course of business or (ii) on the latest to occur of (A) the Effective Date (or as soon as reasonably practicable thereafter), (B) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (C) such other date as may be agreed upon by the Liquidation Trustee and the Holder of such Claim. The Administrative Expense Claim shall be paid from the $1.5 million set aside funded by the GSO, plus an additional $1.0 million from the Make-Whole Notes Reserve.

    b.      Stipulated Secured Notes Adequate Protection Claim

The Stipulated Secured Notes Adequate Protection Claim shall recover proceeds from the Stipulated Secured Notes Adequate Protection Collateral. In the event that the Stipulated Secured Notes Adequate Protection Claim exceeds the value of the Stipulated Secured Notes Adequate Protection Collateral, the excess Stipulated Secured Notes Adequate Protection Claim against the Estates shall be waived.

    c.      Statutory Fees

On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors or the Liquidation Trustee in Cash equal to the amount of such Administrative Expense Claims. Fees payable pursuant to 28 U.S.C. § 1930 on behalf of the Estate after the Effective Date will be paid by the Liquidation Trustee until the closing of the Chapter 11 Cases pursuant to § 350(a) of the Bankruptcy Code.

    d.      Professional Compensation

      i.      Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims may be made any time after the Confirmation Date, but shall be filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court after notice in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.

ii.        Payment of Professional Fees Accrued Post-Confirmation

From and after the Confirmation Date, any requirement that Professionals comply with §§ 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  All Professional Fees accrued from and after the Confirmation Date shall be paid in the ordinary course of business.  This provision of the Plan and Disclosure Statement shall be effective immediately upon confirmation of the Plan notwithstanding the occurrence of the Effective Date.

iii.        Professional Fee Escrow Account

Within fourteen (14) days after the Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds shall not be considered property of the Estate.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall be property of the Liquidation Trust.

iv.        Estimation of Professional Fees and Expenses

Professionals providing services to the Debtors and the Committee shall reasonably estimate their unpaid Professional Fee Claims against the Debtors incurred before and as of the Confirmation Date, and shall deliver such estimate to the Debtors within five (5) Business Days after the Confirmation Date; provided that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.

v.        Post-Effective Date Professional Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Effective Date, subject only to the terms of the Liquidation Trust Agreement, the Liquidation Trustee may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.  Any such funding for Liquidation Trustee professionals and/or expenses shall be paid from the Liquidation Trust Assets.

e.        Bar Date for Administrative Expense Claims

Except with respect to Professional Fee Claims or otherwise as set forth in this Plan, unless previously Filed, requests for payment of Administrative Expense Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than the Administrative Expense Bar Date, which is thirty (30) days after the Effective Date.  Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Administrative Expense Claims and that do not File and serve such a request by the Administrative Expense Bar Date will be forever barred from asserting such Administrative Expense Claims against the Debtors, the Liquidation Trust or their respective property, and such Administrative Expense Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the later of (a) thirty 30 days after the Filing of the applicable request for payment of Administrative Expense Claims or (b) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Expense Claims.

2.      **Payment of Tax Claims**

a.        Priority Tax Claims

Pursuant to § 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Liquidation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will

receive, at the sole option of the Debtors or the Liquidation Trustee, as applicable, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan, pursuant to § 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Liquidation Trustee as they become due.

      b.      Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in Section IV.C of this Plan and Disclosure Statement, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Liquidation Trust or their respective property.

      c.      Secured Tax Claims

Allowed property tax, ad valorem tax, or other non-income tax claims of a governmental unit (as defined in § 101(27) of the Bankruptcy Code) that are (i) secured by valid, perfected, enforceable, senior and nonavoidable liens ("Senior Tax Liens") on the proceeds of the sale or transfer of any assets subject to the Senior Tax Liens (the "Tax Lien Assets"), or (ii) assessed with respect to the Tax Lien Assets for the tax year 2021 that are the obligation of the Debtors under the Asset Purchase Agreements (as defined in the applicable Sale Order) (together, such claims, the "Secured Tax Claims"), shall be reconciled and satisfied in full by the Debtors exclusively as soon as practicable after the Effective Date or as and when such Property Tax Claims come due.

The Secured Tax Claims shall be paid from the $5 million set aside funded by the GSO and the asset purchase agreement adjustment process in accordance with applicable state, federal, and bankruptcy law.

## B.    Classification of Claims and Interests

### 1.    General

Pursuant to §§ 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for the purposes of voting and Distribution pursuant to this Plan, as set forth herein.  A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for herein, the Confirmation Order or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; provided, however, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Bankruptcy Court indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan.  The Debtors may seek Confirmation of this Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

## C.    Treatment of Claims and Interests

### 1.    ABL Claims (Class 1)

      a.      Classification.  Class 1 consists of the ABL Claims.

      b.      Treatment.  The ABL Claims are fully cash collateralized by cash pledged in favor of Bank of America, N.A. and held in a restricted account at ending in -6131 at Bank of America. The letters of credit outstanding under the Prepetition ABL Credit Facility come due on August 2, 2022.  By August 2, 2022, the ABL Claims shall be in paid in full.

      c.      Voting.  Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

2.      **Prepetition Second Lien Note (Class 2)**

      a.      Classification.  Class 2 consists of the Claim on account of the Prepetition Second Lien Note.

      b.      Treatment.  The Claim on account of the Prepetition Second Lien Note will recover cash proceeds from its second lien on the ABL Collateral. Further, the Claim on account of the Prepetition Second Lien Note will be allowed and treated in accordance with the Ascribe 9019 Order.

      c.      Voting.  Claims in Class 2 are Impaired.  Each Holder of an Allowed Claim in Class 2 is entitled to vote on this Plan.

3.      **Additional Prepetition Secured Note (Class 3)**

      a.      Classification.  Class 3 consists of the Claim on account of the Additional Prepetition Secured Note.

      b.      Treatment. The Claim on account of the Additional Prepetition Secured Note will recover cash proceeds from its *pari passu* liens on the Additional Prepetition Secured Note Collateral.  Further, the Claim on account of the Additional Prepetition Secured Note will be allowed and treated in accordance with the Ascribe 9019 Order, which included the waiver of deficiency claims and the waiver of the ability to seek any recoveries from any proceeds of any Avoidance Actions and any D&O Actions.

      c.      Voting. Claims in Class 3 are Impaired.  Each Holder of an Allowed Claim in Class 3 is entitled to vote on this Plan.

4.      **Non-Ascribe Secured Notes Claims (Class 4)**

      a.      Classification.  Class 4 consists of the Secured Notes Claims held by any party other than Ascribe.

      b.      Treatment. The Non-Ascribe Secured Notes Claims will recover (i) cash proceeds from its *pari passu* liens on the Prepetition Secured Notes Collateral, (ii) the Liquidation Trust Loan Non-Ascribe 2018 Notes Funding Amount's allocable portion of the Liquidation Trust Minimum Return, and (iii) all cash held in the Make-Whole Notes Reserve, other than cash used in connection with the Liquidation Trust Loan and to pay Administrative Expense Claims as set forth herein.

      c.      Voting. Claims in Class 4 are Impaired.  Each Holder of an Allowed Claim in Class 4 is entitled to vote on this Plan.

5.      **Ascribe Secured Notes Claims (Class 5)**

      a.      Classification.  Class 5 consists of the Secured Notes Claims held by Ascribe.

b.        Treatment. The Ascribe Secured Notes Claim will recover cash proceeds from its *pari passu* liens on the Prepetition Secured Notes Collateral (excluding any cash held in the Make-Whole Notes Reserve). Further, the Ascribe Secured Notes Claims will be allowed and treated in accordance with the Ascribe 9019 Order, which included the waiver of deficiency claims and the waiver of the ability to seek any recoveries from any proceeds of any Avoidance Actions and any D&O Actions.

c.        Voting. Claims in Class 5 are Impaired. Each Holder of an Allowed Claim in Class 5 is entitled to vote on this Plan.

6.        **Non-Tax Priority Unsecured Claims (Class 6)**

a.        Classification. Class 6 consists of all Non-Tax Priority Unsecured Claims.

b.        Treatment. Unless otherwise agreed by a Holder of an Allowed Priority Unsecured Claim and the Debtors, the Committee and the Ad Hoc Group (prior to the Effective Date) or the Liquidation Trustee (on or after the Effective Date), on the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) the date on which such Priority Unsecured Claim becomes an Allowed Claim, each Holder of an Allowed Priority Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, and release, and in exchange for such Priority Unsecured Claim, the following treatment at the option of the Debtors (prior to the Effective Date) or the Liquidation Trustee (on or after the Effective Date): (A) payment in full in Cash; or (B) such other treatment as is necessary to render such Claim Unimpaired.

c.        Voting. Claims in Class 6 are Unimpaired. Each Holder of an Allowed Claim in Class 6 is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

7.        **Secured Notes Deficiency Claims (Class 7)**

a.        Classification. Class 7 consists of the Secured Notes Deficiency Claims.

b.        Treatment. Unless otherwise agreed by any Holder of an Allowed Secured Notes Deficiency Claim, the Debtors, the Committee and the Ad Hoc Group (prior to the Effective Date) or the Liquidation Trustee (on or after the Effective Date), each Holder of an Allowed Secured Notes Deficiency Claim will receive, in full and final satisfaction, compromise, settlement, and release, and in exchange for, such Claim, its Pro Rata share of the proceeds, subject to the standard priority waterfall, of the Liquidation Trust Assets on the applicable Distribution Date.

c.        Voting. Claims in Class 7 are Impaired. Each Holder of an Allowed Claim in Class 7 is therefore entitled to vote on this Plan.

8.        **General Unsecured Claims (Class 8)**

a.        Classification. Class 8 consists of all General Unsecured Claims.

b.        Treatment. On the applicable Distribution Date, unless otherwise agreed by a Holder of an Allowed General Unsecured Claim and the Debtors, the Ad Hoc Group and the Committee (prior to the Effective Date) or the Liquidation Trustee (on or after the Effective Date), each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, and release, and in exchange for, such General

Unsecured Claim, its pro-rata share of any proceeds of the Liquidation Trust Assets on the applicable Distribution Date[2].

    c.    Voting.  Claims in Class 8 are Impaired.  Each Holder of an Allowed Claim in Class 8 is, therefore, entitled to vote on this Plan.

9.    **Interests in the Debtors (Class 9)**

    a.    Classification.  Class 9 consists of all Interests in the Debtors.

    b.    Treatment.  On the Effective Date, all Interests in the Debtors shall be canceled.  No Distribution shall be made on account of Interests in the Debtors.

    c.    Voting.  Interests in Class 9 are Impaired.  Each Holder of a Class 9 Interest is conclusively presumed to have rejected this Plan and, therefore, are not entitled to vote on this Plan.

**D.    Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, including the Final DIP Order and the GSO, nothing shall affect the rights or defenses of the Debtors or the Liquidation Trustee, as applicable, whether legal or equitable, with respect to any Claim, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**E.    Postpetition Interest on Claims**

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be payable on account of any Claim.

**F.    Insurance**

Relief from the injunction set forth herein at Section IX(f)(5) shall not be required for any Holder with respect to a Claim (a) as to which a separate stipulation or Order has been already entered granting relief from the automatic stay with respect to such Claim prior to the Effective Date; or (b) any Claim that the Holder alleges is covered by (i) a workers' compensation Insurance Policy or (ii) a liability Insurance Policy where the non-bankruptcy law applicable to such Claim provides a direct right of action by the Holder against an Insurer without naming any Debtor as a defendant or (iii) a liability Insurance Policy where the non-bankruptcy law applicable to such Claim does not provide a direct right of action by the Holder against the Insurer, provided that the Holder shall first have served notice on the Debtors and on the Insurer at the address provided by the Insurer in a notice filed with the Bankruptcy Court for such purpose.

Relief from the injunction set forth herein at Section IX(f)(5) shall not be required for any Insurer to commence, defend or continue any legal action against the Debtors (or, after the Effective Date, the Liquidation Trust, as applicable) with respect to the coverage of an Insurance Policy, provided that such Insurer shall not seek any affirmative recovery from, or other relief against, the Debtors (or, after the Effective Date, the Liquidation Trust, as applicable) as a result of such legal action.

The allowance or disallowance of any Claim against the Debtors or the Liquidation Trust shall be solely a determination as to the Holder's right to a Distribution from the Estate under the Plan, and shall not be a determination of the Debtors' liability that is binding on any Insurer. Nothing herein relieves any Holder from being required to file a proof of Claim by the applicable Bar Date to have a Claim against the Debtors.

---

[2] In addition to their Plan treatment, holders of Allowed General Unsecured Claims are also entitled to their Pro Rata share of the GSO General Unsecured Creditor Reserve, as ordered by the GSO, which shall include the Liquidation Trust Loan General Unsecured Creditor Funding Amount's allocable portion of the Liquidation Trust Minimum Return.

In order to establish the Debtors' liability with respect to any Claim for purposes of obtaining the proceeds of any Insurance Policy, the Holder shall establish such liability in a proceeding in a forum outside the Bankruptcy Court. Notwithstanding anything to the contrary in any applicable Insurance Policies, the Insurers shall not be obligated to consult with, or seek the consent of, the Debtors or the Liquidation Trust in connection with resolving or paying any Claim at any time.

**G.      Confirmation Without Acceptance by All Impaired Classes**

The Debtors request Confirmation under § 1129(b) of the Bankruptcy Code in the event that any impaired Class does not accept or is deemed not to accept this Plan pursuant to § 1126 of the Bankruptcy Code. This Plan and Disclosure Statement shall constitute a motion for such relief.

**H.      Class Without Voting Claim Holders**

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject this Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan pursuant to *In re Ruti-Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988).

**ARTICLE V**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      Corporate Existence**

Consistent with Section V.B below, the Debtors will be subject to one or more Dissolution Transactions on or after the Effective Date, at the discretion of the Liquidation Trustee and in accordance with the Liquidation Trust Agreement and the constituent documents of the Debtors. The Debtors shall continue to exist after the transfer of the property of its Estate to the Liquidation Trust until dissolved by the Liquidation Trustee pursuant to a Dissolution Transaction.

**B.      Dissolution Transactions**

**1.      Dissolution Transactions Generally**

At any time on or after the Effective Date, the Liquidation Trustee will enter into such Dissolution Transactions as may be necessary or appropriate on the Debtors' behalf to dissolve or otherwise terminate the corporate existence of the Debtors in accordance with the Liquidation Trust Agreement and the constituent documents of the Debtors. The actions to effect the Dissolution Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that, among other things, are consistent with the terms of this Plan and Disclosure Statement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of this Plan and Disclosure Statement and that satisfy the requirements of applicable law; (c) the filing of appropriate certificates or articles of merger, consolidation, continuance, or dissolution or similar instruments with the applicable governmental authorities; and (d) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

**2.      Recourse Solely to Liquidation Trust Assets**

As of the Effective Date, each Claim against the Debtors (other than any Claim that is an Administrative Expense Claim, Secured Claim, Cure Amount Claim, Priority Unsecured Claim, or Priority Tax Claim) shall be deemed satisfied, settled, released, and discharged as to the Debtors as provided with respect to each such Claim under this Plan and Disclosure Statement, and, except as otherwise set forth in this Plan and Disclosure Statement or other Final Orders of the Bankruptcy Court, any Holder of an Allowed Claim against the Debtors will have recourse solely to the assets of the Liquidation Trust for the payment of any such Allowed Claim in accordance with the terms of this Plan and Disclosure Statement and the Liquidation Trust Agreement.

C.      **Liquidation Trust**

1.      **Liquidation Trust Generally**

On or prior to the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, resolving all Disputed Claims, making all Distributions to Holders of Allowed Claims in accordance with the terms of this Plan and otherwise implementing this Plan.  Subject to and/or to the extent set forth in this Plan, the Confirmation Order, the Liquidation Trust Agreement, the terms of the Liquidation Trust Loan, or any other order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust shall be empowered to:  (a) perform all actions and execute all agreements, instruments and other documents necessary to implement this Plan; (b) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with this Plan; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle, and protect, as applicable, the Liquidation Trust Assets (directly or through its professionals or a Third Party Disbursing Agent), in accordance with this Plan; (d) review, reconcile, settle or object to all Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in this Plan; (e) calculate and make Distributions of the proceeds of the Liquidation Trust Assets to the Holders of Allowed Claims; (f) pursue Retained Causes of Action that are transferred to the Liquidation Trust to the extent that their pursuit would likely result in a material economic benefit to Holders of Claims under this Plan; (g) retain, compensate, and employ professionals to represent the Liquidation Trust; (h) file appropriate Tax returns and other reports on behalf of the Liquidation Trust and pay Taxes or other obligations owed by the Liquidation Trust; (i) file, to the extent reasonably feasible and subject to the Liquidation Trust Agreement, appropriate Tax returns on behalf of the Debtors and pay Taxes or other obligations arising in connection therewith; (j) exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and this Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to implement the provisions of this Plan and the Liquidation Trust Agreement; (k) take such actions as are necessary or appropriate to close the Debtors' Chapter 11 Cases; and (l) dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

Notwithstanding anything to the contrary in this Section V.C.1, the Liquidation Trust's primary purpose is liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidation Trust Assets and provide for the orderly liquidation thereof.

2.      **Liquidation Trust Governance**

The Liquidation Trust is to be administered by David Dunn as the initial Liquidation Trustee and overseen by three (3) trust representatives (the "Liquidation Trust Oversight Committee"), one to be selected by the Committee, one to be selected by the holders of Non-Ascribe Secured Notes, and one independent representative selected by mutual agreement of the other two representatives.  In the event that the other two representatives cannot agree upon an independent representative, the Bankruptcy Court shall have the power to appoint the independent representative.  The rights powers, and duties of the Liquidation Trust Oversight Committee shall be set forth in the Liquidation Trust Agreement.

3.      **Funding of and Transfer of Assets Into the Liquidation Trust**

Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with this Plan and the Liquidation Trust Agreement.  Except as set forth in Section V.I below, the Liquidation Trust Assets shall be transferred to the Liquidation Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by § 363 or § 1123 of the Bankruptcy Code.

The act of transferring the Liquidation Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the asset or right was still held by the Debtors.

The Liquidation Trustee shall have the authority to create additional sub-accounts in the Trust Accounts and sub-trusts within the Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Liquidation Trust. This shall include the creation of sub-accounts and/or sub-trusts to accomplish the purposes of the Litigation Trust.

4.      **Liquidation Trustee**

The Liquidation Trustee shall be the successor to and representative of the Estate of the Debtors within the meaning of § 1123(b)(3)(B) of the Bankruptcy Code.  The powers, rights and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Section V.C.3 above.  Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries, shall be as set forth in the Liquidation Trust Agreement.

5.      **Liquidation Trust Agreement**

Prior to the Effective Date, the Debtors and the Liquidation Trustee shall execute and deliver the Liquidation Trust Agreement.

6.      **Reports to be Filed by the Liquidation Trustee**

Following the Effective Date, the Liquidation Trustee, on behalf of the Liquidation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidation Trust Agreement), no later than 45 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to this Plan, distributions made by it, and other matters relating to the implementation of this Plan.

7.      **Fees and Expenses of the Liquidation Trust**

The fees and expenses of the Liquidation Trustee (including those incurred prior to the Effective Date in connection with the preparation of the Liquidation Trust Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Liquidation Trust Agreement.  The Liquidation Trustee, on behalf of the Liquidation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors and/or the Committee) to assist in carrying out its duties under the Liquidation Trust Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Liquidation Trust Agreement.

8.      **Indemnification**

The Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidation Trustee and/or other parties.  Any such indemnification shall be the sole responsibility of the Liquidation Trust and payable solely from the Liquidation Trust Assets.

9.      **Tax Treatment; No Successor in Interest**

The Liquidation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation § l.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidation Trust will be treated (a) in part as the transfer of assets by the Debtors to the Holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders

to the Liquidation Trust in exchange for the beneficial interests in the Liquidation Trust, and (b) in part as the transfer of assets by the Debtors to one or more Disputed Claims Reserves.

> a.      Liquidation Purpose of the Liquidation Trust

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Liquidation Trust Beneficiaries and not unduly prolong its duration.  The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or in the Liquidation Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustee expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust.  For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustee shall make a good faith determination of the fair market value of the Liquidation Trust Assets as of the Effective Date.  This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes.  The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of § 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of § 345 of the Bankruptcy Code.  The Liquidation Trustee may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective liabilities incurred by the Liquidation Trust in accordance with this Plan and the Liquidation Trust Agreement.

> b.      Disputed Claims Reserves

Liquidation Trust Assets reserved for Holders of Disputed Claims shall be treated as one or more Disputed Claims Reserves.  The Liquidation Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation § 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The Liquidation Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation § 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by the Disputed Claims Reserves.  No Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset.  The Liquidation Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidation Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all Taxes owed from Liquidation Trust Assets.

> 10.     **Settlement of Claims**

Except as otherwise provided in this Plan, and subject to the terms of the Liquidation Trust Agreement, on or after the Effective Date, the Liquidation Trustee may compromise or settle any Claims, other than any Professional Fee Claims, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for liquidating expenses, professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of applications for payment of Professional Fee Claims) without application to the Bankruptcy Court.

### 11. Abandonment of Assets by Liquidation Trust

After the Effective Date, the Liquidation Trustee may abandon any Liquidation Trust Assets which the Liquidation Trustee determines in their reasonable discretion to be of *de minimis* value or burdensome to the Liquidation Trust.

### D. Corporate Governance; Directors and Officers

### 1. Constituent Documents of the Debtors

Consistent with Sections V.A, V.B. and V.C above, the Debtors will cease to exist, and all existing articles of organization and similar constituent documents will be canceled, effective as of the effective date of the Dissolution Transactions; accordingly, no new articles of organization or other constituent documents will be necessary.

### 2. Directors and Officers

Effective as of the Effective Date, all directors, managers, members, and officers of the Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

### 3. Corporate Action

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions), or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Liquidation Trustee, or any other Person: (a) the establishment of the Liquidation Trust; (b) the appointment of the Liquidation Trustee to act on behalf of the Liquidation Trust; (c) the transfer of the Liquidation Trust Assets into the Liquidation Trust, as set forth in this Plan; (d) the distribution of Cash pursuant to this Plan; (e) the adoption, execution, delivery, and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution, and implementation of the Liquidation Trust Agreement; and (g) the other matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required by the Debtors or the Liquidation Trustee.

### E. No Revesting of Assets

To the extent not otherwise Distributed or abandoned in accordance with this Plan, the property of the Estate shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Liquidation Trust to be administered by the Liquidation Trustee in accordance with this Plan and the Liquidation Trust Agreement.

### F. Creation and Maintenance of Trust Accounts

### 1. Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidation Trust or, if applicable and appropriate, a Third Party Disbursing Agent. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Liquidation Trust Agreement and subject to the terms of the Liquidation Trust Loan. The Liquidation Trustee is

authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreement.

2.      **Additional Funding of Trust Accounts**

After the funding of the Trust Accounts on the Effective Date, each Trust Account will be funded by the Cash proceeds obtained through litigation or the disposition of the Liquidation Trust Assets.

3.      **Closure of Trust Accounts**

Upon obtaining an order of the Bankruptcy Court authorizing final Distribution and/or closure of the Debtors' Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with this Plan and the Liquidation Trust Agreement, and the Trust Accounts may be closed.

**G.      Preservation of Causes of Action**

Except as provided in this Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Liquidation Trustee will retain and may enforce any claims, demands, rights and Causes of Action that any Estate may hold against any Person to the extent not satisfied, settled, and released under this Plan or otherwise, including the Avoidance Actions. The Liquidation Trustee may pursue any such retained claims, demands, rights or Causes of Action, as appropriate, in accordance with the best interests of the Liquidation Trust Beneficiaries. The Debtors' inclusion or failure to include any Cause of Action, including any Avoidance Action, on the Schedule of Retained Causes of Action shall not be deemed an admission, denial or waiver of any claims, demands, rights, or causes of action that the Debtors or Estate may hold against any Entity. The Debtors intend to preserve all such claims, demands, rights, or causes of action as Avoidance Actions (except to the extent any such claim is specifically satisfied, settled, and released herein).

**H.      Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (a) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan, or (b) any of the asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article V hereof, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and surrendered and of no further force and effect against the Debtors or the Liquidation Trust, without any further action on the part of the Debtors or the Liquidation Trust; *provided* that upon the Effective Date, except as expressly otherwise provided in this Plan, the Secured Notes, the Prepetition Secured Notes Indenture, and all other Prepetition Secured Notes Documents shall be deemed cancelled, discharged and surrendered without any need for further action or approval of the Bankruptcy Court or any other person or entity, and the Prepetition Secured Notes Trustee and its agents, successors and assigns shall each be automatically and fully released and discharged of and from all duties and obligations under the Prepetition Secured Notes, the Prepetition Secured Notes Indenture and the other Prepetition Secured Notes Documents; *provided further* that notwithstanding the foregoing, or any other provision of this Plan, following the Effective Date the rights, protections, immunities and indemnities of the Prepetition Secured Notes Trustee under the Secured Notes, the Prepetition Secured Notes Indenture and the other Prepetition Secured Notes Documents shall be preserved and the provisions of the Prepetition Secured Notes Indenture and the other Prepetition Secured Notes Documents shall continue in full force and effect solely to the extent necessary to enable the Prepetition Secured Notes Trustee to: (i) allow holders of the Secured Notes to receive the distributions contemplated under this Plan; (ii) allow and preserve the Prepetition Secured Notes Trustee's right to receive and make distributions contemplated under this Plan to holders of Secured Notes; (iii) allow the Prepetition Secured Notes Trustee to appear and be heard in the Chapter 11 Cases, or in any proceeding in the Bankruptcy Court or any other court; (iv) allow the Prepetition Secured Notes Trustee to enforce any rights, or any obligations owed to it individually, under this Plan, the Ascribe 9019 Order, the GSO or the Final DIP Order; (v) preserve the Prepetition Secured Notes Trustee Charging Lien as against any money or property distributable to holders of the Secured Notes, including permitting the Prepetition Secured Notes Trustee to maintain, enforce, and exercise the Prepetition Secured Notes Trustee Charging Lien under the Prepetition Secured Notes Indenture against such distributions; and (vi) preserve all rights, including rights of enforcement, of the Prepetition Secured Notes Trustee against any person, including claims for

indemnification or contribution from the applicable holders of the Secured Notes pursuant and subject to the Prepetition Secured Notes Indenture or any other Prepetition Secured Notes Documents, or under any direction provided to the Prepetition Secured Notes Trustee under the Prepetition Secured Notes Indenture.

Notwithstanding anything to the contrary in the Prepetition Secured Notes Indenture or any of the other Prepetition Secured Notes Documents, the Prepetition Secured Notes Trustee in its capacity as Collateral Agent is hereby authorized and directed, as may be required under this Plan or otherwise ordered by the Bankruptcy Court, to release liens on any Prepetition Secured Notes Collateral without any recourse, representation or warranty by the Prepetition Secured Notes Trustee. For the avoidance of doubt, except to the extent expressly provided otherwise in this Plan, the Prepetition Secured Notes Trustee shall have no duties to the holders of the Secured Notes under the Secured Notes, the Prepetition Secured Notes Indenture or the other Prepetition Secured Notes Documents as of the Effective Date and, except to the extent expressly provided otherwise in this Plan, all obligations of the Prepetition Secured Notes Trustee thereunder shall be released and discharged as of such date.

**I.      Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with this Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all Liens on the property of the Estate shall be fully satisfied, settled, released, and discharged, and all of the right, title, and interest of any Holder of such Liens shall be satisfied, settled, released, and discharged upon such Holder receiving its Distribution in accordance with the terms of this Plan.

**J.      Effectuating Documents; Further Transactions**

The Debtors (prior to the Effective Date) and the Liquidation Trustee (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and evidence the terms and conditions of this Plan and the Dissolution Transactions, in each case, in the name of and on behalf of the Debtors or the Liquidation Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

**K.      Substitution in Pending Legal Actions**

On the Effective Date, the Liquidation Trust or the Liquidation Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (a) pending contested matters or adversary proceedings in the Bankruptcy Court, (b) any appeals of orders of the Bankruptcy Court, and (c) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Liquidation Trustee and its professionals are not required to, but may take such steps as are appropriate to provide notice of such substitution.

**L.      Substantive Consolidation**

The Plan serves as a motion by the Proponents seeking entry, pursuant to § 105 of the Bankruptcy Code, of an order authorizing, on the Effective Date, the substantive consolidation of the Debtors' Estates and all of the debts of all of the Debtors for purposes of classifying and treating all Claims under the Plan, including for voting, confirmation, and distribution purposes. Substantive consolidation will not (i) alter the state of incorporation of any Debtor for purposes of determining applicable law of any of the Causes of Action, including the Retained Causes of Action, (ii) alter or impair the legal and equitable rights of the Liquidation Trustee to enforce any of the Causes of Action, including the Retained Causes of Action, or (iii) otherwise impair, release, discharge, extinguish, or affect any of the Causes of Action, including the Retained Causes of Action, or issues raised as a part thereof.

If substantive consolidation is ordered as provided herein in the Confirmation Order, then on and after the Effective Date, all Assets and liabilities of the Debtors shall be treated under the Liquidation Trust as though they were merged into the estate of Basic Energy Services, L.P. for purposes of treatment of and distributions on Claims. All duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall

automatically be disallowed so that only one Claim survives against the consolidated Debtors. Should the Debtors so choose, they may file omnibus objections to such duplicative claims to obtain specific orders disallowing such duplicative claims.  All guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and/or several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Any alleged defaults under any applicable agreement with the Debtors arising from substantive consolidation under this Plan shall be deemed cured as of the Effective Date.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, each of the Debtors' Executory Contracts or Unexpired Leases shall be deemed automatically rejected in accordance with the provisions of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory or Unexpired Lease: (1) has previously been assumed by the Debtors by Final Order of the Bankruptcy Court; (2) is a Retained Contract set forth in the Plan Supplement; and (3) is the subject of a motion to assume or reject pending as of the Effective Date.

Except as otherwise previously approved by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to §§ 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and assignments and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph.  Unless otherwise indicated herein, assumptions, assumptions and assignments, and rejections, of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Liquidation Trust in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to § 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Liquidation Trustee shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Cure Amount Claim.  Notwithstanding anything to the contrary in this Plan, the Debtors reserve the right to alter, amend, modify or supplement the Plan Supplement prior to the Effective Date on no less than three (3) days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

B.      **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be Filed with the Claims and Noticing Agent within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any proofs of Claim arising from the rejection of any Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors or the Liquidation Trust without the need for any objection by the Debtors or the Liquidation Trust or further notice to or action, order, or approval of the Bankruptcy Court.  The Debtors may, however, choose to file such an objection to obtain a specific Court order.  All Allowed Claims arising from the rejection of any Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Section IV.C hereof.

The Liquidation Trust reserves the right to object to, settle, compromise or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no proof of Claim is timely Filed will be forever barred from asserting a Claim against the Debtors, the Estate, the Liquidation Trust or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.

## C.  Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into or assumed by the Debtors after the Petition Date that are not assigned to a purchaser of the Assets or the Liquidation Trust shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must File a Claim within thirty (30) days of the Effective Date in accordance with this Plan or have their rights forever satisfied, settled, released, and discharged.

## D.  Insurance Policies

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

(a) all of the Insurance Policies, and all of the rights and obligations thereunder shall automatically become vested in the Liquidation Trust as of the Effective Date without necessity for further approvals or orders; provided, however, that the Liquidation Trust shall not be an Insured under any Insurance Policies. In the event that any of the Debtors or the Liquidation Trust, at any time prior to the Effective Date, seeks to assume an Insurance Policy or any related agreements, it shall file a motion with the Bankruptcy Court seeking approval of the Bankruptcy Court of such assumption;

(b) except as specifically set forth in Art. IV.F., all Insurance Policies, and all legal, equitable or contractual terms, conditions, rights, obligations, and defenses of the Insurers, the Debtors (or, after the Effective Date, the Liquidation Trust), or any other individual or entity, as applicable, under such Insurance Policies, whether arising or liquidated before or after the Effective Date, shall survive and shall not be altered, amended, modified, waived, released, discharged or impaired in any respect;

(c) the Debtors (or, after the Effective Date, the Liquidation Trust, as applicable) are not released from their liability or obligations, if any, to any Insurer in connection with any assumed Insurance Policy (including for the payment of premium, reimbursement or other amount owing in connection with such Insurance Policy arising at any time, whether before or after the Effective Date);

(d) the right of any Insurer to reimburse itself from any collateral or security held by such Insurer, or through setoff or recoupment, in full dollars, for any amounts owed at any time by the Debtors (or, after the Effective Date, the Liquidation Trust) on account of any Insurance Policies, shall not be altered, amended, modified, waived, released, discharged, impaired, stayed, or enjoined in any respect;

(e) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (i) claimants with valid workers' compensation claims or direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (ii) the Insurers to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article IX of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (iii) the Insurers to draw against, hold and/or use any or all of the collateral or security provided by or on behalf of the Debtors or any other Entity at any time and to apply any such collateral or security or the proceeds thereof, in full dollars, to the obligations of the Debtors (and the Liquidation Trust, as applicable) under the applicable Insurance

Policies, in such order as the applicable Insurer may determine; and (iv) the Insurers to cancel any Insurance Policy, and take other actions relating to the Insurance Policies (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Policies;

(f) the Insurers shall not be subject to an (i) Avoidance Action or (ii) any Cause of Action related to an Insurer's draw on, use, treatment or application of collateral or security to the obligations of the Debtors (or, after the Effective Date, the Liquidation Trust) under the Insurance Policies;

(g) nothing shall: (i) create or permit a direct right of action by any Holder against any of the Insurers where such right of action does not exist under non-bankruptcy law; (ii) preclude or limit, in any way, the rights of any Insurer to contest and/or litigate the existence, primacy and/or scope of available coverage under any allegedly applicable Insurance Policy, or to otherwise assert any defenses or conditions precedent to coverage; (iii) require any Insurer to "dropdown" or become obligated to pay any self-insured obligation of the Debtors or to advance any deductible obligation of the Debtors unless required by the applicable Insurance Policy; (iv) constitute a determination or admission that coverage exists under any Insurance Policy with respect to any Claim; or (v) impair the rights of the Liquidation Trust or the parties covered under any D&O Liability Insurance Policy;

(h) the Liquidation Trustee shall reasonably cooperate with the Insurers in defending any Claim for which the Holder is seeking a recovery under the Insurance Policies;

(i) the Liquidation Trust shall not be permitted to enter into any agreement or other transaction that would have the effect of selling, assigning, otherwise transferring, or altering any Insurance Policy or portion thereof without the express written consent of the applicable Insurer;

(j) Insurers shall not be required to file or serve any application, claim, proof of Claim or motion for payment or allowance of any Administrative Expense Claim, and Insurers shall not be subject to any bar date or similar deadline governing proofs of Claim or Administrative Expense Claims; *provided, however*, that without limiting the applicability of the foregoing, if an Insurer has Filed a Claim or proof of claim, such Insurer shall have the right (but not the obligation) to amend, at any time before or after the Effective Date, any previously filed proofs of claim to reflect additional obligations incurred or owed by the Debtors;

(k) Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of any assumption and assignment pursuant to § 365 of the Bankruptcy Code of any Insurance Policies listed on the Schedule of Assumed Contracts filed as part of the Plan Supplement and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estate.

(l) Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy assumed and assigned to the Liquidation Trust pursuant to this Section V.C; and

(m) Neither the commencement of the Chapter 11 Cases nor the confirmation of this Plan shall relieve any Insurer of its obligations under an Insurance Policy, *provided, however,* that unless an Insurance Policy has been assumed by the Debtors, nothing in the Plan or in any order of the Bankruptcy Court shall be deemed to have cured any failure by any Debtor to perform its obligations to the Insurer under any Insurance Policy.

Nothing in this Plan shall impair the rights of the Liquidation Trust with respect to (or affect the coverage under) any D&O Liability Insurance Policy that provides liability coverage for officers, directors, and other fiduciaries of the Debtors and their Affiliates.

## E.    Reservation of Rights

Neither the identification of any contract or lease as assumed, assumed and assigned or rejected in connection with the Asset Sales nor anything contained in this Plan or the Plan Supplement, nor the Debtors' delivery of a notice

of proposed assumption and proposed Cure Amount Claim to an applicable counterparty shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired on the Effective Date, the Liquidation Trustee shall have thirty (30) days following entry of a Final Order resolving such dispute to determine whether to alter the treatment of such contract or lease hereunder.

# ARTICLE VII
# PROVISIONS REGARDING DISTRIBUTIONS

**A.     Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article VII, Distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Article V or this Article VII shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Liquidation Trustee.

**B.     Method of Distributions to Holders of Claims**

All Distributions to be made under this Plan shall be made by the Disbursing Agent or such Third Party Disbursing Agents as the Liquidation Trustee may employ in its sole discretion.  Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by this Plan, if approved by the Liquidation Trustee.

**C.     Disbursing Agent**

**1.     Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to:  (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; *provided* that all distributions and reserves contemplated under this Plan on account of the Secured Notes shall be made to or at the direction of the Prepetition Secured Notes Trustee for further distribution through the Depository Trust Company or in accordance with the DWAC Process, as applicable, to the holders of the Secured Notes under the terms of the Prepetition Secured Notes Indenture, including those provisions relating to the surrender and cancellation of the Secured NotesRegardless of whether such distributions are made by the Prepetition Secured Notes Trustee, or by any other Disbursing Agent at the reasonable direction of the Prepetition Secured Notes Trustee, the Prepetition Secured Notes Trustee Charging Lien shall attach to such distributions in the same manner as if such distributions were made through the Prepetition Secured Notes Trustee; and *provided further*, that with respect to all distributions and reserves contemplated under this Plan on account of the Secured Notes, the Debtors or the Liquidation Trustee, as applicable, shall certify to the Prepetition Secured Notes Trustee the allocation of each such distribution and/or reserve contemplated under this Plan between the Non-Ascribe Secured Notes Claim and the Secured Notes Claims held by Ascribe.  Provided further that the Prepetition Secured Notes Trustee, as Disbursing Agent, shall make one distribution on account of the Secured Notes for each distribution made by the Liquidating Trust to the Prepetition Secured Notes Trustee.

**2.     Expenses Incurred on or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including Taxes), including the Prepetition Secured Notes Trustee in its capacity as Disbursing Agent, and any reasonable compensation to the Disbursing Agent for services rendered, including the Prepetition Secured Notes Trustee in its capacity as Disbursing Agent, shall be paid in Cash by the Liquidation Trustee from the Liquidation Trust Assets; provided that the Prepetition Secured Notes Trustee in its capacity as Disbursing Agent's fees are capped at a maximum of $15,000 per disbursement.

**3.     No Liability**

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of this Plan.

**D.      Disputed Claims Reserves**

      1.      **Establishment of Disputed Claims Reserves**

On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee may establish Disputed Claims Reserves for Disputed Administrative Expense Claims, Priority Unsecured Claims, Priority Tax Claims, and Unsecured Claims, which reserves shall be administered by the Liquidation Trustee. The Liquidation Trustee may reserve, in Cash or other property, the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Article VII hereof) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidation Trustee may administer the Disputed Claims Reserves by book entry.

      2.      **Maintenance of Disputed Claims Reserves**

The Liquidation Trustee shall be empowered to establish and maintain one or more Disputed Claims Reserves in their sole discretion. To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. Property in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class. Each Disputed Claims Reserve shall be closed by the Liquidation Trust when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan. Upon closure of a Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in that Disputed Claims Reserve shall be distributed in accordance with this Plan or the Liquidation Trust Agreement, as applicable.

**E.      Investment of Trust Accounts**

To assist in making distributions under this Plan, the applicable Trust Accounts may be held in the name of the Liquidation Trustee or in the name of one or more Third Party Disbursing Agents for the benefit of Holders of Allowed Claims under this Plan, or a secondary Trust Account may be created in the name of the Third Party Disbursing Agent for the purpose of making disbursements. The Liquidation Trustee may invest, or may direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Liquidation Trust Agreement; provided, however, that should the Liquidation Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third Party Disbursing Agent not to invest such Cash. Distributions of Cash from accounts held by Third Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

**F.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

      1.      **Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims or request for payment of Administrative Expense Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the Debtors' Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last

address directed by such Holder after such Claim becomes an Allowed Claim.

    2.    **Undeliverable Distributions Held by Disbursing Agents**

        a.    Holding of Undeliverable Distributions

If any Distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified by written certification of such Holder's then-current address. Nothing contained in the Plan shall require the Disbursing Agent or Liquidation Trustee to attempt to locate any Holder of an Allowed Claim.

        b.    After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date; provided, however, that the applicable Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims allowed as of the record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

        c.    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is ninety (90) days prior to the Final Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Liquidation Trustee, their respective property or the Trust Accounts. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under § 347(b) of the Bankruptcy Code, (b) the Allowed Claims with respect to such Distributions shall be automatically cancelled, (c) the right of the Holders entitled to those Distributions shall be discharged and forever barred, and (d) the undeliverable Distributions will be maintained in the applicable Trust Account for redistribution to other claimants entitled to Distribution from such Trust Account.

**G.**    **Distribution Record Date**

As of 5:00 p.m. (prevailing Central Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes herein to recognize and make Distributions only to those Holders who are Holders of Claims as of 5:00 p.m. on the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to 5:00 p.m. (prevailing Central Time) on the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date. For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of The Depository Trust Company.

**H.**    *De Minimis* **Distributions**

No Distribution of less than twenty-five dollars ($25) shall be made by the Disbursing Agent. Each such Distribution shall revest in the Liquidation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan. Whenever a payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down to the nearest whole dollar.

**I.**    **Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Debtors or the Liquidation Trustee, as applicable, shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8, or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby. The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8, or other tax form or documentation to the Disbursing Agent. If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8, or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding, or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors or the Liquidation Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged, and forever barred without further order of the Bankruptcy Court.

**J.      Manner of Payment Under the Plan**

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**K.      Time Bar to Cash Payments**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Distribution shall be re-allocated as set forth in Section V.9.b of this Plan, notwithstanding any federal or state escheat laws to the contrary.

**L.      Setoffs**

Except with respect to Claims satisfied, settled, released, and discharged pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disbursing Agent may, pursuant to § 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that the Debtors may hold against the Holder of such Claim: provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the Debtors, the Disbursing Agent or the Liquidation Trust of any Causes of Action that the Debtors or the Liquidation Trust may possess against the Holder of a Claim.

**M.      Allocation Between Principal and Accrued Interest**

Interest shall not accrue on any Holder's Claim entitled to a Distribution from Liquidation Trust Assets in respect of the period from the Petition Date to the date a final Distribution is made on such Claim. To the extent that

any Allowed Claim entitled to a Distribution from Liquidation Trust Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**N.     Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of this Plan:  (a) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (b) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  On the Distribution Date that is at least thirty (30) days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

**O.     Claims Paid or Payable by Third Parties**

**1.     Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Liquidation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment, and the applicable portion of such Claim shall be expunged, to the extent of the Third Party Payment, without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court

**2.     Claims Payable by Insurance**

Nothing contained in this Plan, the Plan Supplement, the Confirmation Order, any other document related to any of the foregoing or any other order of the Bankruptcy Court shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurers under any Insurance Policies, or constitute or be deemed a waiver by such Insurers of any rights or defenses, including (i) coverage defenses, (ii) rights of set-off and recoupment, and (iii) conditions precedent to coverage.

**ARTICLE VIII**
**DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS**

**A.     Allowance of Claims**

After the Effective Date, the Liquidation Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely Filed, is not considered Allowed and shall be disallowed without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

**B.     Prosecution of Objections to Claims**

1.      **Authority to Prosecute and Settle Claims**

Except as otherwise specifically provided in this Plan, and subject to the terms of the Liquidation Trust Agreement, the Debtors, prior to the Effective Date, and the Liquidation Trustee, after the Effective Date, shall have the sole authority to:  (a) File, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim (other than a Professional Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court.

2.      **Pending Objections**

To the extent that the Debtors or the Committee have Filed objections to Claims that remain pending as of the Effective Date, the Liquidation Trustee shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

3.      **Application of Bankruptcy Rules**

To facilitate the efficient resolution of Disputed Claims, the Liquidation Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to File omnibus objections to Claims.

4.      **Authority to Amend Schedules**

The Debtors and the Liquidation Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors or the Liquidation Trustee, will provide the Holder of such Claim with notice of such amendment and such parties will have thirty (30) days to File an objection to such amendment in the Bankruptcy Court.

C.      **Estimation of Claims**

The Debtors, prior to the Effective Date, and the Liquidation Trustee after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to § 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Distributions), and the Debtors or the Liquidation Trustee (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

D.      **Claims Subject to Pending Actions**

Except as otherwise provided in this Plan, any Claims held by Entities against which the Debtors, the Committee, the Liquidation Trustee or another party in interest Files a complaint constituting an Avoidance Action, shall be deemed Disputed Claims pursuant to § 502(d) of the Bankruptcy Code. Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due as a result, if any, have been turned over by that Entity to the Liquidation Trust.

E.      **Offer of Judgment**

The Debtors, before the Effective Date, and the Liquidation Trustee, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of

judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors after the making of such offer, the Debtors are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE IX
## CONFIRMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation**

1.      The Confirmation Order shall be entered by the Bankruptcy Court, which Confirmation Order shall be in form and substance satisfactory to the Debtors, the Ad Hoc Group, and the Committee.

2.      Any exhibits or schedules incorporated as part of the Plan and Disclosure Statement shall be acceptable in form and substance to the Debtors, the Ad Hoc Group, and the Committee.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section IX.C below:

1.      The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect.

2.      All other documents and agreements necessary to implement this Plan on the Effective Date, including the Liquidation Trust Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred.

3.      The Liquidation Trustee shall have been appointed and have accepted his or her appointment and the Liquidation Trust Agreement shall have been executed.

4.      The Liquidation Trust Loan shall have been executed.

5.      Cash in the Make-Whole Notes Reserve, in an amount not less than $1,906,716, shall have been distributed to the Prepetition Secured Notes Trustee (as defined in the Final DIP Order) for distribution to holders of the Non-Ascribe Secured Notes.

6.      The Trust Accounts shall be created and funded as set forth herein.

7.      The Professional Fee Escrow Account shall be created and funded as set forth herein.

8.      The DWAC Process shall be completed to the reasonable satisfaction of each of the Debtors, Ascribe, and the Prepetition Secured Notes Trustee.

9.      The GSO General Unsecured Creditors Reserve shall have been transferred to the Debtors or the Liquidation Trust, as applicable.

10.      All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

**C.      Waiver of Conditions to Confirmation or the Effective Date**

Each condition to the Effective Date set forth in Section IX.B, except for Section IX.B., may be waived in whole or in part at any time by the Debtors, but only with consent of the Ad Hoc Group and the Committee to the waiver, without an order of the Bankruptcy Court.

D.      **Notice of Occurrence of Effective Date**

Within five (5) days after occurrence of the Effective Date, the Debtors shall file with the Bankruptcy Court and serve a Notice of Occurrence of Effective Date stating the date on which the Effective Date occurred.

E.      **Effect of Nonoccurrence of Conditions to the Effective Date**

The Debtors reserve the right to seek to withdraw this Plan at any time prior to the Effective Date.  If this Plan is withdrawn by either the Debtors:  (1) each of the provisions of this Plan and the Confirmation Order shall be null and void in all respects, including with respect to (a) the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases and (b) the release described in Section IX.G.5; and (2) nothing contained in this Plan or the Confirmation Order shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

F.      **Effect of Confirmation**

1.      **Binding Effect**

The Plan shall be binding upon all present and former holders of Claims and Interests and their respective successors and assigns. To opt-out of the release and exculpation provisions below, Holders of Claims must file an objection with the Court specifically stating your intention to opt-out by the deadline set by the Court for filing and serving objections to approval of the Plan and Disclosure Statement.

2.      **Comprehensive Settlement of Claims and Controversies**

Pursuant to § 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.  Accordingly, in consideration of the Distributions and other benefits provided under this Plan, the provisions of this Plan, including the releases set forth in Section IX.G.5 hereof, shall constitute a good-faith compromise and settlement of all Claims, disputes and controversies relating to the rights that a Holder of a Claim may have against the Debtors or with respect to any Distribution to be made pursuant to this Plan on account of any such Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, disputes, or controversies provided for herein, and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtors, its Estate, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness.  If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

3.      **Exculpation**

**Except as otherwise specifically provided in this Plan and to the fullest extent permitted by applicable law, the Debtors, the Liquidation Trust, the Liquidation Trustee, the Committee, the members of the Committee (solely in their capacity as such), the Ad Hoc Group and the members thereof, the Prepetition Secured Notes Trustee, and any of the foregoing parties' respective current officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, agents or other professionals and any of such parties' successors and assigns, solely in their capacities as such, and solely in the discharge of their duties as they relate to the Committee, shall not have or incur any claim, action, proceeding, cause of action, avoidance action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, right to payment, or claim (as defined in Bankruptcy Code section 101(5)), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, un-matured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any claimholder or interest holder, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates,**

or any of their successors or assigns, for any act or omission originating or occurring on or after the petition date through and including the effective date (or the date of resignation of an officer or director, if earlier) in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan and the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan, *provided, however*, that the foregoing provisions of this exculpation shall not operate to waive or release any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

For the avoidance of doubt, the exculpation provided for in this section IX.G.3 of the Plan shall not apply to the Ascribe-Related Directors.

4.    **Releases by Releasing Parties**

As of the Plan Effective Date, each Releasing Party is deemed to have satisfied, settled with, released, and discharged each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and an affiliate, the filing of the Chapter 11 Cases, the Plan and Disclosure Statement, the Asset Sales, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan (if any), or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence. Nothing in the foregoing releases shall be construed to preclude an Entity from naming the Debtors or their Estates as a nominal defendant for purposes of pursuing derivative claims asserted on behalf of the Debtors against non-Released Parties.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims satisfied, settled, released, and discharged by the Releasing Parties; (3) in the best interests of the Debtors and their estates; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action satisfied, settled, released, and discharged herein against any of the Released Parties.

5.    **Injunction**

Except as otherwise expressly provided in this Plan or for Distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to this Plan, shall be discharged pursuant to this Plan, or are subject to exculpation pursuant to section IX.G.3 of this Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to section IX.G.3 of this Plan with respect to the Exculpated Parties): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estate of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d)

asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests satisfied, settled, released, and discharged pursuant to this Plan. Nothing contained in this Plan, the Plan Supplement, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court shall enjoin: (i) the commencement or continuation of any coverage litigation after the Effective Date with respect to any Claims for which a Holder has requested or obtained relief from the automatic stay or relief from this injunction; or (ii) any Insurer from administering, handling, defending, settling, or paying covered Claims and expenses incurred in connection with Claims, in the ordinary course of business and without further order of this Bankruptcy Court.

## G.        Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Committee, and their Representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**ARTICLE X**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

A.        Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (1) any request for payment of any Administrative Expense Claim and (2) any and all objections to the amount, allowance, priority or classification of Claims or Interests;

B.        Grant or deny any applications for allowance of any Professional Fee Claims for periods ending on or before the Effective Date;

C.        Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors is a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

D.        Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

E.        Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving the Debtors or the Liquidation Trust that may be pending on the Effective Date or brought thereafter;

F.        Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, the Asset Sales, this Plan, the Disclosure Statement or the Confirmation Order;

G.      Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan, the Confirmation Order or the Asset Sales;

H.      Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Asset Sales, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan, or the Asset Sales, in such manner as may be necessary or appropriate to consummate this Plan and the transactions contemplated hereby;

I.      Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, injunctions and exculpation provided under this Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, injunctions, and exculpation provided under this Plan;

J.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or if Distributions pursuant to this Plan are enjoined or stayed;

K.      Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order, or the Asset Sales;

L.      Enforce, clarify or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.      Enter a final decree closing the Chapter 11 Cases;

N.      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.      Assist in recovery of all assets of the Debtors and its Estate, wherever located; and

P.      Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**A.      Modification of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan before the Effective Date, with the consent of the Ad Hoc Group and the Committee.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, but only with the consent of the Ad Hoc Group and the Committee.  Holders of Claims that have accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such Claim; provided, however, that any Holders of Claims who were deemed to accept this Plan because such Claims were Unimpaired shall continue to be deemed to accept this Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

B.       **Revocation of the Plan or Non-Occurrence of the Confirmation Date or Effective Date**

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date or at the Confirmation Hearing, but only with the consent of the Committee.  If this Plan is revoked or withdrawn, or if the Confirmation Date or the Effective Date does not occur, then this Plan shall be null and void in all respects solely with respect to the Debtors, and nothing contained in this Plan shall:  (a) prejudice in any manner the rights of the Debtors or any other party in interest; (b) constitute a waiver or release of any claims by or against, or any interests in, any of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

C.       **Reservation of Rights Regarding Certain Matters**

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan, the Debtors reserves its rights to exercise its fiduciary duties regarding the resolution of the Chapter 11 Cases.

D.       **Exhibits and Schedules**

All exhibits and schedules to this Plan, including the Plan Supplement, are incorporated into and constitute a part of this Plan as if set forth herein.

E.       **Severability**

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

F.       **Successors and Assigns**

Except as expressly provided otherwise in this Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, representative, beneficiary or guardian, if any, of each Person.

G.       **Service of Documents**

Any pleading, notice or other document required by this Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors and the Committee must be sent via electronic mail, overnight delivery service, or hand delivery on:

1.       **The Debtors**

David Dunn, Wind-Down Director
700 Canal Street
Suite 12E
Stamford, CT 06902

with a copy, which shall not constitute notice, to:

Jackson Walker LLP
1401 McKinney Street, Suite 1900

Houston, TX  77010
Attention:  Bruce J. Ruzinsky
                    Matthew D. Cavenaugh
                    Veronica A. Polnick
E-mail:  bruzinsky@jw.com
             mcavenaugh@jw.com
             vpolnick@jw.com


**2.**        **The Committee**

Brown Rudnick LLP
Seven Times Square
New York, New York 11036
Attention: Robert J. Stark and Andrew M. Carty
Email:    rstark@brownrudnick.com
              acarty@brownrudnick.com

**3.**        **The Ad Hoc Group**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Damian S. Schaible and Adam L. Shpeen
Email: damian.schaible@davispolk.com
          adam.shpeen@davispolk.com

**4.**        **The Prepetition Secured Notes Trustee**

Kelley Drye & Warren LLP
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Attention: Eric R. Wilson and Benjamin D. Feder
Email: ewilson@kelleydrye.com
          Bfeder@kelleydrye.com


# ARTICLE XII
# CONFIRMATION OF THE PLAN

**A.        VOTING PROCEDURES AND REQUIREMENTS**

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.  The procedures for voting were approved by the Court by Order entered on June 28, 2022. [Docket No. 1272]

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims against the Debtors that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan. Accordingly, Classes of Claims or Interests that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Under the Plan, holders of Classes 2, 3, 4, 5, 7, and 8 Claims are, or may be determined to be, Impaired and are entitled to vote.  Holders of  Class 1 and Class 6 Claims are not Impaired and are deemed to have accepted the Plan. Holders of Class 9 Interests are Impaired and deemed to reject the Plan.  Holders of Classes 2, 3, 4, 5, 7, and 8 Claims must state on their ballots, under penalty of perjury, that they hold Claims that have not been assumed by the Purchaser or another Person.  Holders of Claims in Classes 2, 3, 4, 5, 7, and 8 that do not return their ballots or do not indicate whether their Claims have been so assumed and will not be counted.

**Ballots will be accepted through the Claims and Noticing Agent's online portal and regular mail to the Claims and Noticing Agent only.  BALLOTS NOT SUBMITTED VIA EMAIL, FASCIMILE, OR OTHER MEANS OF ELECTRONIC TRANSMISSION (OTHER THAN THE CLAIMS AND NOTICING AGENT'S ONLINE PORTAL) WILL NOT BE COUNTED.  FOR THE AVOIDANCE OF DOUBT, NOMINEES OF PUBLICLY TRADED SECURITIES MAY SUBMIT MASTER BALLOTS VIA EMAIL TO [BASICENERGYBALLOTS@RA.KROLL.COM](mailto:BASICENERGYBALLOTS@RA.KROLL.COM).**

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section of the Bankruptcy Code. The Proponents believe that: (1) the Plan satisfies or will  1129 satisfy all of the necessary statutory requirements of Chapter 11 of the Bankruptcy Code; (2) the Proponents have complied or will have complied with all of the necessary requirements of Chapter 11 of the Bankruptcy Code; and the Plan has been proposed in good faith. Specifically, in addition to others, as applicable, the  (3)Proponents believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section  1129 of the Bankruptcy Code set forth below:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Proponents, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

• Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under Chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code for Equity Interests deemed to reject the Plan.

• Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

• Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

• At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

• Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

## 1. The Best Interest of Creditors Test

Often called the "best interest" test § 1129(a)(7) of the Bankruptcy Code requires that bankruptcy court find, as a condition to confirmation that a Chapter 11 plan provides with respect to each class that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' Assets if these Chapter 11 Cases were converted to Chapter 7 cases under the Bankruptcy Code. Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical Chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the Chapter 11 liquidation contemplated by the Plan. However, the Debtors and the Committee believe that in a Chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a Chapter 7 case.

To make these findings, the Bankruptcy Court must (a) estimate the cash liquidation proceeds that a Chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a Chapter 7 case and the Assets of such Debtors' Estates were liquidated; (b) determine the liquidation distributio that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in Chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and another professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Proponents beleive that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Proponents believe that the "best interests" test of § 1129 of the Bankruptcy Code is satisfied.

## 2. Liquidation Analysis

The Debtors have liquidated substantially all of their assets through their Asset Sale to the Purchaser of substantially all their Assets as provided by the Stalking Horse Agreement and approved by the Sale Order. The Debtors believe that liquidation under Chapter 11 is more beneficial to the Holders of Claims than a liquidation under Chapter 7 because the Plan allows the  Debtors' remaining Assets (including the Retained Assets) to be promptly administered by the Liquidation Trust. To that end, the Plan provides that all of the Debtors' remaining Assets will vest in and be transferred to the Liquidation Trust. The Liquidation Trustee will distribute the proceeds from these remaining Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan. Attached as Exhibit B to this Disclosure Statement is a  liquidation analysis (the "Liquidation Analysis"). As set forth in the Liquidation Analysis, if these Chapter 11 Cases were to be converted to Chapter 7 cases, the proceeds from the prosecution of Retained Causes of Action and Asset Sales of the remaining Assets, if any, would remain unchanged, but the Debtors' Estates would incur the additional costs of a Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee.  These costs would reduce potential distributions to Allowed Unsecured Claims on a dollar for dollar basis. Conversion also would likely delay the liquidation process and the ultimate

distribution, if any, to unsecured creditors. Accordingly, the Proponents believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to Chapter 7 cases.

3.      **Feasibility**

§ 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining Assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Debtors' Estates will no longer exist to be subject to future reorganization or liquidation. Since no further reorganization of the Debtors will be possible, the Proponents believe that the Plan meets the financial feasibility requirement. The Proponents believe that sufficient funds will exist to make all payments required by the Plan.

4.      **Acceptance by an Impaired Class**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a Chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. For a class of impaired equity interests to accept a plan, § 1126(d) of the Bankruptcy Code requires acceptance by equity interest holders that hold at least two-thirds in amount of the allowed equity interests of such class, counting only those equity interests that actually voted to accept or reject the plan. Thus, a class of equity interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 6 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code and their votes will not be solicited.

The Claims in Classes 2, 3, 4, 5, 7, and 8 are Impaired under the Plan. These Classes will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of Classes 2, 3, 4, 5, 7, and 8(other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The Interests in Class 9 are Impaired under the Plan and will not receive a distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of such Class 9 Interests are deemed to reject the Plan and their votes will not be solicited.

5.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes havenot accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

a.      No Unfair Discrimination

This test applies to classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank ( e.g., classes of the same legal character). Bankruptcy courts will consider a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

b.      Fair and Equitable Test

This test applies to classes of different priority and status *(e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

*Secured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

*Unsecured Claims:* The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

*Equity Interests:* The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (1) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled, or (c) the value of such interest; or (2) if the class does not receive the amount as required under (1) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Proponents seek to confirm the Plan utilizing the "cramdown" provision of § 1129(b) of the Bankruptcy Code. The Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of § 1129(b) of the Bankruptcy Code.

Since Class 9 is deemed to reject the Plan, the Proponents seek to confirm the Plan utilizing the "cramdown" provision of § 1129(b) of the Bankruptcy Code. The Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of § 1129(b) of the Bankruptcy Code.

The Proponents submit that if the Debtors "cramdown" the Plan pursuant to § 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Proponents believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## ARTICLE XIII
## PLAN-RELATED RISK FACTORS

A.      **GENERAL BANKRUPTCY LAW AND PLAN RELATED CONSIDERATIONS**

1.      **Parties in Interest May Object to the Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **Failure to Satisfy Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Proponents may seek to accomplish an alternative Chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3.      **The Proponents May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

The Confirmation and consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. It is possible that any alternative could provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding.

The Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

4.   **Nonconsensual Confirmation - "Cramdown"**

   In the event that any impaired class of claims or equity interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

   Although the Proponents believe that the Plan will meet such tests, the Proponents cannot be certain that the Bankruptcy Court would reach the same conclusion. If the Bankruptcy Court does not confirm the Plan, the Proponents may pursue one of the following alternatives: (a) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (b) dismissal of the Chapter 11 Cases, or (c) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

5.   **Proponents May Object to the Amount or Classification of a Claim**

   Except as otherwise provided in the Plan, the Debtors, the Committee, and the Liquidation Trust reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.   **Risk of Nonoccurrence of the Effective Date**

   Although the Proponents believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.   **Risk Affecting Potential Recoveries of Holders of Claims in Voting Classes**

   The Proponents cannot state with any degree of certainty what recovery will be available to Holders of Claims in Voting Classes. Three unknown factors make certainty impossible. First, the Proponents cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the Claims of Holders ,in the Voting Classes. Second, the Proponents cannot know with any certainty, at this timethe number or size of Claims in the Voting Classes which will ultimately be Allowed. Third, the Proponents cannot know with certainty, at this time, the number or size of Claims in Classes senior to the Voting Classes,or Claims that are unclassified, which will ultimately be Allowed.

**B.  RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS**

   <u>**The financial information contained in this Disclosure Statement has not been audited.**</u> In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and recordsthat was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**C.  DISCLOSURE STATEMENT DISCLAIMER**

1.   **Information Contained Herein Is for Soliciting Votes**

   The information contained in this Plan Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.   **This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchang**e **Commission**

This Plan and Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.     T**his Plan and Disclosure Statement May Contain Forward Looking Statements**

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private  Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

4.     **No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement**

This Plan and Disclosure Statement is not legal advice to you. The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.     **No Admissions Made**

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and the Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Committee, the Liquidation Trust, Holders of Allowed Claims or Interests or any other parties in interest.

6.     **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim, cause of action, avoidance action or projected objection to claim is, or is not, identified in this Plan and DisclosureStatement.  Moreover, the Debtors or the Liquidation Trustee, as ,applicable, may seek to investigate, file and prosecute litigation claimscauses of action, and avoidance actions and projected objections to claims after the confirmation or effective date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.

7.     **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors, the Committee, or the Liquidation Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims, Causes of Action, or Avoidance Actions of the Debtors or theirrespective Estates are specifically or generally identified herein.

8.     **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' and Committee's Advisors**

Counsel to and other advisors retained by the Proponents have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Proponents have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.      **Potential Exists for Inaccuracies, and the Proponents Have No Duty to Update**

The statements contained in this Plan and Disclosure Statement are made by the Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement. Further, although the Proponents may subsequently update the information in this Plan and Disclosure Statement, the Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.     **No Representations Outside the Plan and Disclosure Statement are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

D.     **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

The Proponents believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a Chapter 7 liquidation, and therefore, is in the best interests of such Holders.  If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

1.      **Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Proponents could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Proponents have explored various other alternatives in connection with the negotiation process involved in the formulation and development of the Plan. The Proponents believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

2.      **Liquidation Under Chapter 7**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under Chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors.

The Proponents believe that in a liquidation under Chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estates. The assets available for distribution to Holders of Claims and Interests would be reduced by such additional expenses.

3.      **Dismissal of the Chapter 11 Cases**

If the Plan is not confirmed, the Proponents or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to § 1112 of the Bankruptcy Code.  Without limitation, dismissal of the Chapter 11 Cases would

terminate the automatic stay and might allow certain creditors to foreclose on their liens.  Accordingly, the Proponents believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets.

**ARTICLE XIV**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      General Tax Considerations**

The following discussion is a summary of certain material federal income tax consequences expected to result from the consummation of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of federal income taxation that may be relevant to a particular Holder of a Claim or Interest subject to special treatment under federal income tax laws (such as foreign taxpayers, broker dealers, banks, thrifts, insurance companies, financial institutions, regulated investment companies, real estate investment trusts and pension plans and other tax exempt investors), and does not discuss any aspects of state, local or foreign tax laws. Furthermore, this summary does not address all of the federal income tax consequences that may be relevant to a Holder of a Claim or Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the federal income tax consequences described herein.

Accordingly, the following summary of certain federal income tax consequences of the Plan is for informational purposes only and is not a substitute for careful tax planning or advice based upon the individual circumstances pertaining to a particular Holder of a claim or interest. Each Holder of a claim or interest is strongly urged to consult with its own tax advisors regarding the federal, state, local and other tax consequences of the Plan.

**Internal Revenue Service Circular 230 Disclosure: to ensure compliance with requirements imposed by the United States Internal Revenue Service, any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax related penalties under the Tax Code. Tax advice contained in this Disclosure Statement (including any attachments) is not written to support the promotion, marketing or promotion of the transactions or matters addressed by the disclosure statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

**B.      Federal Income Tax Consequences to the Debtors**

The Sale Transaction constituted a taxable sale of the Purchased Assets. The Debtors will recognize either a gain or a loss on the Sale Transaction equal to the difference between: (i) the fair market value of the Sale Proceeds and the Assumed Liabilities; and (ii) the Debtors' adjusted basis in the Purchased Assets. The Debtors expect that gain, if any, as a result of the Sale Transaction will be offset by net operating losses in the amount of $7,688,208 carried  .forward from prior tax periods

The Debtors will realize cancellation of indebtedness ("COD") income in respects of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or is deemed to be) discharged; over (ii) the sum of any cash and the fair market value of any other property given in exchange therefor.  Under IRC, a taxpayer is generally required to

59

include COD income in gross income. However, COD income is not includable in gross income if it occurs in a case of bankruptcy or the extent of the debtor's insolvency immediately before the COD income is recognized. The Debtors' COD income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtors. COD income that is excluded from gross income will reduce certain attributes of the taxpayer, including net operating losses, capital loss carryovers  and the tax basis ofassets, in a specified order of priority beginning with net operating losses, unless a taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. In general, any reduction in tax attributes does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of any asset basis reduction, the first day of the taxable year following the tax year in which COD income occurs.

## C.   FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

### 1.   Consequences to Holders of Claims

Pursuant to the Plan, Claims in Classes 1 through 8 will be surrendered for Cash, collateral securing such Claim, or for their pro-rata share of the Liquidation Trust Assets (the "Recovery Shares"). This will be treated as a taxable exchange under IRC § 1001. Accordingly, Holders of such Claims should recognize gain or loss equal to the difference between: (a) the fair market value of any Cash, collateral, or Recovery Shares received in exchange for such Claims; and (b) the Holder's adjusted basis, if any, in such Claims. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the Cash, collateral, or Recovery Shares received in exchange for such Claims is allocable to accrued but untaxed interest, the Holder may recognize ordinary income. See the section entitled "Accrued But Untaxed Interest" below.

The fair market value of the Recovery Shares is contingent in part on the outcome of certain Avoidance Actions and Causes of Action included in the Liquidation Trust. It is therefore plausible that a Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Avoidance Actions or other Causes of Action included in the Recovery Shares. The federal income tax consequences of an open transaction are uncertain and highly complex, and a Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

#### a.   Accrued But Untaxed Interest

To the extent that any amount received under the Plan by a Holder is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as ordinary interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take the position that the consideration received by a Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

#### b.   Market Discount

Holders who exchange Claims for Cash or Recovery Shares may be affected by the "market discount" provisions of the §§ 1276 through 1278 of the Internal Revenue Code. Under these rules, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a Holder (unless the Holder elected to include market discount in income as it accrued).

     c.   Receipt of Interest in the Liquidation Trust

The Liquidation Trust shall be established on the Effective Date and is currently anticipated to exist as a grantor trust for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), pursuant to Treasury Regulation Section 1.671-1(a) and/or Treasury Regulation Section 301.7701-4(d) and related regulations, the Liquidation Trustee is expected to designate and file returns for the Liquidation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Liquidation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

Holders of Claims that receive a beneficial interest in the Liquidation Trust will be required to report on their U.S. federal income tax returns their share of the Liquidation Trust's items of income gain, loss, deduction and credit in the year recognized by the Liquidation Trust. This requirement may result in Holders being subject to tax on their allocable share of the Liquidation Trust's taxable income prior to receiving any cash distributions from the Liquidation Trust.

Any assets held by the Liquidation Trust on account of creditors holding Disputed Claims shall be treated as held in trust by the Liquidation Trust as fiduciary for the benefit of such holders (each such trust referred to as a "Disputed Claims Reserve").

With respect to each Disputed Claims Reserve, under § 468B(g) of the Internal Revenue Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. In general, Treasury Regulations sections 1.468B-1 et seq. would tax such a reserve as a "qualified settlement fund" and thus subject such reserve to a separate entity level tax.

The Liquidation Trust is expected to (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim in the class of Claims to which such reserve relates, in accordance with the trust provisions of the IRC, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties shall report consistently with such treatment. Accordingly, the Distribution Trust as a fiduciary for Holders of Disputed Claims will report as subject to a separate entity level tax any amounts earned by the Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year. In such event, any amount earned by a Disputed Claims Reserve that is distributed to a Holder during the same taxable year will be includible in such Holder's gross income.

Distributions (net of tax previously paid) from a Disputed Claims Reserve will be made to Holders of Disputed Claims when such claims are subsequently Allowed and to Holders of previously Allowed claims when any Disputed Claims are subsequently disallowed.

Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the right to receive and of the receipt (if any) of property from the post-consummation Trust and each Holder of a Disputed Claim is urged

to consult its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

      2.      **Consequences to Holders of Interests**

Holders of Class 9 Interests that are cancelled in the Plan will be allowed a worthless stock deduction (unless such Holder has previously claimed a worthless stock deduction with respect to such Interests and assuming that the taxable year that includes the Plan is the same taxable year in which such stock first became worthless) in an amount equal to the Holder's adjusted basis in the Interests. A worthless stock deduction is a deduction allowed to a Holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the Holder held Interests as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset.

      3.      **Information Reporting and Backup Withholding**

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and .dividends The Debtors will comply with all applicable reporting requirements of the IRC.

The foregoing discussion is intended only as a summary of certain income tax consequences of the plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only  and is not tax advice. The tax consequences are in many cases uncertain and mayvary depending on a claim holder's particular circumstances. Accordingly, claim Holders are urged to consult their tax advisors about the United States federal, state and local, and applicable foreign income and other tax consequences of the plan.

D.      **Reservation or Rights**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtors and their advisors reserve the right to further modify revise or supplement this Article XIV and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

## CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST

The Debtors and the Committee believe that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests. The Debtors and the Committee urge you to vote to accept the Plan and to evidence such acceptance by returning the Ballot(s) so they will be received by the Voting Deadline.

The Debtors, the Ad Hoc Group, and the Committee request Confirmation of this Plan pursuant to § 1129 of the Bankruptcy Code.

Dated:  June 25, 2022

Respectfully submitted,

Basic Energy Services, L.P., and its Debtor Affiliates

By:   */s/ David Dunn*
Name:   David Dunn
Title:   Wind-Down Director

Exhibit A

Leave-Behind Assets

| Region | Property Type | Occupier | Operating or Storage | Buyer Selected | Legacy Property | Address | City | State | Zip | County Province | Size | Acreage |
|--------|--------------|----------|---------------------|----------------|----------------|---------|------|-------|-----|----------------|------|---------|
| Western | Industrial Building | Ranger | Operatiing | No | Basic | 14082 W. Front Street Williston, ND 58801 | Williston | ND | 58801 | Williams | 20,000 | 5.77 |
| Central | Industrial Building | Ranger | Storage | Yes | Basic | 4638 FISH LANE, BEEVILLE, TX  78102 | Beeville | TX | 78102 | Bee County | 8,000 | 5.45 |
| Central | Industrial Building | Ranger | Storage | Yes | Basic | 1171 State Hwy 83, Denver City, Tx 79323 (Basic) | Denver City | TX | 79323 | Yoakum | 12,500 | 3.9 |
| Central | Industrial Building | Ranger | Operatiing | Yes | C&J | 1161 Hwy 83, Denver City, TX 79323 (C&J) | Denver City | TX | 79323 | Yoakum | 12,029 | 2.42 |
| Central | TBD | Ranger | Storage | Yes | Basic | TX-6, Knox City Texas (Raft Yard North of Downtown) | Knox City | TX | | Knox | | - |
| Central | Industrial Building | Select | Storage | Yes | Basic | 2206 N. Hwy 87, Big Spring, TX 79720 | Big Spring | TX | 79721 | Howard | 12,000 | 2.6 |
| Central | Industrial Building | Select | Storage | Yes | Basic | 500 S BYRD, CRANE, TX NW PARK | Crane | TX | 79731 | Crane | 6,500 | 3.5 |
| Central | Industrial Building | TBD | TBD | No | Basic | 177280 N 3020 Rd, Duncan, OK 73533 | Duncan | OK | 73533 | Stephens | 5,000 | 4.0 |
| Central | Industrial Building | TBD | TBD | No | C&J | 100 Panel Rd. | Elk City | OK | 73644 | Beckham | 4,500 | 1.8 |
| Western | Industrial Building | TBD | TBD | No | Basic | 2140 N. 7 mile Rd Casper, WY 82604 | Casper | WY | 82604 | Natrona | 10,500 | 6.29 |
| Central | Industrial Building | TBD | TBD | Yes | C&J | (Adjoins 438 Flournoy) 502 S Flournoy Rd., Alice, TX 78332 | Alice | TX | 78332 | Jim Wells | - | 2.0 |
| Central | Industrial Building | TBD | TBD | Yes | C&J | 438 S Flournoy Rd. Alice, TX, 78332 | Alice | TX | 78332 | Jim Wells | 9,572 | 3.0 |
| Central | Land | TBD | TBD | Yes | Basic | 10.7 miles south of Alto on US-69 | Alto | TX | 75925 | Cherokee | - | 8.5 |
| Central | Industrial Building | TBD | TBD | Yes | Basic | 110 N Aspen | Knox City | TX | 79529 | Knox | 2,160 | 4.4 |
| Central | TBD | TBD | TBD | Yes | Basic | 100 N. Birch Ave, Knox Knox City Tx. 79529 | Knox City | TX | 79529 | Knox | | |
| Central | Industrial Building | TBD | TBD | Yes | Basic | 132952 Lovington Hwy | Loco Hills | NM | 88255 | Eddy | 7,000 | 8.5 |
| Central | Industrial Building | Vacant | Vacant | Yes | Basic | 1102 Brush ST., Bridgeport, TX 76426 | Bridgeport | TX | 78426 | Wise | 7,500 | 2.5 |
| Central | Land | Vacant | Vacant | Yes | Basic | 3399 W. State Highway 114 | Levelland | TX | 79765 | Hockley | - | 17.5 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 18 Meadow Lane Stanley, ND 58784 | Stanley | ND | 58784 | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 11 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 6 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 4 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 16 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 17 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 15 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Residential | Vacant | Vacant | Yes | Basic | 13 Meadow Lane | Stanley | ND | ND | Mountrail | 1,600 | 0.27 |
| Western | Industrial Building | TBD | TBD | No | Basic | 360 Signal Dr. Rock Springs,WY 82901 | Rock Springs | WY | 82901 | Sweetwater | 11,500 | 5.5 |

Exhibit B

Liquidation Analysis

1

**BASIC ENERGY SERVICES**
**LIQUIDATION ANALYSIS**

**SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS**

The liquidation analysis below reflects the best information, estimates, and assumptions available to the Debtors at the time of the filing.  You should consult with your own counsel regarding the information contained herein.

**Note #1: Cash and Cash Equivalents**

As of June 19, 2022, the Debtors hold approximately $50.9 million in cash and cash equivalents. All the Debtors' cash and cash equivalents are restricted, disputed, or otherwise reserved for the benefit of security interests or reserves outlined in the Global Settlement Order and Ascribe 9019 Order. The approximate composition of the Debtors cash is as follows: (i) $28.8 million of cash restricted for the benefit of the ABL Claims, (ii) $4.8 million of cash reserved for the benefit of Secured Property Tax Claims, (iii) $4.4 million of cash restricted for the benefit of certain surety bonds and utility deposits, (iv) $3.4 million of cash reserved for accrued professional fees, (v) $3.9 million of cash reserved for the Make-Whole Note Reserve, (vi) $1.5 million of cash reserved for Administrative Claims, (vii) $1.5 million of cash reserved for Unsecured Claims[1], (viii) $1.1 million of cash reserved for the Wind Down Reserve, (ix) $714 thousand of cash reserved for Employee Health and Benefit Claims, (x) $674 thousand of 2018 Notes cash, and (xi) $75 thousand of Ascribe 2L Note cash. For the avoidance of doubt, none of the Debtors' cash is unencumbered (collectively, the "Estate Cash").

For solely the purposes of the Liquidation Analysis, the Debtors assume all Dedicated GSO Cash Reserves (as defined below in Note #5) are net out of any Chapter 7 distributable proceeds and are allocated pursuant to the Global Settlement Order. All the other Estate Cash is included in the Chapter 7 distributable proceeds.

**Note #2: 1L & 2018 Notes Collateral Value**

The Debtors Wind Down Budget projects there is approximately $11.9 million of 2018 Notes Collateral left to monetize (the "Remaining 2018 Notes Collateral"). The Remaining 2018 Notes Collateral is primarily comprised of leave behind real estate assets, tax refunds, and litigation actions, among others. The High Case assumes a 100.0% collection rate on the Remaining 2018 Notes Collateral. The Low Case assumes an approximately 60.0% weighted collection rate on the Remaining 2018 Notes Collateral.

**Note #3: ABL & 2L Collateral Value**

The Debtors Wind Down Budget projects there is approximately $5.1 million of ABL Collateral left to monetize (the "Remaining ABL Collateral Value"). The Remaining ABL Collateral Value is primarily comprised of accounts receivable, insurance assets, excess p-card cash collateral, and excess cash collateral on certain surety bonds, among others. The High Case assumes a 100.0% collection rate on the Remaining ABL Collateral Value. The Low Case assumes an approximately 60.0% weighted collection rate on the Remaining ABL Collateral Value.

---

[1] Pursuant to the Ascribe 9019 Order, the $1.5 million of cash reserved for Unsecured Claims is held at UMB, the 2018 Notes' administrative agent. For illustrative purposes, this cash is shown to be held by the Debtors.

**Note #4: D&O Proceeds**
The amount of D&O Proceeds has yet to be determined.

**Note #5: Dedicated GSO Cash Reserves**
Approximately $40.4 million of the Estate Cash has been restricted, reserved, or otherwise set aside due to the Global Settlement Order (the "Dedicated GSO Cash Reserves"). For solely the purposes of the Liquidation Analysis, these amounts are net out of Chapter 7 distributable proceeds and are allocated pursuant to the Global Settlement Order.

**Note #6: Chapter 7 Liquidation Costs**
For solely the purposes of the Liquidation Analysis, the Debtors estimate the non-professional fee related costs to liquidate the Estate through a Chapter 7 liquidation would equal between $1.0 million and $1.5 million. For illustrative purposes, costs are ratably allocated based on the amount of value available.

**Note #7: Chapter 7 Professional Fees**
For solely the purposes of the Liquidation Analysis, the Debtors estimate the professional fee costs to liquidate the Estate through a Chapter 7 liquidation would equal between $2.0 million and $2.5 million. For illustrative purposes, costs are ratably allocated based on the amount of value available.

**Note #8: Secured Property Tax Claims**
For solely the purposes of the Liquidation Analysis, Secured Tax Claims are estimated to equal approximately $4.6 million, which equates to the Debtors estimated Secured Tax Claim pool of approximately $4.8 million minus the approximately $228 thousand of Secured Tax Claims paid in connection with the partial closing of the certain leave behind real estate sales.

**Note #9: Secured Debt Claims**
Secured Debt Claims are equal to the approximate summation of (i) $288.3 million in Non-Ascribe 2018 Notes, (ii) $37.3 million in Ascribe 2018 Notes, (iii) $28.8 million in outstanding ABL Claims, (iv) $15.8 million in Ascribe 1L Notes, and (v) $15.8 million in Ascribe 2L Notes.

**Note #10: Secured Adequate Protection Claims**
For solely the purposes of the Liquidation Analysis, the Debtors assume the Secured Adequate Protection Claims are equal to $10.0 million. This estimate is purely illustrative.

**Note #11: Administrative Claims**
The Administrative Claims pool is based on the Debtors' current best estimate.

**Note #12: Priority Unsecured Claims**
The Priority Unsecured Claims pool includes all priority unsecured claims and is based on the Debtors' current best estimate.

**Note #13: General Unsecured Claims**
The General Unsecured Claims pool is based on the Debtors' current best estimate.

33183481v.1

**Note #14: Non-Ascribe 2018 Notes Deficiency Claims**
Equal to the estimated claim of the Non-Ascribe 2018 Notes minus its estimated recovery, which includes its secured debt claim and the Secured Adequate Protection Claims.

**Note #15: Administrative Claim Reserve**
For solely the purposes of the Liquidation Analysis, the Debtors assume the $1.5 million administrative claim reserve, which was created from the Global Settlement Order, is used to pay back administrative creditors.

**Note #16: Unsecured Claim Reserve**
For solely the purposes of the Liquidation Analysis, the Debtors assume the $1.5 million unsecured claim reserve, which was created from the Global Settlement Order, is used to pay back unsecured creditors pursuant to the priority waterfall.

**Note #17: Employee Health and Benefit Reserve**
For solely the purposes of the Liquidation Analysis, the Debtors assume the $2.5 million employee health and benefit reserve, which was created from the Global Settlement Order and currently has a balance of approximately $714 thousand, is used to pay back employee health and benefit expenses.

**Note #18: Professional Fee Reserve**
For the solely the purposes of the Liquidation Analysis, the Debtors assume the approximately $3.5 million professional fee reserve, which was created from the Global Settlement Order and has continued to be funded from the wind-down reserve with cash to account for professional fees accrued after the Global Settlement Order, is used to pay back professional fees.

**Note #19: Restricted ABL & Cash Collateral Accounts**
The Debtors currently hold approximately $28.8 million of restricted cash collateral for the benefit of the ABL Claims. The Debtors have no ability to access or otherwise touch these funds; thus, they are assumed to be used to pay back the ABL Claims in full.

**Note #20: Restricted Surety Bond & Utility Deposit Cash Collateral Accounts**
The accounts relate to surety bonds cash collateralized by the purchasers through the sale process, whose cash must be returned to them upon transfer of the surety bonds, and an approximately $273.9 thousand utility deposit account.

**Note #21: Creditor Distributions to Date**
Pursuant to the Global Settlement Order and the Ascribe 9019 Order, the Estate has made approximately $48.1 million in interim distributions to certain of its secured debt creditors. These amounts are displayed in the Liquidation Analysis to better estimate the secured debt creditors' recoveries.

**Basic Energy Services, Inc., et al.**
**Consolidated Liquidation Analysis: <u>High Case</u>**
<span style="color:red">Working Draft / Subject to Change</span>
*(Forecast as of week ending 6/19/22)*

| | | Chapter 7 Liquidation Analysis: <u>High Case</u> | | | |
|---|---|---|---|---|---|
| **Consolidated Liquidation Analysis** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Distributable Value** | | | | | |
| Cash | [1] | $ 17,497 | $ 33,451 | $ - | $ 50,948 |
| 1L & 2018 Notes Collateral Value | [2] | 11,952 | - | - | 11,952 |
| ABL & 2L Collateral Value | [3] | - | 5,088 | - | 5,088 |
| D&O Proceeds | [4] | - | - | TBD | - |
| **Total Distributable Value** | | $ 29,449 | $ 38,539 | $ - | $ 67,988 |
| Dedicated GSO Cash Reserves | [5] | (7,060) | (33,377) | - | (40,437) |
| **Net Distributable Value** | | $ 22,389 | $ 5,163 | $ - | $ 27,551 |
| **Liquidation Costs** | | | | | |
| Chapter 7 Liquidation Costs | [6] | (813) | (187) | - | (1,000) |
| Chapter 7 Professional Fees | [7] | (1,625) | (375) | - | (2,000) |
| **Total Liquidation Costs** | | $ (2,438) | $ (562) | $ - | $ (3,000) |
| **Subtotal Distributable Value** | | $ 19,951 | $ 4,601 | $ - | $ 24,551 |
| Chapter 7 Trustee Fees | | (669) | (209) | | (878) |
| **Net Distributable Value** | | $ 19,282 | $ 4,392 | $ - | $ 23,673 |
| **Consolidated Liquidation Analysis: <u>Waterfall</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Secured Property Tax Claims** | [8] | $ 4,569 | $ - | $ - | $ 4,569 |
| Secured Property Tax Claims Recovery ($) | | 4,569 | - | - | 4,569 |
| Secured Property Tax Claims Recovery (%) | | 100.0% | - | - | 100.0% |
| **Recovery Value Available for Secured Debt Claims** | | $ 14,713 | $ 4,392 | $ - | $ 19,105 |
| **Secured Debt Claims** | [9] | $ 341,375 | $ 15,761 | $ - | $ 357,136 |
| Secured Debt Claim Recovery ($) | | 14,713 | 4,392 | - | 19,105 |
| Secured Debt Claim Recovery (%) | | 4.3% | 27.9% | - | 5.3% |
| **Recovery Value Available for Secured Adequate Protection Claims** | | $ - | $ - | $ - | $ - |
| **Secured Adequate Protection Claims** | [10] | 10,000 | 10,000 | 10,000 | 10,000 |
| Secured Adequate Protection Claims Recovery ($) | | - | - | - | - |
| Secured Adequate Protection Recovery (%) | | - | - | - | - |
| **Recovery Value Available for Administrative Claims** | | $ - | $ - | $ - | $ - |
| **Administrative Claims** | [11] | 4,635 | 4,635 | 4,635 | 4,635 |
| Administrative Claims Recovery ($) | | - | - | - | - |
| Administrative Claims Recovery (%) | | - | - | - | - |
| **Recovery Value Available for Priority Unsecured Claims** | | $ - | $ - | $ - | $ - |
| **Priority Unsecured Claims** | [12] | 5,561 | 5,561 | 5,561 | 5,561 |
| Priority Unsecured Claims Recovery ($) | | - | - | - | - |
| Priority Unsecured Claims Recovery (%) | | - | - | - | - |

**Basic Energy Services, Inc., et al.**
**Consolidated Liquidation Analysis: <u>High Case</u>**
<span style="color:red">Working Draft / Subject to Change</span>
*(Forecast as of week ending 6/19/22)*

| | | Chapter 7 Liquidation Analysis: <u>High Case</u> | | | |
|---|---|---|---|---|---|
| **Consolidated Liquidation Analysis** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Recovery Value Available for General Unsecured Claims** | | $ - | $ - | $ - | $ - |
| **General Unsecured Claims** | | | | | |
| General Unsecured Claims | [13] | 157,707 | 157,707 | 157,707 | 157,707 |
| Non-Ascribe 2018 Notes Deficiency Claims | [14] | 230,285 | 230,285 | 230,285 | 230,285 |
| **Total General Unsecured Claims** | | $ 387,992 | $ 387,992 | $ 387,992 | $ 387,992 |
| General Unsecured Claims Recovery ($) | | - | | | |
| General Unsecured Claims Recovery (%) | | | | | |
| **Consolidated Liquidation Analysis: <u>Dedicated GSO Cash Reserves</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Dedicated GSO Cash Reserves** | | | | | |
| Administrative Claim Reserve | [15] | $ 1,500 | $ - | $ - | $ 1,500 |
| Unsecured Claim Reserve | [16] | 1,500 | | | 1,500 |
| Employee Health and Benefit Reserve | [17] | 703 | | | 703 |
| Professional Fee Reserve | [18] | 3,357 | - | | 3,357 |
| Restricted ABL Cash Collateral Accounts | [19] | - | 28,760 | | 28,760 |
| Restricted Surety Bond Cash Collateral Accounts | [20] | - | 4,645 | | 4,645 |
| **Total Dedicated GSO Cash Reserves** | | $ 7,060 | $ 33,405 | $ - | $ 40,464 |
| **Consolidated Liquidation Analysis: <u>Recovery Summary</u>** | **Notes** | **Claims** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Creditor Distributions to Date** | [21] | n/a | $ 42,455 | $ 5,643 | $ - | $ 48,098 |
| **Adjusted Recovery by Claim Type** | | | | | | |
| 2018 Secured Notes (Non-Ascribe) | | $ 288,272 | $ 49,110 | $ - | $ - | $ 49,110 |
| 2018 Secured Notes (Non-Ascribe) Deficiency Claim | | 239,162 | - | | - | - |
| General Unsecured Claims | | 157,707 | 1,500 | - | - | 1,500 |
| Ascribe 2018 Secured Notes | | 37,275 | 5,656 | - | | 5,656 |
| Secured ABL Facility | | 28,760 | - | 28,760 | - | 28,760 |
| Ascribe 1L Note | | 15,827 | 2,402 | - | | 2,402 |
| Ascribe 2L Note | | 15,761 | - | 10,035 | | 10,035 |
| Secured Adequate Protection Claims | | 10,000 | - | - | | - |
| Restricted Surety Bond Cash Collateral Accounts | | 4,645 | - | 4,645 | | 4,645 |
| Administrative Claims | | 4,635 | 1,500 | - | | 1,500 |
| Priority Unsecured Claims | | 5,561 | - | | | - |
| Secured Property Tax Claims | | 4,569 | 4,569 | - | | 4,569 |
| Professional Fee Reserve | | 3,357 | 3,357 | - | | 3,357 |
| Employee Health and Benefit Reserve | | 703 | 703 | - | | 703 |
| **Totals** | | $ 816,234 | $ 68,796 | $ 43,440 | $ - | $ 112,236 |

**Basic Energy Services, Inc., et al.**
**Consolidated Liquidation Analysis: <u>Low Case</u>**
Working Draft / Subject to Change
*(Forecast as of week ending 6/19/22)*

|  |  | Chapter 7 Liquidation Analysis: <u>Low Case</u> | | | |
|---|---|---|---|---|---|
| **Consolidated Liquidation Analysis: <u>Distributable Value</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Distributable Value** |  |  |  |  |  |
| Cash | [1] | $ 17,497 | $ 33,451 | $ - | $ 50,948 |
| 1L & 2018 Notes Collateral Value | [2] | 7,171 | - | - | 7,171 |
| ABL & 2L Collateral Value | [3] | - | 3,053 | - | 3,053 |
| D&O Proceeds | [4] | - | - | TBD | - |
| **Total Distributable Value** |  | $ 24,668 | $ 36,504 | $ - | $ 61,172 |
| Dedicated GSO Cash Reserves | [5] | (7,060) | (33,377) | - | (40,437) |
| **Net Distributable Value** |  | $ 17,608 | $ 3,128 | $ - | $ 20,735 |
| **Liquidation Costs** |  |  |  |  |  |
| Chapter 7 Liquidation Costs | [6] | (1,274) | (226) | - | (1,500) |
| Chapter 7 Professional Fees | [7] | (2,123) | (377) | - | (2,500) |
| **Total Liquidation Costs** |  | $ (3,397) | $ (603) | $ - | $ (4,000) |
| **Subtotal Distributable Value** |  | $ 14,211 | $ 2,524 | $ - | $ 16,735 |
| Chapter 7 Trustee Fees |  | (497) | (146) | - | (644) |
| **Net Distributable Value** |  | $ 13,714 | $ 2,378 | $ - | $ 16,092 |
| **Consolidated Liquidation Analysis: <u>Waterfall</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Secured Property Tax Claims** | [8] | $ 4,569 | $ - | $ - | $ 4,569 |
| Secured Property Tax Claims Recovery ($) |  | 4,569 | - | - | 4,569 |
| Secured Property Tax Claims Recovery (%) |  | 100.0% | - | - | 100.0% |
| **Recovery Value Available for Secured Debt Claims** |  | $ 9,145 | $ 2,378 | $ - | $ 11,523 |
| **Secured Debt Claims** | [9] | $ 341,375 | $ 15,761 | $ - | $ 357,136 |
| Secured Debt Claim Recovery ($) |  | 9,145 | 2,378 | - | 11,523 |
| Secured Debt Claim Recovery (%) |  | 2.7% | 15.1% | - | 3.2% |
| **Recovery Value Available for Secured Adequate Protection Claims** |  | $ - | $ - | $ - | $ - |
| **Secured Adequate Protection Claims** | [10] | 10,000 | 10,000 | 10,000 | 10,000 |
| Secured Adequate Protection Claims Recovery ($) |  | - | - | - | - |
| Secured Adequate Protection Recovery (%) |  | - | - | - | - |
| **Recovery Value Available for Administrative Claims** |  | $ - | $ - | $ - | $ - |
| **Administrative Claims** | [11] | 4,635 | 4,635 | 4,635 | 4,635 |
| Administrative Claims Recovery ($) |  | - | - | - | - |
| Administrative Claims Recovery (%) |  | - | - | - | - |
| **Recovery Value Available for Priority Unsecured Claims** |  | $ - | $ - | $ - | $ - |
| **Priority Unsecured Claims** | [12] | 5,561 | 5,561 | 5,561 | 5,561 |
| Priority Unsecured Claims Recovery ($) |  | - | - | - | - |
| Priority Unsecured Claims Recovery (%) |  | - | - | - | - |

**Basic Energy Services, Inc., et al.**
**Consolidated Liquidation Analysis: <u>Low Case</u>**
<span style="color:red">Working Draft / Subject to Change</span>
*(Forecast as of week ending 6/19/22)*

| | | Chapter 7 Liquidation Analysis: Low Case | | | |
|---|---|---|---|---|---|
| **Consolidated Liquidation Analysis: <u>Distributable Value</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Recovery Value Available for General Unsecured Claims** | | $ - | $ - | $ - | $ - |
| **General Unsecured Claims** | | | | | |
| General Unsecured Claims | [13] | 157,707 | 157,707 | 157,707 | 157,707 |
| Non-Ascribe 2018 Notes Deficiency Claims | [14] | 230,285 | 230,285 | 230,285 | 230,285 |
| **Total General Unsecured Claims** | | $ 387,992 | $ 387,992 | $ 387,992 | $ 387,992 |
| General Unsecured Claims Recovery ($) | | - | | | |
| General Unsecured Claims Recovery (%) | | | | | |
| **Consolidated Liquidation Analysis: <u>Dedicated GSO Cash Reserves</u>** | **Notes** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Dedicated GSO Cash Reserves** | | | | | |
| Administrative Claim Reserve | [15] | $ 1,500 | $ - | $ - | 1,500 |
| Unsecured Claim Reserve | [16] | 1,500 | - | - | 1,500 |
| Employee Health and Benefit Reserve | [17] | 703 | - | - | 703 |
| Professional Fee Reserve | [18] | 3,357 | - | - | 3,357 |
| Restricted ABL Cash Collateral Accounts | [19] | - | 28,760 | - | 28,760 |
| Restricted Surety Bond Cash Collateral Accounts | [20] | - | 4,645 | - | 4,645 |
| **Total Dedicated GSO Cash Reserves** | | $ 7,060 | $ 33,405 | $ - | $ 40,464 |
| **Consolidated Liquidation Analysis: <u>Recovery Summary</u>** | **Notes** | **Claims** | **1L & 2018 Notes Collateral** | **ABL & 2L Collateral** | **Unencumbered Collateral** | **Total** |
| **Creditor Distributions to Date** | [21] | n/a | $ 42,455 | $ 5,643 | $ - | $ 48,098 |
| **Adjusted Recovery by Claim Type** | | | | | | |
| 2018 Secured Notes (Non-Ascribe) | | $ 288,272 | $ 44,409 | $ - | $ - | 44,409 |
| 2018 Secured Notes (Non-Ascribe) Deficiency Claim | | 243,864 | - | - | - | - |
| General Unsecured Claims | | 157,707 | 1,500 | - | - | 1,500 |
| Ascribe 2018 Secured Notes | | 37,275 | 5,048 | - | - | 5,048 |
| Secured ABL Facility | | 28,760 | - | 28,760 | - | 28,760 |
| Ascribe 1L Note | | 15,827 | 2,143 | - | - | 2,143 |
| Ascribe 2L Note | | 15,761 | - | 8,021 | - | 8,021 |
| Secured Adequate Protection Claims | | 10,000 | - | - | - | - |
| Restricted Surety Bond Cash Collateral Accounts | | 4,645 | - | 4,645 | - | 4,645 |
| Administrative Claims | | 4,635 | 1,500 | - | - | 1,500 |
| Priority Unsecured Claims | | 5,561 | - | - | - | - |
| Secured Property Tax Claims | | 4,569 | 4,569 | - | - | 4,569 |
| Professional Fee Reserve | | 3,357 | 3,357 | - | - | 3,357 |
| Employee Health and Benefit Reserve | | 703 | 703 | - | - | 703 |
| **Totals** | | $ 820,935 | $ 63,229 | $ 41,425 | $ - | $ 104,654 |

**Basic Energy Services, Inc., et al.**
**Consolidated Liquidation Analysis: Recovery Summary**
Working Draft / Subject to Change
*(Forecast as of week ending 6/19/22)*

| Recovery Summary | Claims | Chapter 7 - Low | Chapter 7 - High |
|---|---|---|---|
| 2018 Secured Notes (Non-Ascribe) | $  288,272 | 15.4% | 17.0% |
| 2018 Secured Notes (Non-Ascribe) Deficiency Claim | 243,864 | - | - |
| General Unsecured Claims | 157,707 | 1.0% | 1.0% |
| Ascribe 2018 Secured Notes | 37,275 | 13.5% | 15.2% |
| Secured ABL Facility | 28,760 | 100.0% | 100.0% |
| Ascribe 1L Note | 15,827 | 13.5% | 15.2% |
| Ascribe 2L Note | 15,761 | 50.9% | 63.7% |
| Secured Adequate Protection Claims | 10,000 | - | - |
| Restricted Surety Bond Cash Collateral Accounts | 4,645 | 100.0% | 100.0% |
| Administrative Claims | 4,635 | 32.4% | 32.4% |
| Priority Unsecured Claims | 5,561 | - | - |
| Secured Property Tax Claims | 4,569 | 100.0% | 100.0% |
| Professional Fee Reserve | 3,357 | 100.0% | 100.0% |
| Employee Health and Benefit Reserve | 703 | 100.0% | 100.0% |
| **Totals** | **$  820,935** | **n/a** | **n/a** |

<u>Exhibit C</u>

Wind-Down Budget

1

**Basic Energy Services, Inc., et al.**
**Wind Down Budget**
Working Draft / Subject to Change
*($ in thousands)*

| | | | | | Plan / DS | Conditional Approval | | | | | Confirmation Hearing | | Effective Date | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual | Actual | Actual | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | | |
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total | Post-Confirmation | Total |
| Week Ending | 5/29/2022 | 6/5/2022 | 6/12/2022 | 6/19/2022 | 6/26/2022 | 7/3/2022 | 7/10/2022 | 7/17/2022 | 7/24/2022 | 7/31/2022 | 8/7/2022 | 8/14/2022 | 8/21/2022 | Total | Post-Confirmation | Total |
| **Inflows** | | | | | | | | | | | | | | | | |
| Real Estate Sales | 1,421 | - | - | - | - | - | - | - | - | - | - | - | - | 1,421 | 5,630 | 7,051 |
| Federal Tax Refunds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1,398 | 1,398 |
| Rental Income | - | - | - | - | - | 69 | 508 | - | - | - | - | - | - | 577 | 69 | 646 |
| Ark-La-Tex Earn Out Payment | - | - | - | - | - | - | - | 1,000 | - | - | - | - | - | 1,000 | - | 1,000 |
| Accounts Receivable | 19 | 26 | 24 | 6 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 255 | 208 | 463 |
| Insurance Monetization | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,000 | 4,000 |
| Excess Surety Bond / P-Card Collateral | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 700 | 700 |
| Husky Litigation Judgement | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,078 | 3,078 |
| Other | 3 | - | - | - | - | - | - | - | - | - | - | - | - | 3 | 200 | 203 |
| **Total Inflows** | 1,443 | 26 | 24 | 6 | 20 | 89 | 528 | 1,020 | 20 | 20 | 20 | 20 | 20 | 3,255 | 15,283 | 18,538 |
| | | | | | | | | | | | | | | | | |
| **Operating Outflows** | | | | | | | | | | | | | | | | |
| Contractor Expenses | 36 | 42 | 26 | 24 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 442 | 210 | 652 |
| Operating Expenses | 0 | 96 | - | 23 | 5 | 21 | 5 | 5 | 5 | 21 | 5 | 5 | 5 | 197 | 60 | 257 |
| **Total Operating Outflows** | 36 | 138 | 26 | 47 | 40 | 56 | 40 | 40 | 40 | 56 | 40 | 40 | 40 | 639 | 270 | 909 |
| | | | | | | | | | | | | | | | | |
| **Restructuring Outflows** | | | | | | | | | | | | | | | | |
| Ordinary Course Professional Fees | - | - | 17 | 25 | 116 | 40 | - | - | - | - | - | - | - | 198 | 50 | 248 |
| CEIP | 660 | - | - | - | - | - | - | - | - | - | - | - | - | 660 | - | 660 |
| GUC Claim Reconciliation[1] | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 250 | 250 |
| Accrued Professional Fees | - | - | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 728 | 182 | 910 |
| Post-Confirmation Non-Claim Rec Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 110 | 110 |
| **Total Restructuring Outflows** | 660 | - | 84 | 91 | 182 | 106 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 1,586 | 592 | 2,178 |
| | | | | | | | | | | | | | | | | |
| **Net Cashflow** | 747 | (113) | (86) | (132) | (202) | (73) | 422 | 914 | (86) | (102) | (86) | (86) | (86) | 1,030 | 14,421 | 15,451 |
| | | | | | | | | | | | | | | | | |
| **Funded Cash Schedule** | | | | | | | | | | | | | | | | |
| Beginning Funded Cash | 2,166 | 1,469 | 1,331 | 1,222 | 1,084 | 862 | 699 | 593 | 487 | 381 | 259 | 152 | 259 | 2,166 | | 2,166 |
| Net Cashflow | 747 | (113) | (86) | (132) | (202) | (73) | 422 | 914 | (86) | (102) | (86) | (86) | (86) | 1,030 | 14,421 | 15,451 |
| Subtotal, Funded Ending Cash | 2,912 | 1,357 | 1,246 | 1,090 | 882 | 788 | 1,121 | 1,507 | 401 | 279 | 172 | 66 | 172 | 3,196 | 15,361 | 17,617 |
| (-) 2018 Secured Note & Ascribe 1L Inflows | 1,424 | - | - | - | - | 69 | 508 | 1,000 | - | - | - | - | - | 3,001 | 10,375 | 13,376 |
| (-) Ascribe 2L Inflows | 19 | 26 | 24 | 6 | - | 20 | 20 | - | 20 | 20 | 20 | 20 | 20 | 255 | 4,908 | 5,163 |
| (+) Liquidation Trust Loan | - | - | - | - | - | - | - | - | - | - | - | 1,000 | - | 1,000 | - | 1,000 |
| **Funded Ending Cash** | 1,469 | 1,331 | 1,222 | 1,084 | 862 | 699 | 593 | 487 | 381 | 259 | 152 | 46 | 1,152 | 940 | 78 | 78 |

Footnotes:
(1) This amount is exclusively for the reconciliation of general unsecured claims. This line item cannot be modified or changed, notwithstanding anything to the contrary.